# No. 2024-2002

# In the
# United States Court of Appeals
# for the Federal Circuit

REGENERON PHARMACEUTICALS, INC.,

*Plaintiff-Appellee,*

v.

MYLAN PHARMACEUTICALS INC., BIOCON BIOLOGICS INC.,

*Defendants-Appellants,*

AMGEN USA, INC., CELLTRION, INC., SAMSUNG BIOEPIS CO., LTD.,
FORMYCON AG, AMGEN INC.,

*Defendants.*

Appeals from the United States District Court for the Northern District of West Virginia,
Nos. 1:22-cv-00061-TSK-JPM, 1:23-cv-00089-TSK-JPM,
1:23-cv-00094-TSK-JPM, 1:23-cv-00097-TSK-JPM, 1:23-cv-00106-TSK-JPM,
1:24-cv-00039-TSK-JPM, 1:24-00053-TSK, and 1:24-md-03103-TSK-JPM
The Honorable Thomas S. Kleeh, Chief Judge Presiding.

## NON-CONFIDENTIAL OPENING BRIEF OF DEFENDANTS-APPELLANTS

William A. Rakoczy
Deanne M. Mazzochi
Paul Molino
Eric R. Hunt
Heinz J. Salmen
Neil McLaughlin
Lauren M. Lesko
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street
Chicago, Illinois 60654
Telephone: (312) 222-6305

*Counsel for Appellants Mylan Pharmaceuticals
Inc. and Biocon Biologics Inc.*

 COUNSEL PRESS · (866) 703-9373     PRINTED ON RECYCLED PAPER 

# PATENT CLAIMS AT ISSUE

This appeal concerns claims 4, 7, 9, 11, 14, 15, 16, and 17 of U.S. Patent No. 11,084,865 ("Asserted Claims"). The Asserted Claims and the claims from which they depend are provided:

> 1. [unasserted] A vial comprising an ophthalmic formulation suitable for intravitreal administration that comprises:
>
> > a vascular endothelial growth factor (VEGF) antagonist
> > an organic co-solvent,
> > a buffer, and
> > a stabilizing agent,
> > wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; and
> > wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography.
>
> 2. [unasserted] The vial of claim 1, wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml, and wherein said organic co-solvent comprises polysorbate.
>
> 4. The vial of claim 2, wherein said organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20.
>
> 5. [unasserted] The vial of claim 2, wherein said organic co-solvent comprises 0.01% to 3% polysorbate 20.
>
> 7. The vial of claim 5, wherein said buffer comprises 5-25 mM buffer.
>
> 9. The vial of claim 5, wherein said buffer comprises a pH about 6.2-6.3.
>
> 10. [unasserted] The vial of claim 5, wherein said stabilizing agent comprises a sugar.
>
> 11. The vial of claim 10, wherein said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol.

14. The vial of claim 5, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

15. The vial of claim 5, wherein said formulation is capable of providing a turbidity of 0.01 or lower at $OD_{405}$ after 2 month storage at 5º C.

16. The vial of claim 5, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5º C. as measured by size exclusion chromatography.

17. The vial of claim 5, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5º C. for 24 months as measured by size exclusion chromatography.

(Appx413).

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-2002

**Short Case Caption** Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.

**Filing Party/Entity** Mylan Pharmaceuticals Inc. and Biocon Biologics Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/27/2024

Signature: /s/ William A. Rakoczy

Name: William A. Rakoczy

**FORM 9. Certificate of Interest**

Form 9 (p. 2)
March 2023

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Biocon Biologics Inc. | Please see Exhibit A | Please see Exhibit A |
| Mylan Pharmaceuticals Inc. | Please see Exhibit A | Please see Exhibit A |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☑    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☑   Additional pages attached

| | | |
|---|---|---|
| Please see Exhibit B | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)    ☐   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# Exhibit A

**2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

Real parties in interest for both Mylan Pharmaceuticals Inc. and Biocon Biologics Inc.: Momenta Pharmaceuticals, Inc.; Janssen Research & Development LLC; Johnson & Johnson; Biosimilar Collaborations Ireland Limited

**3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Mylan Pharmaceuticals Inc. is wholly owned by Mylan Inc., which is wholly owned by Viatris Inc., a publicly held company. No publicly-held company owns 10% or more of Viatris Inc.'s stock.

Biocon Biologics Inc. is a wholly owned subsidiary of Biocon Biologics UK Limited, which in turn is a wholly owned subsidiary of Biocon Biologics Limited. Biocon Biologics Limited is a subsidiary of Biocon Limited, a publicly traded company. No publicly-held company owns 10% or more of Biocon Limited's stock.

# **Exhibit B**

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

Abraham J. Varon
Jake R. Ritthamel
Jeffrey A. Marx
Katie A. Boda
Lawrence Scott Beall
Steven J. Birkos
Thomas H. Ehrich
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 W. Hubbard St., Suite 500
Chicago, IL 60654
(312) 527-2157

Garrett Matthew Spiker
Gordon H. Copland
John D. Pizzo
William J. O'Brien
Stephanee Raychel Gandee
STEPTOE & JOHNSON PLLC
400 White Oaks Boulevard
Bridgeport, WV 26330
(304) 933-8162

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. xii

TABLE OF ABBREVIATIONS ......................................................... xviii

STATEMENT OF RELATED CASES .................................................... xxi

JURISDICTIONAL STATEMENT ..................................................... xxiii

INTRODUCTION ............................................................................... 1

I.     Yesafili's polysorbate is not an infringing "co-solvent." ................ 1

II.    The Asserted Claims are invalid. ................................................ 2

III.   Remedy. ................................................................................ 3

STATEMENT OF APPEAL ISSUES ....................................................... 4

STATEMENT OF THE CASE AND FACTS ............................................. 5

I.     BACKGROUND. ...................................................................... 5

II.    CLAIM CONSTRUCTION. ......................................................... 6

       A.    Co-solvent's plain and ordinary meaning involves dissolving. ........... 6

       B.    Polysorbate is not presumptively a co-solvent. .................... 6

III.   TRIAL. .................................................................................. 7

       A.    Defendants' product: Yesafili. ........................................... 7

       B.    The Asserted Claims. ....................................................... 8

       C.    The district court's infringement analysis. ........................... 8

             1.    Regeneron concedes Defendants never dissolve aflibercept with polysorbate when formulating. ........................ 9

             2.    The district court's broadened "co-solvent" scope. ................. 10

a.    The anti-aggregation meaning. ........................................11

b.    Yesafili polysorbate—test data (or lack thereof). ..........11

c.    Regeneron's expert admits no evidence for an aflibercept-polysorbate "complex."................................12

D.    The district court's validity analysis. .................................13

1.    POSA background knowledge..................................13

a.    Established prior art clinical uses and dosing routes for anti-VEGF compounds. .............................13

b.    Aflibercept:  Regeneron's "me too" product.................14

2.    The '865 patent. ......................................................14

3.    The Asserted Claims use a known framework and excipients. ..............................................................15

4.    The district court's findings against 40 mg/mL aflibercept formulations create § 112 problems.........................15

5.    The district court did not apply consistent claim meanings, POSA understandings, or correct standards. ............................16

6.    Secondary considerations..........................................19

IV.    THE INJUNCTION ORDER. ....................................................19

V.    FINAL JUDGMENT. ....................................................................20

SUMMARY OF ARGUMENT ...............................................................21

ARGUMENT ............................................................................................25

I.    STANDARD OF REVIEW.................................................................25

II.    THE DISTRICT COURT'S INFRINGEMENT JUDGMENT SHOULD BE REVERSED. ..........................................25

A.    Under the POSA's solvent and co-solvent meanings, no infringement exists. ...........................................................26

    1.    Yesafili's polysorbate never dissolves aflibercept, thereby lacking the "solvent" in "co-solvent." ......................27

    2.    Aflibercept aggregates cannot redissolve. ................28

    3.    No aflibercept-polysorbate "complex" exists. ..........30

B.    The district court could not rewrite the claims, ignoring the POSA's established "co-solvent" meaning, given this Court's precedent. ...........................................................31

    1.    Co-solvent's literal meaning cannot encompass all anti-aggregation efforts. ................................................31

    2.    This Court's precedent recognized "co-solvent" ingredients are not literally surfactant/stabilizer ingredients. ...................................................................33

    3.    Regeneron's evidence never showed Yesafili's polysorbate dissolving aflibercept; its evidence involved polysorbate's surfactant/stabilizer attributes. ..........36

C.    The FDA correctly confirmed polysorbate's surfactant/stabilizer role in Yesafili's specification, which is dispositive..........................39

    1.    The FDA-approved specification controls................39

    2.    The district court legally erred by ignoring Yesafili's FDA-approved specification, and prioritizing Regeneron's internal polysorbate descriptions. ........40

III.    THE    DISTRICT    COURT'S    INVALIDITY    JUDGMENT WARRANTS REVERSAL AND/OR REMAND. ......................43

A.    The district court's 40 mg/mL findings preclude "how to use" written description and enablement....................................44

1. The specification gives POSAs a mere hope 40 mg/mL aflibercept works for intravitreal administration. .....................45

2. The specification cannot enable intravitreal administration..........................................................................47

B. The district court's inconsistent findings on how POSAs utilize information further preclude § 112 compliance................................48

1. The named inventors never showed possession of stable 40 mg/mL aflibercept intravitreal formulations combined with, *e.g.*, any buffer, given the district court's findings..........49

2. The district court's inconsistent POSA findings also preclude enablement. ................................................51

C. The district court inconsistently applied "suitable for intravitreal administration," showing indefiniteness. ...........................................53

D. Consistently applying the claims and POSA's knowledge, Dix anticipates.....................................................................54

1. Dix's formulation framework: stable, anti-VEGF fusion protein, concentration, buffer, stabilizer, and polysorbate. ......54

2. Dix's complete teachings satisfy all Asserted Claim elements. ................................................................55

a. Stability......................................................................55

b. Dix preferred SEQ. ID NO:4 (aflibercept)......................56

c. Dix taught a 10-50 mg/mL range and a 40 mg/mL species.........................................................................57

i. Range breadth is not dispositive. .........................58

ii. Criticality/operability analyses apply to species selections...................................................58

iii. Under the correct legal test, 40 mg/mL is not critical to operability. ..........................................59

iv.    The specification nowhere ties "criticality" benefits to the invention claimed. ........................60

d.    The district court could not use unclaimed elements to differentiate Dix's 40 mg/mL species. .......................61

3.    "Suitable for intravitreal administration" cannot differentiate Dix. ...................................................63

E.    Dix also renders the Asserted Claims obvious....................................64

F.    POSAs would reach the alleged invention by combining Fraser's aflibercept teachings given Genentech's ranibizumab intravitreal formulation teachings. ..........................................................64

1.    Fraser....................................................................................64

2.    Genentech's ranibizumab formulations. ..................................65

3.    POSAs had a reason to use aflibercept in Genentech's ranibizumab intravitreal formulations. ....................................65

4.    Inflammation risks did not dissuade real-world clinicians from intravitreally injecting larger anti-VEGF compounds at concentrations above 10 mg/mL. .........................................67

5.    Choosing a particular dose, pH, or concentration range represents routine optimization..................................................69

6.    The district court's secondary considerations findings must be reversed......................................................................71

IV.    THE PERMANENT INJUNCTION MUST BE VACATED.......................74

A.    No nexus...............................................................................74

B.    Regeneron's market is identifiable and quantifiable...........................74

C.    The district court's findings show Biocon's irreparable harm............77

D.  The district court cannot give a drastic injunction remedy on facts routinely occurring for pharmaceuticals losing regulatory exclusivity. ..........................................................................77

V.  ADOPTING REGENERON FINDINGS. .....................................................78

CONCLUSION ..........................................................................................81

**CONFIDENTIAL MATERIAL OMITTED**

Pursuant to Federal Circuit Rule 25.1(e) and the Protective Order issued in the U.S. District Court for the Northern District of West Virginia on November 2, 2022, Defendants-Appellants Biocon Biologics Inc. and Mylan Pharmaceuticals Inc. are filing a confidential version of this brief that highlights the material marked confidential, and a non-confidential version including appropriate redactions. In the non-confidential version of this brief, confidential material has been redacted from pages 74-75. The material omitted from these pages contains information designated by Regeneron Pharmaceuticals, Inc. ("Regeneron") as constituting its confidential trade secret and business information, and generally includes information about its EYLEA products that Regeneron has deemed confidential.

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Baxter Pharmaceutical Products, Inc.*,
  471 F.3d 1363 (Fed. Cir. 2006) ............................................................. 62, 63

*Alcon Research Ltd. v. Barr Laboratories, Inc.*,
  745 F.3d 1180 (Fed. Cir. 2014) .................................................................49

*Allergan, Inc. v. Sandoz Inc.*,
  796 F.3d 1293 (Fed. Cir. 2015) .................................................................48

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003) .................................................................49

*Amgen Inc. v. Sandoz Inc.*,
  923 F.3d 1023 (Fed. Cir. 2019) ........................................... 25, 33, 35, 38, 39

*Amgen Inc. v. Sanofi*,
  598 U.S. 594 (2023) ...................................................................................47

*Apotex Inc. v. Wyeth LLC*,
  657 F. App'x 998 (Fed. Cir. 2016) ............................................................66

*Apple Inc. v. Samsung Electronics Co., Ltd.*,
  735 F.3d 1352 (Fed. Cir. 2013) .................................................................25

*Apple, Inc. v. Samsung Electronics Co., Ltd.*,
  678 F.3d 1314 (Fed. Cir. 2012) .................................................................74

*Applied Medical Resources Corp. v. United States Surgical Corp.*,
  448 F.3d 1324 (Fed. Cir. 2006) .................................................................35

*Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*,
  632 F.3d 1246 (Fed. Cir. 2011) .................................................................32

*AstraZeneca AB v. Mylan Pharmaceuticals Inc.*,
  19 F.4th 1325 (Fed. Cir. 2021) .............................................................59, 67

*Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mutual Pharmaceutical Co., Inc.*,
    384 F.3d 1333 (Fed. Cir. 2004) ............................................................. 34, 37

*Atofina v. Great Lakes Chemical Corp.*,
    441 F.3d 991 (Fed. Cir. 2006) ......................................................................57

*Bayer AG v. Elan Pharmaceutical Research Corp.*,
    212 F.3d 1241 (Fed. Cir. 2000) ....................................................................39

*Bayer Healthcare Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*,
    713 F.3d 1369 (Fed. Cir. 2013) ....................................................................73

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*,
    616 F.3d 1249 (Fed. Cir. 2010) ....................................................................33

*Belden Inc. v. Berk-Tek LLC*,
    805 F.3d 1064 (Fed. Cir. 2015) ............................................................. 62, 66

*Bright v. Westmoreland County*,
    380 F.3d 729 (3d Cir. 2004) .........................................................................80

*Celgene Corp. v. Hetero Labs Ltd.*,
    No. 17-3387 (ES) (MAH), 2020 WL 3249117 (D.N.J. June 16, 2020)........40

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
    664 F.3d 922 (Fed. Cir. 2012) ......................................................................76

*ClearValue, Inc. v. Pearl River Polymers, Inc.*,
    668 F.3d 1340 (Fed. Cir. 2012) ............................................................. 57, 58

*E.I. Dupont de Nemours & Co. v. Synvina C.V.*,
    904 F.3d 996 (Fed. Cir. 2018) ......................................................................71

*Eisai Co. Ltd. v. Dr. Reddy's Laboratories, Ltd.*,
    533 F.3d 1353 (Fed. Cir. 2008) ....................................................................25

*Genentech, Inc. v. Hospira, Inc.*,
    946 F.3d 1333 (Fed. Cir. 2020) ............................................................. 58, 59

*Hoffmann-La Roche Inc. v. Apotex Inc.*,
    748 F.3d 1326 (Fed. Cir. 2014) ..................................................69

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
    802 F.2d 1367 (Fed. Cir. 1986) ..................................................78

*In re '318 Patent Infringement Litigation*,
    583 F.3d 1317 (Fed. Cir. 2009) ............................................ 47, 48

*In re Applied Materials, Inc.*,
    692 F.3d 1289 (Fed. Cir. 2012) ..................................................71

*In re Cortright*,
    165 F.3d 1353 (Fed. Cir. 1999) ..................................................48

*In re Gleave*,
    560 F.3d 1331 (Fed. Cir. 2009) ..................................................55

*In re Hodges*,
    882 F.3d 1107 (Fed. Cir. 2018) ..................................................56

*Ineos USA LLC v. Berry Plastics Corp.*,
    783 F.3d 865 (Fed. Cir. 2015) ............................... 57, 58, 59, 60, 61

*J.T. Eaton & Co., Inc. v. Atlantic Paste & Glue Co.*,
    106 F.3d 1563 (Fed. Cir. 1997) ..................................................43

*Janssen Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.*,
    97 F.4th 915 (Fed. Cir. 2024) .................................. 64, 66, 67, 69, 70, 72, 73

*Janssen Pharmaceuticals, Inc. v. Watson Laboratories, Inc.*,
    No. 08–5103 (SRC), 2012 WL 3990221 (D.N.J. Sept. 11, 2012) ......... 57, 58

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
    10 F.4th 1330 (Fed. Cir. 2021) ..................................................50

*K-2 Corp. v. Salomon S.A.*,
    191 F.3d 1356 (Fed. Cir. 1999) ..................................................33

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,
    780 F.3d 1376 (Fed. Cir. 2015) ..................................................55

*KSR International Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)......................................................................66

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    481 F.3d 1371 (Fed. Cir. 2007) ..................................................44

*Merck & Co., Inc. v. Biocraft Laboratories, Inc.*,
    874 F.2d 804 (Fed. Cir. 1989) ....................................................71

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) ........................................... 19, 67

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)......................................................................77

*Nalpropion Pharmaceuticals, Inc. v. Actavis Laboratories FL, Inc.*,
    934 F.3d 1344 (Fed. Cir. 2019) ..................................................69

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)......................................................................54

*Novartis Pharmaceuticals Corp. v. Abbott Laboratories*,
    375 F.3d 1328 (Fed. Cir. 2004) ..................................................27

*Novozymes A/S v. DuPont Nutrition Biosciences APS*,
    723 F.3d 1336 (Fed. Cir. 2013) ........................................... 46, 51

*Nuvo Pharmaceuticals (Ireland) Designated Activity Co. v. Dr. Reddy's Laboratories Inc.*,
    923 F.3d 1368 (Fed. Cir. 2019) ........................................... 45, 46

*OSRAM Sylvania, Inc. v. American Induction Technologies, Inc.*,
    701 F.3d 698 (Fed. Cir. 2012) ....................................................57

*Par Pharmaceutical, Inc. v. Eagle Pharmaceuticals, Inc.*,
    44 F.4th 1379 (Fed. Cir. 2022) ..................................................39

*Pfizer, Inc. v. Ranbaxy Laboratories Ltd.*,
    457 F.3d 1284 (Fed. Cir. 2006) ..................................................35

*Rasmusson v. SmithKline Beecham Corp.*,
413 F.3d 1318 (Fed. Cir. 2005) .................................................................47

*Roche Palo Alto LLC v. Lupin Pharmaceuticals, Inc.*,
No. 10–3561(ES), 2012 WL 983697 (D.N.J. Mar. 21, 2012).....................40

*Senju Pharmaceutical Co. v. Lupin Ltd.*,
780 F.3d 1337 (Fed. Cir. 2015) ............................................................ 65, 66

*SRI International v. Matsushita Electric Corp. of America*,
775 F.2d 1107 (Fed. Cir. 1985) .................................................................40

*Sumecht NA, Inc. v. United States*,
923 F.3d 1340 (Fed. Cir. 2019) .................................................................74

*Sunovion Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.*,
731 F.3d 1271 (Fed. Cir. 2013) .................................................................39

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
572 U.S. 1301 (2014).................................................................................76

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015)...................................................................................25

*UCB, Inc. v. Actavis Laboratories UT, Inc.*,
65 F.4th 679 (Fed. Cir. 2023) ........................................................ 57, 58, 59

*United Therapeutics Corp. v. Liquidia Technologies, Inc.*,
74 F.4th 1360 (Fed. Cir. 2023) ..................................................................25

*ViaTech Technologies Inc. v. Microsoft Corp.*,
733 F. App'x 542 (Fed. Cir. 2018).............................................................32

*Zenith Laboratories, Inc. v. Bristol-Myers Squibb Co.*,
19 F.3d 1418 (Fed. Cir. 1994) ...................................................................41

**Statutes**

35 U.S.C. § 102 .............................................................................. 2, 8, 22

35 U.S.C. § 103 .............................................................................. 2, 8, 22

35 U.S.C. § 112 .......................................................... 2, 8, 16, 22, 53, 55

**Rules**

Fed. R. Civ. P. 54(b) .........................................................5, 20

# TABLE OF ABBREVIATIONS

| Abbreviation | Description |
| --- | --- |
| '572 patent | U.S. Patent No. 11,253,572, a method-of-treatment patent asserted in the district court proceedings and at trial. |
| '601 patent | U.S. Patent No. 10,888,601, a method-of-treatment patent asserted in the district court proceedings and at trial. |
| '865 patent | U.S. Patent No. 11,084,865 (PTX 0002) (Appx401-414), a formulation patent asserted in the district court proceedings and at trial. |
| '959 patent | U.S. Patent No. 7,070,959, the now-expired aflibercept molecule patent (DTX 0007) (Appx12512-12589), asserted in the district court proceedings, but not at trial. |
| '992 patent | U.S. Patent No. 10,464,992, a patent in the chain of the '865 patent family, asserted in the district court proceedings, but not at trial. |
| '865 patent family or '865 patent chain. | All patents that Regeneron asserts derive from or claim priority to U.S. Provisional Application No. 60/814,484 |
| BLA | Biologics License Application |
| Appellants or Defendants | Biocon Biologics, Inc. and Mylan Pharmaceuticals Inc. |
| Asserted Claims | Claims 4, 7, 9, 11, 14, 15, 16, and 17 of the '865 patent. (Appx413). |
| Asserted dosing patents | The '601 patent and the '572 patent, collectively |
| Avery | Robert L. Avery et al., *Intravitreal Bevacizumab (Avastin) for Neovascular Age-Related Macular Degeneration*, 113 OPHTHALMOLOGY 363 (2006) (DTX 9036) (Appx15417-15430) |
| Biocon | Biocon Biologics Inc. |
| BLA | Biologics License Application |
| Board | Patent Trial and Appeal Board |
| BPCIA | Biologics Price Competition and Innovation Act |

| Abbreviation | Description |
|---|---|
| CHO | Chinese hamster ovary |
| Dix | U.S. Patent No. 10,406,226 (DTX 0013) (Appx12590-12603), including its provisional application disclosure (DTX 8194) (Appx15073-15091), and publication (DTX 4121) (Appx14681-14692), a patent asserted in the district court proceedings, but which Regeneron did not assert at trial. |
| F6 | Formulation 6 in internal testing data, which includes aflibercept, histidine buffer, trehalose; but not polysorbate. |
| FDA | Food and Drug Administration |
| Fraser | Hamish M. Fraser et al., *Single Injections of Vascular Endothelial Growth Factor Trap Block Ovulation in the Macaque and Produce a Prolonged, Dose-Related Suppression of Ovarian Function* 90 CLINICAL ENDOCRINOLOGY & METABOLISM 1114 (2005) (DTX 0729) (Appx13690-13698) |
| Gaudreault | Jacques Gaudreault et al., *Preclinical Pharmacokinetics of Ranibizumab (rhuFabV2) After a Single Intravitreal Administration*, 46 INVESTIGATIVE OPHTHALMOLOGY & VISUAL SCI. 726 (2005) (DTX 2265 / PTX 1839) (Appx17543-17550) |
| Holash | Jocelyn Holash et al., *VEGF-Trap: A VEGF Blocker with Potent Antitumor Effects*, 99 PNAS 11393 (2002) (DTX 3549) (Appx14265-14270) |
| ITV | Intravitreal |
| Liu | U.S. Patent Application Publication No. US2004/0197324, published on October 7, 2004 (DTX 0730) (Appx13699-13746) |
| Lucentis | Formulations disclosed in the Shams and Gaudreault references |
| M710 | Drug codename used during development of Yesafili |
| mg/mL | Milligram per milliliter |

| Abbreviation | Description |
|---|---|
| mM | Millimolar |
| Mylan | Mylan Pharmaceuticals Inc. |
| PEG | Polyethylene glycol |
| PFS | Pre-filled syringe |
| PK | Pharmacokinetics |
| POSA | Person of ordinary skill in the art |
| PTAB | Patent Trial and Appeal Board |
| PTO | Patent and Trademark Office |
| Randolph | Theodore W. Randolph & LaToya S. Jones, *Surfactant-Proteins*, *in* RATIONAL DESIGN OF STABLE PROTEIN FORMULATIONS 159 (J.F. Carpenter et al. eds., 2002) (PTX 1817) (Appx17241-17257) |
| Regeneron | Regeneron Pharmaceuticals, Inc. |
| SEC | Size exclusion chromatography |
| Shams | International Publication No. WO 2006/047325, published May 4, 2006 (DTX 0726) (Appx13633-13678) |
| TRO | Temporary restraining order |
| UV | Ultraviolet |
| VEGF | Vascular endothelial growth factor |
| Wang | Wei Wang, *Protein Aggregation and its Inhibition in Biopharmaceutics*, 289 INT'L J. PHARMACEUTICS 1 (2005) (PTX 1556) (Appx16991-17020) |

**STATEMENT OF RELATED CASES**

This appeal concerns U.S. Patent No. 11,084,865 ("the '865 patent"). Appeals are presently pending before this Court from the district court's preliminary injunction decisions involving other defendants in *In re: Aflibercept Patent Litigation*, No. 1:24-md-3103-TSK (N.D.W. Va.): *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, Nos. 2024-1965, -1966, -2082, -2083 (Fed. Cir.) (Samsung); *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, Nos. 2024-2009, -2019, -2156 (Fed. Cir.) (Formycon); and *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, No. 2024-2058 (Fed. Cir.) (Celltrion).

In *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, No. 1:22-cv-00061 (N.D.W. Va.) (Biocon/Mylan), Regeneron sued Mylan for alleged infringement of the '865 patent, and U.S. Patent Nos. 7,070,959 (aflibercept molecule patent); 9,222,106; 9,254,338; 9,669,069; 9,816,110; 10,130,681; 10,406,226 ("Dix," which Defendants cite as prior art); 10,415,055; 10,464,992 ("the '992 patent"); 10,669,594; 10,857,205; 10,888,601; 10,927,342; 10,973,879; 11,053,280; 11,066,458; 11,104,715; 11,174,283; 11,186,625; 11,253,572; 11,299,532; 11,306,135; and 11,332,771. (*See* Appx8 at n.3).

Proceedings involving the '865 patent, or within the '865 patent family, are *Regeneron Pharmaceuticals, Inc. v. Celltrion, Inc.*, No. 1:23-cv-00089-TSK (N.D.W. Va.); *Regeneron Pharmaceuticals, Inc. v. Samsung Bioepis, Co., Ltd.*, No.

1:23-cv-00094-TSK (N.D.W. Va.); *Regeneron Pharmaceuticals, Inc. v. Formycon AG*, No. 1:23-cv-00097-TSK (N.D.W. Va.); *Regeneron Pharmaceuticals, Inc. v. Samsung Bioepis, Co., Ltd.*, No. 1:23-cv-00106-TSK (N.D.W. Va.); *Regeneron Pharmaceuticals, Inc. v. Amgen, Inc.*, No. 2:24-cv-00264-JWH-E (C.D. Cal.); *Regeneron Pharmaceuticals, Inc. v. Celltrion, Inc.*, No. 1:24-cv-00053-TSK (N.D.W. Va.); and *Regeneron Pharmaceuticals, Inc. v. Amgen, Inc.*, No. 1:24-cv-00039-TSK-JPM (N.D.W. Va.), which presently are consolidated, over Defendants' objections, into *In re: Aflibercept Patent Litigation*, No. 1:24-md-3103-TSK-JPM (N.D.W. Va.).

The Patent Trial and Appeal Board instituted proceedings challenging the validity of the related '992 patent (which is in the same patent chain as the '865 patent) in *Celltrion, Inc. v. Regeneron Pharmaceuticals, Inc.*, IPR2023-00462 (P.T.A.B.), joined with *Samsung Bioepis Co., Ltd. v. Regeneron Pharmaceuticals, Inc.*, IPR2023-01312 (P.T.A.B.). In IPR2023-00462, the Board stayed an *Ex Parte* Reexamination of the '992 patent. On January 17, 2024, after the district court upheld the '865 patent's validity, Regeneron disclaimed its '992 patent claims as "no longer needed." (Appx12010).

# JURISDICTIONAL STATEMENT

On August 2, 2022, Regeneron sued Mylan in the U.S. District Court for the Northern District of West Virginia, including on the '865 patent, claiming 42 U.S.C. § 262(*l*)(6)(B) jurisdiction from Mylan's submitted BLA under the BPCIA, and "patent dance" participation. (Appx7-8). 28 U.S.C. §§ 1331, 1338(a), and 2201(a) provide subject matter jurisdiction for Defendants-Appellants' counterclaims. Biocon is Mylan's successor defendant. (Appx54).

The district court tried Regeneron's Asserted Claims, issuing judgment on December 27, 2023, on the '865, '572, and '601 patents. (Appx3-316).

On January 26, 2024, both parties appealed; lack of judgment finality prompted dismissal. (Appx11982-11986; Appx11987-11989).

On June 11, 2024, the district court issued a permanent injunction and Fed. R. Civ. P. 54(b) certification opinion, (Appx12432-12511; Appx397); its final order issued June 21, 2024, (Appx398-400).

Defendants timely appealed on June 21, 2024, establishing 28 U.S.C. § 1295(a)(1) jurisdiction.

**INTRODUCTION**

This appeal involves rudimentary pharmaceutical formulations for the old anti-VEGF drug "aflibercept." Defendants' accused Yesafili formulation has 40 mg/mL aflibercept in Genentech's prior-art anti-VEGF intravitreal pharmaceutical formulation (histidine/trehalose/polysorbate). (*See* Appx10567-10568 (2191:5-2192:1) (Trout)).

The district court's judgments that the '865 patent claims are infringed and valid, then subsequently permanently enjoining Yesafili, warrant reversal; findings the district court called "undisputed," which Defendants disputed, require remand.

**I. Yesafili's polysorbate is not an infringing "co-solvent."**

The Asserted Claims "require[] an 'organic co-solvent' comprising 'polysorbate'—either expressly or by virtue of its dependency on another patent claim." (Appx85; Appx413).

POSAs understand "solvents" dissolve solutes. (Appx1222). Co-solvents are "added to the primary solvent to increase the solubility of the solute." (Appx1235). The district court confirmed polysorbate *never* dissolves aflibercept when formulating Yesafili. (Appx111). That precludes classifying Yesafili's polysorbate as a "co-solvent" as POSAs understand the claims.

Rather than confirm no literal infringement, the district court decided polysorbate *maintaining* dissolved aflibercept infringed. (*See, e.g.,* Appx88-98).

That isn't ***increasing*** solubility. The district court reiterated polysorbate maintains solubility through surfactant/stabilizer attributes, despite previously finding the "terms surfactants and 'co-solvents' also are not used interchangeably" by POSAs. (Appx1228). The district court justified ignoring the Asserted Claims' co-solvent "label," and Yesafili's BLA specification, because polysorbate "serves the same role" in Yesafili and Regeneron's commercial product. (Appx87; Appx114).

Given these and other reversible errors, Defendants request judgment of noninfringement.

## II. The Asserted Claims are invalid.

By adopting Regeneron's anticipation, obviousness, written description, enablement, and definiteness findings, the district court created internal factual inconsistencies, and misapplied this Court's precedent. Consistently applying precedent to the findings and evidence renders the claims invalid under 35 U.S.C. § 112 and/or invalid under §§ 102/103 for anticipation/obviousness.

The district court found the prior art taught POSAs using 40 mg/mL glycosylated aflibercept formulations intravitreally would be "fatal." (Appx176-177). The '865 patent never addressed these purported problems; the claims fail under 35 U.S.C. § 112.

Prior art Dix prepared stable aflibercept formulations, with the very excipients the '865 patent's 40 mg/mL Examples and claims use, teaching 10-50 mg/mL and

40 mg/mL "pre-lyophilized" embodiments.  Fraser teaches more potent 25 mg/mL aflibercept formulations (also with the claimed excipients).  Fraser plus Genentech's anti-VEGF intravitreal formulation teachings (Gaudreault, Shams), including Gaudreault's 40 mg/mL species, satisfies the Asserted Claims.

The district court rejected everything using legally erroneous reasons, including requiring a ***single combined*** prior art embodiment (notwithstanding the art's teachings and preferences); misapplying genus-species precedent; elevating unclaimed attributes; ignoring teachings negating its teaching away/no-motivation findings; applying different preamble meanings; and incorrectly analyzing secondary considerations.

***Consistently*** applying the claims, POSA knowledge, and precedent justifies invalidity judgment for Defendants.

## III.    Remedy.

The district court's merits errors justify vacating Regeneron's permanent injunction, as do its irreparable harm and four-factor test balancing errors.

---

For these and other reasons discussed below, the district court's merits and remedy judgments should be reversed and/or vacated.

## STATEMENT OF APPEAL ISSUES

1.     Whether the district court legally erred finding that Yesafili's polysorbate <u>literally</u> infringed the "organic co-solvent" element of the Asserted Claims, when POSAs know solvents dissolve solutes; the district court confirmed it was "unequivocal" Yesafili's polysorbate never dissolves aflibercept during formulation, (Appx111); and its remaining infringement findings rested throughout on reversible error regarding the co-solvent meaning.

2.     Whether the district court's erroneous and inconsistent validity determinations should be reversed when it found:

a)     POSAs would not believe from prior art teachings that 40 mg/mL glycosylated aflibercept concentrations worked, while upholding the claims' support and enablement, despite Regeneron conceding its specification nowhere addressed such shortcomings; and

b)     the prior art taught successfully made and used stable intravitreal anti-VEGF (including aflibercept) formulations, but then misapplied anticipation and obviousness tests, ignored the actual claim scope, and created other problems that permeated its teaching away, motivation, and secondary considerations findings.

3.     Whether the district court's permanent injunction must be vacated given above errors on the merits, irreparable harm, and the four-factor balancing test.

## STATEMENT OF THE CASE AND FACTS

## I.     BACKGROUND.

Mylan filed an BLA under the BPCIA to market "Yesafili," a 40 mg/mL aflibercept intravitreal injection vial.  (Appx7; Appx54-55).  The reference product is Regeneron's 40 mg/mL aflibercept vial.  (Appx6-7; Appx45).

Regeneron sued, alleging Mylan infringed 24 patents.  (Appx8).  Biocon purchased Mylan's BLA, becoming the successor Defendant.  (Appx4; Appx54).

At trial, Regeneron asserted claims 4, 7, 9, 11, and 14-17 of the '865 patent (which directly or indirectly depend upon claim 2, which depends from independent claim 1); and claims from Regeneron's '572 and '601 dosing patents.  (Appx3).

The district court's December 27, 2023, Memorandum Opinion found for Regeneron on the '865 patent, and Defendants on the dosing patents.  (Appx3-316).

Months post-trial, Regeneron moved for permanent injunction.  The district court enjoined Defendants, certifying the '865 patent issues for appeal under Fed. R. Civ. P. 54(b) in its June 11, 2024, Memorandum Opinion, (Appx317-397), entering final '865 patent judgment on June 21, 2024, (Appx398-400).

Defendants appeal all '865 patent procedural, merits, and remedy-related judgments.

## II. CLAIM CONSTRUCTION.

On April 19, 2023, after extensive briefing, expert declarations, depositions, and a *Markman* hearing, the district court construed "organic co-solvent" in the '865 patent. (Appx1221-1235).

### A. Co-solvent's plain and ordinary meaning involves dissolving.

The parties agreed "co-solvent" deserved its plain and ordinary meaning. (Appx1221).

The district court confirmed POSAs understand "solvents" are ingredients "[u]sed to dissolve another substance in preparation of a solution," (Appx1221-1222), and then defined "co-solvent" as "an organic substance added to the primary solvent to increase the solubility of the solute, here a VEGF antagonist [aflibercept]." (Appx1235).

### B. Polysorbate is not presumptively a co-solvent.

Regeneron asked for findings that polysorbate "***must always*** qualify as the claimed 'organic co-solvent.'" (Appx1225). The district court declined, since the '865 patent lacks lexicography classifying polysorbates across all concentrations and formulations as co-solvents. (Appx1225; Appx1230-1233).

The district court's "Venn Diagram" illustrated the organic co-solvent/polysorbate relationship, confirming polysorbate's non-overlapping and distinct "co-solvent" and "surfactant" roles:



Proposed by Regeneron,
court rejected.

Court adopted
from record evidence.

(Appx1229-1230).

## III. TRIAL.

After a bench trial, (Appx5), Defendants prevailed on Regeneron's asserted

dosing patents; Regeneron prevailed on the '865 patent; the district court certified

judgment under Rule 54(b), (Appx397-400).

### A. Defendants' product: Yesafili.

Yesafili adopts Genentech's prior art anti-VEGF intravitreal ranibizumab

formulation (Lucentis), not Regeneron's:

| Lucentis | Yesafili | Eylea |
|---|---|---|
| Anti-VEGF Ranibizumab | Anti-VEGF Aflibercept | Anti-VEGF Aflibercept |
| Histidine HCl | Histidine/Histidine HCl | Sodium phosphate |
| Trehalose | Trehalose | Sucrose |
| Polysorbate 20 | Polysorbate 20 | Polysorbate 20 |
| n/a | n/a | Sodium chloride |
| Water | Water | Water |

(Appx13917 (Lucentis label); Appx13976 (Yesafili: same ingredients); Appx14942

(Yesafili formulation "differs from Eylea®" to adopt "intravitreal biologic drugs at

comparable concentrations" (citing Lucentis label)); Appx45 (Eylea formulation);

Appx16940 (Table 1, same); Appx10567-10568 (2191:5-2192:1) (Trout) (Yesafili uses Lucentis buffer, stabilizer, polysorbate)).

## B. The Asserted Claims.

The parties' main disputes involve claims 1-2, from which all Asserted Claims depend, including "organic co-solvent" and "wherein said organic co-solvent comprises polysorbate"; the "ophthalmic formulation suitable for intravitreal administration" preamble; and the "40 mg/mL" concentration. (Appx47-48; Appx413). Other disputed elements involve aflibercept glycosylation, excipient concentrations, and/or formulation pH. (Appx413).

On infringement, Defendants challenged that Yesafili's polysorbate qualifies as a "co-solvent" ingredient. Since Yesafili's formulation elements were known and old, invalidity issues included how POSAs utilize drug and formulation information (in the prior art and the '865 patent specification), stability, and the meaning of the preamble's "suitable for intravitreal administration." Defendants challenged 35 U.S.C. § 112 written description, enablement, and definiteness; § 102 anticipation; and § 103 obviousness.

## C. The district court's infringement analysis.

Regeneron asserted *only* literal infringement of the '865 patent. (Appx11270; Appx8182-8184; Appx9197-9198 (724:14-725:3)). The parties disputed Yesafili's polysorbate "meets the claim requirement of an organic co-solvent." (Appx86).

### 1. Regeneron concedes Defendants never dissolve aflibercept with polysorbate when formulating.

The term "co-solvent" includes "solvent." The district court confirmed that "solvent" is "well-known in the art (and commonly defined) as… an ingredient [u]sed to dissolve another substance in preparation of a solution." (Appx1221-1222).

Regeneron's expert Dr. Trout conceded he "did not provide any opinion that polysorbate 20 is actually being used to dissolve the aflibercept protein" in Yesafili. (Appx9295 (660:19-22)). Defendants' expert Dr. MacMichael reiterated Defendants formulate aflibercept "already fully soluble [in water] at time zero." (Appx9853 (1407:4-10); Appx9854 (1408:4-6)).

The district court thus confirmed that the "evidence was unequivocal that aflibercept is never 'dissolved' upon formulation, because it is already in solution [in water] when formulated." (Appx111).

Rather than find noninfringement, the district court asserted there was "no scientific basis" for Dr. MacMichael's testimony that Yesafili's polysorbate cannot be a co-solvent for not dissolving aflibercept, (Appx100-101), insisting its prior "construction does not require the co-solvent to 'dissolve' aflibercept," (Appx111).

But the district court's construction findings **confirmed** POSAs understand "solvents" this way:

[Dr. MacMichael], who undisputedly is one of ordinary skill in the art, provided the meaning of organic co-solvent to those of ordinary skill: the term "solvent" is well-known in the art (and commonly defined) as a pharmaceutical excipient (*i.e.*, an ingredient) "[u]sed to dissolve another substance in preparation of a solution." (Dkt. 146, MacMichael Decl. ¶ 52 [Appx623]).... Dr. MacMichael cites to multiple literature sources from the pharmaceutical formulation art to support this common understanding of a person of ordinary skill in the art.

(Appx1221-1222; Appx1228 ("*GlaxoSmithKline*'s description of a solvent as something that ***dissolves*** something else is what Dr. MacMichael explained '[p]ersons of skill in the art widely understand': co-solvents are '***used to dissolve*** another substance.'")).

To find infringement, the district court posited that "co-solvents" need not dissolve aflibercept, just "prevent[] it from becoming insoluble," (Appx101), contravening the POSA's plain and ordinary "solvent" meaning.

## 2. The district court's broadened "co-solvent" scope.

The district court found Yesafili's FDA specification characterizes polysorbate as a surfactant/stabilizer. (Appx115; *see* Appx13967; Appx14942). It invoked extrinsic evidence, *e.g.*, Regeneron's ***internal*** documents variously calling polysorbate "organic co-solvent," "stabilizer, stabilizing agent, or surfactant," (Appx90), and "polysorbate 20 in the Defendants' proposed biosimilar... serv[ing] the same role as... in Regeneron's Eylea" commercial product, (Appx114), to effectively rewrite the "co-solvent" meaning. "[R]egardless of the particular English word used," in the Asserted Claims, the district court considered whether

"polysorbate achieves the **same function** in aflibercept formulations—**reducing aggregation** that leads to aflibercept coming out of solution in the form of insoluble aggregations." (Appx90 (emphases added)).

### a.  The anti-aggregation meaning.

The district court insisted that "increas[ed] solubility of aflibercept" in the court's construction of "organic co-solvent" extended to avoiding "formation of insoluble aflibercept aggregates." (Appx87 (aggregation is "aflibercept coming out of solution, that is, not being sufficiently soluble"); Appx89; Appx91-93).

This approach expanded "solvation" beyond the POSA's meaning, dissolving solute, to hydrophobic interactions with already-dissolved aflibercept, (Appx87-88; Appx91), which the district court acknowledged involve **surfactant** mechanisms, (Appx92 (to avoid "shaking/shearing-induced aggregation, surfactants are most commonly used" to interact "at hydrophobic surfaces/interfaces")).  The district court merged "surfactant" functions into "co-solvents" despite earlier finding "surfactants and 'co-solvents'… are not used interchangeably" by POSAs. (Appx1228).

### b.  Yesafili polysorbate—test data (or lack thereof).

Trying to link Yesafili's polysorbate to preventing aggregation, the district court concluded testing "Defendants' final formulation except for its lack of polysorbate 20," designated Formulation 6 [F6], "supports infringement,"

(Appx106), though Regeneron's expert Dr. Trout conceded that Formulation 6 was "visually clear and free of visible particulates," (Appx9321 (686:13-16) (Trout)), and the testing company found none, (Appx16250).

The district court emphasized a 50 mg/mL aflibercept formulation without polysorbate showed aggregation. (Appx102-106). That was not Yesafili.

The district court suggested its "claim construction did not set a threshold for how many insoluble aggregates polysorbate 20 must inhibit," hence polysorbate's presence infringed. (Appx107). That *wasn't* its "construction"; nevertheless, the Asserted Claims set "co-solvent" thresholds comprising about 0.03-0.1% polysorbate 20. (Appx413 (claim 4)). Named inventor Furfine testified only testing can show formulation excipients influencing aggregation. (Appx9118-9119 (516:10-517:19)).

### c.  Regeneron's expert admits no evidence for an aflibercept-polysorbate "complex."

The district court theorized Yesafili infringed by aflibercept forming a more soluble aflibercept-polysorbate "complex." (Appx94-95). Regeneron's expert admitted he lacked evidence Yesafili's aflibercept formed this complex. (Appx9309-9310 (674:6-675:2) (Trout)).

**D.    The district court's validity analysis.**

The district court confirmed aflibercept, stable aflibercept formulations, and other anti-VEGF intravitreal formulations, were known; and a POSA's skill set was "high." (Appx12-23; Appx69-70).

### 1.    POSA background knowledge.

"VEGF-mediated angiogenesis is a normal part of human functioning," but "too much" produces problems, *e.g.*, overstimulated blood vessels feed cancer cells or cause eye disease. (Appx9). Scientists designed anti-VEGF compounds (VEGF antagonists) to tightly bind VEGF, "to capture circulating VEGF before it reaches a receptor in the body." (Appx10-11).

#### a.    Established prior art clinical uses and dosing routes for anti-VEGF compounds.

FDA approved Genentech's anti-VEGF bevacizumab intravenous formulation, Avastin, for anti-cancer uses in 2004. (Appx19). Doctors subsequently administered Avastin in macular degeneration patients "with very encouraging results," (Appx19), and by 2005, had intravitreally dosed Avastin's intravenous 25 mg/mL concentration formulation, reporting it "well tolerated in all patients," with no ocular toxicity or side effects, (Appx20).

Genentech developed another anti-VEGF, ranibizumab, for eye disease, by "ITV [intravitreal] injection," becoming FDA-approved in 2006. (Appx17-18; Appx22).

### b. Aflibercept: Regeneron's "me too" product.

"Regeneron disclosed in the prior art that it had prepared anti-VEGF compounds" that "allow[ed] the whole molecule to more strongly bind to VEGF." (Appx11-12). Regeneron's prior art patents confirmed aflibercept as Regeneron's preferred anti-VEGF, with anti-cancer and eye disorder uses. (Appx10; Appx15-16).

Regeneron, like Genentech with Avastin, first made intravenous anti-cancer aflibercept formulations, (Appx42; Appx9077 (475:10-13) (Furfine)), then pursued "VEGF Trap [aflibercept] in human studies of vascular eye diseases," reporting "[i]nitial clinical studies in human patients" appear "quite promising," (Appx23 (citing Appx14437)).

Regeneron's aflibercept molecule and other formulation patents have since expired. (Appx299).

### 2. The '865 patent.

Since the Asserted Claims' framework is stable intravitreal 40 mg/mL formulations, across an effectively unlimited excipient set, Defendants challenged validity under § 112. (*See, e.g.*, Appx11714-11730; Appx11748-11750; Appx11898-11903). All stable '865 patent Examples and 40 mg/mL specification disclosures used just phosphate-buffered formulations, and narrow, specifically-named excipient concentrations. (Appx407-409; Appx9147 (545:3-6) (Furfine);

Appx9750 (1420:13-25) (MacMichael); Appx9754 (1424:21-23) (MacMichael); Appx9755 (1425:5-18) (MacMichael)).

### 3. The Asserted Claims use a known framework and excipients.

Regeneron's expert conceded Defendants' prior art—Dix, (Appx12590-12603) (aflibercept), Fraser, (Appx13690-13698) (aflibercept), and Genentech's Shams, (Appx13633-13678) or Gaudreault, (Appx17543-17550), (collectively, "Lucentis") (ranibizumab)—followed the same framework: drug, concentration, buffer, stabilizer, and polysorbate. (Appx10513-10515 (2137:4-2139:17) (Trout)). Dr. Trout complained Defendants did not combine these old elements as *one* prepared stable 40 mg/mL aflibercept embodiment, expressly for intravitreal use. (*See, e.g.*, Appx10448-10449 (2072:5-2073:18) (Dix lacked 40 mg/mL intravitreal species); Appx10437-10438 (2061:24-2062:4) (Fraser used 24.3 mg/mL intravenous, not 40 mg/mL intravitreal); Appx10513 (2137:4-9) (Lucentis intravitreal lacked aflibercept)).

### 4. The district court's findings against 40 mg/mL aflibercept formulations create § 112 problems.

Regeneron argued POSAs would reject a formulation framework using 40 mg/mL aflibercept because POSAs purportedly believed 40 mg/mL glycosylated aflibercept wouldn't work. (*See, e.g.*, Appx10398-10399 (2022:24-2023:2) (Trout); Appx10417 (2041:1-5) (Trout); Appx9070-9072 (468:1-470:7) (Furfine)). The district court agreed POSAs would reject 40 mg/mL aflibercept intravitreally

because aflibercept was a "Frankenstein" protein, (Appx194), with untenable side effects, clinically unable to work at the retina, (*see, e.g.*, Appx44; Appx173-84), and high concentrations "risked instability and adverse effects on patients," (Appx43).

Defendants warned accepting these premises created § 112 claim invalidity because "nothing in the '865 patent resolves these concerns either." (Appx11717).

The district court noted the warning, (Appx178), but found "no tension" since POSAs benefitted from the '865 patent specification. (Appx227; *see* Appx213-215 (adequate written description since specification's "multiple examples" let POSAs "visualize" formulation ingredients)).

But Regeneron's expert and inventor agreed the '865 patent specification never shows 40 mg/mL aflibercept ***working intravitreally***, or addresses concerns the district court found POSAs purportedly had. (Appx9100-9101 (498:24-499:11) (Furfine); Appx10499-10500 (2123:15-2124:19) (Trout); Appx10531-10532 (2155:11-2156:11) (Trout); Appx407-409 (8:5-12:25) (Examples offer stability, not intravitreal safety/efficacy data)).

### 5. The district court did not apply consistent claim meanings, POSA understandings, or correct standards.

After treating the Asserted Claims' ingredients functionally for infringement, (*see, e.g.*, Appx90), and anticipation/obviousness, (*see, e.g.*, Appx166; Appx174-178), for § 112, the district court limited them to their "structures rather than function," (Appx214).

It applied different "suitability" preamble meanings for infringement ("sterile solution," (Appx77)), and anticipation/obviousness (intravitreal use intent, (*see, e.g.*, Appx156; Appx162-163; Appx181-184)); yet for § 112 interpreted the preamble as involving excipients "in marketed [intravitreal] products," (Appx207-208), the '865 patent examples, (Appx207), or those suitable to ophthalmologists, (Appx210-211).

Dix used the Asserted Claims' formulation framework (drug, concentration, buffer, stabilizer, polysorbate); provided near-identical VEGF protein descriptions as the '865 patent specification (with aflibercept preferences); and disclosed a 10-50 mg/mL concentration embodiment and 40 mg/mL lyophilized species. (*See, e.g.*, Appx12593 (2:20-24) (embodiment with 10-50 mg/mL protein, phosphate buffer, sugar, polysorbate); Appx12595 (5:31-42) ("preferred embodiment" of "VEGF antagonist" is "SEQ ID NO:4," or aflibercept); Appx12594 (3:60-62) (embodiment lyophilizing a 40 mg/mL solution)). The district court disparaged this as obligating POSAs to "cobbl[e] together" "disparate disclosures" to reach the Asserted Claims. (Appx156-166 at Appx163). But Dr. Trout agreed Dix preparing a 50 mg/mL stable aflibercept formulation with phosphate buffer, stabilizing sugar, and polysorbate "assist[s] the [POSA] in making" stable 40 mg/mL formulations. (Appx10525-10526 (2149:24-2150:5)).

Under § 112, the district court found the '865 patent Examples and column 2 descriptions let POSAs "visualize" the full claim scope, (Appx212), even though its

cited column 2 and Example support has either broad excipient descriptions with no concentrations, (Appx404 (2:20-32)), or 40 mg/mL-related disclosures limited to phosphate-buffered systems, (Appx404 (2:33-57); Appx407-409 (8:5-12:25); Appx9147 (545:3-6) (Furfine)). The district court found POSAs could not expect "without the ['865] patent's [column 2 and Example] disclosure and data to succeed in obtaining a stable" aflibercept formulation for intravitreal use. (Appx209). But the cited column 2 descriptions encompass prior art formulations the district court *criticized* as intravitreally "unusable" given their high viscosities. (Appx191; Appx10515 (2139:5-17) (Trout)). The '865 patent's specification lacks intravitreal data and prepares just *one* stable 40 mg/mL formulation: phosphate-buffered. (Appx9758 (1428:3-14) (MacMichael)).

The district court demanded Defendants show POSAs would "necessarily" use aflibercept in Genentech's prior ranibizumab formulations, (Appx173), notwithstanding other encouragements in Gaudreault/Shams, or a POSA's background knowledge.

The district court insisted unclaimed safety, efficacy, manufacturing, or clinical benefit elements differentiated Defendants' prior art. (*See, e.g.*, Appx159-160 (*citing* Dix (Appx12594 (3:60-62)); Appx10453 (2077:1-16) (Trout) ("pre-lyophilized" testimony)); Appx183-184 (Fraser retina clinical concerns); Appx174-178 (Gaudreault safety/efficacy concerns)). The district court acknowledged

Defendants' contention such differentiation analysis violated *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005), but deemed such findings "irrelevant" to POSAs making or using the '865 patent's claimed subject matter. (Appx178).

### 6. Secondary considerations.

To find secondary considerations, the district court relied on theories Regeneron never timely disclosed during discovery, despite strictly holding Defendants to their pretrial disclosures. (*See, e.g.*, Appx159-161; Appx164; Appx167-172; Appx197-198).

Defendants never conceded that ranibizumab formulations were the closest prior art to the exclusion of aflibercept formulations. (Appx11697-11698). The district court avoided the substance of Defendants' rebuttal evidence. (Appx11685-11702). On nexus, the district court emphasized aflibercept's longer half-life permitted longer dosing intervals than ranibizumab. (Appx198-200). POSAs already knew aflibercept had better potency, (Appx175); Regeneron's other invalidated patents claimed extended dosing intervals, (Appx48-51).

## IV. THE INJUNCTION ORDER.

Post-trial, Regeneron moved for permanent injunction; Defendants opposed. (*See* Appx324-325). FDA issued Yesafili's final approval May 20, 2024. (Appx399). After serial TROs, the district court's injunction opinion, with Fed. R.

Civ. P. 54(b) findings, issued June 11, 2024. (Appx317-397). Key facts are in the Remedy section.

## V.     FINAL JUDGMENT.

On June 21, 2024, the district court entered its Rule 54(b) judgment order. (Appx398-400).

## SUMMARY OF ARGUMENT

The district court reversibly erred where it adopted Regeneron's proposed infringement, validity, and remedy findings. (*Compare* Appx76-115, *with* Appx10996-11058 (infringement); *compare* Appx156-234, *with* Appx11162-11210 (validity); *see also* Appx341-358; Appx362-379).

### *'865 patent non-infringement*

"Solvent" has a clear meaning to POSAs: it "dissolve[s] another substance in preparation of a solution." (Appx1221-1222). The district court confirmed Yesafili's polysorbate never dissolves aflibercept. (Appx111). Polysorbate in Yesafili thus cannot be a co-solvent.

In concluding otherwise, the district court erred repeatedly.

The district court posited Yesafili's polysorbate might dissolve aggregates or form a more soluble aflibercept-polysorbate "complex." (Appx94-95; Appx109-110). Regeneron's expert admitted polysorbate cannot dissolve later-forming aflibercept aggregates, and that he lacked evidence the complex existed in Yesafili. (Appx9302 (667:8-21) (Trout); Appx9308 (673:13-20) (Trout); Appx9315 (680:6-9) (Trout); *see* Appx11275-11278).

By centering infringement ***not*** on whether polysorbate dissolves, but whether Yesafili's polysorbate behaves like Regeneron's polysorbate "[r]egardless of its label," (Appx90), the district court eviscerated the "solvent" meaning within co-

solvent; and converted the co-solvent meaning requiring "***increas[ing] the solubility*** of the solute" to anything "***preventing it [aflibercept] from becoming insoluble***," namely avoiding aggregation, (*compare* Appx1235 (emphasis added), *with* Appx101). Merging "co-solvent" into polysorbate ensnared polysorbate's "surfactant" or "stabilizing" effects, (*e.g.*, Appx91-95), though neither POSAs, nor the '865 patent, use surfactant/stabilizer interchangeably with "co-solvent," (*see, e.g.*, Appx1228-1230; Appx404; Appx413 (claim 1)).

FDA dispositively designates polysorbate in Defendants' BLA specification (and Regeneron's) as surfactant/stabilizer, ***not*** solvent. (Appx112-113; Appx115; Appx14942). Nor did Defendants admit, or test data show, polysorbate prevents aggregation ***in Yesafili***. (*See, e.g.*, Appx97; Appx112).

The district court's infringement judgment thus should be reversed, and judgment of noninfringement entered for Defendants.

### *'865 patent invalidity*

The Asserted Claims are invalid under 35 U.S.C. §§ 102, 103, and/or 112 after consistently construing and comparing the claims as POSAs would.

The district court finding POSAs would reject 40 mg/mL aflibercept as unstable, toxic, and unable to intravitreally work, (Appx166; Appx167; Appx174-181), invalidates the claims under § 112. The '865 patent lacks data or reasoning to cure this perception the district court called "fatal." (Appx401-414; Appx9100-9101

(498:24-499:11) (Furfine); Appx10499-10500 (2123:15-2124:19) (Trout); Appx10531-10532 (2155:11-2156:11) (Trout)). Compounding this problem is the '865 patent claiming 40 mg/mL narrowly, in conjunction with the universe of, *e.g.*, buffers and stabilizers—a combination nowhere found in the '865 patent embodiments or Examples, and which covers prior art intravitreal systems the inventor admits he never invented, and the district court found won't work.

Further error results from the district court not finding and applying a consistent preamble meaning, or consistently applying how POSAs would utilize comparable prior art and '865 patent specification teachings. Having found POSAs could "visualize" and enable the Asserted Claims from the '865 patent disclosures, the district court erred by rejecting POSAs could likewise envisage, or use ordinary creativity, with Dix and Defendants' prior art to invalidate the claims.

The district court erred applying this Court's anticipation-range precedent, while erroneously importing unclaimed features to ostensibly differentiate the prior art for both anticipation and obviousness.

These and many errors discussed below (including on teaching away, motivation, secondary considerations, and argument exclusion) warrant reversal, or at least vacatur and remand.

### *'865 patent remedy*

The merits errors above, and further four-factor test errors, preclude injunctive relief as well.

### *Adopting Regeneron findings*

Adopting Regeneron's self-interested findings verbatim was an abuse of discretion, especially when excluding issues Defendants appropriately raised or calling undisputed issues plainly in dispute.

———————————

***In sum***, the district court's judgment should be reversed, or at least remanded, and the permanent injunction vacated.

# ARGUMENT

The district court's '865 patent infringement, invalidity, and remedy judgments rest upon errors justifying reversal, or at least remand.

## I. STANDARD OF REVIEW.

After a bench trial, infringement, anticipation, and written description receive clear error review. *United Therapeutics Corp. v. Liquidia Technologies, Inc.*, 74 F.4th 1360, 1367-68 (Fed. Cir. 2023). Claim construction, enablement, obviousness, and indefiniteness are legal questions; the underlying facts receive clear error review. *Id.*; *Eisai Co. Ltd. v. Dr. Reddy's Laboratories, Ltd.*, 533 F.3d 1353, 1356 (Fed. Cir. 2008); *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 321-22 (2015).

District courts' equitable discretion to grant permanent injunctive relief is reviewable for abuse of discretion. *Apple Inc. v. Samsung Electronics Co., Ltd.*, 735 F.3d 1352, 1359 (Fed. Cir. 2013).

## II. THE DISTRICT COURT'S INFRINGEMENT JUDGMENT SHOULD BE REVERSED.

Regeneron must prove infringement. *Amgen Inc. v. Sandoz Inc.*, 923 F.3d 1023, 1027 (Fed. Cir. 2019) (BPCIA case).

The Asserted Claims require a "co-solvent," "wherein said organic co-solvent comprises… polysorbate 20." (Appx413). Applying POSA meanings, Yesafili's polysorbate is not, first, a "solvent," nor, second, a "co-solvent," which its FDA

specification confirms. (Appx112-113 (surfactant or stabilizing agent); Appx13967 (stabilizing agent); Appx14942 (surfactant)). Defendants cannot infringe.

### A. Under the POSA's solvent and co-solvent meanings, no infringement exists.

During claim construction, the parties agreed that the plain and ordinary meaning of "co-solvent" applied, yet Regeneron refused to give a specific "solvent" or "co-solvent" meaning. (Appx1223). The district court observed Regeneron's unwillingness to define its own claims. (Appx1223). It adopted Dr. MacMichael's "unrebutted [construction] as the plain and ordinary meaning" of "organic co-solvent" to POSAs. (Appx1225).

POSAs understand "solvents" are "[u]sed to dissolve another substance in preparation of a solution," with co-solvents "used in conjunction with a primary solvent to increase the solubility of the substance in question." (Appx1222). "More specifically, the co-solvent works in conjunction with a primary solvent (*e.g.*, water) to better dissolve the drug substance," here aflibercept. (Appx1221-1222; *see also* Appx1227 ("*Ecolab* does not preclude ensuring that the meaning of 'co-solvent' describes what a solvent is supposed to do, *e.g.*, help dissolve something.")). Thus, the co-solvent must "increase the solubility of the solute, here a VEGF antagonist." (Appx1235).

## 1. Yesafili's polysorbate never dissolves aflibercept, thereby lacking the "solvent" in "co-solvent."

This Court confirmed the POSA's "solvent" meaning applies within "co-solvent," noting that "[b]y definition,... a co-solvent operates with 'another solvent' to dissolve a solute." *Novartis Pharmaceuticals Corp. v. Abbott Laboratories*, 375 F.3d 1328, 1336 (Fed. Cir. 2004).

Regeneron's expert Dr. Trout conceded he never opined Yesafili's polysorbate *dissolves* aflibercept. (Appx9178 (576:5-8); Appx9235-9236 (600:12-601:6); Appx9295-9296 (660:19-661:14)). To formulate Yesafili under the BLA, "aflibercept is never 'dissolved' upon formulation, because it is already in solution when formulated." (Appx101; Appx111).

The district court found the "evidence was *unequivocal* that aflibercept is never 'dissolved' upon formulation" with polysorbate in Yesafili. (Appx111 (emphasis added); Appx9851-9853 (1405:16-1407:10) (MacMichael); Appx9860 (1414:3-25) (MacMichael)).

That established *noninfringement* under the POSA's solvent meaning. Yesafili's polysorbate cannot be the "solvent" or "co-solvent" when it never dissolves the solute, aflibercept, into solution.

### 2. Aflibercept aggregates cannot redissolve.

The district court deemed contradictory the premise polysorbate is not a co-solvent when, "over time," polysorbate protects aflibercept aggregates from falling out of solution. (Appx100).

POSAs understand solvents are "[u]sed to dissolve another substance in preparation of a solution," (Appx1221-1222), and the district court found that Yesafili's aflibercept "is already in solution [in water] when formulated," (Appx111). Nothing beyond water dissolved it.

Defendants' expert used the following graphic:



(Appx95-96). The aqua-dashed line represents aflibercept's mg/mL water solubility when prepared. (Appx9868 (1456:21-25) (MacMichael)). *If* adding polysorbate to

the black trendline's point dissolved aflibercept aggregates formed over time, total aflibercept water solubility would increase following the gray trendline—but both sides agreed this never happens, hence the red X. (Appx9852 (1406:4-9) (MacMichael); Appx9855 (1409:2-23) (MacMichael); Appx9180 (578:10-19) (Trout); Appx9228-9229 (593:3-594:4) (Trout); *see also* Appx101). Thus, even assuming later-forming aflibercept aggregates, Regeneron's expert Dr. Trout admitted that ***polysorbate cannot dissolve aflibercept aggregates***, which are insoluble. (Appx9295-9296 (660:19-661:14); Appx9178 (576:5-17)).

The district court seized on the "orange" line being "higher than" aflibercept solubility "without polysorbate (the black curve)." (Appx97). Dr. MacMichael explained this involves polysorbate ***preventing*** aggregation. (Appx97-98). The district court concluded, "in other words, the polysorbate increases the solubility of aflibercept." (Appx98; *see also* Appx115 ("leaving more aflibercept in solution than there would be without polysorbate… constitutes an increase in solubility")).

This was legal error, subject to *de novo* review. Regeneron called aggregation a "first stage towards ***insolubility***." (Appx9180 (578:10-16) (Trout) (emphasis added)). The district court cannot convert the POSA's meaning requiring ***dissolving more*** drug substance into solution, (Appx1221-1223), into ***maintaining solubility*** so existing-dissolved aflibercept remains ***stable***. ***Keeping*** an ice cube from melting does not mean ***more*** water was frozen.

Thus, even assuming aflibercept aggregates form later, Yesafili's polysorbate never *dissolves* them, precluding infringement.

### 3. No aflibercept-polysorbate "complex" exists.

The district court erroneously deemed undisputed the premise "interactions between surfactants and the hydrophobic patches" in aflibercept create a "hydrophobicity reversal" that "effectively increases the solubility of the [surfactant-protein] complex." (Appx92-93 (original brackets); *see also* Appx94-95 (citing Appx17249-17250 (Randolph) as support polysorbate increases solubility of a "complex" of "aflibercept interacting with polysorbate")).

Defendants *disputed* Randolph's reportedly more soluble "reverse hydrophobicity" complex 1) existed in Defendants' aflibercept formulation; or 2) satisfied the claims. (Appx11273-11278 (application of Randolph)).

Regeneron's expert Dr. Trout admitted *he had no evidence* that Yesafili's aflibercept and polysorbate formed surfactant-protein complexes, including because Randolph required over *600 times* more polysorbate than what Yesafili has to create one. (Appx9302 (667:8-21); Appx9308 (673:13-20); Appx9315 (680:6-9); Appx11277-11278). He admitted not all proteins form polysorbate-complex bonds, and he never tested Yesafili for one. (Appx9302-9310 (667:12-675:14)).

Nor is increasing "surfactant-protein complex" solubility what the claims require of a co-solvent, which must increase *aflibercept's* solubility in a solvent.

(Appx1235 (solvent dissolves anti-VEGF solute, here aflibercept); Appx1221-1223; Appx1227-1228; Appx11273-11278).

Thus, infringement cannot rest on this disputed, speculative, and nevertheless non-infringing complex.

**B.** **The district court could not rewrite the claims, ignoring the POSA's established "co-solvent" meaning, given this Court's precedent.**

**1.** **Co-solvent's literal meaning cannot encompass all anti-aggregation efforts.**

The district court rejected how POSAs literally understand solvents—"that the cosolvent 'dissolve' the VEGF antagonist" to ***put more*** aflibercept in solution, (Appx100)—instead emphasizing whether "polysorbate achieves the same function in aflibercept formulations" of reducing aggregation, (Appx90), not "in any particular way," (Appx100), beyond leaving aflibercept in solution, (Appx115 ("What matters under the Court's construction is not the label affixed to the ingredient," but "leaving more aflibercept in solution…")). The district court opined that "regardless of the particular English word" the claims use, (Appx90), it need only consider whether polysorbate prevented aggregation, because that was "***the mechanism*** by which proteins like aflibercept ***come out of solution*** as a result of insolubility," (Appx87 (emphasis added); Appx88 (polysorbate "prevents… aggregating")).

That was legal error. The "name of the game is the claim"—the district court cannot "devalue[] the importance of claim language in delimiting the scope of legal protection." *Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1255 n.2 (Fed. Cir. 2011). Regeneron asserted ***literal*** infringement, (Appx8182-8184; Appx9197 (724:14-22)), waiving equivalent infringement, *ViaTech Technologies Inc. v. Microsoft Corp.*, 733 F. App'x 542, 553 (Fed. Cir. 2018).

The district court's cited Wang publication, (Appx91; Appx109-110), illustrates why departing from the POSA's established co-solvent meaning (ingredients dissolving something), to the district court's anti-aggregation focus, (*see* Appx88-98 (repeatedly equating anti-aggregation to aflibercept remaining in solution)), creates problems.

Wang teaches shaking a vial, or freezing a solution, causes protein aggregation. (Appx16993; Appx88 (shear stress aggregation); Appx92 (shaking creates aggregation)). ***Not*** shaking or freezing a vial thus prevents aggregation. The district court asserted "preventing the aggregation of aflibercept and keeping more aflibercept in solution, serves 'to increase the solubility of' the aflibercept." (Appx89). Thus, ***not*** shaking/freezing aflibercept solutions means using a co-solvent within the district court's meaning. Vials passively sitting at room temperature cannot be a "co-solvent" ingredient. A claim meaning "that renders asserted claims facially nonsensical cannot be correct." *Becton, Dickinson & Co. v.*

*Tyco Healthcare Group, LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) (cleaned up).

Wang explains surfactants prevent shaking/shearing aggregation ***not*** by dissolving, but "increas[ing] the viscosity of a protein solution." (Appx17010). This further confirms the district court equating dissolving to any anti-aggregation erroneously eviscerates the plain and ordinary co-solvent meaning.

Had Regeneron "simply wanted to claim" polysorbate "in any context, it could have done so," *Amgen*, 923 F.3d at 1032, and did, in unasserted claim 51, (Appx1234). While the district court excoriated Dr. MacMichael for truthfully testifying Regeneron incorrectly drafted claims here to cover polysorbate as surfactant/stabilizer, (Appx98-99), the district court nevertheless cannot "broaden nor narrow claims to give the patentee something different than what he has set forth" in the claims, *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364-65 (Fed. Cir. 1999). The claims require a co-solvent, and, to POSAs, that means ***dissolving*** to ***increase*** the total solute amounts dissolved. (Appx1221-1223).

Treating anti-aggregation effects equivalent to using "co-solvent" ingredients to find literal infringement was reversible error.

### 2. This Court's precedent recognized "co-solvent" ingredients are not literally surfactant/stabilizer ingredients.

Surfactants and co-solvents are separate species within a "solubilizer" genus of "three distinct types of chemicals: (1) surface active agents (… 'surfactants'), (2) co-solvents, and (3) complexation agents." *Astrazeneca AB, Aktiebolaget Hassle,*

*KBI-E, Inc. v. Mutual Pharmaceutical Co., Inc.*, 384 F.3d 1333, 1336 (Fed. Cir. 2004).

In *Astrazeneca*, the claims were limited to a solubilizer-surfactant species. *Id.* at 1335-36. Mutual, the appellant, used a co-solvent. *Id*. at 1336. Though both categories fell under "solubilizer," this Court properly reiterated that because POSAs differentiate between the two species, this precluded literal infringement. *Id*. at 1339-42.

The district court confirmed during claim construction that, like *Astrazeneca*, "surfactant" and "co-solvent" are "not used interchangeably" by POSAs here. (Appx1228). It found POSAs understand these ingredient roles are non-overlapping:



(Appx1229-1230).

Thus, as a matter of law, polysorbate's surfactant functions and roles cannot interchangeably be imported into "co-solvents." Effectively expanding claim 4

beyond underlying claim 1's scope creates improper dependency. 35 U.S.C. § 112, ¶4; *Pfizer, Inc. v. Ranbaxy Laboratories Ltd.*, 457 F.3d 1284, 1292 (Fed. Cir. 2006).

Similarly, the "use of two terms in a claim requires that they connote different meanings." *Applied Medical Resources Corp. v. United States Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006). The Asserted Claims' formulations comprise both "an organic co-solvent,... and a stabilizing agent." (Appx413).

The '865 patent specification never uses "co-solvent" and stabilizer interchangeably. Rather, the specification ties "aggregation and/or precipitation" to ***physical instability***, not solubility. (Appx406 (5:53-60)). Thus, the district court legally erred by "collaps[ing] the claim's textual distinction" between "co-solvent" and stabilizing ingredients. *Amgen*, 923 F.3d at 1031.

The district court's cited publications likewise preserve POSAs' distinctions between "co-solvent" and surfactant/stabilizer. Wang and Randolph each confirm surfactants inhibit protein aggregation through "stabilization," not dissolution. (Appx17003 (Wang); Appx17013 (Wang) ("often-used protein stabilizing excipient[]" list includes sugars and surfactants, not co-solvents); Appx17242 (Randolph) (surfactants "prevent physical damage during... storage")).

### 3. Regeneron's evidence never showed Yesafili's polysorbate dissolving aflibercept; its evidence involved polysorbate's surfactant/stabilizer attributes.

The district court's cited "co-solvent" opinions from Dr. Trout suffer from the same flaw:  never stating polysorbate *will dissolve* aflibercept in Yesafili, but merely that it will "keep[]" aflibercept soluble or help it "stay[]" or remain soluble. (Appx89; Appx93; Appx9244-9245 (609:25-610:6) (Trout); Appx9235 (600:21-24) (Trout) (*not* opining polysorbate dissolved any solid)).

Dr. Trout never opined polysorbate dissolved *more* aflibercept molecules into the primary solvent in comparison to the originally-formulated amount, as the POSA's co-solvent meaning requires; only that "because of the presence of the polysorbate, [the protein molecules are] not aggregating[,] they're *staying* soluble." (Appx9245 (610:4-6) (emphasis added)).  Legally, that is insufficient for Regeneron to discharge its burden under the POSA's established co-solvent meaning.

The district court justified infringement if polysorbate merely "*stabilizes* proteins by preventing insoluble aggregates."  (Appx91 (emphasis added); Appx87-91; Appx103-104; Appx106-107).  The '865 patent claims do not equate "co-solvent" with "stabilizing agent," but have them as two separate elements.

The district court found "Wang 2005 elucidates how protein aggregation occurs" through "patches of contiguous hydrophobic groups in the folding/unfolding intermediates."  (Appx91 (citing Appx16993 and Appx9233 (598:17-25) (Trout));

Appx109-110 (same); Appx92). It reiterated "the hydrophobic end" of polysorbate interacting "with the hydrophobic patches of aflibercept" would "hinder aggregation." (Appx93 (citing Appx9230-9231 (595:5-596:5) (Trout) and Appx9235-9236 (600:12-601:6) (Trout))).

But the district court recognized "*surfactants*—including polysorbate," possess this property of "accumulating, competitively with proteins, at hydrophobic surfaces/interfaces," (Appx92 (emphasis added)), or stabilizer properties, (Appx92 ("To protect proteins from shaking/shearing-induced aggregation, surfactants are most commonly used"); Appx106-107 (polysorbate's surfactant properties stabilize against agitation-induced aggregation stresses)). Randolph further puts surfactants' polar heads and non-polar tails (*i.e.*, hydrophobic/hydrophilic patches) at "the root of the mechanisms by which *surfactants* affect the physical *stability* of proteins." (Appx17242 (emphasis added)).

Even the polysorbate-aflibercept "hydrophobicity reversal" complex the district court theorized might exist under Randolph involved "interactions between *surfactants* and the hydrophobic patches." (Appx93 (emphasis added)).

It was legally improper for the district court to merge surfactant/stabilizer attributes into co-solvents. That approach directly runs afoul of the POSA's understanding that "surfactants" and "co-solvents" are literally distinct. *Astrazeneca*, 384 F.3d at 1336. This is especially so when the district court

confirmed that POSAs know polysorbate's co-solvent or surfactant roles are distinct and non-overlapping, as the district court's own graphic acknowledged:



(Appx1229-1230).

At trial, only Dr. MacMichael properly applied the POSA's plain and ordinary "solvent" and "co-solvent" meaning, confirming noninfringement. (Appx8661-8664 (59:4-62:16); Appx9735 (1374:5-20) (MacMichael); Appx11840-11847 (2245:19-2252:1)).

The district court also offered that polysorbate co-solvates even **_without_** anti-aggregation effect, because its "claim construction did not set a threshold for how many insoluble aggregates polysorbate 20 must inhibit." (Appx107). That artificially "collapse[s] the claim's textual distinction" between "co-solvent," stabilizing agent, and claim 4's thresholds wherein said organic co-solvent comprises 0.03% to 0.1% polysorbate 20 into just any polysorbate 20. *Amgen*, 923 F.3d at 1031.

**C. The FDA correctly confirmed polysorbate's surfactant/stabilizer role in Yesafili's specification, which is dispositive.**

**1. The FDA-approved specification controls.**

Courts must consider whether FDA specifications "resolve the question of infringement in the first instance." *Sunovion Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.*, 731 F.3d 1271, 1279-80 (Fed. Cir. 2013). FDA-approved specifications "defining a proposed [product] in a manner that directly addresses the issue of infringement will control the infringement inquiry," and are dispositive. *Id.* at 1279; *Bayer AG v. Elan Pharmaceutical Research Corp.*, 212 F.3d 1241, 1248-50 (Fed. Cir. 2000) (noninfringement when specification defined a product outside the claims); *Amgen*, 923 F.3d at 1029 (aBLA specification's one-step manufacturing fell outside claimed three-step process); *Par Pharmaceutical, Inc. v. Eagle Pharmaceuticals, Inc.*, 44 F.4th 1379, 1384 (Fed. Cir. 2022) ("the inquiry begins and ends with [the application's] specification").

The FDA-approved Yesafili specification calls only one ingredient a solvent: water. (Appx399; Appx9832-9833 (1386:25-1387:1) (MacMichael); Appx13967; Appx14942). The district court acknowledged that FDA confirmed polysorbate's role in Yesafili as "a 'stabilizing agent' or 'surfactant.'" (Appx112-113; Appx115; Appx13967; Appx14942; *see also* Appx9830-9832 (1384:4-24) (MacMichael)). That alone resolves infringement. *Sunovion*, 731 F.3d at 1279-80; *Bayer AG*, 212 F.3d at 1248-50; *Amgen*, 923 F.3d at 1029.

The district court cited unpublished district court opinions to reject FDA's classifications as "form over substance." (Appx113; Appx115 (insisting Defendants' BLA "label" did not matter)). *Roche Palo Alto LLC v. Lupin Pharmaceuticals, Inc.*, No. 10–3561(ES), 2012 WL 983697 (D.N.J. Mar. 21, 2012) declined to consider FDA representations "for purposes of claim construction," not with respect to infringement. *Id.* at *18. *Celgene Corp. v. Hetero Labs Ltd.*, No. 17-3387 (ES) (MAH), 2020 WL 3249117 (D.N.J. June 16, 2020) never discussed FDA specifications at all. *See generally id.*

This Court's precedent thus applies.

### 2. The district court legally erred by ignoring Yesafili's FDA-approved specification, and prioritizing Regeneron's internal polysorbate descriptions.

The district court declared because "no dispute at trial" existed that Yesafili's polysorbate played the "same role" in Regeneron's commercial product, (Appx87), and the named inventors "in some internal documents" and "FDA submissions" variously called polysorbate a co-solvent, stabilizer, or surfactant, it could ignore the "English word used" in the claims and equate them all, (Appx90).

Claims must be construed "without reference to the accused device." *SRI International v. Matsushita Electric Corp. of America*, 775 F.2d 1107, 1118 (Fed. Cir. 1985). It "is error for a court to compare in its infringement analysis the accused product" with "the patentee's commercial embodiment"; the "only proper

comparison is with the claims." *Zenith Laboratories, Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994). The district court legally erred using Regeneron's documents and embodiment to expand the claim meaning to ensnare Yesafili's polysorbate. Even if it could, Regeneron's FDA-approved specification *also* calling polysorbate a "[s]tabilizing [a]gent," *not* co-solvent, (Appx16940-16941 (Tables 1 & 2)), confirms neither party's BLA specifications infringe the POSA meaning.

The district court's test data findings likewise erroneously equated co-solvation and anti-aggregation. (*See* Appx101-109 (evaluating data-based arguments)). That alone is reason to disregard it. Nevertheless, Defendants disputed polysorbate behaved identically in Yesafili and Regeneron's products. (*See* Appx11628-11629). Defendants' histidine-buffered formulation, without polysorbate, *never* aggregates in a 4-hour stress test. (Appx16248; Appx9841-9842 (1395:10-1396:18) (MacMichael)). Regeneron's formulation, without polysorbate, reported aflibercept aggregating within 2 hours. (Appx9083 (481:4-19) (Furfine); Appx17727-17729).

Nor did the district court's cited test data show polysorbate *in Yesafili's accused 40 mg/mL formulation* inhibiting aflibercept aggregation.

*PTX-0354.* The district court found a 50 mg/mL formulation without polysorbate in PTX-0354, (Appx15956-15998), aggregated; it thus insisted

polysorbate caused non-aggregation in Defendants' 40 mg/mL formulation, (Appx101-102).

Regeneron's expert admitted that the 50 mg/mL product "is not the Yesafili formulation." (Appx9315-9319 (680:3-684:19) (Trout)). Equating 40 and 50 mg/mL formulations conflicts with the district court's validity findings, which insisted 40 mg/mL was critical to operability versus 50 mg/mL concentrations. (Appx165-166).

PTX-0354's other data further contradict the district court's assumption that polysorbate alone prevents all aggregation. The district court found comparatively more aflibercept monomer in solution means aflibercept solubility increased. (Appx112). Defendants' Yesafili dissolved more monomer versus Regeneron's control. (Appx15982). Aflibercept, buffer, and stabilizer variations *without* polysorbate likewise produced different aflibercept monomer solution levels. (Appx15974-15976 (buffer/sugar combinations); Appx15983-15984; Appx15964 (UV light exposure triggered "increased aggregation"); Appx15959-15962 (pH influenced aggregation); Appx15963-15964 (same, depending on buffer system)).

*PTX-0554*. PTX-0554, (Appx16232-16308), tested what the district court called "Defendants' final formulation" besides polysorbate, (Appx106), which the district court said showed "an increase in turbidity", (Appx106 (citing Appx16250 and Appx9324 (689:15-19) (Trout))). Dr. Trout testified to the *opposite*—the

formulation was visually clear. (Appx9321 (686:13-18); Appx16250 (both test results "comparable to values observed at time zero"); Appx9324-9328 (689:2-693:6)). "The study saw no significant effects of the surfactants." (Appx8565 (83:14-84:12) (Chang)). Combining aflibercept with polysorbate or no polysorbate through various freeze-thaw cycles also showed no aggregation differences. (Appx16245).

The district court found Defendants' anti-aggregation position inconsistent with Defendants' eventual polysorbate use before FDA. (Appx106-107). It was a precautionary measure, not a requirement. (Appx8569 (106:18-107:6) (Chang); Appx8565-8567 (88:05-93:19) (Chang); Appx16234; Appx16248-16250).

Thus, test data never establish polysorbate prevents Yesafili aggregation either. *See J.T. Eaton & Co., Inc. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1570-71 (Fed. Cir. 1997) (reversing infringement finding based on testing).

———————

Given the above, Defendants request judgment of non-infringement.

## III. THE DISTRICT COURT'S INVALIDITY JUDGMENT WARRANTS REVERSAL AND/OR REMAND.

The claims cannot survive consistently applying the district court's findings; separately, the district court's rejection of Defendants' prior art invalidity defenses rest on multiple errors necessitating reversal and/or remand.

## A. The district court's 40 mg/mL findings preclude "how to use" written description and enablement.

"The motto, 'beware of what one asks for,'" is "applicable here." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007).

To reject Defendants' anticipation and obviousness defenses, the district court accepted Regeneron's requested findings that POSAs expected 40 mg/mL glycosylated aflibercept formulations to fail at intravitreal dosing, including because aflibercept was a "Frankenstein" fusion protein, (Appx187; Appx194); its size (especially glycosylated) prevents the drug reaching the retina through intravitreal dosing, (Appx182-183; Appx186); and inflammation risks at 40 mg/mL concentrations, (Appx174-175), were "fatal," (Appx176-177; Appx181; Appx183-184; Appx196).

Regeneron's witnesses admitted the '865 patent nowhere resolves these issues. (*See, e.g.*, Appx10499-10500 (2123:12-2124:19) (Trout) (specification lacks retinal penetration data, "no half-life data, no side effect data" addressing size and inflammation/toxicity risks); Appx10531-10532 (2155:21-2156:11) (Trout); Appx10543-10544 (2167:8-25, 2168:19-21) (Trout) (patent never resolves size and retinal penetration skepticism); Appx10546-10547 (2170:2-2171:6) (Trout) (specification nowhere shows less inflammation versus prior art); Appx10552-10553 (2176:17-20, 2177:4-7) (Trout) (specification lacks binding, affinity, immunogenicity data); Appx9075 (473:2-22) (Furfine) (specification never

44

addresses concerns "associated with higher [aflibercept] concentrations"); Appx9099-9102 (497:7-500:19) (Furfine) (confirming patent lacks retinal penetration, safety, and PK data while never addressing 40 mg/mL aflibercept skepticism); Appx10039-10041 (1680:12-1682:1) (Graham)).

As discussed below, these findings and admissions render the Asserted Claims, requiring intravitreally suitable 40 mg/mL glycosylated aflibercept in stable formulations, invalid for lacking written description and enablement.

### 1. The specification gives POSAs a mere hope 40 mg/mL aflibercept works for intravitreal administration.

Like *Nuvo Pharmaceuticals (Ireland) Designated Activity Co. v. Dr. Reddy's Laboratories Inc.*, the "district court found upon [Regeneron's] insistence as part of its obviousness analysis that ordinarily skilled artisans would not have expected" the claimed 40 mg/mL glycosylated aflibercept pharmaceutical formulations "to be effective," here for intravitreal use. 923 F.3d 1368, 1377 (Fed. Cir. 2019). Like *Nuvo*, "nothing in the specification would teach a person of ordinary skill in the art otherwise." *Id*.

This creates written description failure, because fundamentally, the '865 patent specification "provides nothing more than the mere claim that" glycosylated 40 mg/mL aflibercept formulations "might work" as an ophthalmic intravitreal product. *Nuvo*, 923 F.3d at 1381. That is insufficient when comparable prior art teachings are deemed lacking. Precisely because POSAs "would not have thought

[40 mg/mL glycosylated intravitreal formulations] would work, the specification is fatally flawed." *Id.* With no "hook or disclosure in the specification" that POSAs "can rely on to understand that the inventor possessed" a suitably working 40 mg/mL glycosylated aflibercept intravitreal formulation, the claims lack written description. *Id.* at 1382.

Nor can Regeneron use extrinsic evidence as support; the ***specification*** must "demonstrate that the inventor possessed more than a mere wish or hope that" 40 mg/mL aflibercept formulations "would work" as an intravitreal injection product. *Nuvo*, 923 F.3d at 1381. With the named inventor conceding his patent "doesn't contain anything about skepticism" and confirming "that skilled persons didn't think you could make a 40 mg/mL concentration formulation," (Appx9100-9101 (498:24-499:11) (Furfine)), the patent cannot "demonstrate that the inventor[] [was] in possession of the claimed invention," *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1346 (Fed. Cir. 2013); *id.* at 1350 (POSA "would have understood" from specification "that Novozymes had only predicted" variant thermostability, "not that it possessed or had definitively identified" variants with thermostability).

Thus, just as *Nuvo* accepted the district court's findings, but reversed its validity judgment to find a lack of written description, 923 F.3d at 1384, accepting the district court's anticipation/obviousness findings here means the '865 patent

specification fails how-to-use written description for 40 mg/mL glycosylated aflibercept in stable intravitreal formulations.

## 2. The specification cannot enable intravitreal administration.

The district court disregarded Defendants' argument "that the claims cannot be both nonobvious and enabled" if POSAs faced obstacles with a 40 mg/mL aflibercept formulation. (Appx227).

The district court found enablement because "the patent describes how to *formulate* aflibercept." (Appx227-228 (emphasis added)). That sidesteps how-to-*use* enablement, which requires more than a "hunting license" to suitably intravitreally use 40 mg/mL glycosylated aflibercept. *Amgen Inc. v. Sanofi*, 598 U.S. 594, 613-15 (2023).

Like *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318 (Fed. Cir. 2005), POSAs under these findings "had no basis" to believe 40 mg/mL aflibercept "could be used" suitably in intravitreal formulations "in light of the state of the art and in light of [Regeneron's] failure to provide any data to demonstrate" any 40 mg/mL glycosylated aflibercept-related obstacles had been overcome. *Id.* at 1322; *In re '318 Patent Infringement Litigation*, 583 F.3d 1317, 1325 (Fed. Cir. 2009) (non-enablement when use "could not be inferred from the prior art testing described").

The lack of specification disclosures addressing these problems differentiates *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293 (Fed. Cir. 2015). (Appx212). Allergan's **specification** offered **new** data showing the claimed BAK formulations worked, so POSAs "would not have questioned the utility of the claimed formulation." *Id*. at 1310. Here, there is a "complete absence of data," *In re Cortright*, 165 F.3d 1353, 1356 (Fed. Cir. 1999), or reasoning, *In re '318*, 583 F.3d at 1326, letting POSAs believe '865 patent 40 mg/mL glycosylated aflibercept intravitreal formulations work, while prior art formulations would not. "That is not sufficient." *Id*. at 1327.

## B. The district court's inconsistent findings on how POSAs utilize information further preclude § 112 compliance.

The Asserted Claims' framework involves a suitable intravitreal formulation, which "comprises" 40 mg/mL aflibercept and three excipients: "an organic co-solvent, a buffer, and a stabilizing agent." (Appx413 (19:30-34)). The type and concentration of excipients are open-ended. (Appx9750-9751 (1420:13-1421:20) (MacMichael); Appx9755 (1425:5-18) (MacMichael)).

The '865 patent embodiments never combine 40 mg/mL glycosylated aflibercept with **any** buffer generally, as in the Asserted Claims, (Appx9142-9147 (540:13-545:17) (Furfine)); the stable 40 mg/mL aflibercept embodiments exclusively use phosphate-buffered systems, (Appx9147 (545:3-6) (Furfine); Appx10118 (1759:2-12) (Graham); Appx10511-10512 (2135:1-2136:2) (Trout);

Appx18054-18055 (2006 provisional claims 11-13 with 40 mg/mL, only with phosphate buffer); Appx7114-7116 (2007 non-provisional claims, only phosphate buffer)).

Not until Regeneron filed the Asserted Claims in 2021, years *after* Defendants developed Yesafili's 40 mg/mL histidine-buffered systems, did Regeneron combine generic "buffer" language with 40 mg/mL glycosylated aflibercept formulations. (Appx13473-13479; Appx16238 (Defendants' histidine systems)). Yet, the named inventors never pursued histidine-buffered intravitreal formulations (Appx9147 (545:3-17) (Furfine); Appx10117-10120 (1758:17-1761:5) (Graham)). Indeed they "disfavor[ed]" histidine for intravitreal products since "it would turn yellow." (Appx6290-6291 (relying on Appx6989 (118:4-12))).

1. **The named inventors never showed possession of stable 40 mg/mL aflibercept intravitreal formulations combined with, *e.g.*, any buffer, given the district court's findings.**

Written description "prevent[s] an applicant from later asserting that he invented that which he did not." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003).

The district court decided POSAs understand buffers, stabilizers, and polysorbate structurally, to satisfy written description "[j]ust as in Alcon [*Research Ltd. v. Barr Laboratories, Inc.*, 745 F.3d 1180, 1191 (Fed. Cir. 2014)]." (Appx213; Appx217-218). While that finding conflicts with the district court's infringement

analysis applying "co-solvent" functionally, (Appx90 (emphasizing polysorbate's functional role)), *Alcon*'s specification did link one compound class, "PECOs," to enhanced prostaglandin "chemical stability," providing comparative test data to support "the idea that adding PECO would enhance the chemical stability… across a range of various formulation parameters," 745 F.3d at 1191.

Unlike *Alcon*, the '865 patent never describes **which** formulation ingredients, combinations, or parameters drive stability or intravitreal suitability. (Appx9750-9751 (1420:13-1421:20) (MacMichael); Appx9754-9755 (1424:1-1425:18) (MacMichael)). Thus, *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330 (Fed. Cir. 2021) applies. Like *Juno*, the district court found ingredients "ha[d] the same general structure," but the specification nevertheless failed for providing "no details regarding the characteristics… or structures that would allow a [POSA] to determine **which**" elements (here, buffers, stabilizers, co-solvents, and countless combinations thereof) were envisioned to work. *Id*. at 1339-40 (emphasis added).

The district court also linked specification support for stable formulations to column 2, lines 39-57, and the Examples. (Appx213-214 (citing Appx404 (2:39-57))). Lines 39-53 never discuss stability or aflibercept concentrations. Lines 39-48 discuss what excipients "may be" in "one or more specific embodiments." (Appx404 (2:39-48); Appx9755 (1425:5-18) (MacMichael)). Lines 49-53 offer "various embodiments" of excipients, absent concentrations. Lines 54-57 finally

mention a stable 40-50 mg/mL *range*, but *only* using one buffer—phosphate—and specific excipients (*e.g.*, NaCl). The 40 mg/mL Examples test *one* buffer system, limited to 10 mM phosphate buffer, with specific excipients—40 or 135 mM NaCl; 0.03% polysorbate 20; and optionally 5% sucrose—not representative species. (Appx408 (9:19-10:66); Appx9757-9758 (1427:3-1428:14) (MacMichael); Appx9747 (1417:2-8) (MacMichael); Appx9750-9751 (1420:13-1421:20) (MacMichael); Appx9754 (1424:8-23) (MacMichael)).

"[T]o actually possess the variant[s]" claimed, the '865 patent specification had "to confirm its [stability] predictions by actually making and testing individual variants or at least identifying subclasses of variants that could be expected to possess the claimed properties." *Novozymes*, 723 F.3d at 1350. It never does. Nor can POSAs fill the gap, since the district court rejected Defendants' invalidity defenses because POSAs *cannot* expect stable and intravitreally suitable formulations with other excipients, given aflibercept's unique stability risks. (Appx173-174).

### 2. The district court's inconsistent POSA findings also preclude enablement.

The district court never directly addressed Defendants' contention that the *full claim scope* of stable intravitreal formulations lacked enablement because the "comprising" term renders the excipient elements unlimited, and 40 mg/mL working examples are limited to 10 mM phosphate buffer with specific excipients and

concentrations. (Appx212-234 (*Wands* factors analysis); Appx9750 (1420:13-25) (MacMichael); Appx9755 (1425:5-18) (MacMichael)).

Knowing how to make formulations, or "how to perform SEC and turbidity testing" to **measure** stability, (Appx223), does not tell POSAs which excipients **produce** a stable 40 mg/mL aflibercept formulation, something on which the '865 patent is silent beyond its narrow phosphate Examples, (*see* Appx9748-9756 (1418:25-1426:3) (MacMichael)). The district court insisted it lacked "evidence of interactions among the various ingredients" in the claimed formulations that necessitated "making and testing" formulations to ensure their stability. (Appx229). Its infringement findings that polysorbate interacts with aflibercept to form complexes and prevent aggregation, (*see, e.g.*, Appx109-115), say otherwise.

As with written description, the district court was persuaded that "given the various formulations in the examples" of the '865 patent, a POSA could reach **all** stable formulations claimed. (Appx222). As with written description, the "various formulations" Regeneron offered used **one** phosphate-buffered system. (*See* Sec. III.B.1; Appx231 (finding enablement using Regeneron's undisclosed in-house formulations—all using phosphate-buffered systems); Appx10088-10092 (1729:11-1733:23) (Graham) (discussing formulations in Appx17733-17741, Appx17747-17755)).

The district court claimed Defendants showed no formulation requiring "undue experimentation to make and use (when guided by the patent's teachings)." (Appx225). Its *findings* do: it held if POSAs put 40 mg/mL aflibercept in Fraser (phosphate buffer) or prior art Liu (histidine buffer) formulations, their viscosities would produce "long injection times," making them "unusable." (Appx191).

Thus, particularly given the district court's findings, the claims fail under 35 U.S.C. § 112.

### C. The district court inconsistently applied "suitable for intravitreal administration," showing indefiniteness.

For infringement, the district court satisfied the preamble's suitability phrase with a "sterile solution." (Appx77). For the prior art, the district court demanded express intravitreal intent-to-use. (Appx156; Appx162-163; Appx181-184). To reject indefiniteness, the district court construed the preamble to mean the '865 patent's Example excipients, excipients "used in marketed products with a relevant route of delivery," or formulation acceptability to ophthalmologists. (Appx207-208; Appx210-211). Two involve product lists, the last is subjective opinion. (Appx9747 (1417:9-15) (MacMichael) (term is subjective); Appx9760-9761 (1430:10-1431:5) (MacMichael) (opinions differ on eye acceptability)).

The district court's inability to choose one preamble meaning shows the preamble "fail[s] to inform, with reasonable certainty," the actual "scope of the

invention" to POSAs. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

### D. Consistently applying the claims and POSA's knowledge, Dix anticipates.

The district court complained Dix lacked a 40 mg/mL aflibercept ***embodiment*** arranged as in the claim. (Appx156-158; Appx162-164). The '865 patent specification likewise lacks a 40 mg/mL formulation arranged as claimed, with unlimited ingredient categories; its stable 40 mg/mL aflibercept embodiments are limited to phosphate-buffered systems. (Appx405; Appx407-409; Appx9147 (545:3-6) (Furfine); Appx10118 (1759:2-7) (Graham); Appx10511-10512 (2135:1-2136:2) (Trout)). Applying to Dix's teachings the same POSA criteria, skill set, and methodology the district court applied to uphold the '865 patent under § 112, Dix anticipates.

#### 1. Dix's formulation framework: stable, anti-VEGF fusion protein, concentration, buffer, stabilizer, and polysorbate.

Dix's invention summary describes "[s]table formulations of a VEGF-specific fusion protein" with "a pharmaceutically acceptable carrier." (Appx12593 (1:62-2:1)). Dix's formulation framework tracks the '865 patent claims: anti-VEGF protein, at concentrations, with excipients (buffer, stabilizer, co-solvent/polysorbate). (Appx12596 (7:1-4)). Within the framework, Dix included stable liquids (10-50 mg/mL) and "pre-lyophiliz[ed]" formulation "aspects."

(Appx12593 (2:3-62); Appx12594 (3:35-4:2)). Dix's Examples combined aflibercept (SEQ ID NO:4) with the same '865 patent excipients, and showed each aspect's stability under the '865 patent's metrics. (*Compare* Appx12596-12598 (7:60-12:32), *with* Appx407-409 (8:32-12:25); Appx9100 (498:17-20) (Furfine)).

## 2. Dix's complete teachings satisfy all Asserted Claim elements.

### a. Stability.

The district court found it "fatal" that Dix never "disclose[d] any formulation with 40 mg/mL aflibercept that meets the 98% native conformation" stability claim elements. (Appx162-163). Dix did not need a 40 mg/mL embodiment to "satisfy an *ipsissimis verbis* test," *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009), or show "actual performance" with 40 mg/mL, *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1383 (Fed. Cir. 2015). Anticipation "only requires that those suggestions [in the reference] be enabled to" a POSA. *Id.*

The district court's § 112 findings insist that if POSAs have stable aflibercept Examples to follow (which Dix prepared) using well-known excipients (Dix used the same '865 patent excipients), this enables stable formulations to POSAs. (Appx223-224; *see generally* Appx222-227 (citing, *e.g.*, Appx10485 (2109:6-14) (Trout))). Dix's Example guidance shows 98% native conformation stability for 25 and 50 mg/mL aflibercept formulations. (Appx12596-12598 (Tables 1, 2, 9)). Regeneron admitted this sufficiently enables POSAs to achieve stable 40 mg/mL

aflibercept formulations. (Appx10478 (2102:6-13) (Trout); Appx10479 (2103:6-18) (Trout); Appx10521 (2145:5-12) (Trout); Appx10524-10526 (2148:23-2150:5) (Trout)).

Thus, ***consistently*** applying a POSA's knowledge and skill set within the district court's findings, Dix enables a stable 40 mg/mL formulation to POSAs.

### b. Dix preferred SEQ. ID NO:4 (aflibercept).

The district court objected that Dix's anti-VEGF drug disclosures cover "multiple fusion proteins." (Appx157-158).

Applying Dix's formulation framework within the "four corners" of the reference, *In re Hodges*, 882 F.3d 1107, 1111 (Fed. Cir. 2018), Dix's "VEGF Antagonists" preferences and glycosylation descriptions were later replicated nearly verbatim by the '865 patent, (*compare* Appx12595 (5:31-42), *with* Appx406 (6:25-39)). The parties' experts agreed Dix disclosed ***just*** two sequences. (Appx9498-9499 (1137:11-1138:9) (Rabinow); Appx10449 (2073:19-23) (Trout)). Dix taught "more preferably SEQ ID NO:4," aflibercept. (Appx12595 (5:35-37); Appx12596-12597 (Dix Examples 1-3 and 5 specify "SEQ ID NO:4"); Appx9389 (1028:17-25) (Rabinow)). Dix's Abstract reiterates, "[p]referably, the fusion protein has the sequence of SEQ ID NO:4." (Appx12591).

Dix thus taught POSAs to prefer SEQ ID NO:4 (aflibercept), and taught glycosylation, comparably to the '865 specification. (Appx9415-9416 (1054:18-1055:9) (Rabinow)).

### c. Dix taught a 10-50 mg/mL range and a 40 mg/mL species.

The district court rejected using Dix's 10-50 mg/mL embodiments to anticipate 40 mg/mL, (Appx157; Appx161-162), without a "very small genus," citing *UCB, Inc. v. Actavis Laboratories UT, Inc.*, 65 F.4th 679, 688 (Fed. Cir. 2023); *Janssen Pharmaceuticals, Inc. v. Watson Laboratories, Inc.*, No. 08–5103 (SRC), 2012 WL 3990221, at *9 (D.N.J. Sept. 11, 2012); *OSRAM Sylvania, Inc. v. American Induction Technologies, Inc.*, 701 F.3d 698, 705-06 (Fed. Cir. 2012); and *Atofina v. Great Lakes Chemical Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006), (Appx161-162).

*UCB* reaffirmed principles extensively discussed in *Ineos USA LLC v. Berry Plastics Corp.*, 783 F.3d 865, 869 (Fed. Cir. 2015), which Defendants applied in their briefing. (*See, e.g.*, Appx10880-10881; Appx11353-11354; Appx11647-11651).

*OSRAM* clarified that in *Atofina*, *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340 (Fed. Cir. 2012), and other genus-species cases, anticipation turns on whether the species limitation "was critical," or "worked differently at different points within the prior art range." 701 F.3d at 705-06. When claims and prior art overlap, the criticality to operability of what is claimed, relative to the prior

art range, controls. *UCB*, 65 F.4th at 687-88; *Ineos*, 783 F.3d at 869 ("how the invention operates over the ranges" matters).

The district court found Dix's disclosures "indistinguishable" from *Janssen*, 2012 WL 3990221, at *9, where a ".02-0.05 mg" prior art range did not anticipate a 0.025 mg dose. (Appx163). *Janssen* analyzed the range using the "at once envisage" test. *Janssen*, 2012 WL 3990221, at *6. *UCB* subsequently explained "the 'immediately envisage' line of cases" is "***an improper application of our precedent*** governing overlapping ranges." *UCB*, 65 F.4th at 688 (emphasis added). The district court legally erred.

### i. Range breadth is not dispositive.

The district court found 10-50 mg/mL broad for including tenths and hundredths place variations. (Appx157). But the full range works, providing anticipation. *See ClearValue*, 668 F.3d at 1345 (prior art "disclosure that this chemical process works for systems with 150 ppm or less is what anticipates" species equaling 50 ppm or less).

### ii. Criticality/operability analyses apply to species selections.

The district court found *UCB*, 65 F.4th at 687-88, and *Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1338 (Fed. Cir. 2020), to exempt a single species, like 40 mg/mL, from criticality analyses. (Appx165). Single-species criticality analyses are avoided when the ***prior art species*** meets a ***claimed genus*** range. *UCB,* 65 F.4th

at 688.  In *Genentech*, the prior art 18-25°C range anticipated the claimed 10-18°C temperature range around 18°C.  946 F.3d at 1337-38.

Nevertheless, having found POSAs understand 10-50 mg/mL whole numbers include tenths and hundredths variations, (Appx157), 40 mg/mL is not one concentration, but tenths and hundredths variations, just as an ingredient "present at a concentration of 0.001% w/w" in a pharmaceutical formulation was construed as "0.00095% to 0.00104%," *AstraZeneca AB v. Mylan Pharmaceuticals Inc.*, 19 F.4th 1325, 1335 (Fed. Cir. 2021).

### iii.  Under the correct legal test, 40 mg/mL is not critical to operability.

The *Ineos* claims required 0.05-0.5% by weight of a particular lubricant type; the prior art used "lubricating agents" of "at least 0.1 part by weight" to "not exceed 5 parts by weight."  783 F.3d at 867, 869.  Anticipation turned on "whether the range claimed is critical to the operability of the invention."  *Id*. at 869.

Regeneron's expert Dr. Trout never opined in his report or at trial that 40 mg/mL aflibercept was critical to operability.  (Appx10387-10578 (2011:3-2202:4); Appx7294-7354).   Consistently applying the district court's exclusion rulings precludes considering criticality.  (Appx161 (precluding Defendants from citing Dix's 40 mg/mL formulation); Appx167-172 (refusing to consider obviousness combinations); Appx197-198).

Nor *could* Dr. Trout credibly argue criticality—his infringement and enablement opinions relied on 50 mg/mL formulations performing similarly to 40 mg/mL. (*See, e.g.*, Appx9254-9255 (619:11-620:6); Appx10476-10479 (2100:7-2103:18); Appx9316-9317 (681:18-682:10) (40 mg/mL infringement opinions using 50 mg/mL formulation); Appx15786-15787 (50 mg/mL '865 patent Example compared with 40 mg/mL Biocon product (identified at Appx15767-15768); *see generally* Appx7210-7387).

The '865 patent embodiments having broad buffer, stabilizer, and organic co-solvent elements use *even wider* 1-100 mg/mL ranges of "VEGF-specific fusion protein antagonist." (Appx404-405 (2:33-38 ("stable liquid ophthalmic formulation… comprises 1-100 mg/mL VEGF"), cols. 2-3 (embodiments include 40, 50, and 40-50 mg/mL))). That *concedes* 10-50 mg/mL range operability.

### iv. The specification nowhere ties "criticality" benefits to the invention claimed.

The district court posited inventor testimony showed criticality because Regeneron "chose the 40 mg/ml concentration to maximize the half-life of aflibercept in the eye while minimizing toxicity and stability concerns." (Appx159). The *Ineos* inventor similarly argued his composition range was "critical to avoid unnecessary manufacturing costs" and "undesirable blemishes." 783 F.3d at 870. "[E]ven if true, this has nothing to do with the operability or functionality of the claimed invention," absent the specification establishing a "relationship between"

them. *Id*. at 871. The '865 patent specification establishes no formulation relationship to aflibercept half-life or toxicity. (Appx10499-10500 (2123:18-2124:19) (Trout) (confirming "no half-life data, no side effect data")). Nor do the district court's inventor citations at Appx159—Appx9075 (473:2-22) (Furfine) and Appx10039-10041 (1680:12-1682:1) (Graham)—generally discuss higher concentrations' desirability, whereas Appx10139 (1780:18-20) (Graham) notes 40 and 50 mg/mL concentrations lacked *equivalent* needle shear stresses.

Dix reports 25 mg/mL and 50 mg/mL aflibercept formulations with near-identical ingredients achieved the claimed 40 mg/mL stability metrics. (Appx12598 (12:1-30); Appx12596 (8:20-40)). Regeneron's witnesses admitted 40 mg/mL in those Dix formulations also would be stable. (Appx10524-10525 (2148:15-2149:8) (Trout); Appx10068-10069 (1709:19-1710:6) (Graham)).

Thus, *no* testimony shows 40 mg/mL aflibercept working where 10-50 mg/mL range formulations failed; criticality fails under *Ineos*. 783 F.3d at 870-71. Dix's concentration teachings anticipate.

> **d.    The district court could not use unclaimed elements to differentiate Dix's 40 mg/mL species.**

Dix also disclosed a 40 mg/mL species, (Appx12594 (3:60-62); Appx159-160), that the district court rejected as "forfeited," (Appx159-161; Appx164); and then disparaged as a "pre-lyophilized" "manufacturing intermediate," (Appx159-160; Appx195-196).

Defendants never "forfeited" Dix's express 40 mg/mL formulation teachings; indeed, Regeneron's trial objection was overruled. (Appx9419-9420 (1058:6-1059:18)). *Regeneron* solicited testimony about Dix's 40 mg/mL species from Dr. Trout *on direct* examination. (Appx10453 (2077:6-16) (Trout)). Defendants cross-examined Regeneron's inventor against Dr. Trout's theories. (*See, e.g.*, Appx10149 (1790:14-17) (Graham)). Defendants properly offered it "to explain, repel, counteract, or disprove the evidence of" Regeneron. *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1081-82 (Fed. Cir. 2015).

Dix's 40 mg/mL formulation being pre-lyophilized cannot differentiate what is *claimed*. The '865 patent's claims don't exclude pre-lyophilization. The specification confirms the "invention includes" "formulations that may be lyophilize[d] and reconstituted for intravitreal administration," (Appx404 (1:49-52); Appx405 (4:6-62); Appx406 (5:11-22) ("pre-lyophilized formulation" embodiment)), and that "[l]yophilized [f]ormulations" are "ophthalmically acceptable," (Appx407 (7:26-30)).

Nor is it "material that the district court found the anticipating" 40 mg/mL pre-lyophilized formulation involved an "intermediate step." *Abbott Laboratories v. Baxter Pharmaceutical Products, Inc.*, 471 F.3d 1363, 1369 (Fed. Cir. 2006). The formulation meets the claims; "[c]ommercial finality is not claimed." *Id.*

Dix thus independently satisfies the framework's concentration with its 40 mg/mL species disclosure.

### 3. "Suitable for intravitreal administration" cannot differentiate Dix.

The district court emphasized Dix lacked intravitreal injection instructions. (Appx156; Appx195-196 (same, for obviousness)).

If intravitreal suitability involves formulation *properties*, anticipation "is not avoided" just because "the patentee explicitly claims that property" of prior art products; it is inherent. *Abbott*, 471 F.3d at 1368.

Moreover, the district court construed ophthalmic formulations "suitable for intravitreal administration," to include formulations using excipients in the '865 patent's Examples, or "used in intravitreal administration" in the prior art. (Appx210-211). Dix's formulations meet *that* standard. Dix's 10-50 mg/mL embodiment, and stable Examples, *e.g.*, Example 1 and Example 5, use phosphate buffer, sucrose stabilizer, and polysorbate, *identical* to the '865 patent's Example 1 ingredients. (*Compare, e.g.*, Appx12593 (2:20-34); Appx12596 (7:60-8:19); *and* Appx12598 (12:1-30), *with* Appx407 (8:36-59)). Dix's Example 4 "pre-lyophilized" formulation used histidine, sucrose, and PEG, (Appx12597 (10:15-26)); Genentech's prior art intravitreal ranibizumab formulations used histidine, sugar, and polysorbate, (Appx13664 (31:27-30)). Consistently applying the district court's definiteness construction, all were "suitable."

Independently, Dix reports its formulations' anti-cancer utilities. (Appx12593 (1:43-54); Appx12597 (10:4-10) ("intravenous infusion")). POSAs' background knowledge included doctors successfully intravitreally injecting Avastin's anti-cancer, anti-VEGF intravenous infusion formulation, (Appx19-20), and aflibercept's anti-cancer and intravitreal uses and injection suitability, (Appx13-17; *see* Appx9389-9390 (1028:14-1029:7) (Rabinow); Appx9415 (1054:1-16) (Rabinow); Appx27092-27093; Appx9601-9603 (1240:24-1242:19) (Chu 30(b)(6)); Appx13921-13924; Appx9130 (528:2-12) (Furfine); Appx14238-14264; Appx13839-13847; Appx15421-15429 (Avastin intravitreal dosing)). POSAs thus understood Dix's formulations were intravitreally "suitable."

### E. Dix also renders the Asserted Claims obvious.

The district court rejected Dix obviousness "for reasons similar to" its anticipation analysis. (Appx195). Each error justifies reversing and/or remanding on obviousness. *Janssen Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.*, 97 F.4th 915, 925-31 (Fed. Cir. 2024) (reversing and remanding when district court rigidly analyzed references and used unclaimed elements to differentiate claims).

### F. POSAs would reach the alleged invention by combining Fraser's aflibercept teachings given Genentech's ranibizumab intravitreal formulation teachings.

#### 1. Fraser.

Fraser had the formulation framework of aflibercept, buffer, stabilizing sugar, and polysorbate (Tween 20), at 24.3, not 40 mg/mL, aflibercept. (Appx13691;

Appx9386-9387 (1025:23-1026:6) (Rabinow); Appx10515 (2139:5-17) (Trout)). Fraser explained that "[c]ompared with earlier versions of receptor-based fusion proteins," aflibercept had "greater affinity" for VEGF and "improved bioavailability and pharmacokinetic properties." (Appx13691).

### 2. Genentech's ranibizumab formulations.

Genentech's anti-VEGF eye disease success was a "game changer." (Appx8725 (123:6-7) (Yancopoulos)). Regeneron called Genentech's January 2005 Gaudreault publication assessing ranibizumab's intravitreal performance in monkeys not an inflammatory worry, but a "nice find." (Appx18). Gaudreault's intravitreal formulations had 10 and 40 mg/mL ranibizumab in sodium succinate buffer, trehalose stabilizing sugar, and polysorbate. (Appx17544; Appx10514 (2138:2-24) (Trout)).

Genentech's Shams patent application published in May 2006; it included Genentech's human clinical trial protocol for 10 mg/mL intravitreal ranibizumab in histidine buffer, trehalose stabilizing sugar, and polysorbate. (Appx13664; Appx10513 (2137:4-21) (Trout)).

### 3. POSAs had a reason to use aflibercept in Genentech's ranibizumab intravitreal formulations.

Like *Senju Pharmaceutical Co. v. Lupin Ltd.*, 780 F.3d 1337 (Fed. Cir. 2015), Genentech's intravitreal prior art "gave reasons to one of ordinary skill in the art to combine with" Fraser's aflibercept disclosures "because [aflibercept] was

recognized in the art as an improved" anti-VEGF. *Id*. at 1347. Dr. Rabinow testified without rebuttal that POSAs understood the small competitor space: Genentech with ranibizumab and off-label bevacizumab, and Regeneron. (Appx9401 (1040:4-14)). Regeneron reported in 2003 aflibercept "markedly suppressed the development of choroidal neovascularization" after intravitreally dosing mice eyes. (Appx14-15).

The district court rejected *Senju* applied.

First, it erroneously converted this Court's caution against **assuming** that POSAs "would **always** be motivated to try later generation compounds in an old composition," *Apotex Inc. v. Wyeth LLC*, 657 F. App'x 998, 1003 (Fed. Cir. 2016) (emphasis added), into a heightened obligation that Defendants prove POSAs "**would necessarily** have been motivated to replace one drug in a formulation with another in its class," (Appx173 (emphasis added)). *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 415 (2007), rejected using this rigid standard. This error "carried through [to] the remainder of its obviousness analysis," alone "reason to vacate the decision." *Janssen*, 97 F.4th at 930.

Second, it cited Regeneron's expert and inventor to find "the POSA would not just substitute one protein formulation for another" because aflibercept was a "fusion protein." (Appx173-174). That deserves outright reversal. "[A] reference must be considered for everything it **teaches**…." *Belden*, 805 F.3d at 1076. Shams **expressly** states his invention applies to any anti-VEGF inhibitor, including "fusion[]

proteins, *e.g.*, VEGF-Trap (Regeneron)," (Appx13630), which is aflibercept, (Appx13). POSAs had reason to combine under the correct legal standard.

> ### 4. Inflammation risks did not dissuade real-world clinicians from intravitreally injecting larger anti-VEGF compounds at concentrations above 10 mg/mL.

The district court erred characterizing Dr. Trout's testimony that Gaudreault's 40 mg/mL ranibizumab formulation caused more inflammation than 10 mg/mL, discouraging POSAs away from 40 mg/mL aflibercept, as "unrebutted." (Appx174-175).

Preliminarily, the district court's analysis "clearly erred" "because the ['865] patent also fails to explain how its higher [concentration] would overcome these dose-related side-effects." *Merck*, 395 F.3d at 1373-76. The district court ignored *Merck* by interpreting *AstraZeneca*, 19 F.4th at 1337, as allowing "prior art formulations showing drug adhesion taught away" from claims "not recit[ing] anything about drug adhesion." (Appx180). *AstraZeneca*'s "pharmaceutical composition" claim was construed as suspensions, where "the active ingredient remains as a solid in the liquid." 19 F.4th at 1328 n.1. Where prior art formulations "don't work" to stay suspended—a claim attribute—that taught away. *Id*. at 1336-38. Here, "[n]othing in the claims requires" avoiding inflammation or reducing side effects, "let alone [that formulations] be ideal for" that purpose. *Janssen*, 97 F.4th at 926.

Unlike Gaudreault's ranibizumab, Fraser showed aflibercept's higher doses had "significantly longer" activity than lower doses. (Appx15). The formulation excipients satisfy the district court's intravitreal suitability construction, which does not address inflammation. (Appx210-211).

The district court asserted lower drug potency was preferable. (Appx175). No clinician said so. Inventor Furfine conceded notwithstanding inflammation, formulators "make [their] judgments of what [they] want to do" following evaluation of "the degree" or "severity" of inflammation, and how it resolves. (Appx9149-9151 (547:4-549:22)). Regeneron's expert conceded Gaudreault taught inflammation "completely resolved by day 8," and ranibizumab was "well tolerated." (Appx17544-17545; Appx10547-10548 (2171:18-2172:10) (Trout); Appx11688; Appx11691). Clinicians accept inflammation when the alternative is blind patients. (Appx10792 (933:6-13) (Albini) (doctors can administer a drug "regardless of safety concerns" if "that… patient was certain to… go blind… without the drug")).

Moreover, doctors *actually* intravitreally injected, in *human* eyes, the large Avastin molecule at 25 mg/mL concentration (1.25 mg in 0.05 mL) with "no ocular toxicity" notwithstanding supposed teaching-away from concentrations above 10 mg/mL. (Appx19-21; Appx181). Clinicians proposed *why* ranibizumab's primate side effects were avoided in human eyes. (Appx20-21; Appx13839-13840;

Appx15421-15422; Appx9394 (1033:4-19) (Rabinow) (Avery disclosures); Appx9548-9550 (1187:20-1189:2) (Rabinow) (Avery overriding concerns)).

Thus, any alleged "doubt about the efficacy of" high-concentration intravitreal aflibercept "that may have been created" was "put to rest." *Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1331 (Fed. Cir. 2014).

Under the "objective reach" of the claims, *Janssen*, 97 F.4th at 926, the district court also ignored the "inescapable, real-world fact here," *Nalpropion Pharmaceuticals, Inc. v. Actavis Laboratories FL, Inc.*, 934 F.3d 1344, 1354 (Fed. Cir. 2019), that Fraser, Dix, and others ***created*** stable aflibercept formulations with concentrations higher than 10 mg/mL. Dix lets POSAs reasonably expect Fraser's 25 mg/mL concentration, and Dix's own 50 mg/mL concentrations were stable. (Appx10525 (2149:3-8) (Trout) (POSA "would have known that" 50 mg "reaches the 98 percent" stability threshold); Appx9417-9418 (1056:7-1057:4) (Rabinow)). Since Dix's 25 and 50 mg/mL were stable, 40 mg/mL is reasonably expected to be stable. (Appx10068-10069 (1709:19-1710:6) (Furfine)). Avastin at 25 mg/mL was stable. (Appx9127 (525:10-22) (Furfine); Appx13553; Appx13559).

***Formulators*** thus were not dissuaded from high-concentration aflibercept and related anti-VEGF formulations.

### 5. Choosing a particular dose, pH, or concentration range represents routine optimization.

The district court dismissed Defendants' combinations because no reference

expressly showed one embodiment with all claim elements. (Appx172-190). *Janssen* confirms this improperly "analyze[s] the prior art without giving the needed weight to the perspective of a POSA capable of deducing what references fairly suggest." 97 F.4th at 928.

The district court complained Fraser lacked intravitreal dosing "intent," (Appx181), and glycosylation, (Appx182-184). Applying how the district court construed intravitreal suitability, (Appx210-211), Fraser used the '865 patent formulations' excipients, satisfying the phrase, (Appx13691; Appx10515 (2139:5-17) (Trout)). Fraser taught sourcing aflibercept made from CHO cells, which the '865 patent admits generates glycosylation. (Appx13691 (aflibercept provided by Regeneron); Appx9380; Appx9405 (1019:15-25, 1044:13-22) (Rabinow) (Holash, cited by Fraser for its aflibercept, taught producing aflibercept in CHO cells); Appx406 (6:32-39); Appx9375-9376 (1014:25-1015:2) (Rabinow); Appx9405 (1044:13-22) (Rabinow)). The PTAB accepted that POSAs understood aflibercept's production from CHO cells. (Appx12198-12199).[1]

The district court opined Fraser, Gaudreault, and Shams used different concentrations, pH, and polysorbate levels. (Appx188-190). "A recognition in the prior art that a property is affected by the variable is sufficient to find the variable

---

[1] The PTAB considered the '992 patent in the '865 patent chain. (Appx402). Regeneron later disclaimed it. (Appx12010).

result-effective." *In re Applied Materials, Inc.*, 692 F.3d 1289, 1297 (Fed. Cir. 2012). Dose adjustments were. *Merck & Co., Inc. v. Biocraft Laboratories, Inc.*, 874 F.2d 804, 809 (Fed. Cir. 1989). Regeneron admitted protein formulation first sets the protein's optimal pH, then optimizes the remaining excipients—the routine buffer, stabilizer, polysorbate framework. (Appx10482-10483 (2106:25-2107:5) (Trout); Appx10501-10508 (2125:7-2132:25) (Trout)). It is not inventive to find optimum concentrations of old formulations. *E.I. Dupont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1006 (Fed. Cir. 2018).

### 6. The district court's secondary considerations findings must be reversed.

Defendants objected to Regeneron's new "teaching away, unexpected results, industry skepticism, and copying" theories since Regeneron's interrogatory responses never disclosed them. (Appx196; Appx11779-11780 (interrogatory answer lists only commercial success, failure "to develop its first formulation," "unexpected syringeability," "unexpectedly low turbidity," and "development partner's decision" not to pursue aflibercept for ophthalmology)). Having repeatedly refused to consider Defendants' evidence as allegedly untimely, (*see, e.g.*, Appx159-161; Appx164; Appx167-172; Appx197-198), the district court abused its discretion by arbitrarily exempting Regeneron.

Defendants addressed teaching-away above.

Aflibercept's half-life permitting extended dosing intervals versus ranibizumab was neither unexpected nor uncontested. (Appx197-200; Appx11697-11698).

Half-life is an aflibercept *molecule* property, known in the prior art. (Appx10498-10499 (2122:22-2123:11) (Trout); Appx9099 (497:10-22) (Furfine); Appx14266-14268 (Holash lauding "length of time in which VEGF-Trap$_{R1R2}$ remained efficacious")).

"Evaluating unexpectedness via a comparison" to other medications' dosing interval paradigm "was improper [as t]here is simply nothing unexpected" from "other medications [that] were dosed differently." *Janssen*, 97 F.4th at 934. The closest *relevant* comparison is Dix and/or Fraser's aflibercept formulations, which were as stable as 40 mg/mL. (Appx10479 (2103:6-18) (Trout); Appx10525-10526 (2149:24-2150:5) (Trout)).

Nor is there nexus when the purported unexpected property is attributable to the prior art molecule, (Appx10498-10499 (2122:22-2123:22) (Trout)), which permits the extended-dosing claimed by the now-invalidated '572 and '601 patent claims; the latter two's specifications admit therapeutically effective dose amounts, which correspond to aflibercept amounts in Fraser and Dix's prior art formulations if dosed in the eye, (Appx3714-3715; Appx3686-3687). Regeneron's molecule applications also blocked POSAs. (*See, e.g.*, Appx12512-12589).

The district court's "skepticism" that "clinical use of fusion proteins like aflibercept 'remains to be validated,'" (Appx202), did not change after the '865 patent teachings; conflicts with Shams; and was superseded by Avery as noted above. It lacks nexus when the claims lack clinical use elements. *Janssen*, 97 F.4th at 933. Dix showed even higher aflibercept concentration formulations were stable. (*See, e.g.*, Appx12596-12598 (Examples 1-3)).

Nor did Defendants "copy" the claims, which never existed until 2021, years after Yesafili's development. (Appx13473-13474). Using aflibercept at a "40 mg/ml concentration," (Appx203), is an FDA requirement, and thus not "probative of nonobviousness," *Bayer Healthcare Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013). Defendants' polysorbate, (Appx203), and formulation derives from Genentech prior art, not Regeneron, (Appx13664 (31:27-30); Appx13917 (§11)).

Defendants' secondary considerations *rebuttal* evidence was erroneously rejected as allegedly new obviousness *combinations*. (Appx167-172).

Thus, the district court reversibly erred on obviousness.

———————————

The district court's errors thus justify reversing its validity judgment.

## IV. THE PERMANENT INJUNCTION MUST BE VACATED.

The district court reversibly erred on the merits; "the absence of an adequate showing with regard to any one factor may be sufficient… to justify the denial" of equitable relief and reversal here. *Sumecht NA, Inc. v. United States*, 923 F.3d 1340, 1348 (Fed. Cir. 2019).

### A. No nexus.

Irreparable harm cannot be shown by sales lost "regardless of the infringing conduct." *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012). Regeneron never argued that ***anyone*** buys Defendants' product for polysorbate co-solvation; Regeneron's expert admitted Regeneron's harm results from mere ***competition***. (*See, e.g.*, Appx23341-23342 (36:7-38:16) (Sheridan) ("The presentation of the product… won't change the irreparable harm…."); Appx23372 (159:19-160:22) (Sheridan) (neither formulation nor excipients relevant to competitive effects)). Yesafili's molecule and stable intravitreal excipients were known in prior art.

### B. Regeneron's market is identifiable and quantifiable.

The district court confirmed the aflibercept market is starkly segmented, with Regeneron market data for ***not*** Regeneron market data (Appx337-339).

The district court assumed the vial market's ▮Regeneron market data▮ market share was still "a significant volume." (Appx341). That volume was not Regeneron's *loss*; it defined the competitive market. (Appx341-342).

Regeneron's Insights and Analytics Team for years predicted and calculated **Regeneron market data** (Appx23250-23251; Appx23483 (17:2-12) (Clark); Appx23493 (54:8-23, 55:10-17) (Clark); Appx23494 (60:5-61:3) (Clark)). Because of the slow biosimilar uptake rate for this market, and physician hesitancy to switch patients off successful eye treatment given the risks involved, (Appx23246; *see* Appx20810 (Fig. 15); Appx20815 (Fig. 19); Appx20826 (Fig. 27); Appx20836 (Fig. 34); Appx22523), Regeneron calculated it might lose ▮Regeneron market data▮ *total market share* by 2027 (when the '865 patent expires), (Appx23249; Appx21732; Appx25357-25359 (¶41); Appx25362 (¶47); *see also* Appx24312). That is small, identifiable, and quantifiable, not irreparable.

Moreover, this market produces unit-by-unit sales and use data; identifies exactly when one prescription product has been substituted for another; and details how market share and price compare to, and are affected by, competition. (Appx23249-23251).

**Regeneron never disputed** "there would be a clear paper trail" to make readily "identifiable and quantifiable" which sales go to whom, and when. (Appx25349-25350 (¶23); *see also* Appx25351 (¶25)). Its own expert admitted he could quantify

such sales. (Appx23351-23352 (76:20-79:2) (Sheridan); Appx25387-25388 (¶105)).

*If* price erosion occurred, Regeneron's corporate witness confirmed he could readily calculate discounts or rebates Regeneron needed to offer to maintain price or share. (Appx23536 (229:16-22) (Clark); *see also, e.g.*, Appx25383-25388 (¶¶96-107); Appx24801 (¶28) ("impact of payer restrictions quantifiable and measurable")). That confirms quantifiability.

To deem share loss and price erosion irreparable, the district court heavily relied on *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922 (Fed. Cir. 2012). (Appx353-354). But in *Celsis*, there was "no effective way to measure the loss of sales or potential growth—to ascertain the people who do not knock on the door or to identify the specific persons who do not reorder because of the existence of the infringer." 664 F.3d at 930. That is the *opposite* of the admitted facts here, where unit-by-unit prescription and tracking data are available, and Regeneron monitors it assiduously. (Appx23250-23251; Appx25351 (¶25); Appx25363-25365 (¶¶49-54); Appx22431-22433; Appx23495-23496 (63:5-66:16) (Clark)). Losses cannot be irreparable when they are quantifiable. *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 572 U.S. 1301, 1301 (2014) (Roberts, C.J., in chambers) (patentee did not show "likelihood of irreparable harm" because "[patentee] will be able to recover

damages"; "[g]iven the availability of that remedy, the extraordinary relief that [patentee] seeks is unwarranted").

## C.     The district court's findings show Biocon's irreparable harm.

The district court pronounced that "early infringing competition can alter market dynamics moving forward in a way that cannot be unwound," concluding "[t]his is classic irreparable harm." (Appx342; *see also* Appx331-367 (finding all but R&D considerations in Regeneron's favor)). Regeneron exploited 10+ years of aflibercept first mover advantage. These findings justify **Biocon**'s irreparable harm for losing its first-mover biosimilar status from its early FDA approval and other patent litigation success. The district court never favorably weighed that for Biocon. (*See* Appx367-374).

## D.     The district court cannot give a drastic injunction remedy on facts routinely occurring for pharmaceuticals losing regulatory exclusivity.

The district court concluded—without record citation—that newly competing against products incorporating one's own alleged patented invention features necessarily creates irreparable harm. (Appx341). That scenario exists for virtually all generics or biosimilars. The district court's approach runs afoul of the guiding principle that permanent injunctions are "drastic and extraordinary remed[ies]," not to be routinely granted, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), and ignores that branded companies' regulatory exclusivity periods give

their molecules competition-free environments at the outset. Moreover, Regeneron's 30(b)(6) witness failed to rely on ***any*** harm Regeneron proposed during fact discovery, (Appx23237), which further justifies rejecting it.

Because the district court's merits decisions are in doubt; its conclusory findings lacked substantial evidence; it failed to properly consider and balance the significant evidence before it on not just quantifiability, but Biocon's harm as well; and Regeneron failed to timely disclose its harm theories; the district court's permanent injunction should be vacated and reversed.

## V. ADOPTING REGENERON FINDINGS.

"[T]he likelihood of clear error" arises in district court findings that merely adopt a party's proposed findings. *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986).

A sampling of issues in Defendants' briefing, motions, and findings left unaddressed include, *e.g.*, Appx11600-11604 (Defendants explaining conditions for hydrophobicity reversal, and why testing, not speculation, was required to show it for Yesafili); Appx11604-11605 (Regeneron's theories improperly burden-shift to Defendants to prove "non-zero" binding for noninfringement); Appx11633-11636 (prior art given 6-14-2007 priority date); Appx11646 and Appx11653 (Regeneron's infringement allegations independently show anticipation); Appx11655 (stability-related disclosures in Andya 1 (Appx13987-14035) for trehalose/polysorbate

formulations show reasonable expectation); Appx11673; Appx11692 (successful dosing of molecules larger than aflibercept through ITV injection); Appx11675-11676 (POSA's knowledge of competitive landscape of VEGF inhibitors for intraocular formulations); Appx11680 (POSA's background knowledge of aflibercept's structural features/glycosylation); Appx11683 (Liu's low-viscosity disclosures); Appx11702-11704 (Regeneron's failure to timely disclose various secondary consideration theories presented at trial); Appx11721-11724 (broad patent disclosure using open-ended language did not provide requisite "blaze marks" to satisfy written description requirement, especially when patent includes limited class of examples); Appx11730-11760 (no entitlement to 6-16-2006 priority date for Dix obviousness); Appx341-355 (ignoring Defendants' irreparable harm expert and corporate witness on lost market share and price erosion).

Regeneron's characterizations of issues in the findings as "undisputed," (*see, e.g.*, Appx11025; Appx11028; Appx11033; Appx11039; Appx11041; Appx11046-11047; Appx11175; Appx11179; Appx11182; Appx11191; Appx11193-11194); "unrebutted," (*see, e.g.*, Appx11006-11007; Appx11026; Appx11029-11030; Appx11041; Appx11043; Appx11047-11048; Appx11057-11058; Appx11158; Appx11173-11177; Appx11183-11185; Appx11193-11195); or "[un]timely," (*see, e.g.*, Appx11026; Appx11049; Appx11163), were self-serving and apply standards inconsistently applied to Defendants' comparable objections to Regeneron,

undermining "the vital purposes served by judicial opinions," *Bright v. Westmoreland County*, 380 F.3d 729, 732 (3d Cir. 2004).

Defendants cannot reasonably appeal all self-serving Regeneron findings, using a sentence to utter but requiring pages to explain and rebut. Defendants provide notice if Regeneron's responsive arguments render them material, they are not unchallenged, waived, or otherwise conceded; and request this Court exercise its discretion to consider same.

## CONCLUSION

The district court's '865 patent infringement judgment should be reversed; its

invalidity judgment reversed or remanded; and injunction order vacated.

Dated:  August 21, 2024                  Respectfully submitted,

/s/ Deanne M. Mazzochi
William A. Rakoczy
Deanne M. Mazzochi
Paul Molino
Eric R. Hunt
Heinz J. Salmen
Neil McLaughlin
Lauren M. Lesko
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60654
(312) 222-6305
dmazzochi@rmmslegal.com

*Counsel for Appellants Biocon Biologics,
Inc. and Mylan Pharmaceuticals Inc.*

# ADDENDUM

| | **ADDENDUM TABLE OF CONTENTS** | |
|---|---|---|
| ad | Description | Appendix Page(s) |
| | Orders & Judgments Appealed | |
| 525 | Order, dated June 6, 2023. | Appx1 |
| 664 | Memorandum Opinion, dated December 27, 2023. [Sealed, redacted as D.I. 692] | Appx3 |
| 665 | Judgment, dated December 27, 2023. | Appx316 |
| 794 | Order, dated June 11, 2024. [Sealed, redacted as D.I. 799] | Appx317 |
| 795 | Judgment, dated June 11, 2024. | Appx397 |
| 800 | Order, dated June 21, 2024. | Appx398 |
| | Patents | |
| PTX-0002 | U.S. Patent No. 11,084,865 | Appx401 |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

REGENERON PHARMACEUTICALS, INC.,

      Plaintiff/Counter-Defendant,

    v.                                CIVIL NO. 1:22-CV-61
                                        (KLEEH)

MYLAN PHARMACEUTICALS INC.,

      Defendant/Counter-Claimant.

ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT [ECF NO. 428, 429]
AND RELATED MOTIONS [ECF NOS. 439, 483, 484]

      Pending before the Court are motions for summary judgment
filed by both parties.  The Court finds that genuine disputes
regarding material facts exist in this case, to the extent that
summary judgment for either party is inappropriate under Rule 56
of the Federal Rules of Civil Procedure.  The parties' motions for
summary judgment are **DENIED** [ECF Nos. 428, 429].  As such,
Regeneron's amended motion to strike arguments raised in Mylan's
reply brief is **DENIED AS MOOT** [ECF No. 484].  Regeneron's original
motion to strike is also **DENIED AS MOOT** [ECF No. 483].

      Mylan also filed a Rule 56(d) motion to defer and conduct
further discovery to adequately oppose summary judgment.  Because
the Court is denying both motions for summary judgment, the motion
to defer is **DENIED AS MOOT** [ECF No. 439].

      It is so **ORDERED**.

      The Clerk is **DIRECTED** to transmit copies of this Order to

REGENERON V. MYLAN                                    1:22-CV-61

**ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT [ECF NOS. 428, 429]
AND RELATED MOTIONS [ECF NOS. 439, 483, 484]**

counsel of record.

     Entered:   June 6, 2023

                   *Tom S Kleeh*
                   THOMAS S. KLEEH, CHIEF JUDGE
                   NORTHERN DISTRICT OF WEST VIRGINIA

Appx2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


REGENERON PHARMACEUTICALS, INC.,

        Plaintiff,

v.                                  CIVIL NO. 1:22-CV-61
                                      (KLEEH)

MYLAN PHARMACEUTICALS INC., and
BIOCON BIOLOGICS, INC.,

        Defendants.


**SEALED**

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

#### I.   INTRODUCTION

In this patent infringement action, the plaintiff, Regeneron Pharmaceuticals, Inc., ("Regeneron"), and the Defendants, Mylan Pharmaceuticals Inc. and Biocon Biologics, Inc. (collectively, "the Defendants"),[1] dispute whether the Defendants have infringed claims 6 and 25 of Regeneron's U.S. Patent No. 11,253,572 ("the '572 Patent"); Claims 11 and 19 of Regeneron's U.S. Patent No. 10,888,601 ("the '601 Patent"); and claims 4, 7, 9, 11, 14, 15, 16, and 17 of Regeneron's U.S. Patent No. 11,084,865 ("the '865 Patent"). They also dispute whether each of these asserted claims is valid and enforceable.

---

[1] Regeneron initially brought this lawsuit against only Defendant Mylan Pharmaceuticals Inc. ("Mylan"). (ECF No. 1). Defendant Biocon Biologics, Inc. was added later by stipulation (ECF No. 523).

REGENERON V. MYLAN                                            1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Regeneron has sued the Defendants under the Biologics Price Competition and Innovation Act ("BPCIA"), which "governs a type of drug called a biosimilar, which is a biologic product that is highly similar to a biologic product that has already been approved by the Food and Drug Administration (FDA)." Sandoz Inc. v. Amgen Inc., 582 U.S. 1, 5 (2017). The BPCIA provides an abbreviated route for FDA approval of biosimilars.

The patents-in-suit are associated with Regeneron's FDA approved Eylea® product, which contains a biological product known as aflibercept. The Defendants filed a Biologics License Application ("BLA") seeking FDA approval to market a biosimilar aflibercept product under the trade name Yesafili™ prior to the expiration of the patents in suit.[2]   The Court is tasked with deciding the following:

(1)   whether the Defendants' BLA products infringe claims 4, 7, 9, 11, 14, 15, 16, and 17 of the '865 Patent;

(2)   whether the Defendants' proposed label induces infringement of claims 6 and 25 of the '572 Patent and claims 11 and 19 of the '601 Patent;

---

[2] Mylan filed BLA No. 761274 with the FDA on October 29, 2021.  It transferred ownership of that BLA to Biocon effective March 31, 2023.  (ECF No. 523).

Appx4

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

(3)   whether claims 4, 7, 9, 11, 14, 15, 16, and 17 of the '865 Patent are invalid as anticipated or obvious or invalid under 35 U.S.C. § 112 for lack of written description, lack of enablement, or indefiniteness;

(4)   whether claims 6 and 25 of the '572 Patent are invalid as anticipated or obvious or invalid under 35 U.S.C. § 112 for lack of written description, lack of enablement, or indefiniteness; and

(5)   whether claims 11 and 19 of the '601 Patent are invalid as anticipated or obvious or invalid under 35 U.S.C. § 112 for lack of written description, lack of enablement, or indefiniteness.

Following a nine-day bench trial, the parties submitted their memoranda of law of these issues, and the case is ripe for the Court's decision.

## II.   FINDINGS OF FACT

### A.   Parties, Jurisdiction, and Venue

Regeneron is a corporation organized under the laws of the State of New York, with its principal place of business at 777 Old Saw Mill River Road, Tarrytown, NY 10591.  Mylan is a company organized under the laws of the State of West Virginia with its principal place of business at 3711 Collins Ferry Road, Morgantown, West Virginia 26505.  Mylan is an indirect wholly-owned subsidiary

Appx5

REGENERON V. MYLAN                                      1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

of Viatris Inc.  Biocon is a company based in India.  The Court has subject matter and personal jurisdiction, and venue in this District is proper.

## B.    The BPCIA

Under the Public Health Service Act ("PHSA"), a sponsor seeking to market a biologic drug must file a BLA with the Food and Drug Administration ("FDA") that details the biologic's chemistry, pharmacology, manufacturing process, and medical effects.  Sandoz, 582 U.S. at 6.  Through the BPCIA, Congress amended the Public Health Service Act and the Patent Act in an effort to balance the goals of competition and innovation.  BPCIA § 7001(b), Pub. L. No. 111-148.  To expedite getting competing "biosimilars" to market, Congress created an abbreviated regulatory approval pathway so that the biosimilar applicant does not have to regenerate early preclinical and clinical studies; rather, the applicant can instead rely, in part, on the data supporting the previous approval of a reference biologic product.  42 U.S.C. § 262(i)(2), (k); Sandoz, 582 U.S. at 7.  A biosimilar "is a biologic product that is highly similar to a biologic product that has already been approved."  Sandoz, 582 U.S. at 5.

The Defendants' BLA for its biosimilar product, Yesafili, relies on the Eylea BLA data as the reference biologic product

4

Appx6

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

under the statute.  (ECF No. 1, ¶ 3; ECF No. 435, Answer to ¶ 3).

To compensate the reference product sponsor ("RPS"), here Regeneron, for the use of these data, Congress grants the RPS a valuable twelve (12) years of marketing exclusivity, independent of any patent protection to which it is entitled.  Sandoz, 582 U.S. at 7 ("the manufacturer of a new biologic enjoys a 12-year period when its biologic may be marketed without competition from biosimilars").  Regeneron's marketing exclusivity period (which includes an additional extension for performing a pediatric study) is set to expire on May 18, 2024.  ECF Nos. 5, 7.

C.   **Procedural Background**

By letter dated January 5, 2022, Mylan notified Regeneron that "FDA has received a BLA from Mylan for M710, a proposed biosimilar to aflibercept, which was submitted under 42 U.S.C. § 62(k)."  By letter dated February 22, 2022, Regeneron served on Mylan a list of patents pursuant to 42 U.S.C. § 262(l)(3)(A), that Regeneron believed "could reasonably be asserted against a person 'engaged in the making, using, offering to sell, selling or importing into the United States of the biological product that is the subject of' Mylan's BLA No. 761274."  Regeneron's list of patents pursuant to 42 U.S.C. § 262(l)(3)(A) included each patent-in-suit as well as additional patents.  Mylan subsequently served

5

1:22-CV-61

**SEALED**

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

detailed statements related to the identified patents, on April 14, 2022, pursuant to 42 U.S.C. § 262(l)(3)(B).  Regeneron provided its responsive detailed statements on June 10, 2022, pursuant to 42 U.S.C. § 262(l)(3)(C).  The parties conducted negotiations pursuant to 42 U.S.C. § 262(l)(4)(A) and exchanged lists of patents to litigate pursuant to 42 U.S.C. § 262(l)(5)(B).

Pursuant to 42 U.S.C. § 262(l)(6)(B), Regeneron brought suit against Mylan on the patent-in-suit, among other patents, on August 2, 2022.[3]  In accordance with the Court's Scheduling Order, following claim construction, Regeneron reduced its asserted patents and claims to claims 11, 19, and 27 of the '601 Patent, claims 4, 7, 9, 11, and 14-18 of the '865 Patent and claims 6, 7, 12, 13, 18, 19, 22, 23, and 25 of the '572 Patent.  (ECF No. 433).  Regeneron also stipulated to the invalidity of claims 5-6 and 9 of the '601 Patent and claims 1-5, 8-11, 14, 26-28 of the '865 Patent under the Court's claim construction.  <u>Id.</u>

Thereafter, the parties filed cross motions for summary judgment, which the Court denied.  (ECF Nos. 428, 429, 525).  The Court held a final pretrial conference on May 30, 2023.  (ECF No.

---

[3] Regeneron sued on 24 patents, U.S. Patent Nos. 7,070,959; 9,222,106; 9,254,338; 9,669,069; 9,816,110; 10,130,681; 10,406,226; 10,415,055; 10,464,992; 10,669,594; 10,857,205; 10,888,601; 10,927,342; 10,973,879; 11,053,280; 11,066,458; 11,084,865; 11,104,715; 11,174,283; 11,186,625; 11,253,572; 11,299,532; 11,306,135; and 11,332,771.  (ECF No. 1, ¶ 6).

6

Appx8

REGENERON V. MYLAN                                            1:22-CV-61

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

512).   The Court denied the Defendants' request to challenge inventorship, and to challenge the enforceability of the claims based on inequitable conduct.   (ECF No. 524, 1-2).

**D.   Technical Background**

The general background to this art involves biologic molecules, and their use as anti-VEGF compounds.

**1.   The aflibercept molecule and anti-VEGF clinical targets**

**a.   Vascular endothelial growth factor ("VEGF")**

In the early 1990s, targeted gene inactivation studies in mice showed that a particular signaling compound in the body called Vascular Endothelial Growth Factor (VEGF) "is necessary for the early stages of vascular development."   (DTX 3619.8; DTX 4041.2). In layman's terms, this growth factor stimulates the body to assemble cells to grow new blood vessels.   Angiogenesis is the beginning part of that process to signal new blood vessel growth.

VEGF-mediated angiogenesis is a normal part of human functioning.   (DTX 4041.2)   But too much of the VEGF protein can lead to undesirable effects, such as blood vessel growth for cancerous tumors, or abnormal growth of blood vessels under the retina in the eye, which can lead to fluid leakage or undesirable blood vessel growth in and around the retina.   <u>Id.</u>; Tr. 111:5-15

Appx9

REGENERON V. MYLAN                                          1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

(Yancopoulos);  Tr.  280:8-25,  282:18-24,  287:8-17  (Csaky);  Tr. 921:18-922:3 (Albini).

By 1993, "Ferrara and colleagues" showed that anti-VEGF antibodies "could inhibit the growth of several human tumor types" in  mice;  but  varying  results  based  on  targeting  pathways "highlighted the need to optimize blockade of this [VEGF] pathway." (DTX  3592.3).   Regeneron's  early  patents,  including  one  that published in 2000, noted that "[p]ersistent angiogenesis may cause or exacerbate certain diseases such as . . . diabetic retinopathy and neovascular glaucoma. An inhibitor of VEGF activity would be useful  as  a  treatment  for  such  diseases  and  other  VEGF-induced pathological  angiogenesis  and  vascular  permeability  conditions, such as tumor vascularization."  DTX 3619.6, ll. 8-13; see also DTX 3619.36-37 (anti-VEGF compounds are useful for treating "eye disorders  such  as  age-related  macular  degeneration  and  diabetic retinopathy")).

VEGF  binds  to  receptors  in  the  body.   (Tr.  111:5-9 (Yancopoulos); DTX 3619.5-6).  A "portion of the receptor that is displayed  on  the  surface  of  the  cell"  is  "generally  the  most distinctive portion of the molecule."  (DTX 3619.2).  One of these receptors was designated as Receptor 1 ("R1"), another as Receptor 2 ("R2").  PTX 3333.25.  "VEGF-R1 binds to VEGF with [the] highest affinity."  (Id.)  Anti-VEGF compounds were designed to mimic these

8

Appx10

REGENERON V. MYLAN                                                    1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

receptor binding sites, to capture circulating VEGF before it reaches a receptor in the body.  (DTX 4041.3, 5; Tr. 111:18-112:1 (Yancopoulos)).

### b.   The therapeutic goal and structural rationale for aflibercept

Regeneron identified the therapeutic goal that it sought to solve with its aflibercept molecule: "produce a receptor based VEGF antagonist that has a pharmacokinetic profile that is appropriate for consideration of the antagonist as a therapeutic candidate," and which has "improved pharmacokinetic properties as compared to other known receptor-based VEGF antagonists."  (DTX 3619.29-30).  Pharmacokinetic properties of the drug are commonly assessed to see how the drug is absorbed, distributed, moves and works, and then eventually metabolizes, through the body.  (Tr. 461:2-8 (Furfine)); see, e.g., Persion Pharms. LLC v. Alvogen Malta Operations Ltd., 945 F.3d 1184, 1187 (Fed. Cir. 2019) (noting pharmacokinetic effects included clinical effects such as blood concentration levels of the drug, and side effects associated with administering the drug).

Aflibercept is a man-made protein.  (Tr. 448:1-8 (Furfine)). Regeneron disclosed in the prior art that it had prepared anti-VEGF compounds, which had one segment designed to mimic the VEGF binding segments of the R1 and R2 receptors, fused together; and

9

Appx11

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

then an antibody segment, allowing the whole molecule to more strongly bind to VEGF. (DTX 3619.11-14, 16; Tr. 114:1-17 (Yancopoulos); Tr. 448:1-8 (Furfine) ("Aflibercept is a man-made . . . protein where you take two receptors that are normally on the surface of the cell and you genetically engineer them to be on an antibody part" called "the Fc domain," and "that creates a drug")).

The full protein sequence of the R1 receptor "has poor pharmacokinetics that make it difficult to use as a therapeutic agent," so modifying it in the way that Regeneron did (including replacing some parts with parts of the VEGF R2 receptor region) produced a molecule with better pharmacokinetics, including, _e.g._, VEGFR1R2-FcΔC1(a). (DTX 3619.59-60).

One of the preferred embodiments that Regeneron disclosed was the fusion polypeptide that had "the amino acid sequence set forth in Figure 24A-24C," which was VEGF$_{R1R2}$FcΔCl(a). (DTX 3619.16, 60, 23 ("Figure 24A-24C. Nucleotide and deduced amino acid sequence of the modified FIt1 receptor termed VEGFR1R2FcΔCl(a)")).

Regeneron secured a patent to the aflibercept molecule, the '959 patent, which issued in 2006. (DTX 7.1; Tr. 1432:23-1433:23 (MacMichael)). Example 20 of the '959 patent explains how to prepare VEGFR1R2FcΔCl(a), and provides the complete sequence

10

Appx12

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

across Figures 24A-24C.  (DTX 7.73, 29:13:29; DTX 7.63, 9:65-67; DTX 7.42-44).

Regeneron has assigned various descriptors to the molecule known as aflibercept, including VEGF Trap, VEGF Trap-Eye (formulated for use in the eye); and VEGFR1R2FcΔCl(a).  (DTX 4008.1, DTX 7.63, 9:65-67, DTX 3592.3 (describing structural features of protein "that we term VEGF Trap"); DTX 4957.5 ("[VEGF Trap-Eye] has been purified and formulated in concentrations suitable for direct injection into the eye."); Tr. 1227:9-12 (Chu 30(b)(6)); Tr. 208:25-209:10 (Yancopoulos); Tr. 1432:8-1438:24 (MacMichael)).

   **2.   Early anti-VEGF performance:  non-human data**

Before a drug goes into human use, it is required to be tested in preclinical animal models pertaining to the mechanism of action and/or for the disease, and to get a sense of what range of doses will likely work to accomplish the drug's effect.  (Tr. 459:2-21, 462:15-465:14 (Furfine)).

      **a.   Establishing aflibercept's anti-angiogenic effect, dose amounts**

By 2002, Regeneron published papers in the scientific literature touting aflibercept's potency.  In Holash, Regeneron explained its "hope" that "anti-VEGF approaches can be generalized to many different types of cancer, as well as to other diseases in

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

which pathologic angiogenesis contributes, such as diabetic retinopathy." (DTX 3549.1). Regeneron stated that it had "engineer[ed] a very potent high-affinity VEGF blocker" with "prolonged <u>in</u> <u>vivo</u>" activity, which "lacks nonspecific toxicities, and can effectively suppress the growth and vascularization of a number of different types of tumors <u>in</u> <u>vivo</u>." (<u>Id.</u>) Regeneron reported that its studies using cell lines and rats "indicated that VEGF-Trap$_{R1R2}$ has the potential to be a long-term and potent pharmacologic blocker of VEGF-mediated activities <u>in</u> <u>vivo</u>, far superior to that of parental VEGF-Trap." (DTX 3549.4). Regeneron reiterated that this "combination of high-affinity and improved pharmacokinetics apparently contributes toward making VEGF-Trap$_{R1R2}$ one of the most, if not the most, potent and efficacious VEGF blocker available." (DTX 3549.5; Tr. 114:14-17 (Yancopoulos)).

Much of Regeneron's early work with aflibercept focused on the anti-angiogenic effects of the drug in connection with cancer applications. (Tr. 449:14-16 (Furfine); PTX 3333.27). But Regeneron also assessed the anti-angiogenic effects of aflibercept in animal eyes specific to treating eye disease. In 2003, Saishin et al. reported their results with both subcutaneous and intravitreal injection of aflibercept into mice eyes. (DTX 2751.1; Tr. 1050:24-1051:11, 1080:10-18 (Rabinow)). The authors confirmed that VEGF-TRAP$_{R1R2}$ given as a single intravitreous injection

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

"markedly suppressed the development of choroidal neovascularization over the course of two weeks." (DTX 2751.7). While the subcutaneous dosing method also produced good results, it required five injections to produce the reported results. (DTX 2751.4; Tr. 1090:5-22 (Rabinow)).

After seeing aflibercept's performance in vivo in mice and rats, the next step was to assess how it performed in primates, and better identify the dose ranges to target. Regeneron specifically assessed which primate doses produced the desired anti-angiogenic effects. (Tr. 1067:9-22 (Rabinow)). Fraser et al. published these results in 2005, reporting among other things "the minimal dose of VEGF Trap$_{R1R2}$ that would be required to interrupt follicular development," which is the time period when angiogenesis occurs, and whether the dose amount impacted the "duration" of the anti-VEGF effect. (DTX 729.2). Fraser reported that the "VEGF Trap$_{R1R2}$ was well tolerated at all doses tested." (Id., 3). The 4 mg/kg and the 1 mg/kg doses "resulted in a significantly longer" period of activity compared to the lower doses. (Id., 5).

In 2005, Regeneron's published patent application reported the results of aflibercept injections into mouse eyes, including intravitreally. (DTX 4229.24 [0031]).

13

Appx15

REGENERON V. MYLAN                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

In U.S. Patent No. 7,303,747 ("the '747 patent"), which published February 9, 2006, and which issued on December 4, 2007, Regeneron characterized the disclosed invention as involving a "therapeutic method for treating or ameliorating an eye disorder," including "age related macular degeneration" and "diabetic retinopathy." (DTX 2730.13, 1:49-54). The compounds preferred to use for this purpose included VEGFR1R2FcΔCl(a). (Id., 1:64-2:2). Regeneron disclosed that the initial dose should be "at least approximately 25-4000 micrograms [4 mg] VEGF inhibitor protein to an affected eye." (Id., 2:14-15; DTX 2730.16, 7:52-55). The '747 patent included preclinical data that tested VEGFR1R2FcΔCl(a), aflibercept, in various retinal models in animals, reporting good results with intravitreal injections. (DTX 2730.13-14 (referencing data in Figures 4-9)). The '747 patent confirms that "[p]referably" the drugs would be administered "directly to the eye," including through "intravitreal injections." (DTX 2730.16, 7:5-10). The aqueous solutions would have "ophthalmically compatible pH and osmolality." (Id., 7:26-28).

The intravitreal injections in the Examples were dosed at 50, 250, or 500 mcg/eye [0.05, 0.25, or 0.5 mg doses/eye]. (DTX 2730.20, 15:2-4). The specification reports that "a single intravitreal injection (500 mcg) [0.5 mg] of VEGFR1R2-FcΔCl(a)

14

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

made following the laser injury [to the eye] reduced the incidence of grade 4 lesions from 44% to 0% within 10 days of treatment." (Id., 15:19-23).  Example 16 tested VEGFR1R2FcΔCl(a) to assess the "ability of an intravitreally administered protein to reach the desired site of action, i.e. the macula in the case of macular degeneration," and concluded that it would in fact reach "both ocular tissue (vitreous humor, retina and choroid) and that "if a compound is delivered into the vitreous humor, it can be cleared from that region and be distributed into the surrounding tissue, i.e. retina and choroid." (DTX 2730.21-22).  The larger VEGF trap protein stayed in the eye tissue longer in comparison to its smaller mini-VEGF trap version.  (DTX 2730.22).  The specification then proposed treatment in human patient eyes, including that the "eye to be treated is injected with 25-4000 micrograms [4 mg] of VEGF trap protein in an ophthalmic solution." (Id. (Example 17)).

**b.   Other anti-VEGF compounds: dosing methods**

Regeneron closely monitored Genentech, as well as how Genentech planned to dose its anti-VEGF compounds. (See, e.g., Tr. 448:16-449:6 (Furfine); DTX 710.1 (noting Genentech had dosed ranibizumab in rabbits subconjunctivally, intracamerally, and intravitreally)).  By March 1, 2004, Genentech reported the

15

Appx17

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

"highest levels [of ranibizumab were] observed for ITV," intravitreal doses.  (DTX 710.2).

Genentech compared how ranibizumab performed intravitreally and intravenously in monkeys, confirming by January 2005 that based on the systemic clearance rates, ranibizumab would be "favorable for its clinical use in treating neovascular AMD by monthly ITV injection."  (DTX 2265.1; DTX 714.1 (Regeneron calling the Gaudreault paper a "nice find").  Gaudreault likewise evaluated different dosing ranges in primates.  (DTX 2265.2 (February 2005 publication by Gaudreault, comparing the performance of intravitreal and intravenous formulations, including 10 mg/mL and 40 mg/mL in 50 microliters dosed intravitreally)).

> c. **The human clinical activity with anti-VEGF compounds**

By 2005, clinicians pursued anti-VEGF strategies, including with intravitreal injections, to treat their patients.

> i. **The first FDA-approved anti-VEGF agent: Macugen**

The anti-VEGF agent, Macugen (pegaptanib), was in Phase I clinical studies as early as April 1999, and had proceeded to Phase II/III studies by 2001.  (DTX 209.2-3).  In the Phase III studies, "1186 patients were enrolled to test the efficacy of intravitreal injections of pegaptanib every six weeks."  (DTX 209.3).  By August

16

Appx18

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

31, 2004, Regeneron knew that the FDA's advisory committee had considered the Phase III clinical and safety data, and that "70% of patients met the primary endpoint" of "patients losing less than 15 letters, or three lines, of visual acuity on the eye chart from baseline after 54 weeks." (DTX 209.1, 5). FDA approved Macugen in December 2004. (DTX 4041.1).

> **ii.    Avastin—approved as an anti-VEGF cancer drug, but used by physicians intravitreally to target wet AMD and DME**

FDA approved the anti-VEGF Avastin (bevacizumab) as an intravenous anti-cancer therapy in February 2004. (DTX 210.2). By March 3, 2005, the Bascom Palmer Eye Institute issued a press release (which Regeneron received) confirming that it had used Avastin to treat wet AMD. (DTX 210.1; Tr. 1240:22-1242:19 (Chu 30(b)(6))). The study's lead, Dr. Phil Rosenfeld, explained that "[w]e've been injecting anti-VEGF drugs into the eye for the past 3 years with very encouraging results." (DTX 210.1). Dr. Rosenfeld also studied systemic patient dosing because even though "[s]ome people would rather have an injection in the eye than worry about the risks from a systemic drug" systemic dosing would offer "a new potential option for patients with wet AMD." (DTX 210.2). He acknowledged that "the potential disadvantage" of Avastin given systemically was "the risk of systemic side-effects," but

17

Appx19

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

indicated that thus far, patients' blood pressure increases were readily controlled with medication.  (Id.)

Shortly thereafter, in July/August 2005, Dr. Rosenfeld and others published further details about their intravitreal Avastin injection process, confirming that Avastin produced efficacious results in a human patient, when injected intravitreally at a concentration of 25 mg/mL.  (DTX 3058.2; Tr. 528:2-12 (Furfine); DTX 3510; DTX 2264.1-2; DTX 9036.5-6 (Avery publication from March 3, 2006 dosing 1.25 mg of Avastin in 0.05 mL); DTX 9036.3 (library receipt page showing Avery publication received by March 3, 2006)).  The injections were described as "well tolerated in all patients," with no ocular toxicity, "or thromboembolic events," or "significant elevation" in blood pressure "observed over the course of the study."  (DTX 2264.3; DTX 9036.7).  The "vast majority of patients demonstrated stability or improvement" of their visual acuity," and four weeks after the injections, many "demonstrated complete resolution of retinal edema"; even some non-responders "also showed resolution" after they "received reinjections at week 12."  (DTX 2264.3-4; DTX 9036.7-8).

Avery also addressed the theory in the literature that had warned that there might be a "lack of retinal penetration beyond the [internal limiting membrane] after intravitreal administration of full-length antibodies," which was plainly contradicted by "the

REGENERON V. MYLAN                                          1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

apparent rapid biologic effect demonstrated in this current study

with bevacizumab." (DTX 2264.8; DTX 9036.12). Avery proposed

that the use of a larger dose, human anatomy versus primate

anatomy, and the methodology used in the primate studies could

account for why the theory did not lead to failure for bevacizumab.

(Id.)

Avastin was then tested in clinical trials on extended dosing

intervals, with Bashur et al. reporting in 2008 that after three

monthly injections, visual acuity gains could be maintained for

several months by giving just 3.4 injections on average for the

remainder of the year. (DTX 4013.1; Tr. 768:2-10 (Albini)).

### iii.    Lucentis (ranibizumab)

At the July 2005 American Society of Retinal Specialists

meeting," the results from a "large phase Ill clinical trial"

demonstrated that ranibizumab was "effective in the treatment of

neovascular AMD." (DTX 2264.1-2; DTX 9036.5-6). The active

ingredient in Lucentis, ranibizumab, is an antibody fragment. Tr.

2014:5-7 (Trout); Tr 1832:11-1833:1 (Csaky); Tr. 113:7-18

(Yancopoulos); Tr. 452:7-14 (Furfine).

Dr. Rosenfeld presented his one-year PrONTO outcomes at the

May 2006 Association for Research in Vision and Ophthalmology

("ARVO") meeting. (DTX 218.2; DTX 3131.3 (dosing patients on a

PRN basis after 3 monthly doses)). On May 9, 2006, Regeneron

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

internally circulated a copy of Dr. Rosenfeld's press release about the study, including that he had dosed ranibizumab using intraocular injections for wet AMD, and that most patients had only needed 5 or 6 injections in the year. (DTX 218.1-2). He reported that "82% of patients had the same or better vision after one year and 35% of patients experienced a two-fold improvement in vision as defined by gaining three lines of vision on a standardized visual acuity chart." (<u>Id.</u>, 1). Dr. Rosenfeld did this work even though Lucentis had not yet been officially approved by FDA, and was still being tested in Phase III studies. (<u>Id.</u>, 2).

By May 4, 2006, Genentech's patent to Dr. Shams published. Example 1 included a study protocol for the "efficacy and safety of intravitreal injections of VEGF antagonist (e.g., ranibizumab) administered monthly for 3 doses followed by doses every 3 months." (DTX 726.32).

FDA approved Lucentis for wet AMD in June 2006. (<u>See</u> DTX 3040.1). By October 5, 2006, Dr. Rosenfeld and others published the successful Phase III clinical trial results with monthly dosing of ranibizumab for wet AMD in the New England Journal of Medicine. (DTX 2034). Mitchell summarized data for the ANCHOR monthly dosing (2006), PRONTO PRN dosing (2007), and EXCITE quarterly dosing (2008), showing visual acuity gains over many months of time. (DTX

Appx22

**SEALED**

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

4061.4; see also DTX 3115.1 (Fung, Rosenfeld et al. reported on using OCT to guide extended-interval dosing after three monthly loading doses)).

Once the efficacy of ranibizumab for AMD was established, doctors quickly began using it for other indications, namely DME, DR, and RVO, and also on extended dosing intervals. One review article summarizing DME clinical work included Lalwani 2009, where patients received three monthly doses of ranibizumab (baseline, month 1, month 2), followed by dosing at an extended two month interval, at months 4 and 6, for a mean gain of 8 letters by month 12. (DTX 2733.1; Tr. 768:24-769:14 (Albini)).

### iv.    Aflibercept

Regeneron initially began its aflibercept work for cancer indications, as part of a partnership with Sanofi. (Tr. 112:19-20 (Yancopoulos); DTX 4956.3-4). Regeneron disclosed that the "results in animal models have supported the exploration of the VEGF Trap in human studies of vascular eye diseases. Initial clinical studies in human patients suffering from both AMD and diabetic edema and retinopathy appear quite promising, with evidence in early trials that the VEGF Trap can rapidly and impressively decrease retinal swelling." (DTX 3592.4)

21

REGENERON V. MYLAN                                         1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL
_____

> **a)   Regeneron tries, and rejects, systemic
>        aflibercept   and   instead   pursues
>        intravitreal aflibercept for human use**

Regeneron initiated its first Phase I study with aflibercept
through intravenous delivery, by January 2004.  (DTX 207.1-2; Tr.
1238:13-19 (Chu)).   Like Dr. Rosenfeld, Regeneron initially
thought that the ability to dose the drug systemically would be an
advantage over direct injection into the eye.  (DTX 207.2; DTX
210; Tr. 1240:24-1242:5 (Chu)).   Regeneron also secured and
published its systemic dosing results in humans in the '747 patent,
which published in February 2006.  (DTX 2730.23).   At the higher
3.0 mg/kg dose group, 2 of the 5 patients experienced adverse
events, causing them to all be "prematurely withdrawn from [the]
study." (DTX 2730.23, 21:39-22:1)).

Thus, not surprisingly, in its SEC Form 10-K filed in March
2005, Regeneron confirmed its "plan to initiate a clinical trial
of the VEGF Trap delivered through intravitreal injection in mid-
2005.  While use of the VEGF Trap for eye diseases using systemic
delivery remains part of our collaboration with sanofi-aventis, we
and sanofi-aventis do not currently intend to pursue further
clinical development using systemic delivery of VEGF Trap for eye
diseases."  (DTX 4956.4; id., 119 (publication date March 11,
2005)).

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Regeneron additionally released its intravenous aflibercept results for AMD at the ARVO meeting in May 2005. (DTX 211.6-7). Regeneron's briefing document listed its objectives for this 2005 ARVO meeting. Regeneron planned to increase "awareness of the VEGF Trap as [a] promising compound for the treatment of neovascular diseases," (DTX 211.2), reporting that Regeneron had "successfully completed the Phase I study of intravenous VEGF Trap in wet AMD," and identifying the maximum tolerated dose (MTD) for systemic VEGF Trap administration, (id., 3). Regeneron planned to represent that "[n]o unexpected side effects were observed during the systemic Phase I trial," that "[p]roof of concept was obtained for both ITV [intravitreal] and systemic deliveries in a primate model of CNV," and that VEGF Trap had "demonstrated pre-clinical efficacy" when given intravitreally. (Id.) Regeneron also planned to explain that in view of the systemic side effects, it would "continue development with an ITV formulation to maximize VEGF Trap therapeutic benefit," with this "ITV phase 1 study" to begin "this year." (Id.; id., 14 ("ITV formulation chosen to maximize therapeutic benefit"); see also DTX 214.2.

Regeneron also planned to discuss its belief that the intravitreal dosing approach would "allow[] for a longer interval between injections when administered intravitreally," and that "[e]xpansion into other ophthalmic indications including, but not

23

REGENERON V. MYLAN                                        1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

limited to, diabetic macular edema is also a possibility." (DTX 211.3-4) Copies of the abstracts submitted to ARVO for the May 2005 meeting are at DTX 211.8-13; and are likewise referenced on Dr. Yancopoulos' CV. Thus, Regeneron's intent to dose aflibercept through the intravitreal route to treat eye diseases such as AMD and DME was known to a person of ordinary skill in the art by 2005.

Karen Chu confirmed that the intravitreal dose-ranging study No. 0502, the CLEAR-IT-1 study, was also performed in 2005, and used dose amounts that included 1, 2 and 4 mg, and at 40 mg/mL concentrations. (Tr. 1645:3-1646:21 (Chu); DTX 9005.23). Regeneron announced the results of this dose-ranging study at least by February 2006. (Tr. 1649:5-1650:2 (Chu); DTX 4957.5 ("In February 2006, [Regeneron] announced positive preliminary results from an ongoing Phase I dose-escalation study of the VEGF Trap-Eye")). By March 21, 2006, Regeneron also had submitted its Phase I intravitreal study data, called "CLEAR-IT 1," to the American Society of Retinal Specialists ("ASRS") to present at its meeting in the fall of 2006; Regeneron presented this data again at ARVO in May of 2006. (DTX 216 (confirming ASRS submission); DTX 9006.12 (reference 56); Tr. 1647:11-1648:22 (Chu)). The CLEAR-IT 1 abstract reported that intravitreal injections "of up to 4 mg of VEGF Trap has been well-tolerated." (DTX 216.3; Tr. 1650:7-22 (Chu)).

24

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

In early 2006, Regeneron also sought input from key opinion leaders to guide Regeneron's next steps for clinical trial design, including whether clinicians would continue to dose with Avastin, or adopt the PIER loading doses with Lucentis, as well as to seek guidance for how best to dose DME.  (DTX 212; DTX 213.1 ("How will Lucentis be used in practice?  Monthly . . . Induction followed by quarterly maintenance . . . Induction followed by PRN"; "Will off-label use of Avastin still be rampant after Lucentis is approved"); DTX 213.2 ("How Important is dose frequency?")).

After Dr. Rosenfeld presented his results with less frequent injections with Lucentis from the PrONTO study, Regeneron noted internally that the results "may suggest that the so-called 'clinician prn practice' following 'induction dose' is as good as monthly injections for at least the first year, and that is probably the take home message that the market will follow."  (DTX 220.1).  Since Lucentis showed effectiveness for 6-8 weeks, Dr. Avner Ingerman suggested that there would be a "potential advantage, of showing comparable efficacy, or even a slightly lower efficacy, and have a win on label dosing interval."  (Id.)  Dr. Yancopoulos likewise noted that since Lucentis could not last for a full 2 months, this "may provide us [a] major opportunity for VEGF Trap interval advantage!"  (DTX 220.2).

25

Appx27

REGENERON V. MYLAN                                    1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

By August 2006, Regeneron had reached out to Dr. Rosenfeld to get his input on their VEGF Trap-Eye data, including for DME.  Dr. Rosenfeld suggested that Regeneron had a "better probability of showing a more durable treatment effect" compared to Lucentis, and recommended that Regeneron pursue the 2 or 4 mg dose, "which is a 4-fold molar excess over Lucentis with a good chance of better durability," and then dose "every 2 weeks or 4 weeks for a fixed number of doses then see the patients back every 4 weeks and dose as needed."  (DTX 222.1).  Regeneron's CEO, Len Schleifer, told Dr. Yancopoulos that dosing plans should be finalized "when we know more about our partnering efforts."  (Id.)

By February 2007, the European regulatory authorities approved Lucentis with a dosing regimen that included "a loading phase of one injection per month for three consecutive months, followed by a maintenance phase in which patients should be monitored for visual acuity on a monthly basis."  (DTX 913.1).

Regeneron discussed with its development partner Bayer its ideas of how aflibercept "could even be better than Lucentis." Tr. 112:7-113:18 (Yancopoulos).  As the field recognized, a significant drawback of the primary dosing regimen in Lucentis's label was that it required monthly intravitreal injections of Lucentis, subjecting patients to the very unpleasant experience of having a needle inserted into their eye once a month.  See Tr.

26

Appx28

**\*\*SEALED\*\***

<u>**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**</u>

129:1-17 (Yancopoulos); Tr. 290:16-291:8 (Csaky).  Dr. Yancopoulos thus hoped to develop an aflibercept regimen that would allow the drug to attain either improved patient outcomes, or an extended dosing interval, or both, compared to Lucentis.  He sought to reduce "the very significant onerous treatment burden of monthly treatments" and "cut the number of treatments by half," that would "be game-changing for these patients and their caregivers and the doctors."  Tr.  124:11-125:1  (Yancopoulos);  Tr.  128:9-15 (Yancopoulos).

By March 2007, Dr. Jesse Cedarbaum proposed that in order to "not have to wait for the 80 mg/mL formulation," which had "formulation issues," Regeneron should proceed with the 2 mg dose for the Phase III clinical trials, and that he "could get behind an 8 week interval in place of 12" based on the loss of 8-10 days of half-life exposure due to using the lower dose.  (DTX 226.1).

On April 2, 2007, the Regeneron/Bayer joint development team reported a decision to use a dosing regimen of "2mg q8wks w/PlER lead in (dose monthly for 1st 3mths)."  (DTX 227.1; Tr. 1258:12-1259:1  (Chu  30(b)(6))).   On  April  5,  2007,  Robert  Terifay, Regeneron's head of marketing, noted that having sat with the joint development team to review the CLEAR-IT 2/0508 data, it was clear that "Q8 weeks dosing appears to maintain visual acuity better than Q12 weeks dosing," which justified pursuing the 8-week dosing

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

interval.  He explained the marketing advantages of having a label with an advantage over the Lucentis interval, particularly for drug pricing.  (DTX 229.3; DTX 230 (Terifay April 18, 2007 e-mail emphasizing marketing advantages); Tr. 1249:14-19 (Chu (30(b)(6))).

By May 2007, Regeneron released the CLEAR-IT 2 Phase II study data for aflibercept intravitreal injections.  (See DTX 232; DTX 234; Tr. 1264:4-1265:15 (Chu 30(b)(6)) (confirming data were presented and public)).  Regeneron also published its Phase I DME data, including that its intravitreal injection of a 4 mg dose was "well tolerated" with "no serious drug-related adverse events," and mean BCVA improvements of 2.6 to 6.8 letters by 6 weeks with just a single injection.  (DTX 234.3).

Regeneron ultimately submitted to the FDA its Phase III clinical trial plan for 3 monthly doses, followed by every-8-week dosing.  FDA announced that the Phase III study would commence in August 2007 on its clinicaltrials.gov website on or around August 1, 2007.  (DTX 231.2, 8).

Dixon published that Regeneron's Phase III clinical trials included an arm that had 3 doses given 4 weeks apart, followed by dosing every 8 weeks.  (DTX 204.4).  Regeneron announced that its Phase III clinical trials met their primary endpoint on November 22, 2010.  (DTX 917.1).

REGENERON V. MYLAN                                           1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL
v.    Design of methods for using anti-VEGF agents

The development of any method of treating angiogenic eye disorders using anti-VEGF agents entails a number of design decisions.  The testimony at trial reflected that for any given dosing regimen, the POSA would need to consider the dosage amount, the route of administration, the frequency of administration, the concentration of drug to be administered, whether to use loading doses at the outset of treatment, the number of loading doses to be used, and the duration and frequency of any maintenance doses. Tr. 862:15-863:18 (Albini).

In the context of anti-VEGF therapies, the concept of "loading doses" refers to treatments given one after another, on a fixed schedule, administered unconditionally without personalized decision-making based, for example, on the progression of a patient's disease as measured by Optical Coherence Tomography ("OCT") scans.  Tr. 1849:3-25 (Csaky).

The remainder of the treatment schedule (sometimes referred to as the maintenance or extended dosing phase) then can involve various strategies to treat the patient going forward and, ideally, less than monthly injections.  For example, in the general time period of 2007-2011, physicians began to make use of a dosing strategy generally called pro re nata ("PRN"), meaning as-needed

29

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

dosing. See Tr. 305:18-306:13 (Csaky); Tr. 1877:7-11 (Csaky). PRN dosing generally entailed administering loading doses and then seeing the patient on a fixed schedule going forward (often, but not always, monthly), where the patient would be assessed at regular intervals using an OCT scan that determined whether fluid had begun to reaccumulate in the eye, and then administered a dose of the anti-VEGF agent if fluid had recurred. Tr. 305:18-306:13 (Csaky); Tr. 1819:15-1822:22 (Csaky); DTX-3131 at 11; see also PDX 8.004.

In clinical practice, retina specialists also began using an approach called "treat and extend," in which, following loading doses, the treating physician would attempt to extend the interval for both visits and re-treatment. Tr. 773:16-774:9 (Albini) (describing treat-and-extend). If OCT indicated fluid had recurred at the time of an attempted extended interval visit, the physician would scale back the interval to the prior interval that did not result in the reaccumulation of fluid.

Both PRN and treat-and-extend strategies differ from fixed extended dosing regimens. In the latter, a doctor injects patients at fixed intervals regardless of whether fluid has reaccumulated according to an OCT scan. Tr. 1824:22-1825:6 (Csaky) (fixed extended dosing regimens are "completely different" than OCT-based, individualized retreatment approaches); Tr. 1825:12-25

30

Appx32

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

(Csaky) (fixed approaches differ from personalized approaches); see also Tr. 776:5-20 (Albini) ("there were fixed regimens" and "there were also individualized regimens that sought to evaluate patients and make decisions about whether or not to reinject on a patient basis."); Tr. 835:1-16 (Albini) (distinguishing between PRN treatment and "fixed regimens like monthly dosing"). While PRN and treat and extend treatment methodologies entail "conditional" decisions to retreat a patient, Tr. 1825:3-6 (Csaky), fixed interval strategies do not. Tr. 1825:3-6 (Csaky); Tr. 776:5-20 (Albini); Tr. 781:19-782:7 (PRN dosing means making "decisions . . . whether or not to inject based on clinical measures and imaging findings for that patient") (Albini). The parties agreed that the claims at issue at trial described "loading doses" followed by "subsequent eight-week injections," Tr. 777:25-778:7 (Albini); see Tr. 780:2-10 (Albini) ("eight-week injections"); Tr. 778:20-779:5 (Albini) ("q8-week regular dosing."). Those subsequent eight-week fixed interval injections may be referred to as "maintenance doses" after the initial loading dose treatment phase. Tr. 301:10-23 (Csaky).

vi.     **Prior Art efforts to develop extended dosing regimens**

The parties also largely agreed on a key point at trial: prior to 2011, efforts to attempt fixed extended dosing regimens to

31

Appx33

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

maximize the time that patients could go between intravitreal injections heavily focused on individualized treatment strategies using PRN and treat-and-extend regimens. Tr. 1819:15-20 (Csaky) (personalized approaches were the predominant method for extended dosing prior to 2011); Tr. 875:2-6 (Albini) (most physicians were using personalized approaches in 2010 to 2011). PRN had been widely accepted in light of new OCT technology, which allowed physicians to measure the recurrence of fluid that was believed to contribute to the impairment of vision in connection with angiogenic eye disorders. Tr. 1820:1-19 (Csaky). Dr. Csaky testified at trial that the emergence of OCT technology was critical to the development of personalized treatment strategies, because doctors could measure the fluid re-accumulation in each individual patient and decide whether to retreat or not. Tr. 1822:8-18 (Csaky).

The parties also largely agreed that pre-priority date efforts at fixed extended dosing regimens — *i.e.*, dosing schedules with intervals longer than one month — resulted in worse visual outcomes than monthly and PRN treatment schedules and had largely fallen out of favor. And the unrefuted evidence at trial is that the POSA's goal (like Regeneron's) would have been to improve upon the results that obtained with monthly ranibizumab for treating wet AMD, either in terms of visual acuity gains, or the interval

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

between doses to spare patients the inconvenience and unpleasantness of injections into the eye. Tr. 1816:4-24 (Csaky) ("[O]ur goals [pre-2011] were . . . to maximize patient's vision," "reduce the number of injections that we were giving to patients to achieve that maximum vision that we could offer them," "reduce the burden on having [patients] come to the office," and "ensure that we were doing these [injections] in a safe way and not exposing patients to undue risks."); Tr. 1822:23-1823:10 (Csaky) (attaining outcomes similar to monthly treatment was what the POSA was aiming for); 123:21-125:1 (Yancopoulos) ("Lucentis set a high bar, but the opportunities were we could either restore more vision or we could do exactly the same as Lucentis but perhaps . . . cut the number of treatments by half . . . ."); <u>see also</u> Tr. 134:21-136:3 (Yancopoulos); 1849:12-25 (Csaky); PTX-3333 at 42, 51. Dr. Yancopoulos testified that in developing his treatment regimen for AMD in particular, he was well aware of the trials that had shown less than promising results using fixed extended dosing regimens at both eight-week and 12-week intervals with ranibizumab. Tr. 130:25-132:5 (Yancopoulos); PTX-3333 at 46-47.

Efforts to achieve a fixed extended dosing regimen before the Treatment Patents' priority date were discouraging. Several clinical trials had tested ranibizumab in wet AMD at extended 12-week fixed dosing intervals following loading doses, with

33

REGENERON V. MYLAN                                              1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

disappointing results.   Tr.   129:18-130-17   (Yancopoulos);   Tr.
1916:7-16 (Csaky); PTX-3333 at 46; DTX-4061 at 6 (SAILOR).   Most
notably, the PIER trial even resulted in an eventual loss of vision
for patients once they entered the extended dosing phase.   Tr.
872:7-873:15 (Albini); see also PTX-1146 at 8 (EXCITE trial results
showing clinical superiority of monthly treatment regimen as
opposed to quarterly treatment regimen); DTX-4061 at 6 (SAILOR
trial results "indicated that quarterly visits were insufficient
to monitor and capture disease progression").   Indeed, even the
FDA-approved label for Lucentis notes that dosing every 3 months
will lead to an approximate 5-letter (1-line) loss of visual acuity
benefit."   DTX-4056 at 1.   PRN dosing regimens, in contrast, had
at least resulted in net vision gains, contributing to the uptake
of such regimens by physicians in clinical practice.   Tr. 1823:11-
25 (Csaky).   The PrONTO trial, for example, was a well-known
clinical trial that helped establish PRN as a recognized method of
treating patients with ranibizumab.   Tr. 869:25-870:23 (Albini)
(PrONTO trial contributed to the "wide adoption of prn dosing back
in the 2007-08 time frame"); Tr. 1822:24-1823:25 (Csaky).

Despite PRN's prevalence, the art in the years immediately
preceding the January 2011 priority date reflected the POSA's view
that the best treatment strategies for wet AMD and DME were
unsettled.   Both parties cited references describing that

34

REGENERON V. MYLAN                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

uncertainty, and Defendants' expert, Dr. Albini, agreed that as of 2010 "there was uncertainty as to what the best dosing approaches were for anti-VEGF agents," Tr. 864:6-8 (Albini).   One January 2010 article quoted Dr. Csaky as describing dosing approaches for Avastin, for example, as "all seat-of-the-pants," in part because there were no clinical trial-based guidelines.   DTX-9014; Tr. 1999:20-2000:23 (Csaky).

Regeneron sought to develop Eylea with the use of extended eight-week <u>fixed</u> dosing regimen. The fixed dosing regimens for aflibercept claimed in the '601 and '572 patents set monthly loading dose periods ("initial" and "secondary" doses) followed by eight-week fixed extended dosing intervals (or "tertiary" doses). Figure 1 of the '601 and '572 patents depicts this concept:



PTX-1 at 10-12, 21-22 ('601 patent); PTX-3 at 13, 15, 25 ('572 patent).   It shows an initial loading dose at the beginning of the treatment regimen, two additional loading doses administered at weeks 4 and 8, and the extended fixed dosing intervals every 8 weeks thereafter.   PTX-1 at 11-12; PTX-3 at 15.   This dosing

35

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

regimen and the others claimed in the '601 and '572 patents are not personalized to the individual patient. Tr. 1824:22-1825:6 (Csaky). Physicians do not alter treatment based on an individualized assessment of the patient's vision at any given visit, such as an OCT scan, a clinical examination, or visual acuity measurements. See Tr. 1849:3-18 (Csaky); Tr. 1864:6-11 (Csaky); Tr. 1875:14-1876:5 (Csaky); Tr. 864:18-866:23 (Albini). Instead, physicians treat patients on the "very regimented" schedule as set forth in the Treatment Claims. Tr. 1824:22-1825:6 (Csaky).

In designing its Phase 3 wet AMD trials, for example (the "VIEW 1 and VIEW 2" trials), Regeneron did not know whether its dosing regimen of 2.0 mg of aflibercept using three monthly loading doses, followed by an eight-week fixed extended dosing period would succeed, which is why it included a 2.0 mg monthly regimen as a treatment arm as well. Tr. 134:15-136:3 (Yancopoulos).

> **vii.     Challenges of developing treatment methods for anti-VEGF agents**

The parties' experts agreed that drug development is difficult and that the process of developing a drug does not end with the invention of the active molecule. Rather, developers must also create a stable formulation, and then test that drug product by gathering safety and efficacy data during Phase 1, 2,

36

Appx38

REGENERON V. MYLAN                                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

and 3 clinical trials and beyond.  In the context of drugs used to treat angiogenic eye disorders, Phase 1 trials seek "to make sure that nothing terrible happens to the eye" in "a small number of patients," Tr. 1826:17-1827:5 (Csaky), Phase 2 trials seek "to make sure there's a benefit" and "start to decipher a dose and some type of regimen that may or may not give us some ideas of activity," though they "typically are also underpowered," Tr. 1827:6-15 (Csaky), and Phase 3 trials are "the big ones" with "hundreds and hundreds, if not thousands, of patients" that are "able to demonstrate safety and efficacy for the FDA's requirements and then submission to the FDA for approval," Tr. 1827:16-22 (Csaky).  The POSA's knowledge of how a drug performs "expands as the number of patients increases in trials over time," and the POSA would know that information from each phase "can either confirm or contradict what you've seen in the preceding phase." Tr. 859:19-860:2 (Albini).

Phase 1 and 2 trials generate "early preliminary data that you try to use to design your definitive Phase 3" trials, "but you can't really count on those numbers and the information that you get there," which is why the FDA demands "not only one large Phase 3 but two large Phase 3 trials to make sure that you see it in very large numbers of patients and you repeat it and confirm it." Tr. 143:7-14, 144:13-145:24 (Yancopoulos).  Most drugs "do not

37

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

make it through the development process all the way through Phase 3," Tr. 1827:23-1828:6 (Csaky), and other anti-VEGF drugs have failed to demonstrate safety or efficacy during clinical trials and even after FDA approval, see Tr. 1828:7-1829:12 (Csaky). The POSA would have been aware that such a failure could arise at any time. As Defendants' clinical expert Dr. Albini acknowledged, not only can anti-VEGF drugs "get all the way to Phase 3 and still not make it to the market," but "further, a drug can pass Phase 3 and make it into the market and still fail in the real world." Tr. 860:11-861:23 (Albini).

The Court notes, based on the trial record that there was, and may still be, unpredictability in the art that relates to the development of anti-VEGF agents, and improvements in anti-VEGF therapy have not been easy to attain. For instance, both sides' experts referenced the widely recognized failure of another anti-VEGF treatment, Beovu, even after its Phase 3 clinical trials and FDA approval. Tr. 861:6-21 (Albini) (Beovu's significant safety issues only became known after it entered the market); Tr. 1829:6-12 (Csaky) (some patients using Beovu experienced occlusive vasculitis, resulting in blindness). Another anti-VEGF drug, KSI-301, failed its Phase 3 trial. Tr. 860:18-22 (Albini). And even Dr. Albini participated in the clinical trial of a drug called abicipar which also failed after late-stage clinical trials. Tr.

38

REGENERON V. MYLAN                                           1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

860:23-861:5 (Albini). Efforts to improve drug delivery through a port delivery system also have experienced difficulties. Tr. 1995:14-23 (Csaky) (port delivery system has since been recalled). Indeed, following Eylea's approval in 2011, many years passed before another anti-VEGF therapy was both approved and attained some traction in the market. Tr. 1995:19-23 (Csaky) (FDA approved faricimab in February 2022); Tr. 172:22-24 (Yancopoulos) ("[T]he field was littered with many, many failures, including our own" in the "several attempts to improve on Eylea.").

E.   **Regeneron's Eylea Product and Methods of Treatment**

Regeneron is the holder of BLA No. 125387 for Eylea, which the FDA first approved on November 18, 2011. (ECF No. 494-12, ¶ 12; ECF No. 435, Answer to ¶ 1). As discussed above, Eylea is an ophthalmic drug product invented by Regeneron scientists that has been used to treat millions of patients suffering from diseases that can cause vision loss or even blindness. Tr. 114:21-116:22, 128:2-8 (Yancopoulos); Tr. 282:25-288:9 (Csaky). Specifically, Eylea is indicated for the treatment of patients with angiogenic eye disorders, including Neovascular (Wet) Age-Related Macular Degeneration (AMD), Macular Edema Following Retinal Vein Occlusion (RVO), Diabetic Macular Edema (DME), Diabetic Retinopathy (DR), and Retinopathy of Prematurity (ROP).

Appx41

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

The active ingredient in Eylea is aflibercept, a fusion protein. Tr. 2012:12-17 (Trout); Tr. 110:14-19 (Yancopoulos); Tr. 448:1-12 (Furfine). Aflibercept works by preventing VEGF from stimulating blood vessel growth in the retina. Tr. 280:6-281:8, 288:10-19 (Csaky); Tr. 110:24-112:1 (Yancopoulos).

After inventing the aflibercept molecule, Regeneron endeavored to develop a safe, effective, and successful ophthalmic drug product. Tr. 172:12-173:22, 184:17-185:7 (Yancopoulos); Tr. 449:19-9 (Furfine). Aflibercept entered into preclinical development in the mid-1990s, and was initially developed as a potential treatment for cancer. Tr. 121:8-12 (Yancopoulos); Tr. 449:14-16, 475:10-17 (Furfine). Its use to treat ophthalmic diseases by injection into the eye was only later considered. Tr. 449:14-21 (Furfine); Tr. 1679:5-1680:11 (Graham). Two of Regeneron's early development partners, Procter & Gamble and Aventis, concluded that an aflibercept-containing product would not be a viable drug product, and abandoned the partnership. Tr. 112:10-113:25 (Yancopoulos). But Regeneron persisted in its efforts to develop a drug that doctors could administer to patients less frequently than the leading treatment at the time, Lucentis. Tr. 2014:5-7 (Trout); Tr 1832:11-1833:1 (Csaky); Tr. 113:7-18 (Yancopoulos); Tr. 452:7-14 (Furfine). Eylea was first approved

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

by the FDA for the treatment of wet AMD in November 2011.  Tr. 214:18-24 (Yancopoulos).

Regeneron's inventors had several aims in developing Eylea. They sought to develop Eylea as a drug for intravitreal injection— i.e., for injection directly into the jelly-like vitreous of the eye.  Tr. 288:20-25 (Csaky); Tr. 2034:2-20 (Trout); Tr. 117:15-118:21 (Yancopoulos); Tr. 465:22-466:9 (Furfine).  In doing so, Regeneron aimed to develop a drug that was both stable and highly concentrated, thereby delivering large amounts of drug to the eye in a single injection while minimizing the risk of it coming out of solution and causing serious side effects.  Tr. 115:1-116:3 (Yancopoulos); Tr. 1680:12-1681:17 (Graham).  Although a high concentration could lead to higher efficacy, it also risked instability and adverse effects on patients.  Tr. 2044:8-22, 2054:13-15, 2066:10-21 (Trout); Tr. 469:21-471:4, 472:6-19, 473:2-22, 480:6-9 (Furfine); Tr. 1681:18-1682:1, 1691:11-19 (Graham). Among other complications, injecting a drug directly into the eye requires doctors to use exceedingly small, narrow-bore needles that put pressure on drugs—known as shear stress—and can cause the aflibercept protein to come out of solution.  Tr. 578:2-9, 2062:9-17, 2066:17-21 (Trout); Tr. 476:2-478:13 (Furfine); Tr. 1683:4-13, 1685:7-15, 1687:3-22, 1688:17-21 (Graham); Tr. 1125:13-16 (Rabinow); Tr. 1465:12-25 (MacMichael).

41

Appx43

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

Because aflibercept is an unnatural fusion protein, not (like other anti-VEGF agents) an antibody or antibody fragment, the inventors did not expect that formulation ingredients that might stabilize an antibody therapeutic would be capable of stabilizing aflibercept. Tr. 573:10-13 (Trout); Tr. 1156:17-24 (Rabinow); Tr. 452:15-454:1 (Furfine). And even if one succeeded in creating a stable, high-concentration formulation of aflibercept, a cloud of uncertainty hung over the whole endeavor: it was unknown whether a protein as large as aflibercept could penetrate through the retinal membrane to an extent that would allow it to enter the retina, the site of action for improving patients' vision. Tr. 2027:14-2028:9 (Trout).

Scientists understood at the time that larger molecules the size of antibodies stayed mostly in the vitreous and did not penetrate the retina, whereas smaller molecules like the antibody fragment ranibizumab were able to penetrate into the retina. Tr. 2027:14-2030:14 (Trout); PTX-1839 at 1 (Gaudreault); PTX-576 at 8-9 (Ghate); PTX-1842 at 1 (Jackson); see also Tr. 455:4-456:24 (Furfine). For precisely that reason, the leading biotechnology company at the time, Genentech, selected a small antibody fragment (ranibizumab), as opposed to a full-sized protein, in developing its intravitreal product Lucentis. Tr. 2026:17-2028:9 (Trout).

42

Appx44

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Regeneron itself was concerned that aflibercept, originally intended for cancer treatment, was too large to penetrate into the retina, and so undertook a parallel development project involving a smaller protein called "Mini-Trap" as a backup candidate in case the full-length aflibercept proved incapable of sufficiently penetrating into the retina.  Tr. 2035:13-2036:17 (Trout); PTX-1757 at 11 (Daly); Tr. 119:1-121:5 (Yancopoulos); Tr. 457:17-458:4, 459:22-25, 461:10-13 (Furfine).  In the end, Regeneron unexpectedly demonstrated that aflibercept could penetrate the retina and developed a stable, high-concentration, intravitreal formulation of aflibercept—which eventually became the commercial Eylea formulation.  Tr. 466:22-467:9, 495:15-496:17 (Furfine). The Eylea formulation contains 40 mg/ml aflibercept, 10 mM sodium phosphate, 40 mM sodium chloride, 0.03% polysorbate 20, and 5% sucrose, pH 6.2.

Regeneron also sought to develop a clinical regimen superior to Lucentis's monthly dosing regimen, one that would reduce the number of injections that patients had to receive.  Tr. 116:7-22, 128:9-132:5 (Yancopoulos).  Intravitreal injection into the eye is burdensome for patients and their caregivers, and entails serious risks—including infection, inflammation, and retinal detachment, as well as anxiety and discomfort.  Tr. 291:22-295:8 (Csaky). Although Lucentis provided significant benefit to patients

43

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

compared to previous therapies, the need to administer it every month to patients by intravitreal injection posed an onerous treatment burden; a drug product that could be administered less frequently would constitute a benefit for patients.  Tr. 307:16-309:1, 334:12-337:25, 1816:4-24 (Csaky); <u>see</u> <u>also</u> Tr. 129:18-132:5, 137:3-21 (Yancopoulos).  Regeneron's co-founder and Chief Scientist, Dr. George Yancopoulos, sought to reduce that "very significant onerous treatment burden of monthly treatments" and "cut the number of treatments by half," which would "be game-changing for these patients and their caregivers and the doctors." Tr. 124:11-125:1 (Yancopoulos); Tr. 128:9-15 (Yancopoulos). Ultimately, Dr. Yancopoulos invented fixed, extended-dosing regimens for aflibercept, and Regeneron obtained FDA approval for Eylea using these regimens.  Tr. 303:6-304:25, 308:23-309:20 (Csaky); PTX-917 at 1 (Eylea Label); PTX-1 & PTX-3 (Treatment Patents); <u>see</u> <u>also</u> Tr. 133:10-13, 137:3-21, 153:4-8 (Yancopoulos).

**F.   The Patents-in-Suit and Asserted Claims**

The '865 Patent, also referred to as the "Product Patent," covers formulations of aflibercept such as Eylea.  The '601 and the '572 Patents, also referred to as the "Treatment Patents," are directed to methods of using aflibercept.

**\*\*SEALED\*\***

## MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

### 1.   The '865 Patent

The '865 Patent was issued by the United States Patent and Trademark Office ("USPTO") on August 10, 2021.  The title of the '865 Patent is "VEGF Antagonist Formulations Suitable for Intravitreal Administration."  The '865 Patent lists Eric Furfine, Daniel Dix, Kenneth Graham, and Kelly Frye as the inventors.  The '865 Patent issued from U.S. Patent Application No. 16/739,559, which was filed on June 10, 2020.  Regeneron is listed as assignee on the face of the '865 Patent.  The '865 Patent on its face claims priority and/or benefit to U.S. Provisional Application No. 60/814,484, which was filed on June 16, 2006.  The '865 Patent lists nine other patents that, as of the issue date of the '865 Patent, had issued from the same patent family.

Regeneron asserts claims 4, 7, 9, 11, and 14-17 of the '865 Patent.  The asserted claims depend from claims 1 and 2 which provide as follows:

> 1.   A vial comprising an ophthalmic formulation suitable for intravitreal administration that comprises:
>> a vascular endothelial growth factor (VEGF) antagonist,
>> an organic co-solvent,
>> a buffer,
>> and a stabilizing agent,
>
> wherein said VEGF antagonist fusion protein is glycosy- lated and comprises amino acids 27-457 of SEQ ID NO:4; and

45

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

---

> wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography.
>
> 2.  The vial of claim 1, wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml, and wherein said organic co-solvent comprises polysorbate.

PTX 2.19.  Claim 4 is illustrative.  If the Defendants Infringe claim 4, then they necessarily infringe the other asserted claims. Claim 4 states: "The vial of claim 2, wherein said organic co-solvent comprises about 0.03% to about 0.1 % polysorbate 20." PTX-2.19.

### 2.   The '601 Patent

The '601 Patent was issued by the USPTO on January 12, 2021. The title of the '601 Patent is "Use of a VEGF Antagonist to Treat Angiogenic Eye Disorders."   The '601 Patent lists George Yancopoulos as the inventor.   The '601 Patent issued from U.S. Patent Application No. 16/397,267, which was filed on April 29, 2019.   Regeneron is listed as assignee on the face of the '601 Patent.

The '601 Patent on its face claims priority and/or benefit to U.S. Provisional Application No. 61/432,245, which was filed on January 13, 2011; U.S. Provisional Application No. 61/434,836,

46

REGENERON V. MYLAN                                                1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

which was filed on January 21, 2011; U.S. Provisional Application

No. 61/561,957, which was filed on November 21, 2011;

PCT/US2012/020855, which was filed on January 11, 2012; and U.S.

Patent Application No. 13/940,370, filed on July 12, 2013, among

additional U.S. Patent Applications. The '601 Patent lists three

other patents that, as of the issue date of the '601 Patent, had

issued from the same patent family.

Regeneron asserts claim 11 of the '601 Patent which depends

from claim 10:

> 10. A method for treating diabetic macular edema in a
> patient in need thereof, comprising intravitreally
> administering, to said patient, an effective amount
> of aflibercept which is 2 mg approximately every 4
> weeks for the first 5 injections followed by 2 mg
> approximately once every 8 weeks or once every 2
> months.
> 11. The method of claim 10, wherein approximately every
> 4 weeks comprises approximately every 28 days or
> approximately monthly.

PTX 1.21.

Regeneron also asserts claim 19 of the '601 Patent which

depends from claim 18.

> 18. A method for treating diabetic retinopathy in a
> patient in need thereof, comprising intravitreally
> administering, to said patient, an effective amount
> of aflibercept which is 2 mg approximately every 4
> weeks for the first 5 injections followed by 2 mg
> approximately once every 8 weeks or 2 months.
> 19. The method of claim 18, wherein approximately every
> 4 weeks comprises approximately every 28 days or
> approximately monthly.

PTX 1.22.

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

3.   The '572 Patent

The '572 Patent was issued by the USPTO on February 22, 2022. The title of the '865 Patent is "Use of a VEGF Antagonist to Treat Angiogenic Eye Disorders."   The '572 Patent lists George Yancopoulos as the inventor.   The '572 Patent issued from U.S. Patent Application No. 17/352,892, which was filed on June 21, 2021.   Regeneron is listed as assignee on the face of the '572 Patent.

The '572 Patent on its face claims priority and/or benefit to U.S. Provisional Application No. 61/432,245, which was filed on January 13, 2011; U.S. Provisional Application No. 61/434,836, which was filed on January 21, 2011; U.S. Provisional Application No. 61/561,957, which was filed on November 21, 2011; PCT/US2012/020855, which was filed on January 11, 2012; and U.S. Patent Application No. 13/940,370, filed on July 12, 2013, among additional U.S. Patent Applications.   The '572 Patent lists six other patents that, as of the issue date of the '572 Patent, had issued from the same patent family.

Regeneron asserts claim 6 of the '572 Patent which depends from claims 1, 2, and 3:

> 1.   A method of treating an angiogenic eye disorder in a patient in need thereof comprising sequentially administering to the patient by intravitreal injection a single initial dose of 2 mg of aflibercept, followed by one or more secondary

48

Appx50

REGENERON V. MYLAN                                          1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

doses of 2 mg of aflibercept, followed by one or more tertiary doses of 2 mg of aflibercept;

wherein each secondary dose is administered approximately 4 weeks following the immediately preceding dose; and wherein each tertiary dose is administered approximately 8 weeks following the immediately preceding dose;

wherein the patient achieves a gain in visual acuity within 52 weeks following the initial dose.

2.  The method of claim 1 wherein the patient achieves a gain in Best Corrected Visual Acuity (BCVA) according to Early Treatment Diabetic Retinopathy Study (ETDRS) letter score.

3.  The method of claim 2 wherein the patient gains at least 7 letters Best Corrected Visual Acuity (BCVA) according to Early Treatment Diabetic Retinopathy Study (ETDRS) letter score.

6.  The method of claim 3 wherein the aflibercept is formulated as an isotonic solution.

PTX 3.25.

Regeneron also asserts claim 25 of the '572 Patent which

depends from claim 15:

15.  A method of treating diabetic macular edema in a patient in need thereof comprising sequentially administering to the patient a single initial dose of 2 mg of aflibercept, followed by one or more secondary doses of 2 mg of aflibercept, followed by one or more tertiary doses of 2 mg of aflibercept;

wherein each secondary dose is administered to the patient by intravitreal injection approximately 4 weeks following the immediately preceding dose; and

wherein each tertiary dose is administered to the patient by intravitreal injection approximately 8 weeks following the immediately preceding dose.

49

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

> 25.  The method of claim 15 wherein four secondary doses
>       are administered to the patient.

PTX 3.25.

## G.   Claim Construction

### 1.   The Product Patent

In the course of this litigation, the parties stipulated that the term "glycosylated" in claim 1 of the Product Patent is construed as "containing at least one amino acid residue with an attached carbohydrate." During claim construction, they submitted several claim terms from the Product Patent for construction by the Court, "organic co-solvent" and "native conformation." The Court construed "organic co-solvent" to mean "an organic substance added to the primary solvent to increase the solubility of the solute, here a VEGF antagonist." (ECF No. 427 at 20). The Court construed "native conformation" to mean "the original intact form of the VEGF antagonist, which is a form that does not exhibit chemical or physical instability." Id. at 25-26.[4] The Court applies its prior constructions to these claim terms and applies the "ordinary and customary" meaning as understood by a person of ordinary skill in the art to the remaining claim terms. See

---

[4] The Court also found that the claim term "[w]herein the exclusion criteria for the patent include. . . ," as used in the '601 Patent and the '865 Patent to lack patentable weight. (ECF No. 427 at 29-37).

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

<u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

### 2.   The Treatment Patents

Certain language in claims 11 and 19 of the '601 Patent and claims 6 and 25 of the '572 Patent, collectively referred to as the "Treatment Claims," relates to the visual acuity outcomes measured by doctors in the patients they treat.   During claim construction, the Court construed these visual acuity limitations to lack patentable weight.  (ECF No. 427 at 37–39).

The Court applies its prior constructions to these claim terms herein.   Accordingly, it affords no patentable weight to the following language of claims 1, 2, and 3 of the '572 Patent, all of which are incorporated by virtue of dependency into claim 6 of the '572 Patent:

- "wherein the patient achieves a gain in visual acuity within 52 weeks following the initial dose";

- "wherein the patient achieves a gain in Best Corrected Visual Acuity (BCVA) according to Early Treatment Diabetic Retinopathy Study (ETDRS) letter score"; and

- "wherein the patient gains at least 7 letters Best Corrected Visual Acuity (BCVA) according to Early Treatment Diabetic Retinopathy Study (ETDRS) letter score."

51

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

The Court does not consider the visual acuity limitations included in claims 1, 2, and 3 of the Angiogenic Eye Disorder Claim in its infringement or validity analyses, because it has concluded that those are not entitled to patentable weight. (ECF No. 427 at 37-39). The Court applies the "ordinary and customary" meaning as understood by a person of ordinary skill in the art to the remaining claim terms. Phillips, 415 F.3d at 1313.

H.    **The Defendants' BLA and Yesafili Product**

Mylan submitted BLA No. 761274 to FDA on October 29, 2021. Tr. 309:21-310:6 (Csaky). Mylan later transferred its rights in the Yesafili BLA to Biocon, a biopharmaceutical company based in India. (ECF No. 523 at 1-2; Tr. 310:7-15 (Csaky)). By stipulation of the parties, Biocon was then added to this case as a Defendant-Counterclaim Plaintiff. (ECF No. 523 at 2). If Yesafili is eventually marketed in the United States, it will be sold by Biocon. Tr. 310:13-15. The parties stipulated, and the Court ordered, that any evidence that supports a finding of patent infringement as to Mylan will support a finding of patent infringement as to Biocon. (ECF No. 523 at 2).

Appx54

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL
─────────────────────────────────────────────────────

███████████████████  The Defendants' BLA seeks FDA approval to market an aflibercept biologic product under the trade name Yesafili.   (ECF No. 523, 1; ECF No. 494-12, ¶¶ 1, 41).  BLA No. 761274 seeks FDA licensure of Yesafili pursuant to 42 U.S.C. § 262(k)(4) for each of the following angiogenic eye disorders: neovascular age-related macular degeneration ("wet AMD"), macular edema following retinal vein occlusion ("RVO"), diabetic macular edema ("DME"), and diabetic retinopathy ("DR").

The Defendants' BLA also specifies the composition of Yesafili.  PTX-1541.  The ████ drug product for BLA No. 761274 comprises ████ M710, ████ ██ histidine, ████ ██ histidine hydrochloride monohydrate, ████ polysorbate 20, ██ trehalose dihydrate and water for injection q.s. to 0.05 mL.  Like Eylea, Yesafili's active ingredient is aflibercept at a target concentration of 40 mg/ml.  PTX-1541; Tr. 584:7-12, 587:13-588:5 (Trout).  In the composition of the M710 drug product, the Defendants' BLA identifies ████ ████ ██ ██ ███████ ██████████████████████████████████████████████ ████ █████ ██████ █████ ██ ████ ████ ██████ █████ █████ ██████ ██████

─────────────



Appx55

REGENERON V. MYLAN                                          1:22-CV-61

**SEALED**

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

███████████████████████████████████████████████████

████████████████████████████████████

The Defendants' Yesafili BLA also includes a proposed label to be packaged along with the marketed product.  Tr. 310:16-311:13 (Csaky); PTX-3097 (Mylan label dated August 2022); PTX-3338 (Biocon label).  That label contains no material differences from the label that Regeneron includes with its Eylea product.  Tr. 313:7-22 (Csaky); PTX-917 (Regeneron's Eylea label).  In particular, there is no difference in how Regeneron's label recommends that doctors use Eylea to treat AMD, DME, and DR as compared with how the Defendants' proposed label recommends that doctors use Yesafili to treat AMD, DME, and DR.  Tr. 313:18-22 (Csaky).

I.  **Prior Art**

The parties have stipulated the following regarding the prior art:

"VEGF Trap-Eye for the treatment of neovascular age-related macular degeneration," by J.A. Dixon et al. ("Dixon"), published in 2009.

"An Exploratory Study of the Safety, Tolerability and Bioactivity of a Single Intravitreal Injection of Vascular

54

Appx56

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Endothelial Growth Factor Trap-Eye in Patients with Diabetic Macular Edema," by D. Do et al, ("Do 2009") published in 2009.

"Anti-VEGF Therapy in Diabetic Macular Edema: An Overview of New Agents Under Investigation," by G. Lalwani ("Lalwani 2009") published in 2009.

"Enrollment Completed in Regeneron and Bayer Healthcare Phase 2 Studies of VEGF Trap-Eye in Neovascular Age-Related Macular Degeneration (Wet AMD)," ("9-14-2009 Press Release") is a press release publicly distributed by Regeneron Pharmaceuticals, Inc. on September 14, 2009.

U.S. Patent No. 7,303,747 issued December 4, 2007, and claims priority to a June 8, 1999 provisional patent application.

"Single Injections of Vascular Endothelial Growth Factor Trap Block Ovulation in the Macaque and Produce a Prolonged, Dose-Related Suppression of Ovarian Function," by H.M. Fraser et al. ("Fraser") published in February 2005.

"VEGF-Trap: A VEGF Blocker with Potent Antitumor Effects," by J. Holash et al. ("Holash" or "Holash 2002") published in August 2002.

"Prevention of Thecal Angiogenesis, Antral Follicular Growth, and Ovulation in the Primate by Treatment with Vascular Endothelial Growth Factor Trap R1R2," by C. Wulff et al. ("Wulff") published in July 2002.

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Patent Application No. WO 00/75319 ("Papadopoulos") published in 2000.

"Physical Stability of Proteins in Aqueous Solution: Mechanism and Driving Forces in Nonnative Protein Aggregation," by Chi et al. ("Chi") published in September 2003.

U.S. Patent No. 10,406,226 ("the '226 patent") claims priority to a U.S. Provisional Application filed March 25, 2005.

U.S. Patent No. 8,110,546 ("Dix") claims priority to a U.S. Provisional Application filed March 25, 2005.

U.S. Patent Application Publication No. US2001/0014326 ("Andya '326") published on August 16, 2001.

U.S. Patent Application Publication No. US2004/0197324 ("Liu") published on October 7, 2004.

Patent Publication No. WO 2006/047325 ("Shams") published May 4, 2006.

"Preclinical Pharmacokinetics of Ranibizumab (rhuFabV2) After a Single Intravitreal Administration," by J. Gaudreault et al. ("Gaudreault") published in February 2005.

Patent Publication No. WO 97/04801 ("Andya '801") published on February 13, 1997.

U.S. Patent No. 9,340,594 ("'594 patent") issued from the same family from which the '865 Patent issued.

56

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

U.S. Patent No. 9,580,489 ("'489 patent") issued from the same family from which the '865 Patent issued.

U.S. Patent No. 7,608,261 ("'261 patent") issued from the same family from which the '865 Patent issued.

## J.    Trial Witnesses

The parties presented live testimony from the following witnesses, listed in alphabetical order, at trial.

### 1.    Dr. Thomas Albini

Dr. Thomas Albini is an ophthalmologist and vitreoretinal surgeon who received his medical degree from the Johns Hopkins University School of Medicine; he completed an ophthalmology residency at the Doheny Eye Institute at the University of Southern California and is currently a Professor of Ophthalmology at the Bascom Palmer Eye Institute of the University of Miami Miller School of Medicine. (Tr. 748:7-749:3 (Albini)). Dr. Albini is a member of, and serves on committees of, the Retina Society and the Macula Society, is a founding member of the Vit-Buckle Society, serves as co-director of the annual Angiogenesis meeting, and has served as an editor for the Journal of Vitreoretinal Diseases and Retina Today. (Tr. 751:2-752:4 (Albini)). Dr. Albini was qualified without objection as an expert in the diagnosis and treatment of vitreoretinal disease. (Tr. 754:18-755:11 (Albini)).

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

**2.  Abby Cahn**

Abby Cahn is Regeneron's Marketing and Customer Engagement Executive Director and was designated as a 30(b)(6) witness concerning Regeneron's marketing of Eylea.  (Tr. 951:9-12, 22-24 (Cahn (30(b)(6)); <u>see</u> <u>also</u> DTX 802.3).  She was presented by designated video deposition testimony.

**3.  Dr. Hana Chang**

Dr. Hana Chang is a research scientist who was formerly employed by a third-party company, Integrity Bio.  (ECF No. 543, 2).   Dr. Chang was presented by designated video deposition testimony.

**4.  Karen Chu**

Karen Chu has worked at Regeneron for the past twenty years and currently serves as Regeneron's Executive Director of Clinical Strategy and Execution for Ophthalmology.  Tr. 1583:5-1912, 1586:6-8 (Chu).  In that role, she oversees "all of ophthalmology clinical development," including "the design, strategy, and execution of clinical trials."  Tr. 1583:13-19.  As Ms. Chu testified, she was involved with the clinical development of Eylea

58

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

from the time it first entered clinical trials.  Tr. 1586:19-25.
She testified in her personal capacity about the history of Eylea's
clinical development as well as Dr. Yancopoulos's involvement in
the Eylea development program.

Regeneron also designated Chu as a Rule 30(b)(6) deponent on
a variety of topics, including Regeneron's clinical trials,
secondary considerations, and the conception and reduction to
practice of the claimed inventions.  (DTX 202.1; Tr. 1225:23-
1227:14, 1230:6-10 (Chu (30(b)(6)); <u>see also</u> DTX 802.3).  Her
30(b)(6) testimony was presented by designated video deposition.

### 5.   Jenifer Colyer

Jennifer Colyer is Regeneron's Executive Director of
Commercial Finance and Business Planning. (Tr. 971:14-16 (Colyer
30(b)(6))). Regeneron designated Ms. Colyer as a 30(b)(6) witness
to testify concerning Eylea marketing and financial data,
including Eylea sales information. (DTX 501.1; Tr. 969:7-18
(Colyer 30(b)(6)); <u>see also</u> DTX 802.3).  She was presented by
designated video deposition testimony.

### 6.   Dr. Karl Csaky

Dr. Karl Csaky, M.D., Ph.D., is a physician who studies and
cares for patients with diseases of the retina.  Tr. 268:3-15
(Csaky).  Dr. Karl Csaky is a retinal specialist and vitreal
retinal surgeon who received his medical degree from the University

Appx61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

of Louisville and completed an ophthalmology residency at Washington University in St. Louis (Tr. 268:3-15, 270:16-18, 271:4-12, (Csaky)). Dr. Csaky currently works at a "not-for-profit academic research institution" called the Retina Foundation of the Southwest in Dallas, Texas, where he holds the titles Chief Executive Officer, Chief Medical Officer, and T. Boone Pickens Director of the Molecular Ophthalmology Laboratory and Clinical Center of Innovation for Macular Degeneration. Tr. 269:12-270:6. Dr. Csaky is involved with the Macula Society, the Retina Society, the American Society of Retina Specialists, and the American Ophthalmologic Society, and serves on several committees, as well as training fellows and publishing in the area of angiogenic eye disorders. (Tr. 275:11-276:22 (Csaky)).

For the past thirty years, Dr. Csaky has treated patients with retinal diseases, including AMD, DME, and DR, and has done so using Eylea. Tr. 268:16-20, 274:16-275:10. About half of his more than 140 publications relate to such retinal diseases. Tr. 276:17-22. Dr. Csaky has run and helped organize clinical trials, including working closely with FDA on the design of clinical trials. Tr. 277:1-9. Dr. Csaky was qualified without objection as an expert in ophthalmology with a specialty in angiogenic retinal diseases and their treatment. (Tr. 277:20-278:1 (Csaky)).

60

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

### 7.   Dr. Eric Furfine

Dr. Eric Furfine is the former head of preclinical development at Regeneron; and is a named co-inventor of the '865 Patent.  (Tr. 443:7-10, 445:20-446:5, 446:12-21 (Furfine)).  Dr. Furfine serves as Chief Scientific Officer and Chief Executive Officer of Mosaic Biosciences,  providing  scientific  services  to  small  biotech companies.  Tr. 443:7-16 (Furfine).  From 2002 through 2006, Dr. Furfine led Regeneron's preclinical development efforts, including protein  formulation  development  and  early  animal  studies.   Tr. 445:1-4, 445:22-446:5.  Dr. Furfine testified about his work at Regeneron on the Eylea product, including his efforts to develop the Eylea formulation covered by the claims of the Product Patent.

### 8.   Dr. Parag Goyal

Dr. Parag Goyal is a former Mylan employee who was a Senior Director, Biologics R&D at Mylan, Inc., and who was designated as Mylan's Rule 30(b)(6) witness regarding certain aspects of the development of Mylan's aflibercept product.  (ECF No. 543, 22). He was presented by designated video deposition testimony.

### 9.   Dr. Kenneth Graham

Dr. Kenneth Graham is a senior director in a formulation development group at Regeneron, and is a named co-inventor of the '865 Patent.  (Tr. 1671:24-1672:2, 1678:17-19 (Graham)).  Dr. Graham has worked at Regeneron for more than twenty-two years; he

Appx63

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

currently serves as a Senior Director overseeing a formulation-development team at Regeneron.  Tr. 1671:20-1672:2 (Graham).  Dr. Graham testified about his efforts to develop and test stable formulations of aflibercept for intravitreal injection, culminating in the stable formulation of Regeneron's Eylea product, which is covered by the Product Patent.

### 10. Dr. Gregory MacMichael

Gregory MacMichael, Ph.D., is a consultant with experience in the biopharmaceutical industry.  Tr. 1369:21-24, 1371:12-18 (MacMichael).  He was accepted as an expert in the formulation and development of therapeutic proteins.  Id.

### 11. Dr. Barrett Rabinow

Dr. Barrett Rabinow received his Ph.D. in physical organic chemistry from the University of Chicago; earned the title of Baxter Distinguished Scientist after nearly 40 years of employment at Baxter Healthcare Corporation; and is currently a pharmaceutical consultant.  (Tr. 1000:22-1001:2, 1001:16-21, 1004:2-18 (Rabinow)).  He was qualified without objection as an expert in pharmaceutical formulation science, including the development and manufacture of therapeutic protein formulations.  (Tr. 1005:9-16 (Rabinow)).

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

### 12.   Vanessa Smith

Vanessa Smith is Mylan's Director of Core Regulatory Labeling Strategy, who was designated as Mylan's Rule 30(b)(6) witness on the topic of labeling.  (ECF No. 538-3, 8).  She was presented by designated video deposition testimony.

### 13.   Dr. Jay Stewart

Dr. Jay Stewart is an ophthalmologist and retinal specialist who received his medical degree from Harvard; is a full professor with the University of California San Francisco medical school, and Chief of Ophthalmology at SF General Hospital.  (Tr. 1267:13-1268:16 (Stewart)).   He serves as the Editor-in-Chief for the American Journal of Ophthalmology Case Reports and Associate Editor-in-Chief for Annals of Eye Science.   (Tr.  1269:2-6 (Stewart)).  He was qualified without objection as an expert in the medical and surgical treatment of vitreoretinal and ophthalmic diseases.  (Tr. 1270:9-15 (Stewart)).

### 14.   Dr. Bernhard Trout

Dr. Bernhardt Trout received his Ph.D. in chemical engineering from the University of California, Berkeley, and is a Professor of Chemical Engineering at the Massachusetts Institute of Technology.  (Tr. 567:4-18 (Trout)). At MIT, Dr. Trout performs pharmaceutical development and manufacturing research on biologic (e.g.,   protein-based)   therapeutics   and   small-molecule

63

Appx65

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

therapeutics.  Tr. 568:2-6.  Since 1998, Dr. Trout has worked on approximately fifty biologic therapeutics.  Tr. 568:14-2420.  He has experience working with bevacizumab, a protein-based drug that is injected into the eye.  Tr. 568:21-24.  Dr. Trout teaches undergraduate students, graduate students, and post-doctoral researchers on fundamental aspects of chemical engineering.  Tr. 569:3-7.  He also teaches an annual course to professionals from the biopharmaceutical industry on the subject of biologic molecule formulations ("bioformulation").  Tr. 569:8-23.  Dr. Trout regularly consults with industry and government officials, including FDA and foreign regulatory agencies.  Tr. 569:24-570:16.  He has authored more than two hundred publications, including more than fifty in the field of protein formulation.  Tr. 570:17-23.  He was qualified without objection as an expert in formulation and stabilization of protein and small-molecule therapeutics.  (Tr. 571:24-572:5 (Trout)).

**15.  Dr. George Yancopoulos**

Dr. Yancopoulos is the co-founder, co-chairman, President, and Chief Scientist at Regeneron.  Tr. 97:7-9 (Yancopoulos).  In his role as Chief Scientist, Dr. Yancopoulos oversees all aspects of biopharmaceutical research and development at Regeneron.  Tr.

64

Appx66

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

97:10-13.  He is listed as the sole named inventor of the '572 and '601 Patents. (Tr. 100:7-101:21 (Yancopoulos)).

Dr. Yancopoulos testified on background regarding Regeneron, and its various research and development efforts over the years with aflibercept.  (Tr. 97:14-99:17, 107:11-108:2, 108:7-109:16 (Yancopoulos)).  Dr. Yancopoulos explained his early interest in science and his role in developing Regeneron from a small startup to one of the world's leading biopharmaceutical companies.  Tr. 102:20-110:10.  Dr. Yancopoulos testified about his involvement in the development of Eylea, including his work leading to the methods of treatment claimed in the Treatment Patents.

Dr. Yancopoulos is the named inventor on more than 150 patents, is an author of more than 500 scientific publications, and has been recognized as one of the top scientists in the world based on citation index.  Tr. 100:10-12, 102:3-6, 102:16-19.  He was elected to the National Academy of Sciences and to the Biotech Hall of Fame; selected by Ernst & Young as Entrepreneur of the Year; and recognized by Forbes Magazine as one of the Heroes of the Pandemic.  Tr. 102:7-15.  Dr. Yancopoulos acknowledged that he is not a formulator, (Tr. 216:13-16 (Yancopoulos)), or practicing ophthalmologist, (Tr. 242:17-19, 252:6-9 (Yancopoulos)); he has further earned in excess of $100 million off the value of Regeneron.  (Tr. 251:23-252:5 (Yancopoulos)).

65

**\*\*SEALED\*\***

---

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

---

### III. <u>CONCLUSIONS OF LAW</u>

**A.   Person of Ordinary Skill in the Art**

In a patent case, the overall framework for analysis is presented in the context of a hypothetical person of ordinary skill in the art ("POSA"). <u>Standard Oil Co. v. Am. Cyanamid Co.</u>, 774 F.2d 448, 454 (Fed. Cir. 1985). This legal construct is "akin to the 'reasonable person' used as a reference in negligence determinations. The legal construct also presumes that all prior art references in the field of the invention are available to this hypothetical skilled artisan." <u>In re Rouffet</u>, 149 F.3d 1350, 1357 (Fed. Cir. 1998). "A person of ordinary skill in the art is also a person of ordinary creativity, not an automaton." <u>KSR Int'l Co. v. Teleflex Inc.</u>, 550 U.S. 398, 421 (2007). Courts may also account for "the inferences and creative steps that a person of ordinary skill in the art would employ." <u>Id.</u> at 418.

Determining who constitutes a person of ordinary skill in the art ("POSA") is a factual question. <u>See</u> <u>ALZA Corp. v. Andrx Pharm., LLC</u>, 603 F.3d 935, 940 (Fed. Cir. 2010). To determine the level of ordinary skill in the art, courts consider the following non-exhaustive factors: "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which

66

Appx68

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." <u>Daiichi Sankyo Co., Ltd. v. Apotex, Inc.</u>, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

### 1.   The Product Patent

The parties advanced substantially similar definitions of a POSA to whom the '865 Patent is directed.  According to Regeneron, the POSA "would be a professional with a master's degree at least in a relevant field, so a technical field directly relevant to formulations here."  Tr. 2092:6-17 (Trout); PDX-9.002 (explaining that the POSA "would have held an advanced degree, such as a Master's in a biopharmaceutical science, or a related discipline, such as chemical engineering, and several years of experience in the development of biologics products.  Alternatively, the POSA could have a Ph.D. in such discipline and less experience.  The POSA may collaborate with others, including a medical doctor with experience treating ophthalmic diseases.").  According to the Defendants, the POSA would have a similar but somewhat higher level of skill: "at least a PhD in chemistry, chemical engineering, biochemistry, pharmacology, or a related field, along with one to two years of experience in the development and manufacture of formulations of therapeutic proteins or a lower degree with more

67

REGENERON V. MYLAN                                            1:22-CV-61

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

practical   industrial   experience."   Tr.   1372:25-1373:14 (MacMichael).

The parties agree that there is no significant difference between these definitions that would impact the Court's examination of the '865 Patent.  The Court adopts Regeneron's less-stringent definition of the POSA for purposes of this opinion.  However, its opinion would be no different were it to perform the required analysis under the Defendants' definition of the POSA.

**2.    The Treatment Patents**

The parties likewise offered substantially similar definitions of a POSA to whom the '601 and '572 Patents are directed.  Regeneron offered the following definition of the POSA as relates to the Treatment Claims:

> A person of ordinary skill in the art relevant to the claims is an ophthalmologist with experience in treating angiogenic eye disorders, including through the use of VEGF antagonists, and would have access to individuals with experience with intravitreal injection formulations.

Tr. 1815:13-1816:3 (Csaky).

The Defendants offered a slightly different definition of the POSA with respect to the Treatment Claims, stating that they would have:

> 1. Knowledge regarding the diagnosis and treatment of angiogenic eye disorders,

68

REGENERON V. MYLAN                                          1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

> including the administration of therapies to
> treat said disorders; and
>
> 2. The ability to understand results and
> findings presented or published by others in
> the field, including the publications
> discussed herein.

Typically, such a person would have an advanced degree,
such as an MD or PhD, or equivalent or less education
but considerable professional experience in the medical,
biotechnological, or pharmaceutical field with practical
academic or medical experience in:

> 1. Developing treatments for angiogenic eye
>    disorders, such as AMD, including through
>    the use of VEGF antagonists; or
>
> 2. Treating of same, including through the use
> of VEGF antagonists.

Tr. 752:17-753:13 (Albini).

Neither party has presented any substantive difference
between these two definitions as dispositive or critical to
resolution of any issue in the case. Nevertheless, because one of
the Treatment Claims involves formulation as an isotonic solution
('572 Patent, claim 6), the Court concludes that Regeneron's
definition of the POSA is most appropriate to the claims at issue
and adopts it for purposes of this opinion. However, the Court
finds that its opinion would be no different were it to perform
the required analysis under the Defendants' definition of the POSA.

69

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL
B.    **Infringement of the Patents-in-Suit**

Regeneron contends that the Defendants have infringed the Product Patent because Yesafili meets each of the asserted claim limitations.  The Defendants dispute that Yesafili infringes the Product Patent because the polysorbate in their formulation is not an "organic co-solvent" as the claim has been construed by the Court.

Regeneron further asserts that the Defendants will induce infringement of the asserted claims of the Treatment Patents because the proposed Yesafili label copies the Eylea label and instructions physicians to carry out the claimed methods of treatment.  The Defendants, however, contend that Regeneron has failed to demonstrate that physicians will use Yesafili in a manner that constitutes direct infringement and has failed to demonstrate that the Defendants specifically intended to induce infringement.

1.    **Legal Standard**

"[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). "The patentee bears the burden of proving infringement by a preponderance of the evidence." Creative Compounds, LLC v. Starmark Lab'ys, 651 F.3d 1303, 1314 (Fed. Cir. 2011) (quoting SRI

70

REGENERON V. MYLAN                                                1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1123 (Fed. Cir. 1985)). "An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc) (citation omitted). The first step is a question of law, id. at 979, while the second step is a question of fact. Spectrum Pharms., Inc. v. Sandoz Inc., 802 F.3d 1326, 1337 (Fed. Cir. 2015); see also Vanda Pharms. Inc. v. W.-Ward Pharms. Int'l Ltd., 887 F.3d 1117, 1125 (Fed. Cir. 2018) ("In a bench trial," whether the BLA infringes "is a question of fact.").

Under 35 U.S.C. § 271(e)(2)(A), when a party submits a regulatory submission to the FDA that describes "a drug claimed in a patent," this can constitute an infringing act under certain circumstances. In re Brimonidine Pat. Litig., 643 F.3d 1366, 1377 (Fed. Cir. 2011). Like the Hatch-Waxman Act for an ANDA filing, and under the BPCIA for a BLA filing, the submission to the FDA constitutes a hypothetical "artificial" or a "technical" act of infringement. Sandoz, 582 U.S. at 10; Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc., 731 F.3d 1271, 1278 (Fed. Cir. 2013).

An infringement inquiry provoked by a regulatory filing must be "focused on a comparison of the asserted patent against 'the

71

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

product that is likely to be sold following [BLA] approval.'"
<u>Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.</u>, 745 F.3d 1180, 1186 (Fed.
Cir. 2014). "[I]f a product that an . . . applicant is asking the
FDA to approve . . . falls within the scope of an issued patent,
a judgment of infringement must necessarily ensue." <u>Sunovion
Pharm., Inc.</u>, 731 F.3d at 1278.

> **a.   Literal Infringement**

"Literal infringement requires the patentee to prove that the
accused device contains each limitation of the asserted claim(s)."
<u>Bayer AG v. Elan Pharm. Rsch. Corp.</u>, 212 F.3d 1241, 1247 (Fed.
Cir. 2000). "If even one limitation is missing or not met as
claimed, there is no literal infringement." <u>Mas-Hamilton Grp. v.
LaGard, Inc.</u>, 156 F.3d 1206, 1211 (Fed. Cir. 1998).

> **b.   Induced Infringement**

"To succeed on a theory of induced infringement, the plaintiff
is required to prove by a preponderance of the evidence (1) direct
infringement, <u>i.e.</u>, if defendant's drug was 'put on the market, it
would infringe the relevant patent'; and (2) 'that [defendant]
possessed the specific intent to encourage another's
infringement.'" <u>Genentech, Inc. v. Sandoz Inc.</u>, 55 F.4th 1368,
1376 (Fed. Cir. 2022) (quoting <u>Vanda</u>, 887 F.3d at 1129-30). "This
requires a plaintiff to show that the alleged infringer's actions
induced infringing acts and that he knew or should have known his

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

actions would induce actual infringements." GlaxoSmithKline v. Teva Pharm., 7 F.4th 1320, 1327 (Fed. Cir. 2021).

Specific intent may be shown if the defendant's proposed label recommends, encourages, or promotes an infringing act or through other circumstantial evidence. Genentech, 55 F.4th at 1376; GlaxoSmithKline, 7 F.4th at 1327. When a plaintiff relies on a drug's label accompanying the marketing of a drug to prove intent, "[t]he label must encourage, recommend, or promote infringement." Sanofi v. Watson Labs. Inc., 875 F.3d 636, 644 (Fed. Cir. 2017).

"For purposes of inducement, 'it is irrelevant that some users may ignore the warnings in the proposed label.'" Eli Lilly & Co. v. Teva Parenteral Medicines, Inc., 845 F.3d 1357, 1368 (Fed. Cir. 2017)(quoting AstraZeneca LP v. Apotex, Inc., 633 F.3d 1042, 1060 (Fed. Cir. 2010)). "The pertinent question is whether the proposed label instructs users to perform the patented method." AstraZeneca, 633 F.3d at 1060; see also Vita-Mix Corp. v. Basic Holding, Inc., 581 F.3d 1317, 1329 n. 2 (Fed. Cir. 2009) ("The question is not . . . whether a user following the instructions may end up using the device in an infringing way. Rather, it is whether [the] instructions teach an infringing use of the device such that we are willing to infer from those instructions an affirmative intent to infringe the patent.").

73

Appx75

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

2.  **The Defendants' BLA Product Infringes the Asserted Claims of the Product Patent**

Only one claim limitation is at issue as to the '865 Patent. The parties dispute whether Yesafili is an ophthalmic formulation containing an organic co-solvent comprising about 0.03% to about 0.1% polysorbate 20. Regeneron contends that the Defendants' BLA product satisfies this claim limitation because Yesafili contains ███ █ polysorbate 20 which increases the solubility of the aflibercept. The Defendants, however, assert that their BLA product does not infringe the Product Patent because polysorbate is not a co-solvent in Yesafili.

Regeneron must prove by a preponderance of the evidence that the BLA product satisfies every claim limitation. <u>Roche Palo Alto LLC v. Apotex, Inc.</u>, 531 F.3d 1372, 1377 (Fed. Cir. 2008); <u>Warner-Lambert Co. v. Apotex Corp.</u>, 316 F.3d 1348, 1366 (Fed. Cir. 2003). As detailed below, the Court finds that Regeneron has satisfied this burden. Because Yesafili meets every limitation of the asserted claims, the Defendants infringe the Product Patent.

Both parties presented expert testimony on the topic of infringement of the Asserted Product Claims. Regeneron called Dr. Trout, who testified that the Defendants' Yesafili product infringes all of the Asserted Product Claims. Tr. 582:15-23 (Trout). The Defendants called Dr. MacMichael, who testified that,

Appx76

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

in his opinion, the Asserted Product Claims are not infringed because the Defendants' Yesafili product does not contain an "organic co-solvent" under the Court's construction. Tr. 1375:9-15 (MacMichael). As explained below, the Court credits the testimony of Dr. Trout over the testimony of Dr. MacMichael on issues involving infringement of the asserted claims of the Product Patent.

### a.   Yesafili Satisfies All Undisputed Limitations of the Asserted Product Claims

The Defendants and Dr. MacMichael do not dispute that Yesafili meets every limitation of the Asserted Product Claims other than the "organic co-solvent" limitations. Dr. Trout's testimony that Yesafili meets all limitations of the Asserted Product Claims is therefore unrebutted as to all limitations other than "organic co-solvent."

### i.   Claim 1

Every Asserted Product Claim ultimately depends from claim 1. Dr. Trout testified that Yesafili meets each limitation of claim 1 of the Product Patent. Dr. Trout explained that ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ meets the requirement of claim 1 of "A vial comprising an

**\*\*SEALED\*\***

<u>**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**</u>

ophthalmic formulation suitable for intravitreal administration that comprises." Tr. 583:1-23 (Trout); PTX-1541.

Dr. Trout next testified that the requirement of "a vascular endothelial growth factor (VEGF) antagonist . . . wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4"



Dr. Trout testified that the Defendants' Yesafili product meets the requirement of "a buffer" in claim 1. Tr. 627:1-21 (Trout).

Dr. Trout further testified that the Defendants' Yesafili product meets the requirement of "a stabilizing agent" in claim 1.

76

REGENERON V. MYLAN                                              1:22-CV-61

**SEALED**

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

Tr. 628:20-629:20 (Trout). ██████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████      ████████████████████████████████

        Dr. Trout also addressed the limitation of claim 1 reciting

"wherein at least 98% of the VEGF antagonist is present in native

conformation following storage at 5°C. for two months as measured

by size exclusion chromatography." Tr. 629:21-633:3 (Trout); PTX-

66A; PTX-1820 at 9 (Table 2.3.P.8-6); PTX-1802 at 15-24. ███████

77

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓   ▓▓▓▓▓▓▓▓▓▓   Dr. Trout thus concluded that the Defendants' Yesafili product meets this limitation of claim 1.

The Defendants and their non-infringement expert, Dr. MacMichael, offered no argument or evidence that their accused Yesafili product does not meet the foregoing limitations of claim 1. The Court credits Regeneron's unrebutted evidence, including the testimony of Dr. Trout, that the Defendants' Yesafili product meets each of the foregoing claim limitations.

Regarding the dependent claims, aside from the "organic co-solvent" limitation, the Defendants did not dispute at trial any limitations of any of the asserted dependent claims of the Product Patent. Regeneron, through its expert Dr. Trout, explained that the Defendants' Yesafili product meets each of these claim limitations, as summarized below. The Court credits Dr. Trout's unrebutted testimony.

### ii.    Claim 2

All of the Asserted Product Claims also depend from claim 2. Dr. Trout testified that the Defendants' Yesafili product meets the requirement of claim 2 that "wherein the concentration of said VEGF antagonist fusion protein is 40 mg/mL." Tr. 587:6-588:5. Dr. Trout explained that Mylan's BLA submission states that its

Appx80

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

product is formulated at a concentration of 40 mg/ml.  <u>Id.</u>; PTX-1541 at 1.  Dr. MacMichael did not dispute that the Defendants' product contains 40 mg/ml aflibercept.  Tr. 1504:25-1505:2.

### iii.    Claim 7

Regarding claim 7, which recites "wherein said buffer comprises 5-25 mM buffer," Dr. Trout testified that the Defendants' Yesafili product contains a buffer as required by the asserted claims.  Tr. 627:18-21.  ███████████████████

███████████████████████████████  ████

████  ██  ████  ████  ████  ████  ██  ████

██████████████████████████  ██████

█████████████

### iv.    Claim 9

Regarding claim 9, Dr. Trout testified that Defendants' Yesafili product meets the requirement that "wherein said buffer comprises a pH about 6.2-6.3."  Tr. 627:22-628:19.  ████████

████████████████████████████████████

████████████████████████████  ████

█████

Appx81

REGENERON V. MYLAN                                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL
### v.      Claims 10 and 11

Regarding claims 10 and 11, Dr. Trout testified that the Defendants' Yesafili product meets the limitations of these claims.  Tr. 628:20-629:20.  He testified that the trehalose stabilizing agent in Yesafili is a sugar, so Yesafili meets the requirement of claim 10 that "said stabilizing agent comprises a sugar."  Id.  He further testified that the trehalose stabilizing agent in Yesafili is among the sugars expressly listed in claim 11, so Yesafili meets the requirement of claim 11 that "wherein said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol."  Id.

### vi.      Claim 14

Regarding claim 14, Dr. Trout testified about the specific glycosylation sites on the aflibercept protein in the Defendants' product.  As he explained, the aflibercept protein in the Defendants' product is glycosylated at the specific sites recited in claim 14.  Tr. 585:18-586:8; PTX-3097 at 13 (the Defendants' proposed Yesafili label describing aflibercept as a "glycoprotein").  Thus, Yesafili meets the requirement of claim 14 that "wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4."

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

####     vii.     Claim 15

Regarding claim 15, Dr. Trout testified that the Defendants' Yesafili product meets the additional limitation the of this claim. Tr. 639:2-640:8. 

####     viii.     Claim 16

Regarding claim 16, Dr. Trout testified that

Appx83

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>



Dr. Trout thus concluded that Mylan's Yesafili product meets the claim element set forth in claim 16.  <u>Id.</u>

     **ix.    Claim 17**

Regarding claim 17, Dr. Trout testified that 

Appx84

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**



Dr. Trout thus concluded that Mylan's Yesafili product meets the claim element set forth in claim 17. Id.

    **b.    Yesafili Satisfies the "Organic Co-solvent" Limitation of the Asserted Product Claims**

Each Asserted Product Claim requires an "organic co-solvent" comprising "polysorbate"—either expressly or by virtue of its dependency on another patent claim. Claim 1 recites "an organic co-solvent"; claim 2 specifies that "said organic co-solvent comprises polysorbate"; claim 4 specifies that "said organic co-

83

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

solvent comprises about 0.03% to about 0.1% polysorbate 20"; and claim 5 specifies that "said organic co-solvent comprises 0.01% to 3% polysorbate 20." ████████████████████████

████ ████ ████ ████ ██ ████ ██ ██ █

█████████████████████████

████ ██████████████████

████ ████ ██ █████ █████ ███████

███████ ████████████████

█████████████████████████

█████████████████████████

█████████████████████████

█████████████████████████

█████████████████████████

█████████████████████████

████████ ███████████████

█████████████████████████

████████████████████

The parties' only infringement dispute focuses on whether the polysorbate 20 undisputedly present in the Defendants' Yesafili product meets the claim requirement of an organic co-solvent comprising polysorbate 20.  The Defendants argued at trial that, under the Court's construction, Yesafili's ████ polysorbate 20 is not a co-solvent because it is not "added to the primary solvent"

84

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

(<u>i.e.</u>, the water in Yesafili) "to increase the solubility of the solute, here a VEGF antagonist" (<u>i.e.</u>, the aflibercept in Yesafili).  Tr. 1375:23-1376:5 (MacMichael).  By contrast, Regeneron maintained that Yesafili meets every limitation of the Asserted Product Claims, including the "organic co-solvent" limitation as that term was construed by the Court, by virtue of the polysorbate 20 in the Defendants' Yesafili product.  Tr. 589:16-590:1 (Trout).

There was no dispute at trial that ████████████████

████████ ████ ████ ████ ███ ████ ██ ████

████████████████████████████████

████████████████████ ███ ███████

████████████████████████████████

██ ████ ██████ ████████ ███ ████ ██ ████

████████████████████████████████

████████████████  Aggregation is the mechanism by which proteins like aflibercept come out of solution as a result of insolubility.  Tr. 593:16-594:4, 598:13-10 (Trout); PTX-1556 at 3-4 (Wang).  The Product Patent Inventors prevented the formation of insoluble particles in their intravitreal aflibercept formulations by including polysorbate 20.  Tr. 483:4-10 (Furfine).  Polysorbate achieved this objective by interacting with "hydrophobic patches" on the aflibercept molecules, thus preventing aggregation.  Tr.

Appx87

REGENERON V. MYLAN                                                    1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

489:2-22 (Furfine), 595:5-596:14 (Trout).  The term "hydrophobic"
means "water-repelling" and refers to substances that are
insoluble in water, like oil.  Tr. 590:20-25 (Trout).
"Hydrophilic" means "water-loving" and refers to substances that
interact favorably with water.  Id.  Because polysorbate 20 has
both hydrophobic and hydrophilic parts, PTX-1813A at 3; Tr. 590:12-
591:6 (Trout), its hydrophobic part interacts favorably with
hydrophobic regions of the protein and thereby prevents those
hydrophobic patches from binding to other proteins and
aggregating, Tr. 595:5-23 (Trout).

Preventing aflibercept from aggregating and coming out of
solution is especially important in the context of intravitreal
injections.  Intravitreal injections use narrow needles, Tr.
472:21-473:8 (Trout); Tr. 1465:15-21 (MacMichael); Tr. 476:9-14
(Furfine), which lead to shear stress and enhanced risk of protein
aggregation, Tr. 577:10-578:25 (Trout); Tr. 1465:19-25
(MacMichael).  Forcing protein solutions through a narrow-bore
needle creates shear stress, which can cause a protein to aggregate
and come out of solution.  Tr. 578:2-9 (Trout); Tr. 1465:15-25
(MacMichael); see also Tr. 476:2-24 (Furfine); Tr. 1680:6-11
(Graham).  Polysorbate 20 protects against such stresses,
preventing the aflibercept from aggregating and becoming
insoluble.  Tr. 1455:11-16, 1458:4-8, 1460:22-1461:13

86

Appx88

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

(MacMichael). A protein coming out of solution can lead to several potential problems, including protein inactivation, inflammation, and even adverse immune responses. Tr. 578:25-579:10 (Trout). The critical question for formulation scientists, therefore, is not whether aflibercept stays in solution under non-stressed conditions, but rather whether it stays in solution under all of the temperature and pressure conditions attendant to the manufacture, storage, shipment, and use (including through narrow needles) of the product. Tr. 577:10-578:9, 580:16-22 (Trout).

The experts agreed that polysorbate 20 prevents the aggregation of aflibercept, Tr. 595:5-596:5, 596:22-597:2, 599:11-600:7 (Trout); Tr. 1407:15-20, 1408:13-18, 1460:17-1461:20 (MacMichael), and that preventing the aggregation of aflibercept keeps more aflibercept in solution, Tr. 600:12-20, 601:1-6, 601:14-602:15, 602:22-603:13 (Trout); Tr. 1412:11-14, 1458:4-14, 1459:2-1460:13, 1462:13-18 (MacMichael), *i.e.*, increasing solubility of aflibercept as the Court's construction of "organic co-solvent" requires.



Appx89

REGENERON V. MYLAN                                          1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

███████████████████████████████████████████████████████

███████████████████████████████████████

The inventors used various labels to refer to polysorbate 20. In the Product Patent, in some internal documents, and in parts of their FDA submissions, they called it an "organic co-solvent." PTX-2, 2:39-42; Tr. 488:1-489:1 (Furfine); PTX-86 at 5 ("formulation development will require minimizing organic co-solvent (PEG and polysorbate)"); Tr. 1739:16-1740:22 (Graham); PTX-672 at 26 ("[A]ddition of an organic co-solvent (PEG3350, PEG300, or polysorbate 20) to the VEGF Trap drug substance significantly inhibited the degradation of 0.5 mg/ml VEGF Trap when agitated."). At times they referred to it as a stabilizer, stabilizing agent, or surfactant. Tr. 501:2-9 (Furfine). Regardless of its label, polysorbate 20 refers to a specific substance known to the POSA. Tr. 590:12-591:6 (Trout); PTX-1813A (Handbook of Pharmaceutical Excipients) at 3. And regardless of the particular English word used, polysorbate achieves the same function in aflibercept formulations—reducing aggregation that leads to aflibercept coming out of solution in the form of insoluble aggregations. Tr. 595:5-596:5, 596:22-597:2, 599:11-600:7 (Trout); Tr. 1407:15-20, 1408:13-18, 1460:17-1461:20 (MacMichael).

Appx90

REGENERON V. MYLAN                                                    1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

As relevant to the infringement inquiry, it was undisputed at trial that polysorbate 20 reduces formation of insoluble aggregates. Dr. Trout reviewed the scientific literature and explained how polysorbate 20 stabilizes proteins by preventing insoluble aggregates, thereby increasing the protein's solubility. The literature reflects the connection between reducing insoluble aggregates (which both parties agree polysorbate 20 does in aflibercept formulations, Tr. 595:5-596:5, 596:22-597:2, 599:11-600:7 (Trout); Tr. 1407:15-20, 1408:13-18, 1460:17-1461:20 (MacMichael)) and increasing solubility of a protein (the Court's construction of organic co-solvent, ECF No. 427 at 20; Tr. 600:12-20, 601:1-6, 601:14-602:15, 602:22-603:13 (Trout); Tr. 1412:11-14, 1458:4-14, 1459:2-1460:13, 1462:13-18 (MacMichael)). Wang 2005 elucidates how protein aggregation occurs: "[i]t is the patches of contiguous hydrophobic groups in the folding/unfolding intermediates that initiate the aggregation process." PTX-1556 at 3; Tr. 598:17-25 (Trout). Dr. Trout evaluated the three-dimensional structure of an aflibercept domain and confirmed that aflibercept has such hydrophobic patches that will be shielded by polysorbate, thereby increasing the solubility of aflibercept. Tr. 607:7-610:12; PTX-68A (showing hydrophobic regions in red). The Defendants offered no disagreement or contrary evidence. The Court credits Dr. Trout's unrebutted analysis.

89

REGENERON V. MYLAN                                     1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL
_____

The literature reflects the principle that as the hydrophobic patches of proteins associate, they begin to aggregate and become insoluble. "The initial protein aggregates are soluble but gradually become insoluble as they exceed certain size and solubility limits." PTX-1556 at 4; Tr. 599:1-7 (Trout). Polysorbate 20 prevents the formation of insoluble aggregates—protein out of solution. "To protect proteins from shaking/shearing-induced aggregation, surfactants are most commonly used," and these surfactants—including polysorbate, Tr. 601:14-25 (Trout), 1379:22-25 (MacMichael)— "inhibit protein aggregation by accumulating, competitively with proteins, at hydrophobic surfaces/interfaces and/or by binding directly to proteins." PTX-1556 at 20; Tr. 599:11-600:7. The hydrophobic/hydrophilic nature of polysorbate allows it to serve as a bridge between the hydrophobic patches of the protein and the aqueous (hydrophilic) solvent, thus inhibiting aggregation. PTX-1813A at 3; Tr. 590:12-591:6 (Trout). The Court finds that polysorbate 20's inhibition of the formation of insoluble aflibercept aggregates meets the Court's construction of "organic co-solvent."

Using a series of animations, Dr. Trout illustrated how polysorbate inhibits the formation of insoluble aggregates. Tr. 592:2-597:3. Dr. MacMichael did not dispute this understanding.

90

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

Tr. 1407:15-20, 1408:13-18, 1412:11-14, 1460:17-1461:20.  Without polysorbate, aflibercept molecules aggregate and then fall out of solution as insoluble particles.  Tr. 593:15-594:4, 599:1-7 (Trout); PTX-1556 at 4.  In the presence of polysorbate 20, however, the hydrophobic end of the polysorbate 20 molecule interacts with the hydrophobic patches of aflibercept and "tends to hinder aggregation, and therefore, keep the molecules soluble." Tr. 595:5-596:5 (Trout).  In other words, more aflibercept remains in solution with polysorbate 20 than without it; polysorbate 20 thus increases the solubility of aflibercept, consistent with the Court's claim construction.  <u>Id.</u>; <u>see</u> Tr. 600:12-601:6 (Trout); Tr. 1461:22-1462:8 (MacMichael).

The literature confirms Dr. Trout's testimony and the link between reduced aggregation and increased solubility.  The Randolph publication explained that interactions between surfactants and the hydrophobic patches on protein molecules lead to a "hydrophobicity reversal" that "effectively increases the solubility of the [surfactant-protein] complex":

> The <u>hydrophobic portion of non-ionic surfactants can</u>
> <u>bind to hydrophobic patches on proteins</u>.  This naturally
> causes the surfactant to order itself so that more
> hydrophilic groups are solvent exposed, resulting in a
> "<u>hydrophobicity reversal</u>."  <u>This "hydrophobicity</u>
> <u>reversal" means that the protein-surfactant complex is</u>
> <u>more hydrophilic tha[n] either the surfactant or protein</u>
> <u>alone, and effectively increases the solubility of the</u>
> <u>complex.</u>

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

PTX-1817 at 9-10 (emphasis added).   Dr. Trout explained that Randolph "teach[es] exactly as I've been describing and exactly as the Wang article teaches," Tr. 601:14-20, and is "a reflection of the Court's construction of organic cosolvent.  It increases the solubility of the complex."[6]   Tr. 602:16-21.   Neither the Defendants nor their experts offered a contrary interpretation of the literature, which reflects the understanding in the field that preventing aggregation is synonymous with increasing solubility. The Court credits Dr. Trout's unrebutted testimony.

Randolph also addressed polysorbate 20 specifically, explaining that its "addition" "blocked the progression of aggregates from a relatively low molecular weight, soluble fraction to insoluble aggregates." PTX-1817 at 10.  Dr. Trout confirmed Randolph's teaching that "just adding a very little bit of the polysorbate 20 starts to reduce the percentage of insoluble aggregates or increases the solubility." Tr. 604:12-606:8 (discussing PTX-1817 at 10, Fig. 4).  In addition, Randolph demonstrates that surfactants like polysorbate 20 "increase[] the solubility of the complex" (here, aflibercept interacting with polysorbate) at low concentrations of polysorbate 20, thereby

---

[6] The "complex" referenced in Randolph corresponds to a "weak interaction" between the aflibercept protein and polysorbate—it is not a new molecule.  Tr. 603:14-22 (Trout).

REGENERON V. MYLAN                                              1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

blocking the formation of insoluble aggregates. PTX-1817 at 9-10; Tr. 603:14-22 (Trout). The Court credits Dr. Trout's testimony and the teachings of Randolph, both of which demonstrate infringement.

The Defendants' argument that polysorbate 20 is not an organic co-solvent under the Court's construction and does not increase the solubility of aflibercept, see Tr. 1375:16-1376:5 (MacMichael), lacks support in the scientific literature, ███ ███████████████████████ and is contrary to the plain claim language reciting that the "organic co-solvent comprises . . . polysorbate 20." ██████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████ ████ █████ ██████ ████████ ████ ██████ ███

████████████████████████████████████

██████ █████ ██████████ █████ ████ ████ ██

████████████████████

For example, Dr. MacMichael confirmed on cross-examination that polysorbate 20 increases the solubility of aflibercept. Dr. MacMichael presented the following demonstrative reflecting the effect of polysorbate 20 on protein solubility in water:

93

REGENERON V. MYLAN                                                    1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL



DDX-8.34.  Discussing the graph, Dr. MacMichael agreed with Dr.
Trout that "hydrophobic patches can interact and cause
aggregation" of aflibercept "over time, if not protected" by
polysorbate, Tr. 1458:6-8 (MacMichael).  He also agreed that, if
aflibercept aggregates "get large enough, they will fall out of
solution," Tr. 1454:14-16, see also 1456:10-16, 1459:4-5
(MacMichael).  This testimony contradicts the Defendants' argument
that nothing can serve as an "organic co-solvent" for aflibercept
in the claimed formulations because the aflibercept is fully
soluble in water alone.  Tr. 1452:11-16, 1405:16-1406:9
(MacMichael).  As Dr. MacMichael agreed, "over time, if not
protected" by polysorbate, the aflibercept will not remain in
solution.  Tr. 1458:6-8 (MacMichael).  That is because the
solubility of aflibercept in water is not an invariable constant,

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

but rather depends on external conditions such as time, pressure, and temperature.  Tr. 1457:1-6 (MacMichael).  As Dr. MacMichael admitted, a protein solution experiences changes in such conditions as it is handled and used—for example, "[a]s you push the liquid through" a narrow-gauge needle upon intravitreal administration, the protein molecule "[i]s experiencing shear." Tr. 1465:12-25 (MacMichael).  Conditions such as "agitation-induced shear stresses" can increase aflibercept's "propensity for aggregation."  Tr. 1466:19-1467:6 (MacMichael).  And as Dr. MacMichael explained, the black curve in his graph shows the aflibercept "monomer in solution is going down over time as aggregates form."  Tr. 1458:11-14.  (A "monomer" is a "singular molecule of aflibercept," in contrast to aggregates of multiple aflibercept molecules.  Tr. 1462:23-1463:8.)

Critically, Dr. MacMichael's figure shows that aflibercept's "Solubility in Water" with polysorbate in the formulation (the orange dashed line) is consistently <u>higher</u> than its solubility without polysorbate (the black curve).  Dr. MacMichael confirmed that "[w]hat we're showing in this graphic is that," without polysorbate, "<u>the monomer aggregates and falls out of solution. And when we add polysorbate, it would stop that aggregation</u>."  Tr. 1461:18-20 (emphasis added); <u>see</u> Tr. 1462:2-5 ("[W]ith polysorbate, you're going to prevent aggregation and the

95

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

[aflibercept] monomer from falling out of solution, either as soluble aggregates or insoluble aggregates."). Thus, as Dr. MacMichael agreed, "you have more monomer in solution with polysorbate than without," Tr. 1462:13-18—in other words, the polysorbate increases the solubility of aflibercept.

Dr. MacMichael and Dr. Trout thus did not substantively dispute the underlying scientific principles of how polysorbate 20 interacts with aflibercept to prevent aggregation and cause more aflibercept to remain in solution. Dr. MacMichael instead advanced two primary arguments in support of the Defendants' noninfringement position. First, he argued that the specification and claims of the Product Patent incorrectly describe polysorbate as a co-solvent. And second, he argued that that the Court's claim construction imposes an unstated requirement that is not met by the polysorbate in the Defendants' product. As explained below, the Court credits neither of these arguments.

First, by Dr. MacMichael's own admission, the claims and specification of the Product Patent expressly describe polysorbate as an organic co-solvent. For example, Dr. MacMichael acknowledged that asserted claim 4 recites "wherein said organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20." Tr. 1470:13-17 (MacMichael). In Dr. MacMichael's opinion, however, claim 4 is "inaccurate" and "doesn't make sense." Tr. 1471:4-18. He

96

REGENERON V. MYLAN                                        1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

testified that he "would have written" the claim differently. Tr. 1471:19-24 (MacMichael). In addition, he acknowledged that the Product Patent's specification repeatedly refers to polysorbate as an organic co-solvent, but he "disagree[d] with the wording" of the patent's specification. Tr. 1472:2-5, 1472:16-17 (MacMichael). He testified that the patent is "wrong" and "the way it's defining polysorbate as a cosolvent is incorrect." Tr. 1473:6-13 (MacMichael). In other words, Dr. MacMichael concedes that the Product Patent's specification expressly defines "organic co-solvent" to include polysorbate, and he further concedes that the claims likewise refer to polysorbate 20 as an "organic cosolvent" — he simply disagrees with the language chosen by the inventors to define and claim their patented invention. The Court declines to rewrite the Product Patent as Dr. MacMichael "[h]ypothetically . . . would have written" it if he were the inventor. Tr. 1471:19-24 (MacMichael). The specification and claims of the Product Patent are clear that polysorbate is an organic co-solvent, and the Court's construction reflects the language of the Product Patent. As explained above, there is no substantive dispute between Dr. Trout and Dr. MacMichael about how polysorbate 20 and aflibercept interact to prevent aflibercept from aggregating, thereby increasing the solubility of aflibercept under the Court's construction of "organic co-solvent."

97

Appx99

REGENERON V. MYLAN                                        1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Dr. MacMichael also argued that the Court's construction of "organic co-solvent" imposes an additional, unstated requirement—that the polysorbate must "dissolve" the aflibercept in order to qualify as an organic co-solvent. Tr. 1405:18-20, 1406:4-9, 1407:4-10 (MacMichael); see also Tr. 1577:21-22 (the Defendants' counsel arguing that "[t]he claim construction requires that a cosolvent has to actually help dissolve, get more things into solution"). To be clear, the Court's construction requires only that the organic co-solvent is "added to the primary solvent to increase the solubility of the solute, here a VEGF antagonist." (ECF No. 427 at 20). It does not require that the organic co-solvent achieve the solubility increase in any particular way, and it specifies no requirement that the cosolvent "dissolve" the VEGF antagonist. Dr. MacMichael nonetheless argued that because aflibercept is "fully soluble and, therefore, would not need a cosolvent to further its solubility," polysorbate 20 cannot increase the solubility of aflibercept. Tr. 1452:11-16; see Tr. 1405:16-1406:9. As explained above, however, this argument is contradicted by Dr. MacMichael's own testimony that, "over time, if not protected" by polysorbate, aggregates of aflibercept "can fall out of solution," Tr. 1458:6-8, 1459:4-5. The additional requirement that Dr. MacMichael and the Defendants urge is not

Appx100

REGENERON V. MYLAN                                          1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

part of the Court's construction, nor is it found anywhere in the Product Patent or the scientific literature.

As the parties' experts agreed, the notion of "dissolving" aflibercept has no scientific basis. The evidence was consistent that aflibercept is never "dissolved" upon formulation, because it is already in solution when formulated. Tr. 1469:5-9 (MacMichael) (acknowledging that from the time the molecule is synthesized by the cell through its "final formulation," the aflibercept molecule is "continuously in an aqueous environment" and "[i]s not in a solid format"); Tr. 576:5-8 (Trout) ("Typically, aggregates are irreversible. So once they form, they don't go backwards."); Tr. 1409:2-18 (MacMichael) (agreeing with Dr. Trout); see also Tr. 505:4-12, 531:8-11, 561:15-562:8 (Furfine); Tr. 1677:4-7 (Graham). Rather, the evidence showed that a cosolvent may increase the solubility of aflibercept by preventing it from becoming insoluble. As described above, "with polysorbate, you're going to prevent aggregation and the [aflibercept] monomer from falling out of solution" and forming "insoluble aggregates." Tr. 1462:2-5 (MacMichael); see also Tr. 562:2-8 (Furfine). In this way, polysorbate 20 serves to "increase the solubility" of aflibercept.

███████████████████████████████████████

███  ██  ████  ██  ████  ████  ████  ████  ████  ████  ███

███████████████████████████████████████

Appx101

REGENERON V. MYLAN                                      1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL



Appx102

REGENERON V. MYLAN                                      1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL



101

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL



Appx104

REGENERON V. MYLAN                                                1:22-CV-61

**SEALED**

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

███████████████████████████████████  █████████████████████

████████████  Even if the Court did not consider this testimony,

however, that would not change the Court's rulings in favor of

Regeneron as to the Product Patent.

Dr. MacMichael's only response to ███████████████████████

██████  ███  ████  ████  ███  █████████  ██████████  ██████████  ██  ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████  ████████████████  ██████████████████████

██████  ██████  ███████  ███████  ██████  █  ████████  █████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████  ██████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████  █████████████████████████████████████████

██████  ████████  █████████  ████  █████████  █████████  ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████  ██████████████████████████████

████████████████████████████████████████████████████████████

██████████████  ████████████████████████████████████████████

████████████████████████████████████████████████████████████

103

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL



104

**SEALED**

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL



**SEALED**

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

In sum, having considered the evidence and testimony at trial regarding whether Yesafili contains an "organic co-solvent [that] comprises . . . polysorbate 20" under the Court's construction, the Court concludes that the ▮▮▮ polysorbate 20 in the Defendants' Yesafili product meets the requirements of the asserted claims of an organic co-solvent that comprises polysorbate 20. In doing so, the Court finds Dr. Trout's testimony to be more credible than Dr. MacMichael's. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ And Dr. MacMichael misapplied the Court's claim construction in arguing that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

106

Appx108

REGENERON V. MYLAN                                          1:22-CV-61

**SEALED**

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

████████████████████████████ the Court's construction requires only that the organic co-solvent is "added to the primary solvent to increase the solubility of the solute, here a VEGF antagonist" — not that the organic co-solvent achieve the increased solubility in any particular way. (ECF No. 427 at 20).

c. **Conclusion**

As explained, the only infringement dispute between the parties regarding the Product Patent is whether the polysorbate 20 in the Defendants' Yesafili product meets the "organic co-solvent" claim limitation under the Court's construction of that term. In other words, the dispute centers on whether the polysorbate 20 in the Defendants' Yesafili product "is added to the primary solvent [<u>i.e.,</u> the water in the Defendants' Yesafili product] to increase the solubility of" the aflibercept in the Defendants' Yesafili product. (ECF No. 427 at 20).

The Randolph publication explained that interactions between surfactants like polysorbate 20 and the hydrophobic patches on protein molecules lead to a "hydrophobicity reversal" that "effectively increases the solubility of the [surfactant-protein] complex." PTX-1817 at 9-10. And Wang 2005 elucidates how protein aggregation occurs: "[i]t is the <u>patches of contiguous hydrophobic groups</u> in the folding/unfolding intermediates that initiate the

107

Appx109

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

aggregation process." PTX-1556 at 3; Tr. 598:17-25 (Trout). Randolph also addressed polysorbate 20 specifically, explaining that its "addition" "blocked the progression of aggregates from a relatively low molecular weight, soluble fraction to insoluble aggregates." PTX-1817 at 10.

Notably, the Defendants' infringement expert, Dr. MacMichael, did not respond to the pertinent teachings of Wang 2005 and Randolph, and did not dispute Dr. Trout's analysis of how polysorbate 20 interacts with aflibercept. Dr. Trout's testimony thus stands unrebutted and compels a judgment of infringement. See Raytheon Techs. Corp. v. Gen. Elec. Co., 993 F.3d 1374, 1382 (Fed. Cir. 2021) ("unrebutted evidence" on issue was "conclusive"); Imperium IP Holdings v. Samsung Elecs. Co., 757 F. App'x 974, 978-79 (Fed. Cir. 2019) (no reasonable basis to reject opinion of expert whose "testimony was not contradicted" or impeached).

While Dr. MacMichael and Dr. Trout did not substantively dispute the underlying principles for how polysorbate 20 interacts with aflibercept, Dr. MacMichael asserted that the Court's claim construction imposes several requirements that are found nowhere in the Product Patent or the literature. He argued that because aflibercept is "fully soluble and, therefore, would not need a cosolvent to further its solubility," polysorbate 20 cannot

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

increase the solubility of aflibercept.  Tr. 1452:11-16; see Tr. 1405:16-1406:9.  But the Court's construction does not require the co-solvent to "dissolve" aflibercept.  Tr. 1405:18-24 (MacMichael).  Under the Defendants' interpretation of the construction, Dr. MacMichael could identify *nothing* that could serve as a co-solvent for aflibercept in the claims, confirming that the Defendants improperly seek to impose a requirement that cannot be satisfied.  See Lisle Corp. v. A.J. Mfg. Co., 398 F.3d 1306, 1314 (Fed. Cir. 2005) (rejecting "hyper-technical reading" requiring "tool disclosed by the patent" to perform function it was "incapable" of performing); Kenall Mfg. Co. v. H.E. Williams, Inc., 2013 WL 427119, at *2 (N.D. Ill. Feb. 1, 2013) ("[R]eadings of patents are to be avoided where they would arrive at an absurd result rather than achieve a common sense meaning.").  The Court's construction requires only that the organic co-solvent is "added to the primary solvent to increase the solubility of the solute, here a VEGF antagonist."  (ECF No. 427 at 20).  It does not require that the organic co-solvent achieve the increase in solubility in any particular way.

The evidence was unequivocal that aflibercept is never "dissolved" upon formulation, because it is already in solution when formulated.  Tr. 505:4-12, 531:8-11, 561:15-562:8 (Furfine); Tr. 1677:4-7 (Graham); Tr. 576:5-8 (Trout) ("Typically, aggregates

REGENERON V. MYLAN                                        1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

are irreversible.  So once they form, they don't go backwards.");
Tr. 1469:5-9 (MacMichael) ("From the time that the molecule is
synthesized by the cell it's in an aqueous environment. . . It's
not in a solid format."), 1409:2-18 (MacMichael) (agreeing with
Dr. Trout).  Rather, as described above, polysorbate 20 serves to
"protect against degradation and precipitation and falling out of
solution."   Tr. 562:2-8 (Furfine).   Although Dr. MacMichael
asserted that aflibercept is "fully soluble" without polysorbate
20, Tr. 1403:4-7, he admitted that "hydrophobic patches can
interact and cause aggregation" of aflibercept "over time, if not
protected" by polysorbate, Tr. 1458:6-8, and that if aflibercept
aggregates "get large enough, they will fall out of solution," Tr.
1454:13-15; see also Tr. 1456:10-16, Tr. 1459:4-5.  Critically,
Dr. MacMichael agreed that the figure he discussed on direct
examination showed that "you have more monomer in solution with
polysorbate than without," Tr. 1462:13-18—in other words, the
polysorbate increases the solubility of aflibercept.  By
protecting against such aggregation and precipitation, polysorbate
20 "increase[s] the solubility" of aflibercept, and thus is an
"organic co-solvent" under the Court's construction and the plain
terms of the patent.

The Defendants also argue that ███████████████████

███████████  ██  █  ████████  █████  ██  ██████████  ████

Appx112

REGENERON V. MYLAN                                              1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

██████████████████████████████ it cannot meet the "organic co-solvent compris[ing] . . . polysorbate 20" limitation.  This argument epitomizes form over substance.  The Product Patent describes polysorbate 20 as an organic co-solvent.  E.g., PTX-2, 2:39-40; Tr. 1473:6-13 (MacMichael) (agreeing the patent "[is] defining polysorbate as a cosolvent" but contending the patent "is incorrect"); Tr. 2098:19-22 (Trout).  It is well-established that chemicals may appropriately be described using different labels, which is of little moment where, as here, the patent specification and claims identify polysorbate 20 expressly as an organic co-solvent.  PTX-2, claim 4, 2:39-42; see Celgene Corp. v. Hetero Labs Ltd., 2020 WL 3249117, at *12 (D.N.J. June 16, 2020) ("[N]othing in the specification or the prosecution history supports . . . that the 'lubricant' has to be a substance that is 'distinct from' a binder or filler."); Roche Palo Alto LLC v. Lupin Pharm., Inc., 2012 WL 983697, at *18 (D.N.J. Mar. 21, 2012) ("[I]ngredients can overlap by serving multiple functions within a given formulation.").  By contrast, the patent identifies substances other than polysorbate as stabilizing agents.  PTX-2, 2:44-45.  The Defendants cannot avoid infringement merely by ███

████████████  ████  ████████  ████  █  ████  ████████  ████  ████  ████

████████████████████████████████████████████████████████

Appx113

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

Dr. MacMichael acknowledges the patent's unambiguous description of polysorbate 20 as a co-solvent; he just thinks the patent "is wrong." Tr. 1470:21-23. But disagreement with a patent is not a defense to patent infringement. Patent infringement "is a strict liability offense" and judgment must follow "regardless of the intent, culpability or motivation of the infringer." <u>Jurgens v. CBK, Ltd.</u>, 80 F.3d 1566, 1570 n.2 (Fed. Cir. 1996).



—and Regeneron referred to polysorbate 20 as an organic co-solvent repeatedly, including in the Product Patent and the Eylea BLA. PTX-2, 2:39-42; Tr. 488:1-489:1 (Furfine); PTX-86 at 5 ("formulation development will require minimizing organic co-solvent (PEG and polysorbate)"); Tr. 1739:16-1740:22 (Graham); PTX-672 at 26 ("[A]ddition of an organic co-solvent (PEG3350, PEG300, or polysorbate 20) to the VEGF Trap drug substance significantly inhibited the degradation of 0.5 mg/ml VEGF Trap when agitated.").

The Court declines to rewrite the Product Patent as Dr. MacMichael "[h]ypothetically . . . would have written" it if he

112

Appx114

**\*\*SEALED\*\***

## MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

were the inventor.  Tr. 1471:19-24 (MacMichael).  The specification

and claims of the Product Patent are clear that polysorbate is an

organic co-solvent, and the Court's construction reflects the

language of the Product Patent.  Thus, the Court concludes that

polysorbate 20 meets the "organic co-solvent" claim element ▮



For these reasons, the Court concludes that Regeneron has

demonstrated by a preponderance of the evidence that the

Defendants' BLA Product infringes the asserted claims of the

Product Patent.

### 3.    The Defendants' BLA Product Induces Infringement of the Treatment Patents

The parties next dispute whether the Defendants' BLA product

and proposed instructions and label will induce infringement of

Appx115

REGENERON V. MYLAN                                              1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

the Treatment Claims, claims 11 and 19 of the '601 Patent and claims 6 and 25 of the '572 Patent. The Treatment Claims relate to the treatment of angiogenic eye disorders using Regeneron's dosing regimen: a period of every-four-week dosing of aflibercept followed by at least one eight-week dose of aflibercept. These claims fall into three categories: (1) claims involving methods of treating DME by administering aflibercept in a series of five monthly loading doses followed by one or more subsequent doses spaced eight weeks apart - claim 11 of the '601 Patent and claim 25 of the '572 Patent (the "DME Claims"); (2) a claim involving a method of treating DR by administering aflibercept in a series of five monthly loading doses followed by one or more subsequent doses spaced eight weeks apart – claim 19 of the '601 Patent (the "DR Claim"); and (3) a claim involving a method of treating an angiogenic eye disorder by administering aflibercept in an isotonic solution in a series of every-four-week loading doses followed by one or more subsequent doses spaced eight weeks apart - claim 6 of the '572 Patent (the "Angiogenic Eye Disorder Claim").

Regeneron asserts that the Defendants' prescribing information for Yesafili will induce infringement of the Treatment Claims because its label and marketing recommend that physicians administer the BLA product in an infringing manner. The Defendants, on the other hand, argue that Regeneron has failed to

REGENERON V. MYLAN                                        1:22-CV-61

**SEALED**

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

demonstrate that physicians will use Yesafili in an infringing way

if commercialized or that the Defendants intended to induce

infringement.

   As detailed below, the Court finds that (1) if the Defendants

market Yesafili with its proposed label, some physicians will

follow the recommendations in that label and will thereby perform

acts that directly infringe the Treatment Claims, and (2) the

Defendants' proposed label for Yesafili encourages, recommends,

and promotes administration of Yesafili in an infringing manner.

Accordingly, the Court finds that the Defendants will induce

infringement of the Treatment Claims if they market Yesafili.

    a.   **Physicians Will Use the Defendants' BLA product in an Infringing Manner**

   The evidence at trial demonstrated that if the Defendants

market Yesafili with its proposed label, some physicians will

follow its recommendations and treat patients in a manner that

directly infringe the Treatment Claims.  Regeneron presented

expert testimony on the topic of infringement of the Treatment

Claims, through its clinical expert Dr. Karl Csaky, whom the Court

accepted as an expert in ophthalmology with a specialty in

angiogenic retinal diseases and their treatment in view of his

extensive qualifications, detailed above.  The Defendants did not

offer opposing expert testimony.

115

REGENERON V. MYLAN                                    1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Dr. Csaky testified that the Defendants induced infringement of each Asserted Treatment Claim by the express instructions in the proposed label for Yesafili. See Tr. 345:10-23, 360:17-361:6, 371:23-372:8, 373:17-20, 381:21-382:9, 388:21-389:5 (Csaky); see also PTX-3097 (the Defendants' August 2022 label); PTX-3338 (the Defendants' March 2023 label, which they produced after expert discovery, and which is substantively identical to the August 2022 label, Tr. 311:4-312:9 (Csaky)). No witness testified to the contrary. As Dr. Csaky explained, he and other ophthalmologists read labels, and the label for a drug "gives us a starting point for how do we utilize the drug." Tr. 331:18-333:7 (Csaky). The Defendants' clinical expert Dr. Jay Stewart admitted on cross-examination that he has reviewed labels for Eylea in his clinical practice. Tr. 1350:6-10 (Stewart).

Dr. Csaky also testified that if the Defendants market Yesafili accompanied by their proposed label, at least some doctors will follow the label instructions and therefore perform the methods of the Treatment Claims in some patients. Tr. 367:4-371:22 & 379:17-381:20 (Csaky) (DME Claims); Tr. 386:10-388:20 (Csaky) (DR Claim); Tr. 331:3-345:9 & 355:5-360:16 (Csaky) (Angiogenic Eye Disorder Claim). Dr. Csaky based those opinions on his experience, Tr. 304:13-25, 307:16-309:1, 331:18-333:7, 334:12-337:4, 344:19-345:9, 356:7-358:9, 360:3-16, 367:4-371:22,

REGENERON V. MYLAN                                           1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

379:17-381:20, 386:10-388:20 (Csaky), his discussions with fellow ophthalmologists, Tr. 304:13-25, 307:16-309:1, 334:12-335:6, 337:5-25, 344:19-345:9, 356:7-358:4, 358:21-359:7, 360:3-16, 367:4-371:22, 379:17-381:20, 387:1-388:20 (Csaky), the sworn testimony of other ophthalmologists, Tr. 339:2-341:16, 344:19-345:9, 358:10-20, 360:3-16 (Csaky), and peer-reviewed literature, Tr. 341:19-345:9 (Csaky); see also PTX-586. He also grounded his opinions in the fact that ophthalmologists, including Dr. Csaky himself, have performed these methods with Eylea, which has a substantively identical label. Tr. 333:17-337:25, 339:2-344:18, 355:11-359:7, 359:20-360:16, 369:4-371:6, 380:18-381:20, 386:10-388:20 (Csaky).

At trial, the Defendants objected to Dr. Csaky's reliance on the written testimony of Dr. Diana Do that Regeneron submitted in an IPR proceeding, as informing his understanding that ophthalmologists make use of the dosing regimens set forth in the Eylea label in various contexts. Tr. 433:17-34 (Csaky). Regeneron did not and does not request admission of the underlying Declaration itself, but Dr. Csaky was permitted to reference it in explaining how he formed his opinions. Tr. 338:14-18 (Csaky). As a qualified expert, Dr. Csaky was permitted to rely on his understanding of practices in the field as informed by his understandings from other ophthalmologists. Fed. R. Evid. 703.

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

Just as he could consider views as expressed in written publications or in oral conversations, there is no reason he could not take into account the views of another expert as set forth in a written declaration made under oath. Dr. Csaky testified that he knows Dr. Do, has co-authored a paper with her, and finds her trustworthy. Tr. 339:12-340:21, 433:5-15, 1833:13-21, 2003:20-2005:6 (Csaky); PTX-1027. One of the Defendants' experts, Dr. Albini, agreed that she is well-regarded. Tr. 884:14-16 (Albini). Also, as Dr. Csaky explained in his testimony, physicians frequently rely on the opinions of physicians who are paid by industry leaders for their work, and he himself has done so in the context of his own research. Tr. 432:11-15 (Csaky). The Court will consider Dr. Csaky's testimony about the Do declaration, but not the declaration itself, in its infringement analysis. Even if the Court did not consider Dr. Csaky's testimony relying on the Do declaration, however, it would not change the Court's infringement analysis.

As Mylan's Rule 30(b)(6) corporate representative and Director of Core Regulatory Labeling Strategy, Vanessa Smith, testified, "we based our labeling [for Yesafili] off of the reference product labeling [for Eylea]," ECF No. 538-3 at 48:16-17; the Yesafili label contains "the same indications that are listed on the current Eylea label" and instructs treatment using

REGENERON V. MYLAN                                      1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

"the same dosage regimens that are reflected on the current Eylea label," ECF No. 538-3 at 31:17-32:22; and the purpose for including such statements in the label was to "provide the information pertaining to how the product should be dosed for the defined indications . . . and how that product should be administered . . . for each particular indication," ECF No. 538-3 at 32:8-17. Copying the label for Eylea allowed the Defendants to take advantage of an abbreviated path to FDA approval by using dosing regimens that Regeneron developed and tested at great expense with clinical trials, the cost of which "can easily run in the hundreds of millions of dollars." Tr. 1590:2-3 (Chu).

>    b.    **The Defendants' BLA product Label Recommends Infringing Uses**

Further, the Defendants' proposed label for Yesafili encourages, recommends, and promotes administration of Yesafili in a manner that meets every limitation of each of the Treatment Claims.

>         i.    **The DME Claims (Claim 11 of the '601 Patent and Claim 25 of the '572 Patent)**

With regard to the DME Claims, the Defendants' Yesafili label recommends, encourages and promotes clinicians to use Yesafili to treat "Diabetic Macular Edema (DME)," consistent with claim 10 of

119

Appx121

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

the '601 patent and claim 15 of the '572 patent, from which the asserted claims depend.

The Yesafili label recommends only one dosing regimen for the treatment of DME. Tr. 347:4-25, 349:2-17 (Csaky); PTX-3097 at 1-2; see also Tr. 303:19-304:1, 313:18-22 (Csaky) (Eylea and Yesafili labels recommend the same thing). Specifically, the label recommends ophthalmologists treat DME by administering 2 mg Yesafili "by intravitreal injection every 4 weeks (approximately every 28 days, monthly) for the first 5 injections, followed by 2 mg (0.05 mL) via intravitreal injection once every 8 weeks (2 months)." This recommended regimen meets every limitation of claim 11 of the '601 patent and claim 25 of the '572 patent, as Dr. Csaky testified, and as set forth in more detail below. Tr. 361:12-367:3, 374:11-379:16 (Csaky).

### 1)    Claim 25 of the '572 Patent

The Defendants' proposed label for Yesafili recommends that doctors perform every step of the method of claim 25 as to which the Court has afforded patentable weight, including those limitations incorporated by virtue of claim 25's dependency on claim 15. Specifically, the Defendants' proposed label for Yesafili recommends that doctors perform:

120

Appx122

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

- "A method for treating diabetic macular edema in a patient in need thereof" (see PTX-3097 at 2; see also PTX-3097 at 1; Tr. 362:11-24, 375:8-376:13 (Csaky));

- "sequentially administering to the patient a single initial dose of 2 mg of aflibercept, followed by one or more secondary doses of 2 mg of aflibercept . . . wherein each secondary dose is administered to the patient by intravitreal injection approximately 4 weeks following the immediately preceding dose" . . . "wherein four secondary doses are administered to the patient" (see PTX-3097 at 2; see also PTX-3097 at 1 ("2 mg (0.05 mL) administered by intravitreal injection every 4 weeks (approximately every 28 days, monthly) for the first 5 injections"); Tr. 362:25-365:7, 376:14-378:11 (Csaky));

- "and wherein each tertiary dose is administered to the patient by intravitreal injection approximately 8 weeks following the immediately preceding dose" (see PTX-3097 at 2; see also PTX-3097 at 1; Tr. 365:8-366:12, 378:12-379:2 (Csaky)).

The evidence also demonstrates that if the Defendants market Yesafili, some physicians will perform the steps recommended in its proposed label and thereby directly infringe claim 25 of the

121

Appx123

REGENERON V. MYLAN                                        1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

'572 patent. As described above, Dr. Csaky testified that some physicians would follow the instructions in Yesafili's label based on, among other things, his own experience and discussions with fellow ophthalmologists. Tr. 367:4-371:22 (Csaky discussing claim 25); ¶¶ 162-63 (Csaky testimony regarding physicians reviewing labels and performing methods described in Yesafili and Eylea labels); Tr. 369:3-370:1 (Csaky testimony that Eylea and Yesafili labels both recommend infringement of claim 25).

For example, Dr. Csaky testified that based on "the way that doctors currently use" Eylea, "there will be some doctors who will perform these methods" as recommended in Yesafili's label, and that he personally has used those methods to treat DME, as claim 25 requires. Tr. 355:5-356:21 (Csaky). Dr. Csaky elaborated that "it's very common to say we're going to try five injections at the very beginning, especially for someone with diabetic macular edema; and then, of course, if they respond well, then you want to start extending them to a longer period, like eight weeks." Tr. 357:4-9 (Csaky).

Accordingly, the Court finds that if the Defendants market Yesafili, the Defendants will induce infringement of claim 25 of the '572 patent.

Appx124

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

**2)   Claim 11 of the '601 Patent**

The Defendants' proposed label for Yesafili recommends that doctors perform every step of the method of claim 11 having patentable weight, including those limitations incorporated by virtue of claim 11's dependency on claim 10. Specifically, the Defendants' proposed label for Yesafili recommends that doctors perform:

- "A method for treating diabetic macular edema in a patient in need thereof" (see PTX-3097 at 2; see also PTX-3097 at 1; Tr. 362:11-24, 375:8-376:13 (Csaky));

- "comprising intravitreally administering, to said patient, an effective amount of aflibercept which is 2 mg approximately every 4 weeks for the first 5 injections" (see PTX-3097 at 2; see also PTX-3097 at 1 ("2 mg (0.05 mL) administered by intravitreal injection every 4 weeks (approximately every 28 days, monthly) for the first 5 injections"); Tr. 362:25-365:7, 376:14-378:11 (Csaky));

- "followed by 2 mg approximately once every 8 weeks or once every 2 months" (see PTX-3097 at 2; see also PTX-3097 at 1; Tr. 365:8-366:12, 378:12-379:2 (Csaky));

- "wherein approximately every 4 weeks comprises approximately every 28 days or approximately monthly" (see

123

Appx125

REGENERON V. MYLAN                                      1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

PTX-3097 at 2; <u>see</u> <u>also</u> PTX-3097 at 1; Tr. 377:16-378:11

(Csaky)).

The evidence also demonstrates that if the Defendants market Yesafili, some physicians will perform the steps recommended in its proposed label and thereby directly infringe claim 11 of the '601 patent. As described above, Dr. Csaky testified that some physicians would follow the instructions in Yesafili's label based on, among other things, his own experience and discussions with fellow ophthalmologists. Tr. 379:18-381:20 (Csaky); <u>supra</u> ¶¶ 162-63. In addition to the testimony Dr. Csaky provided in the context of claim 25, <u>supra</u> ¶ 169—all of which is relevant to claim 11—Dr. Csaky specifically testified that doctors will also perform claim 11's additional limitation—administering aflibercept once every four weeks for the first five injections, "wherein approximately every 4 weeks comprises approximately every 28 days or approximately monthly" — which is consistent with his own practice and the practice of other ophthalmologists with whom he has spoken. Tr. 380:5-381:9 (Csaky) ("Yes. I would say that we often do this approximately every 28 days.").

Accordingly, the Court finds that if the Defendants market Yesafili, the Defendants will induce infringement of claim 11 of the '601 patent.

124

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

ii.    The DR Claim (Claim 19 of the '601 Patent)

The Defendants' proposed label for Yesafili recommends that doctors perform every step of the method of claim 19 of the '601 patent having patentable weight, including those limitations incorporated by virtue of claim 19's dependency on claim 18. Specifically, the Defendants' proposed label for Yesafili recommends that doctors perform:

- "A method for treating diabetic retinopathy in a patient in need thereof" (see PTX-3097 at 1, 3; Tr. 383:6-25 (Csaky));

- "comprising intravitreally administering, to said patient, an effective amount of aflibercept which is 2 mg approximately every 4 weeks for the first 5 injections" (see PTX-3097 at 3; see also PTX-3097 at 1; Tr. 384:1-385:4 (Csaky));

- "followed by 2 mg approximately once every 8 weeks or 2 months" (see PTX-3097 at 3; see also PTX-3097 at 1; Tr. 385:5-24 (Csaky));

- "wherein approximately every 4 weeks comprises approximately every 28 days or approximately monthly" (see PTX-3097 at 3; see also PTX-3097 at 1; Tr. 384:1-385:4 (Csaky)).

125

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

The evidence also demonstrates that if the Defendants market Yesafili, some physicians will perform the steps recommended in its proposed label and thereby directly infringe claim 19 of the '601 patent. Dr. Csaky testified that he has personally performed and that others have performed the method of claim 19 to treat DR using Eylea, and that in his opinion, some doctors will follow Yesafili's label for the treatment of patients with DR.   Tr. 386:11-388:20 (Csaky).   Dr. Csaky elaborated that "there's more and more interest in using this approach," and that he has talked with other physicians "about the utility of this approach in treating these types of patients, and they claim that they are using this approach" especially "where the alternative is laser photocoagulation. Tr. 387:1-10 (Csaky); <u>see also</u> Tr. 357:10-358:9 (Csaky).

Accordingly, the Court finds that if the Defendants market Yesafili, the Defendants will induce infringement of claim 19 of the '601 patent.

### iii.   The Angiogenic Eye Disorder Claim (Claim 6 of the '572 Patent)

The Defendants' proposed label for Yesafili recommends that doctors perform every step of the method of claim 6 of the '572 patent having patentable weight, including those limitations incorporated by virtue of claim 6's dependency on claims 1, 2, and

126

REGENERON V. MYLAN                                    1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

3.    Specifically, the Defendants' proposed label for Yesafili

recommends that doctors perform the following steps for the

treatment of each of AMD, DME, and DR.

- "A method of treating an angiogenic eye disorder in a

  patient in need thereof comprising sequentially

  administering to the patient by intravitreal injection a

  single initial dose of 2 mg of aflibercept" (AMD, DME, and

  DR: see PTX-3097 at 2-3; id. at 1; Tr. 316:22-318:10,

  346:3-347:3 (Csaky))

- "followed by one or more secondary doses of 2 mg of

  aflibercept, followed by one or more tertiary doses of 2

  mg of aflibercept wherein each secondary dose is

  administered approximately 4 weeks following the

  immediately preceding dose . . . wherein each tertiary dose

  is administered approximately 8 weeks following the

  immediately preceding dose" (AMD: see PTX-3097 at 2; id.

  at 1; Tr. 318:11-323:21 (Csaky); DME and DR: PTX-3097 at

  2-3; id. at 1; Tr. 347:4-352:8 (Csaky));

- "followed by one or more tertiary doses of 2 mg of

  aflibercept . . . wherein each tertiary dose is

  administered approximately 8 weeks following the

  immediately preceding dose" (AMD: PTX-3097 at 2; id. at 1;

127

Appx129

REGENERON V. MYLAN                                    1:22-CV-61

**SEALED**

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

Tr. 323:22-325:9 (Csaky); DME and DR: PTX-3097 at 2-3; <u>id.</u> at 1; Tr. 352:9-353:20 (Csaky));

- "wherein the aflibercept is formulated as an isotonic solution (AMD, DME and DR: PTX-3097 at 13; PTX-1800 at 2; PTX-1820 at 14; Tr. 642:5-15, 640:9-641:23, 640:9-642:22 (Trout)).

With respect to the final limitation of claim 6, ▮▮



▮▮▮▮▮ Tr. 1168:25-1169:2 (Rabinow) (agreeing "isotonic and iso-osmolar have roughly the same meaning"); <u>see also</u> Tr. 526:22-527:1 (Furfine).

128

REGENERON V. MYLAN                                                    1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

The evidence also demonstrates that if the Defendants market Yesafili, doctors will follow the recommended dosing regimens for AMD, DME, and DR and will therefore perform acts of direct infringement. As he testified with regard to the Yesafili label's instructions for treating DME and DR, Dr. Csaky testified that at least some doctors would follow the label's instructions for treating wet AMD, and in fact that those instructions reflect "a very common approach" that he and other doctors use with patients. Tr. 333:8-337:25 (Csaky). Dr. Csaky also properly relied on the sworn declaration of a renowned ophthalmologist, Dr. Diana Do, who testified that she and other physicians "typically and frequently treat wet AMD" as well as "other diseases like diabetic macular edema, DME, or diabetic retinopathy" by using the method of claim 6 of the '572 Patent. Tr. 339:2-341:16 (Csaky); see PTX-1527 (Decl. of Diana Do).

#### iv.    Additional Evidence of Infringement

Even were the specific dosing regimens discussed above not included in Yesafili's label, other statements in the Defendants' proposed Yesafili label are sufficient to induce infringement because those statements convey to ophthalmologists that Yesafili should be used identically to the way in which some ophthalmologists already administer Eylea. See Tr. 331:3-345:9,

129

Appx131

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

## MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

355:5-361:7, 367:4-371:22, 379:17-381:20, 386:10-388:20, 393:10-396:1 (Csaky).

First, Dr. Csaky considered language that the Defendants included in their Yesafili label, stating that Yesafili is "highly similar" to Eylea, that "there are no clinically meaningful differences between" Yesafili and Eylea, and that Yesafili "can be expected to produce the same clinical result as [Eylea] in any given patient." PTX-3097 at 1. This language was optional, not required by the FDA, as Mylan's Rule 30(b)(6) corporate representative and Director of Core Regulatory Labeling Strategy, Vanessa Smith, acknowledged. (ECF No. 538-3 (Smith) at 110:08-112:09, 114:05-115:13, 117:12-118:10). Dr. Csaky testified — unrebutted — that this language alone conveys to clinicians that "the two drugs are the same" and that they "can use Yesafili in the exact same way [they] can use Eylea." Tr. 394:20-396:1 (Csaky). Accordingly, the Court concludes that this language alone, without regard to any other language in the label, demonstrates the Defendants' inducement of infringement.

Second, Dr. Csaky considered language that the Defendants included in their Yesafili label, stating that Yesafili is "interchangeable" with Eylea. PTX-3097 at 1. Again, this language was optional, not required by the FDA, as Mylan's Rule 30(b)(6) corporate representative acknowledged. (ECF No. 538-3 (Smith) at

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

110:08-112:09, 114:05-115:13, 117:12-118:09). Dr. Csaky testified — unrebutted — that this language would convey to clinicians that "the two drugs are the same" and that they "can essentially exchange and use Yesafili in the exact same fashion that [they are] using Eylea in the clinic." Tr. 394:1-19 (Csaky).

Third, Dr. Csaky considered statements the Defendants made in a presentation delivered by their consultant, Dr. Susan Bressler, at the 2022 meeting of the American Academy of Ophthalmology ("AAO"). See PTX-331. The AAO meeting is the "largest ophthalmology meeting" in the country that "all general ophthalmologists, retina specialists will attend" and that "is the one place where you can disseminate information and share the results of data with the community." Tr. 390:5-17 (Csaky). In their presentation, the Defendants stated that they had performed a Phase 3 trial in which Yesafili was administered in a baseline dosing regimen within the scope of the DME Claims and the Angiogenic Eye Disorder Claim, see PTX-331 at 5-6, and announced that the study had "demonstrated therapeutic equivalence of [Yesafili] and [Eylea] in the treatment of diabetic macular edema (DME)," that Yesafili "was safe and well tolerated, with a similar safety and immunogenicity profile to . . . Eylea," and that "[f]ollowing regulatory approval, [Yesafili] is expected to be a new treatment option for patients with DME," id. at 12. Dr. Csaky

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

testified — unrebutted — that ophthalmologists would understand such statements to convey that they could "use Yesafili essentially in an identical way that [they are] using Eylea in the treatment of DME." Tr. 393:10-21 (Csaky). This evidence supports a finding that the Defendants actively encourage infringement of the Treatment Claims as to DME.

The Defendants offered no expert testimony to rebut Dr. Csaky's conclusions on infringement. The Court credits Regeneron's unrebutted evidence of infringement, including the testimony of Dr. Csaky, that if the Defendants market Yesafili, the Defendants will induce infringement of each of the Treatment Claims.

### c.   Conclusion

The Defendants induce infringement of the Treatment Patents because they propose to sell Yesafili with prescribing information that will explicitly encourage, recommend, and promote its administration in a manner that would infringe the Treatment Claims, and it is undisputed that some doctors will follow the label and use Yesafili to treat patients in an infringing way. Federal Circuit "precedent has consistently held that, when a product is sold with an infringing label or an infringing instruction manual, such a label is evidence of intent to induce

132

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

infringement." GlaxoSmithKline, 7 F.4th at 1334; see also Sanofi, 875 F.3d at 646; Eli Lilly, 845 F.3d at 1368; AstraZeneca, 633 F.3d at 1059.

To the extent that the Defendants argue that some doctors will ignore the label directions and engage in noninfringing uses of Yesafili, see Tr. 713:16-22, 715:10-18, the Federal Circuit has rejected this argument. In AstraZeneca v. Apotex, the Federal Circuit acknowledged that "where a product has substantial noninfringing uses," intent to induce infringement could not be inferred from a defendant's mere knowledge that its product might be put to infringing use, but clarified that "liability for active inducement may be found where evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statements or actions directed to promoting infringement." 633 F.3d at 1059. Here, the Defendants' label instructions meet this standard and "encourage, recommend, or promote" infringing conduct, particularly given the Defendants' continued pursuit of FDA approval of those instructions despite repeated notice of Regeneron's infringement claims. See, e.g., id. at 1060; Sanofi, 875 F.3d at 646 (rejecting argument that because product "has substantial noninfringing uses not forbidden by the proposed labels . . . the district court could not permissibly find intent to encourage an infringing use" and

133

REGENERON V. MYLAN                                               1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

concluding "there is no legal or logical basis for the suggested limitation on inducement"); GlaxoSmithKline, 7 F.4th at 1334 ("Our precedent has consistently held that, when a product is sold with an infringing label or an infringing instruction manual, such a label is evidence of intent to induce infringement.").

To the extent that the Defendants argue that the Yesafili label discusses noninfringing uses, including potential alternative regimens, the Federal Circuit also has rejected that argument.  In GlaxoSmithKline, the accused infringer contended its label language about treating two categories of patients, when arguably the treatment of only one category fell within the scope of the claim, "preclude[d] inducement since this may encourage both infringing and noninfringing uses."  Id. at 1329.  The court rejected the argument that the "label's recommended use on both types of patients somehow obviates infringement."  Id. at 1330. In Vanda, the court similarly rejected a noninfringement argument based on a label's target dose range allowing for the use of both infringing and noninfringing doses.  887 F.3d at 1132.  The court explained that "[e]ven if not every practitioner will prescribe an infringing dose, that the target dose range 'instructs users to perform the patented method' is sufficient to 'provide evidence of . . . affirmative intent to induce infringement.'"  Id. (quoting AstraZeneca, 633 F.3d at 1060).

134

REGENERON V. MYLAN                                    1:22-CV-61

**SEALED**

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

The Defendants also induce infringement of the Treatment Patents because their marketing has instructed and will instruct health care providers to administer Yesafili in the same infringing manner they have administered Eylea for many years, and it is undisputed that some doctors will follow those directions and use Yesafili to treat patients in an infringing way. As the Federal Circuit stated in <u>AstraZeneca</u>, "liability for active inducement may be found where evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statements or actions directed to promoting infringement." 633 F.3d at 1059.

Here, such statements or actions included the Defendants' statements in their label that Yesafili is "highly similar" to Eylea, that "there are no clinically meaningful differences between" Yesafili and Eylea, that Yesafili "can be expected to produce the same clinical result as [Eylea] in any given patient," and that Yesafili is "interchangeable" with Eylea, see PTX-3097, as well as the Defendants' statements via a consultant's presentation at a medical conference that they had "demonstrated therapeutic equivalence of [Yesafili] and [Eylea] in the treatment of diabetic macular edema (DME)," that Yesafili "was safe and well tolerated, with a similar safety and immunogenicity profile to . . . Eylea," and that "[f]ollowing regulatory approval, [Yesafili]

135

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

is expected to be a new treatment option for patients with DME,"

see PTX-331.

For these reasons, the Court concludes that Regeneron has demonstrated by a preponderance of the evidence that, if the Defendants were to market their BLA Product, they would induce infringement of the asserted claims of the Treatment Patents.

**C.  Invalidity of the Patents-in-Suit**

According to the Defendants, the asserted claims are anticipated, obvious, or invalid under 35 U.S.C. § 112. Specifically, the Defendants contend the asserted claims of the Product Patent are anticipated by Dix '226; obvious in light of three combinations of prior art references: (1) Fraser and Lucentis, (2) Fraser and Lui, and (3) Dix '226 alone; and invalid under § 112 because they are indefinite, lack written description, and lack enablement.

As to the Asserted Treatment Claims, the Defendants assert that Claim 6 of the '572 Patent, (the angiogenic eye disorder claim) is anticipated by Dixon or is obvious in view of Dixon alone or in combination with Hecht.  They further assert that Claim 6 is invalid under § 112 for lack of written description and enablement.

The Defendants also assert that claims 25 of the '572 Patent and claim 11 or the '601 Patent (the DME claims) and claim 19 of

136

REGENERON V. MYLAN                                               1:22-CV-61

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

the '601 Patent (the DR claim) are anticipated by Regeneron's September 2009 press release or are rendered obvious in view of the '747 Patent, the 9-14-2009 Press Release, and in combination with Do 2009 and Lalwani 2009b. They further assert that these claims are invalid under § 112 for lack of written description and enablement.

### 1. Legal Standards

In 2011, Congress passed the America Invents Act ("AIA"), which changed the United States patent system from a "first to invent" system to a "first inventor to file" system. <u>See</u> <u>Madstad Eng'g, Inc. v. U.S. Pat. & Trademark Off.</u>, 756 F.3d 1366, 1368 (Fed. Cir. 2014). Where, as here, the claims have an effective filing date prior to March 16, 2013, pre-AIA 35 U.S.C. § 102 applies. <u>Blue Calypso, LLC v. Groupon, Inc.</u>, 815 F.3d 1331, 1341 n.4 (Fed. Cir. 2016); <u>Solvay S.A. v. Honeywell Int'l Inc.</u>, 742 F.3d 998, 1000 n.1 (Fed. Cir. 2014) (noting that the "AIA amendments apply only to applications and patents with an effective filing date of March 16, 2013, or later"). Thus, the Court's citations to 35 U.S.C. §§ 102, 103, or 112 shall be in reference to the pre-AIA versions of the statute, unless expressly stated otherwise.

137

Appx139

REGENERON V. MYLAN                                           1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

In all cases, each asserted claim is presumed to be valid. See 35 U.S.C. § 282; Microsoft Corp. v. I4i Ltd. P'ship, 564 U.S. 91, 94 (2011); Novo Nordisk A/S v. Caraco Pharm. Lab'ys, Ltd., 719 F.3d 1346, 1352 (Fed. Cir. 2013). The Defendants thus bear the burden of proving invalidity by clear and convincing evidence. See 35 U.S.C. § 282 ("The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."); Microsoft, 564 U.S. at 102 ("[A] defendant raising an invalidity defense [bears] a heavy burden of persuasion, requiring proof of the defense by clear and convincing evidence." (citation and quotation marks omitted)). "[A] patentee never must submit evidence to support . . . that a patent remains valid . . . ." Prometheus Labs., Inc. v. Roxane Labs., Inc., 805 F.3d 1092, 1101-02 (Fed. Cir. 2015) (emphasis in original) (quoting Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1360 (Fed. Cir. 2007)). "Clear and convincing evidence places in the fact finder 'an abiding conviction that the truth of [the] factual contentions are highly probable.'" Procter & Gamble Co. v. Teva Pharm. USA, Inc., 566 F.3d 989, 994 (Fed. Cir. 2009) (quoting Colorado v. New Mexico, 467 U.S. 310, 316 (1984)).

### a. Anticipation

A patent claim is invalid for anticipation when subject matter that the claims cover "was patented or described in a printed

138

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

publication . . . more than one year prior to the date of application for patent in the United States." 35 U.S.C. § 102(b); Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc., 855 F.3d 1356, 1367 (Fed. Cir. 2017); Net MoneyIN, Inc. v. VeriSign, Inc., 545 F.3d 1359, 1369 (Fed. Cir. 2008). Whether a prior art reference anticipates a claim is a question of fact. Atofina v. Great Lakes Chem. Corp., 441 F.3d 991, 995 (Fed. Cir. 2006).

To prove anticipation, a defendant must show not only that a single reference "disclose[s] all elements of the claim within [its] four corners," but "all elements of a claimed invention arranged as in the claim." Net MoneyIN, 545 F.3d at 1369-71 (emphasis in original) (internal quotation marks omitted). A patent thus is invalid for anticipation if "a single prior art reference discloses each and every limitation of the claimed invention." Schering Corp. v. Geneva Pharm., Inc., 339 F.3d 1373, 1377 (Fed. Cir. 2003).

"[I]t is not enough that the prior art discloses part of the claimed invention, which an ordinary artisan might supplement to make the whole, or that it includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention." Net MoneyIN, 545 F.3d at 1371; see also, e.g., Finisar Corp. v. DirecTV Grp., Inc., 523 F.3d 1323, 1334-35 (Fed. Cir. 2008); Union Oil Co. of Cal. v. Atl. Richfield Co., 208 F.3d 989,

139

Appx141

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

995 (Fed. Cir. 2000). "[A]ll of the limitations" must be "arranged or combined in the same way as recited in the claim" in order to "prove prior invention of the thing claimed and . . . anticipate under 35 U.S.C. § 102." Net MoneyIN, 545 F.3d at 1371.

An anticipatory reference must "clearly and unequivocally disclose the claimed [invention] or direct those skilled in the art to the [invention] without any need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference." Sanofi-Synethelabo v. Apotex, Inc., 550 F.3d 1076, 1083 (Fed. Cir. 2008) (quoting In re Arkley, 455 F.2d 586, 587 (C.C.P.A. 1972) (emphasis in original)). The reference must also "enable one of ordinary skill in the art to make the invention without undue experimentation." In re Gleave, 560 F.3d 1331, 1334 (Fed. Cir. 2009) (quoting Impax Labs., Inc. v. Aventis Pharms. Inc., 545 F.3d 1312, 1314 (Fed. Cir. 2008)).

### b.  Obviousness

A claimed invention is invalid as obvious "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (pre-AIA). "Obviousness is a question of law based on

140

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective considerations of nonobviousness." Osram Sylvania, Inc. v. Am. Induction Techs., Inc., 701 F.3d 698, 706 (Fed. Cir. 2012) (citing Graham v. John Deere Co. of Kan. City, 383 U.S. 1, 17–18 (1966)); see also KSR Int'l Co. v. Teleflex, Inc., 550 U.S. 398, 406-07 (2007) ("[T]he [Graham] factors continue to define the inquiry that controls"). "The determination of obviousness is made with respect to the subject matter as a whole, not separate pieces of the claim." Sanofi-Synthelabo v. Apotex, Inc., 550 F.3d 1075, 1086 (Fed. Cir. 2008). A party alleging obviousness based on a combination of prior-art references generally must prove by clear and convincing evidence both "[(1)] that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and [(2)] that the skilled artisan would have had a reasonable expectation of success from doing so." Cyclobenzaprine, 676 F.3d at 1068-69 (quoting Procter & Gamble, 566 F.3d at 994).

In considering the POSA's reasons or motivations to make or use the claimed invention, "a reference 'must [be] considered for all it taught, disclosures that diverged and taught away from the invention at hand as well as disclosures that pointed toward and

141

REGENERON V. MYLAN                                          1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

taught the invention at hand.'" Polaris Indus., Inc. v. Arctic Cat, Inc., 882 F.3d 1056, 1069 (Fed. Cir. 2018) (quoting Ashland Oil, Inc. v. Delta Resins & Refractories, Inc., 776 F.2d 281, 296 (Fed. Cir. 1985)); see also Arctic Cat Inc. v. Bombardier Recreational Prods. Inc., 876 F.3d 1350, 1363 (Fed. Cir. 2017) ("Evidence suggesting reasons to combine cannot be viewed in a vacuum apart from evidence suggesting reasons not to combine.").

A patentee can refute an allegation that the POSA would have had a motivation or reason to make or use the claimed invention by showing that a particular prior art reference "taught away" from the invention. See Rembrandt Wireless Techs., LP v. Samsung Elecs. Co., 853 F.3d 1370, 1379–80 (Fed. Cir. 2017) ("[A] showing that a prior art reference teaches away from a given combination is evidence that one of skill in the art would not have been motivated to make that combination to arrive at the claimed invention."). A reference teaches away from the claimed invention if the POSA, "upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken in the claim." AstraZeneca v. Mylan Pharm. Inc., 19 F.4th 1325, 1337 (Fed. Cir. 2021) (quoting Meiresonne v. Google, Inc., 849 F.3d 1379, 1382 (Fed. Cir. 2017)). The reference need not explicitly disparage an invention or address an aspect of the invention recited specifically in the claim to

142

Appx144

REGENERON V. MYLAN                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

teach away.  See id.; see also, e.g., Arctic Cat Inc., 876 F.3d at 1360; Institut Pasteur & Universite Pierre et Marie Curie v. Focarino, 738 F.3d 1337, 1345–46 (Fed. Cir. 2013) (finding that a prior-art suggestion of a risk of toxicity precluded a conclusion of obviousness regardless of whether the claims recited a lack of toxicity).  Whether the prior art "teaches away" is a question of fact.  See Bombardier Recreational Prods. Inc., 876 F.3d at 1360; see also, e.g., Spectralytics, Inc. v. Cordis Corp., 649 F.3d 1336, 1343 (Fed. Cir. 2011), abrogated on other grounds by Halo Elecs., Inc. v. Pulse Elecs., Inc., 579 U.S. 93 (2016).

A claimed invention that is merely one of a "finite number of identified, predictable solutions," may be obvious if it was "obvious to try." KSR, 550 U.S. at 421.  But "[t]o the extent an art is unpredictable, . . . KSR's focus on these 'identified, predictable solutions' may present a difficult hurdle because potential solutions are less likely to be genuinely predictable." Eisai Co. v. Dr. Reddy's Labs., 533 F.3d 1353, 1359 (Fed. Cir. 2008).  If "the prior art, at best, [gives] only general guidance as to the particular form of the claimed invention or how to achieve it, relying on an obvious-to-try theory to support an obviousness finding is impermissible." Cyclobenzaprine, 676 F.3d at 1073 (internal quotation marks omitted) (quoting In re Kubin, 561 F.3d 1351, 1359 (Fed. Cir. 2009)).  An invention is not

143

Appx145

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

"obvious to try" if the prior art "gave no direction as to which of the many possible combination choices were likely to be successful" and "consistently taught away" from the claimed invention. <u>Leo Pharm. Prods., Ltd. v. Rea</u>, 726 F.3d 1346, 1357 (Fed. Cir. 2013).

Proving obviousness also requires a showing by clear and convincing evidence that the POSA would have had a reasonable expectation of success in achieving the claimed invention. <u>InTouch Techs., Inc. v. VGO Commc'ns, Inc.</u>, 751 F.3d 1327, 1347 (Fed. Cir. 2014); <u>see, e.g.</u>, <u>Cyclobenzaprine</u>, 676 F.3d at 1068-69. To have such an expectation, the POSA must have been "motivated to do more than merely to 'vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful.'" <u>Medichem, S.A. v. Rolabo, S.L.</u>, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (quoting <u>In re O'Farrell</u>, 853 F.2d 894, 903 (Fed. Cir. 1988)).

As with the POSA's reason for modifying or combining the prior art, the POSA's expectation of success must be assessed with respect to the actual needs in the pertinent art. <u>See KSR</u>, 550 U.S. 398 (focusing on motivation based on demands "present in the marketplace"); <u>Institut Pasteur</u>, 738 F.3d at 1345-46; <u>Endo Pharms.</u>

144

REGENERON V. MYLAN                                        1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Sols., Inc. v. Custopharm Inc., 894 F.3d 1374, 1385 (Fed. Cir. 2018).  Thus, in assessing whether the POSA would have had a reasonable expectation of success, a factfinder must determine whether the POSA would have believed that the invention would succeed based on the goals that the POSA would have had, regardless of whether those goals are recited as claim limitations.  See, e.g., Institut Pasteur, 738 F.3d at 1345-46 (POSA would not have had a reasonable expectation of practicing a method of manipulating a living cell based on prior art references stating that such a method would be toxic to the cell, even though the claims did not expressly require that the cell remain viable).

The use of hindsight is prohibited in the obviousness analysis.  KSR, 550 U.S. at 421 ("A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning.").  This is because the obviousness inquiry is conducted from the perspective of the POSA as of the priority date.  Graham, 383 U.S. at 36 (courts must "resist the temptation to read into the prior art the teachings of the invention at issue"); Metalcraft of Mayville, Inc. v. Toro Co., 848 F.3d 1358, 1367 (Fed. Cir. 2017) ("[W]e cannot allow hindsight bias to be the thread that stitches together prior art patches into something that is the claimed invention."); Dey, L.P. v. Teva Parenteral Medicines, Inc., 6 F.Supp.3d 651,

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

673-74 (N.D. W.Va. 2014). "[T]he proper analysis requires a form of amnesia that 'forgets' the invention and analyzes the prior art and understanding of the problem at the date of the invention." Mintz v. Dietz & Watson, Inc., 679 F.3d 1372, 1379 (Fed. Cir. 2012). As the Federal Circuit has explained, "[t]he inventor's own path itself never leads to a conclusion of obviousness; that is hindsight. What matters is the path that the person of ordinary skill in the art would have followed, as evidenced by the pertinent prior art." Otsuka Pharm. Co. v. Sandoz, Inc., 678 F.3d 1280, 1296 (Fed. Cir. 2012). Indeed, "the path that leads an inventor to the invention is expressly made irrelevant to patentability by statute." Life Techs., Inc. v. Clontech Labs., Inc., 224 F.3d 1320, 1325 (Fed. Cir. 2000); see also 35 U.S.C. § 103(a) (pre-AIA) ("Patentability shall not be negatived by the manner in which the invention was made.").

Objective indicia of non-obviousness must be considered where present. Cyclobenzaprine, 676 F.3d at 1075-76, 1079. Such evidence can help to "guard against slipping into use of hindsight" and "the temptation to read into the prior art the teachings of the invention at issue." Apple Inc. v. Samsung Elecs. Co., 839 F.3d 1034, 1052 (Fed. Cir. 2016) (en banc) (quoting Graham, 383 U.S. at 36); see also WBIP LLC v. Kohler Co., 829 F.3d 1317, 1328 (Fed. Cir. 2016) ("[O]bjective indicia of non-obviousness play an

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

important role as a guard against the statutorily proscribed hindsight reasoning in the obviousness analysis."); AstraZeneca AB v. Aurobindo Pharma Ltd., 232 F. Supp. 3d 636, 649 n.8 (D. Del. 2017) ("Because Aurobindo has failed to establish a prima facie case of obviousness, the court does not address AstraZeneca's secondary considerations."); Takeda Pharm. Co. v. Handa Pharm., 2013 WL 9853725, at *66 (N.D. Cal. Oct. 17, 2013) ("[T]he absence of secondary considerations does not prove obviousness.").

Evidence of an invention's unexpected properties, that the invention met a long-felt need, that the invention received industry praise, that others failed to solve the problems addressed by the invention, and that others have copied the invention all can serve as such objective indicia in support of non-obviousness. See, e.g., WBIP, 829 F.3d at 1332–37; Mintz, 679 F.3d at 1379–80. Likewise, "[e]vidence of industry skepticism weighs in favor of non-obviousness." WBIP, 829 F.3dat 1336 ("Doubt or disbelief by skilled artisans regarding the likely success of a combination or solution weighs against the notion that one would combine elements in references to achieve the claimed invention."). Objective indicia of nonobviousness also may consist of evidence that a prior art reference taught away from the claimed invention, i.e., that "person of ordinary skill, upon reading the reference, would be discouraged from following the

147

REGENERON V. MYLAN                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." Millennium Pharm., Inc. v. Sandoz Inc., 862 F.3d 1356, 1366 (Fed. Cir. 2017) (quoting In re Urbanski, 809 F.3d 1237, 1244 (Fed. Cir. 2016)).

### c.   Section 112

The first paragraph of 35 U.S.C. § 112 states that the "specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112, ¶ 1 (emphasis added). This section protects the public interest by enforcing the basic quid pro quo of the patent monopoly, ensuring the inventor possessed what is claimed as the invention at the time of filing (written description), and gave a disclosure where one of ordinary skill can make and use the full scope of the claimed invention without undue experimentation (enablement). Amgen Inc. v. Sanofi, 143 S. Ct. 1243, 1254 (2023); AK Steel Corp. v. Sollac & Ugine, 344 F.3d 1234, 1244 (Fed. Cir. 2003) (an adequate disclosure in the specification is "part of the quid pro quo of the patent bargain"). Every patent specification must comply with both requirements. See AbbVie Deutschland GmbH

148

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

& Co., KG v. Janssen Biotech, Inc., 759 F.3d 1285, 1298 (Fed. Cir.
2014) ("drafters of patent applications know that they must
describe their inventions as well as disclose how to enable their
use"); Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 1563-64 (Fed.
Cir. 1991). Both written description and enablement must be proven
by clear and convincing evidence.  Invitrogen Corp. v. Clontech
Lab'ys, Inc., 429 F.3d 1052, 1072 (Fed. Cir. 2005).

Section 112 also requires the patent applicant to conclude
the specification with "one or more claims particularly pointing
out and distinctly claiming the subject matter which the applicant
regards as his invention."  35 U.S.C. § 112, ¶ 2.

### i.    Written Description

The written description requirement § 112 provides that a
patent specification must "contain a written description of the
invention, and of the manner and process of making and using it."
35 U.S.C. § 112 ¶ 1 (pre-AIA).  The "hallmark" of an adequate
written description is "disclosure."  Ariad Pharms., Inc. v. Eli
Lilly & Co., 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).  The
patent must "reasonably convey[] to those skilled in the art that
the inventor had possession of the claimed subject matter as of
the filing date."  Id.

The relevant inquiry — "possession as shown in the disclosure"
— is an "objective inquiry into the four corners of the

149

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

specification from the perspective of a person of ordinary skill" where "the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed." Ariad, 598 F.3d at 1351. Possession is shown "by describing the invention, with all its claimed limitations." Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1572 (Fed. Cir. 1997). The patent's specification is not required to have "either examples or an actual reduction to practice; rather, the critical inquiry is whether the patentee has provided a description that in a definite way identifies the claimed invention in sufficient detail that a person of ordinary skill would understand that the inventor was in possession of it at the time of filing." Alcon Rsch. Ltd. v. Barr Labs., Inc., 745 F.3d 1180, 1190-91 (Fed. Cir. 2014) (internal quotation marks omitted) (quoting Ariad, 598 F.3d at 1350).

The written description requirement prevents an applicant from overreaching by later asserting that he invented something he did not actually invent. See Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1330 (Fed. Cir. 2003); Purdue Pharma L.P. v. Faulding Inc., 230 F.3d 1320, 1327 (Fed. Cir. 2000). It ensures that the "patentee had possession of the claimed invention at the time of the application, i.e., that the patentee invented what is

REGENERON V. MYLAN                                      1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

claimed." LizardTech, Inc. v. Earth Res. Mapping, Inc., 424 F.3d 1336, 1344-45 (Fed. Cir. 2005).

### ii.        Enablement

Under § 112, a patent specification also must "enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112 ¶ 1 (pre-AIA). "To prove that a claim is invalid for lack of enablement, a challenger must show by clear and convincing evidence that a person of ordinary skill in the art would not be able to practice the claimed invention without 'undue experimentation.'" Alcon, 745 F.3d at 1188 (quoting In re Wands, 858 F.2d 731, 736-37 (Fed. Cir. 1988)). That some experimentation is necessary does not mean that a claim is not enabled. In re Wands, 858 F.2d at 736-37. The "key word is 'undue,' not experimentation." Id.

"The test for undue experimentation is not merely quantitative, since a considerable amount of experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed to enable the determination of how to practice a desired embodiment of the claimed invention." Johns Hopkins Univ. v. CellPro, Inc., 152 F.3d 1342, 1360 (Fed. Cir. 1998) (quoting PPG Indus., Inc. v. Guardian Indus. Corp., 75 F.3d 1558, 1564 (Fed. Cir. 1996)).

151

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

"Whether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations."  <u>Id.</u> at 737.  These include the following "<u>Wands</u>" factors:

> (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

<u>Id.</u>

"[T]he question is whether undue experimentation is required to make and use the full scope of embodiments of the invention claimed."  <u>McRO, Inc. v. Bandai Namco Games Am. Inc.</u>, 959 F.3d 1091, 1100 (Fed. Cir. 2020).  The Supreme Court recently reiterated that:

> If a patent claims an entire class of processes, machines, manufactures, or compositions of matter, the patent's specification must enable a person skilled in the art to make and use the entire class.  In other words, the specification must enable the full scope of the invention as defined by its claims.  The more one claims, the more one must enable.

<u>Amgen</u>, 143 S. Ct. at 1254.  When a patent specification has a broad disclosure, it is not required that every embodiment covered by the claims be exemplified; "it may suffice to give an example (or a few examples) if the specification also discloses 'some general quality . . . running through' the class that gives it a 'peculiar

152

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

fitness for the particular purpose.'" Id.  A "specification may call for a reasonable amount of experimentation to make and use a patented invention.  What is reasonable in any case will depend on the nature of the invention and the underlying art." Id. at 1255. But the person of ordinary skill in the art cannot be left with merely "a hunting license" or obligated to engage in "painstaking experimentation" or "trial and error" to "see what works." Id. at 1254, 1256-57.  Whether a specification enables the full scope of the claimed invention is "determined as of the effective filing date of the patent's application." Alza Corp. v. Andrx Pharms., LLC, 603 F.3d 935, 940 (Fed. Cir. 2010).

### iii.      Indefiniteness

A claim is invalid as indefinite if, when read in light of the specification and prosecution history, the claim "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 901 (2014); 35 U.S.C. § 112 ¶ 2 (pre-AIA). While definiteness "mandates clarity," the Supreme Court has recognized that "absolute precision is unattainable." Nautilus, 572 U.S. at 910.  "One must bear in mind . . . that patents are 'not addressed to lawyers, or even to the public generally,' but rather to those skilled in the relevant art." Id. at 909 (quoting Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 437 (1902)).

153

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Accordingly, "[c]laims reciting terms of degree 'have long been found definite' if they provide reasonable certainty to a skilled artisan when read in the context of the patent." Mentor Graphics Corp. v. EVE-USA, Inc., 851 F.3d 1275, 1290 (Fed. Cir. 2017) (quoting Biosig Instruments, Inc. v. Nautilus, Inc., 783 F.3d 1374, 1378 (Fed. Cir. 2015)). Definiteness "is to be evaluated from the perspective of someone skilled in the relevant art" at the time the patent was filed." Nautilus, 572 U.S. at 908.

2.    **Invalidity of the Product Patent**

    a.    **Dix '226 Does Not Anticipate the Product Patent**

The Defendants argue anticipation of the asserted claims of the Product Patent based on Dix '226 (U.S. Patent No. 10,406,226 B2), a patent assigned to Regeneron and issued on September 10, 2019.  DTX-13.  Dix '226 is directed to formulations of VEGF antagonists for cancer.  Dix '226 does not include any teaching of an "ophthalmic formulation[s]" or intravitreal administration, to which the Product Patent claims are directed.  To the contrary, Dix '226 only teaches that VEGF is involved in cancer.  DTX-13, 1:42-54; Tr. 1123:25-1124:11 (Rabinow).

The Court finds that Dix '226 does not anticipate the Asserted Claims of the Product Patent.  Dix does not anticipate the Product Patent because it does not disclose 40 mg/ml aflibercept, the

154

REGENERON V. MYLAN                                    1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

concentration required by every asserted claim of the Product Patent.

The Defendants argued that 40 mg/ml aflibercept claim requirement is satisfied by the disclosure in Dix '226 of "10-50 mg/ml of the fusion protein." DTX-13, 2:23; Tr. 1083:15-18 (Rabinow); see also DTX-13, 7:8-9. The Defendants' expert, however, admitted that 40 mg/mL is not expressly disclosed by the range of "10-50 mg/ml." Tr. 1133:25-1134:3 (Rabinow). Moreover, the range of 10-50 mg/ml is not a small range. Dr. Rabinow's testimony made clear that "10-50 mg/ml" includes not just every whole-number value from 10 to 50, but also includes more precise values to the tenths and hundredths decimal places—like "37.2" and "49.35" mg/ml—resulting in thousands of discrete values within the disclosed range. Tr. 1135:25-1138:9. Dr. Trout also testified that the range was not a small one. Tr. 2072:16-17 (Trout).

Furthermore, the disclosure in Dix '226 of "10-50 mg/ml" is not linked to aflibercept specifically, but instead refers to a generic "VEGF-specific fusion protein antagonist." DTX-13 at 2:20-23. The Defendants' expert did not dispute that multiple fusion proteins would fall within that genus. Dr. Rabinow explained that the recited "fusion protein" is not limited to aflibercept but instead covers a "class" of proteins, Tr. 1135:25-1138:9, and Dr. Trout agreed, Tr. 2073:13-2074:4. Notably, Dix

155

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

'226 identifies at least two such fusion proteins by sequence, and more would fall within the class. DTX-13 at 2:3-19. As Dr. Rabinow agreed, only the aflibercept fusion protein falls within the asserted claims; the other fusion proteins encompassed by Dix's disclosed class do not meet the limitations of the Product Patent. Tr. 1136:14-1138:2. Thus, the Defendants' argument based on "Dix '226's disclosed aflibercept protein range of 10 to 50 mg/ml" (ECF No. 576 (Defs.' Opening Br.) at 22 (emphasis added)) incorrectly describes Dix's disclosed genus. The disclosure in Dix '226 of "10-50 mg/ml of the fusion protein" refers to a large range of numerical concentrations and also encompasses multiple different fusion proteins — and yet, only one such concentration (40 mg/ml) and one such fusion protein (aflibercept) meets the asserted claims of the Product Patent. The evidence does not support the Defendants' argument that Dix's broad genus of "10-50 mg/ml of the fusion protein" discloses 40 mg/ml of aflibercept. As a result, the Defendants have not proven the legal requirements of anticipation as to Dix '226.

Nor is this a case of "overlapping ranges" giving rise to a "prima facie case of anticipation." Defs.' Opening Br. 22. Each asserted claim recites the specific concentration of 40 mg/ml aflibercept, not a range of concentrations. As explained below, the Defendants also are incorrect in arguing that Regeneron must

156

Appx158

REGENERON V. MYLAN                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

prove that 40 mg/ml is "'critical to the operability' of the invention." Defs.' Opening Br. 22. In any event, the testimony at trial demonstrated that the inventors specifically chose the 40 mg/ml concentration to maximize the half-life of aflibercept in the eye while minimizing toxicity and stability concerns, see, e.g., Tr. 473:2-22 (Furfine); Tr. 1680:12-1682:1, 1780:18-20 (Graham), and their selection of 40 mg/ml contributed to the beneficial properties of Eylea, see Tr. 493:10-494:7, 495:16-21 (Furfine). No record evidence shows that these desirable benefits of the claimed invention would obtain at other concentrations between 10 and 50 mg/ml. Accordingly, even if anticipation law required a showing of criticality in the present situation, undisputed evidence at trial demonstrates that the 40 mg/ml concentration of aflibercept is critical to the benefits provided by the claimed invention.

In their post-trial briefing, the Defendants state that Dix '226 disclosed a "'40 mg/ml' embodiment." Defs.' Opening Br. 4 (citing DTX-13, 3:60-61). The Defendants' characterization of this disclosure is incorrect, and their reliance on it is forfeited. Dix refers to "a 40 mg/ml pre-lyophilized solution [that] is lyophilized and reconstituted to a 80 mg/ml solution." DTX-13, 3:60-62. Dr. Trout offered unrebutted testimony that a pre-lyophilized solution is only "a manufacturing intermediate"

157

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

not intended for any kind of injection. Tr. 2077:1-16. Dr. Trout's testimony is consistent with the disclosure of Dix, which states that the pre-lyophilized solution "is lyophilized and reconstituted" to a different concentration; Dix does not disclose the pre-lyophilized solution as being stored or injected. DTX-2, 3:60-61. Dr. Trout also explained that Dix did not teach that the "pre-lyophilized solution" included aflibercept, and that the POSA would not expect this manufacturing intermediate to meet the 98% native conformation limitation over two months, as a formulator would not "store it for nearly that long." Tr. 2077:17-2079:1. Thus, Dix's "40 mg/ml pre-lyophilized solution" does not refer to any kind of formulation to be administered, much less an ophthalmic formulation or, as the claim requires, an ophthalmic formulation of aflibercept.

In any event, the arguments in the Defendants' opening brief involving anticipation over Dix '226 never reference Dix's "40 mg/ml pre-lyophilized solution" disclosure, Defs.' Opening Br. 22-23, and so the Court holds that any reliance on that passage has been forfeited. See Vanda Pharms., Inc. v. Teva Pharms. USA, Inc., 2022 WL 17593282, at *12 n.1 (D. Del. Dec. 13, 2022) (holding that a party "forfeited its right" to raise a specific argument "by not raising it in timely fashion" and "by the passing manner in which it raised the argument in its post-trial brief"), aff'd, 2023 WL

REGENERON V. MYLAN                                              1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

3335538 (Fed. Cir. May 10, 2023).  Furthermore, Dr. Rabinow did not disclose any reliance on the pre-lyophilized solution in his expert reports, and indeed never even addressed it.  PTX-55 ¶¶ 122-27, 245-59.

To prove anticipation, a defendant must prove that a single prior art reference discloses <u>every</u> limitation of the claim. <u>Atofina v. Great Lakes Chem. Corp.,</u> 441 F.3d 991, 999 (Fed. Cir. 2006).  "It is well established that the disclosure of a genus in the prior art is not necessarily a disclosure of every species that is a member of that genus."  <u>Id.</u>; <u>see</u> <u>also</u> <u>UCB, Inc. v. Actavis Labs.,</u> 65 F.4th 679, 688 (Fed. Cir. 2023) ("[T]he disclosure of a range is not a disclosure of the endpoints of the range or other discrete points within the range."); <u>Janssen Pharms. v. Watson Labs.,</u> 2012 WL 3990221, at *9 (D.N.J. Sept. 11, 2012) (same); <u>OSRAM Sylvania v. Am. Induction Techs.,</u> 701 F.3d 698, 705-06 (Fed. Cir. 2012) (same).

As relevant here, "the disclosure of a range is not a disclosure of the endpoints of the range or other discrete points within the range." <u>UCB, Inc. v. Actavis Labs.,</u> 65 F.4th 679, 688 (Fed. Cir. 2023).  A numerical range is a genus encompassing the values within it, <u>Janssen,</u> 2012 WL 3990221, at *7 (holding "dosage range in [prior art] is a genus"), and only "a very small genus" may anticipate specific intervening values, <u>Atofina,</u> 441 F.3d at

159

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

999.   For example, the Federal Circuit's predecessor court concluded that disclosure of a genus of "20 possible compounds" with similar structures and properties could anticipate a species within the genus.  In re Ruschig, 343 F.2d 965, 973-74 (C.C.P.A. 1965) (discussing In re Petering, 301 F.2d 676 (C.C.P.A. 1962)). The Defendants failed to establish that the five-fold range of 10-50 mg/ml disclosed in Dix '226 (DTX-13) is "very small." Atofina, 441 F.3d at 999.   Rather, in Dr. Rabinow's view, this range encompasses hundreds of discrete concentrations between 10 and 50 (like "28" mg/ml, "37.2" mg/ml, and "49.35" mg/ml).  Tr. 1134:9-19; see Atofina, 441 F.3d at 999 ("A temperature range of over 100 degrees is not a small genus."); Tr. 2072:16-17 (Trout).

The genus is further enlarged by the fact that Dix's range is not limited to aflibercept, but rather covers a broader generic set of "VEGF-specific fusion protein antagonist" molecules, both sides' expert agreed.  Tr. 1135:25-1138:9 (Rabinow); Tr. 2073:13-2074:4 (Trout).  Nor does Dix '226 disclose any formulation with 40 mg/ml aflibercept that meets the 98% native conformation limitation, or any ophthalmic formulation, also required by each claim, which separately is fatal to the Defendants' anticipation argument.  See Tr. 1124:9-11, 1124:25-1125:16 (Rabinow); e.g., Atofina, 441 F.3d at 999 ("single reference" must disclose "each limitation").  Because Dix '226 does not disclose what the claims

160

REGENERON V. MYLAN                                        1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

require specifically — 40 mg/ml of aflibercept, with 98% native conformation after two months storage at 5°C—it cannot anticipate the claims.

Thus, the Defendants' anticipation theory involves the POSA arbitrarily and improperly selecting 40 mg/ml from the range of 10-50 mg/ml and cobbling together other, disparate disclosures from Dix '226.  But to anticipate, the prior-art reference must disclose each element "arranged as in the claim." Net MoneyIN, Inc. v. Verisign, Inc., 545 F.3d 1359, 1370-71 (Fed. Cir. 2008). The Defendants' "mechanistic dissection and recombination" of disclosures from Dix '226 involves just the kind of impermissible "hindsight anticipation[]" relying on "the guidance of a[] [patentee's] disclosures" that precedent has long forbid. Ruschig, 343 F.2d at 974.

Following that precedent, the Janssen court rejected an anticipation argument indistinguishable from the one the Defendants raise here, concluding that a dosage range of ".02-0.05 mg" did not anticipate a specific dose of "0.025 mg."  2012 WL 3990221, at *6-10.  The Court's holding in Janssen is consistent with Federal Circuit precedent explaining that where "[t]he disclosure is only that of a range, not a specific [point] in that range, . . . the disclosure of a range is no more a disclosure of the end points of the range than it is of each of the intermediate

161

Appx163

REGENERON V. MYLAN                                            1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

points." Atofina, 441 F.3d at 1000; UCB, 65 F.4th at 688. The Court holds likewise here that the range of 10-50 mg/ml in Dix '226 does disclose every intermediate point in the range, including 40 mg/ml.

As explained, the Defendants forfeited any reliance on the 40 mg/ml "pre-lyophilized solution" disclosed in Dix '226 by not relying on it in their post-trial brief. Furthermore, Dr. Rabinow did not disclose any reliance on the pre-lyophilized solution in his expert reports–indeed, he never even addressed it. PTX-55 (Rabinow Opening Report) ¶¶ 122-27, 245-59. The Court therefore strikes Dr. Rabinow's testimony as to the "40 mg/mL pre-lyophilized solution" portion of the prior art reference. See PersonalWeb Techs. LLC v. Int'l Bus. Machs. Corp., 2017 WL 8186294, at *6 (N.D. Cal. July 25, 2017) (excluding expert opinion on claim limitation at trial that was not disclosed in expert report).

In any event, the "pre-lyophilized solution" refers only to a "manufacturing intermediate," not a formulation for administration, and Dix '226 does not indicate whether the pre-lyophilized solution contains aflibercept or any other limitation of the claims. Tr. 2077:1-16 (Trout). Thus, even if considered, the isolated disclosure of 40 mg/ml pre-lyophilized solution, unconnected to any of the other claim elements, is not a disclosure

162

Appx164

REGENERON V. MYLAN                                        1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

of each element "arranged as in the claim." Net MoneyIN, 545 F.3d at 1370.

The Defendants also argue that Regeneron must show criticality of the claimed aflibercept concentration. Defs.' Opening Br. 22. However, the Federal Circuit has held that criticality is a factor only where a disclosed range "overlaps" with a "claimed range," not a specific point. Genentech, Inc. v. Hospira, Inc., 946 F.3d 1333, 1338 (Fed. Cir. 2020) (emphasis added). Furthermore, the Federal Circuit has specifically rejected equating "discrete points" in a range with a range itself. UCB, 65 F.4th at 687-88. The Product Patent claims a specific concentration — 40 mg/ml — not a "claimed range." The Defendants cite no case where a court considered criticality in an anticipation inquiry under these circumstances.

The Court concludes that criticality is thus irrelevant here — consistent with Janssen, 2012 WL 3990221, at *6-10, which addressed indistinguishable facts and also did not consider criticality — as well as with numerous other precedents addressing anticipation in the genus/species context. See Ruschig, 343 F.2d at 974 (not considering criticality in anticipation context of whether genus anticipates species); Mylan Pharm. Inc. v. Merck Sharp & Dohme Corp., 50 F.4th 147, 153-54 (Fed. Cir. 2022) (same); Eli Lilly & Co. v. Bd. of Regents of Univ. of Washington, 334 F.3d

163

Appx165

REGENERON V. MYLAN                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

1264, 1271-72 (Fed. Cir. 2003) (same); Bristol-Myers Squibb Co. v. Ben Venue Labs., 246 F.3d 1368, 1380 (Fed. Cir. 2001) (same); Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc., 687 F. Supp. 2d 486, 499 (D. Del. 2010), aff'd, 655 F.3d 1291 (Fed. Cir. 2011) (same).

Nonetheless, even if criticality were relevant, the Court concludes that Regeneron has demonstrated criticality of the 40 mg/ml concentration, because the prior art taught away from using that concentration and because Regeneron demonstrated unexpected properties of the claimed compositions, as described further below. See Cot'n Wash, Inc. v. Henkel Corp., 56 F. Supp. 3d 626, 644 (D. Del. 2014) (finding criticality based on unexpected results and teaching away).

For these reasons, the Court concludes that Mylan has failed to demonstrate by clear and convincing evidence that Dix '226 anticipates the asserted clams of the Product Patent.

> **b.    The Defendants Combinations of Prior Art do not Render the Product Patent Obvious**

To prove obviousness, the Defendants must show by clear and convincing evidence that the differences between the claims "and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made" to the POSA. 35 U.S.C. § 103(a) (pre-AIA).    Here, the asserted claims all

164

REGENERON V. MYLAN                                         1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

require an ophthalmic formulation of the VEGF antagonist aflibercept at a concentration of 40 mg/ml. As explained further below, in the prior art cited by the Defendants, the only disclosure of a 40 mg/ml formulation taught the POSA away from using that concentration for aflibercept because it would lead to unacceptable inflammation without any advantages. That teaching forecloses obviousness. AstraZeneca v. Mylan, 19 F.4th at 1336 (teaching away "on its own is sufficient to sustain" nonobviousness); Winner Int'l Royalty Corp. v. Wang, 202 F.3d 1340, 1349-50 (Fed. Cir. 2000) (teaching away "finding alone can defeat" nonobviousness). Furthermore, the other evidence at trial, including Regeneron's objective evidence of nonobviousness, demonstrated that the inventions claimed in the Product Patent were not obvious.

> i.    The Defendants are limited to their disclosed
>        obviousness combinations

As an initial matter, the Court rejects any attempt by the Defendants to rely on reference combinations never disclosed in discovery, or prior art that was never disclosed at all, consistent with the Court's ruling during trial. Tr. 796:14-797:6 (precluding obviousness opinion as to Fraser, Dix, and Lucentis); see ECF Nos. 529, 540. As the Court explained, "the Federal Circuit has been abundantly clear . . . that when we're talking about obviousness,

165

Appx167

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

the specific prior art needs to be identified and then an explanation needs to be identified in the expert disclosures," Tr. 996:16-997:1; the Court will not "tie . . . together" reference combinations that the Defendants themselves did not timely disclose, Tr. 1075:17-22. See Innogenetics, N.V. v. Abbott Labs., 512 F.3d 1363, 1373 (Fed. Cir. 2008); ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312, 1327-28 (Fed. Cir. 2012) (deeming obviousness opinion insufficient where expert "failed to explain how specific references could be combined, which combination(s) of elements in specific references would yield a predictable result, or how any specific combination would operate or read on the asserted claims"); Changzhou Kaidi Elec. Co. v. Okin Am., Inc., 112 F. Supp. 3d 330, 334 (D. Md. 2015) (excluding expert opinion asserting "previously undisclosed combinations of those same prior art references," enforcing rules requiring the defendants to identify expressly "any combinations of prior art showing obviousness"); see also S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 596 (4th Cir. 2003).

When the Defendants sought to rely on another undisclosed combination (Lucentis and Liu), the Court again sustained Regeneron's objection. Tr. 1045:23-1048:7, 1074:20-1075:22. And just as trial was not the place for new obviousness theories and combinations, the Court rejects any effort by the Defendants to

166

Appx168

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

circumvent the Courts' rulings at trial by relying on undisclosed references, combinations, or prior art theories in their post-trial briefing, as set forth below.

### a)   Avery

The Court concludes that the Defendants did not disclose during discovery any obviousness theory relying on Avery (DTX-2264) to provide a motivation either to use a larger molecule for intravitreal injection or to use a higher concentration.  The Court excludes any such theory.  Even if the Court did consider it, however, it would not change the Court's rulings in favor of Regeneron as to the Product Patent.

### b)   "Background" References

In addition, the Court notes that several of the references the Defendants cite as "Background" reflect Regeneron's own work published less than a year before Regeneron's asserted June 16, 2006 priority date of the Product Patent.  See DTX-4957 (Regeneron Form 10-K for fiscal year 2005); DTX-216 (internal Regeneron discussion dated March 21, 2006 regarding conference abstract).  The Defendants did not disclose these references during discovery or pursuant to their statutory obligation under 35 U.S.C. § 282 as

167

REGENERON V. MYLAN                                               1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

relevant prior art to the Product Patent, which precluded their use at trial.

### c) Ferrara 2005

Dr. Rabinow also offered testimony regarding a separate Ferrara reference ("Ferrara 2005," DTX-4041) concerning a Phase 3 ranibizumab study.  Tr. 1031:3-6 (Rabinow).  Regeneron objected to this line of testimony as outside the scope of Dr. Rabinow's report.  Id.  Regeneron explained that Dr. Rabinow never identified Ferrara 2005 as a prior art reference or discussed it in detail. Tr. 1031:08-1032:18 (Rabinow).  Dr. Rabinow discussed forty-six references in the background of his opening report, see generally PTX-55 (Rabinow Opening Report) ¶¶ 96-176, but the Ferrara 2005 reference is not identified there.  He then identified four combinations of certain of those prior art references that he asserted against Regeneron's claims.  Again, these did not include Ferrara 2005.  PTX-55 ¶ 180.  Dr. Rabinow mentions Ferrara 2005 just twice in his "tutorial" about "VEGF Antagonists."  PTX-55 ¶¶ 67-68.

The Defendants suggest that Dr. Rabinow can opine about the Ferrara 2005 reference because he referred generally to the results of Lucentis clinical trials published in other articles in his report.  However, Dr. Rabinow did so only with respect to different

168

Appx170

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

references concerning ranibizumab, not Ferrara 2005.  That does not suffice to disclose an expert opinion under Rule 26.  An expert cannot testify about obviousness based on a prior art reference that was not previously disclosed under Federal Rule of Civil Procedure 26.  See Innogenetics, 512 F.3d at 1373; ActiveVideo Networks, 694 F.3d at 1327-28; Changzhou Kaidi Elec. Co., 112 F. Supp. 3d at 334.  Thus, the Court will not consider Dr. Rabinow's testimony about the Ferrara 2005 reference as prior art.  Tr. 1031:3-16 (Rabinow).  Even if the Court did consider this reference, however, it would not change the Court's rulings Regeneron as to the Product Patent.

### d)    Rudge

Relatedly, the Court concludes that the Defendants did not meet their burden of proving that the Rudge reference (DTX-3592) is prior art to the Product Patent.  Rudge's publication date is unclear from the record.  Regeneron asserts Dr. Rabinow acknowledged on cross examination that Rudge cited "papers published after the June 16, 2006 priority date."  Tr. 1147:11-15.  Although the reference lists a copyright date of 2005, Dr. Rabinow agreed that it was "confusing" how a reference could both be published in 2005 yet cite to publications from after June 16, 2006.  Tr. 1147:18-1148:3.  The Defendants assert that this attack

169

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

is unwarranted because Dr. Rabinow explained that the fact that the Rudge paper has a publication date of 2005, but includes citations to references in 2006 is not surprising, because often versions of papers or abstracts are released online earlier than their official publication dates. (Tr. 1141:7-1143:11-15 (Rabinow)). And, most of the citations Regeneron pointed to were expressly identified as ARVO e-abstracts. (See, e.g., Tr. 1142:12-16; DTX 3592.5 (Brown citation of "IOVS 2006. 47: ARVO E-Abstract 2963"); DTX 3592.6 (Heier citation of "IOVS. 2006. 47: ARVO E-Abstract 2959")). In view of this conflicting evidence, the Court concludes the Defendants did not meet their burden of showing by clear and convincing evidence that Rudge is prior art. Sandt, 264 F.3d at 1350. Even if the Court did consider this reference, however, it would not change the Court's rulings in favor of Regeneron as to the Product Patent.

ii.    **Fraser and Lucentis**

The Defendants' first obviousness argument relies on the combination of Fraser (DTX-729) and "Lucentis," i.e., Gaudreault (PTX-1839) and Shams (DTX-726). The Defendants argue that the POSA would have been motivated to replace the ranibizumab in either of the Lucentis references with aflibercept, which the Defendants contend was disclosed in Fraser.

170

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

As an initial matter, the Court disagrees with the Defendants that the POSA would necessarily have been motivated to replace one drug in a formulation with another in its class.  The Defendants cite <u>Richardson-Vicks Inc. v. Upjohn Co.</u>, 122 F.3d 1476, 1483-84 (Fed. Cir. 1997) and <u>Senju Pharm. Co. v. Lupin Ltd.</u>, 780 F.3d 1337, 1347 (Fed. Cir. 2015), but neither case stands for the "general proposition that a skilled artisan would always be motivated to try later generation compounds in an old composition."  <u>Apotex Inc. v. Wyeth LLC</u>, 657 F. App'x 998, 1003 (Fed. Cir. 2016) (addressing <u>Senju</u>).  <u>Richardson-Vicks</u> did not address formulations at all, but rather involved claims to a combination of two known drugs that the Federal Circuit concluded would have been obvious to combine based on the facts of the case.  122 F.3d at 1480-84.

Likewise, <u>Senju</u> (as the Federal Circuit confirmed in <u>Apotex</u>) also turned on the factual record in that case and the close structural similarity of the claimed compounds in the formulations of the prior art and the claims.  780 F.3d at 1346-47.  In the particular context relevant here, Dr. Trout explained that the POSA would not just substitute one protein formulation for another, Tr. 2148:3-14; <u>see</u> Tr. 453:10-18 (Furfine) (explaining "[t]hat's not how we do formulation discovery").  Furthermore, Dr. Trout explained that fusion proteins are fundamentally different from antibodies in that fusion proteins are synthetic molecules made by

171

REGENERON V. MYLAN                                        1:22-CV-61

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

humans, while antibodies have evolved over time to be stable.  Tr. 2013:14-17, 2014:21-2015:16; <u>see</u> <u>also</u> PTX-1835 (Fast) at 15 ("In comparison with native IgG proteins, wherein interdomain interactions presumably have evolved to provide mutual stabilization, fusion proteins may lack such stabilizing interdomain stabilization."); Tr. 448:1-6, 456:6-9 (Furfine).

> a)   **Lucentis taught away from 40 mg/ml of a VEGF antagonist**

A reference teaches away where a POSA "upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken in the claim." <u>AstraZeneca v. Mylan</u>, 19 F.4th at 1337 (quoting <u>Meiresonne v. Google, Inc.</u>, 849 F.3d 1379, 1382 (Fed. Cir. 2017)).  Here, the prior art taught away from the claimed concentration of 40 mg/ml of glycosylated aflibercept.  Specifically, the prior art both taught against "following the path set out in the reference," (using a 40 mg/ml formulation of a VEGF antagonist in an ophthalmic formulation) and "led [the POSA] in a direction divergent from the path that was taken in the claim" (40 mg/ml of aflibercept). <u>AstraZeneca v. Mylan</u>, 19 F.4th at 1337. Dr. Trout's testimony was that the "moderate to severe" inflammation exhibited after administration with 40 mg/ml ranibizumab taught away from using 40 mg/ml aflibercept.  Tr.

172

Appx174

REGENERON V. MYLAN                                    1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

2040:10-2041:10, 2041:22-2043:2, 2045:8-11 (Trout).   Dr. Trout
explained that the inflammation persisted for seven days and was
"problematic from an immune response standpoint" and thus "would
teach the [POSA] away from the 40 mg/ml."  Tr. 2041:1-10.   In
contrast, the 10 mg/ml ranibizumab formulation did not exhibit
such levels of inflammation, and the authors found that this lower
"dose provides maximum inhibition of VEGF."  Tr. 2041:22-2042:9;
PTX-1839 at 7.  Dr. Trout's analysis of Gaudreault was unrebutted
by Dr. Rabinow, and is "conclusive" of teaching away.  Raytheon,
993 F.3d at 1382 ("unrebutted evidence" on issue was "conclusive");
Imperium, 757 F. App'x at 978-79 (no reasonable basis to reject
opinion of expert whose "testimony was not contradicted").

     Moreover, it was undisputed that aflibercept was much more
potent than ranibizumab.  Tr. 2042:13-17 (Trout); Tr. 114:1-25
(Yancopoulos).  Because of its higher potency, less aflibercept is
needed to inhibit the same amount of VEGF as compared to
ranibizumab.  Critically, Gaudreault found that only 10 mg/ml of
ranibizumab resulted in "maximum inhibition of VEGF," PTX-1839 at
7, and Dr. Trout explained that the POSA would have been motivated
to use a concentration of aflibercept lower than the 10 mg/ml
ranibizumab in view of aflibercept's higher potency and the greater
risk of aggregation caused by a higher concentration, Tr. 2042:18-
2043:2, 2044:5-22 (Trout); PTX-1556 (Wang 2005) at 9.  Dr. Rabinow

173

Appx175

REGENERON V. MYLAN                                                1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

again offered no contrary testimony, thus undermining the Defendants' argument that a POSA would use 40 mg/ml aflibercept. See Raytheon, 993 F.3d at 1382; Imperium, 757 F. App'x at 978-79. Thus, the Defendants have failed to point to any motivation in the prior art to use a 40 mg/ml formulation of aflibercept.

The Court is mindful that "the fact that there may be reasons a skilled artisan would prefer one [option] over the other does not amount to a teaching away from the lesser preferred but still workable option." Bayer Pharma AG v. Watson Labs., Inc., 874 F.3d 1316, 1327 (Fed. Cir. 2017). The unrebutted evidence at trial, however, demonstrated that the POSA would not have viewed the 40 mg/ml formulation merely as an inferior or unpreferred but nonetheless suitable option. To the contrary, the POSA would have been discouraged from the "path set out in" Gaudreault regarding a 40 mg/ml formulation, because it produced a problematic immune response without providing any advantage in VEGF inhibition, and because the POSA would have considered fusion proteins like aflibercept to have a higher risk of generating an immune response. AstraZeneca v. Mylan, 19 F.4th at 1337; Tr. 2040:23-2041:5, 2043:8-2044:4 (Trout).

Generating such an immune response would have been a fatal property for an ophthalmic formulation—as it was for Gaudreault's 40 mg/ml ranibizumab formulation, which undisputedly was never

174

Appx176

REGENERON V. MYLAN                                                    1:22-CV-61

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

developed further.    Tr. 2042:10-12 (Trout); Tr. 549:11-22
(Furfine) (noting that Genentech "did not develop the 40 mg/ml
formulation").   Indeed, the evidence at trial was unequivocal that
"moderate to severe" inflammation was an extremely concerning
phenomenon for any intravitreal drug product to exhibit, as it
could result in vision loss and thus defeat the purpose of using
an ophthalmic drug product in the first place.   See Tr. 468:1-
470:7 (Furfine) (the inflammation in the 40 mg/ml Gaudreault
formulation was "substantial and concerning" and "unacceptable");
Tr. 549:1-2 (Furfine) ("[R]epeated moderate to severe inflammation
might cause vision loss."); Tr. 115:16-20 ("[M]any drugs in this
space have failed because they've caused what's called
inflammation or other side effects leading to actual blindness.
So the cure can be worse than the disease if you inject something
that can almost immediately cause blindness."), 125:2-21
(Yancopoulos); Tr. 861:1-5 (Albini) (agreeing that "significant
intraocular inflammation" occurred with a drug called abicipar,
which then "did not make it to the market").

      There was nothing in the prior art that would have pointed a
POSA to the 40 mg/ml concentration absent hindsight in working
backwards from the claimed invention.   Thus, the Court concludes
Gaudreault's teachings with respect to the 40 mg/ml concentration
of a VEGF antagonist meet the standard for teaching away.   See

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Crocs, Inc. v. ITC, 598 F.3d 1294, 1308-09 (Fed. Cir. 2010) (finding teach away where prior art taught claimed material was "unsuitable"); Millennium, 862 F.3d at 1366-67 (holding that prior art taught away from modification where it "would have been unattractive to a person of ordinary skill for fear of disturbing the chemical properties whereby bortezomib functions effectively as an anti-cancer agent"); AstraZeneca v. Mylan, 19 F.4th at 1337 (prior art taught away where district court held that reference "cut against the very goal a [POSA] would have been trying to achieve—a stable product with a consistent dose").

The Defendants criticize the Product Patent on the basis that it "provides no additional motivation to overcome" the problems the prior art taught regarding high concentrations, citing Merck & Co., Inc. v. Teva Pharm., 395 F.3d 1364, 1373-74 (Fed. Cir. 2005). Defs.' Opening Br. 27. But the disclosure of the Product Patent's specification is not prior art; it is irrelevant to the motivation of the POSA and whether that prior art taught away from the invention. The role of the specification is not to review the prior art's failures or its teachings against the claimed invention, but rather to "disclose[] and teach[]" the invention and inform the POSA how to make and use it. Ariad, 598 F.3d at 1347.

176

Appx178

REGENERON V. MYLAN                                      1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

There is no requirement for a patent to point out each instance where it deviates from the prior art, as the obviousness analysis forecloses reading the prior art through the lens of the patent with the benefit of hindsight. Sanofi-Aventis U.S., LLC v. Dr. Reddy's Labs., 933 F.3d 1367, 1375 (Fed. Cir. 2019); ATD Corp. v. Lydall, Inc., 159 F.3d 534, 546 (Fed. Cir. 1998). The Defendants' cited portions of Merck have nothing to do with teaching away or the POSA's motivation, but rather with differences between the prior art and the claims. 395 F.3d at 1373-74.

Similarly, the Federal Circuit has explained that "'[t]eaching away' does not require that the prior art foresaw the specific invention that was later made, and warned against taking that path." Spectralytics v. Cordis, 649 F.3d 1336, 1343 (Fed. Cir. 2011). What ultimately matters is whether the POSA, upon reading the prior art, would have been taught against taking the approach required by the claimed invention. AstraZeneca v. Mylan, 19 F.4th at 1337. And here, the unrebutted testimony demonstrated that the POSA would have been taught against using 40 mg/ml aflibercept.

Likewise, the Court rejects the Defendants' suggestion that the claims were required to recite explicitly the properties related to pharmacokinetics and inflammation in order to be relevant. The teaching-away analysis focuses on the motivation of

177

Appx179

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

the POSA, without hindsight knowledge of the invention.  And as
the Federal Circuit has explained, that analysis may properly
consider an "unclaimed feature" if it is relevant to the POSA's
motivation to modify or combine the prior art to make the claimed
invention.  Chemours Co. FC v. Daikin Indus., Ltd., 4 F.4th 1370,
1377 (Fed. Cir. 2021).  In AstraZeneca v. Mylan, for example, the
prior art at issue contained data on formulations which displayed
"drug adhesion" to the dispensing device and the POSA accordingly
would have understood those formulations "were not suitable" and
"clearly don't work."  19 F.4th at 1336.  Because those
formulations were similar to those claimed in the patent at issue
and would have led the POSA away from making them, the Federal
Circuit concluded that the prior art formulations showing drug
adhesion taught away, id., even though the claims did not recite
anything about drug adhesion, id. at 1328; see also Chemours, 4
F.4th at 1377 (prior art's teachings to a POSA regarding "unclaimed
feature" of "molecular weight distribution" precluded motivation
to combine); Institute Pasteur, 738 F.3d at 1345-46 (Board erred
by not considering toxicity of proposed combination even though
claims did not require viability or level of toxicity); cf.
Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, 655 F.3d
1291, 1307 (Fed. Cir. 2011) ("Our case law is clear that the
structure of a claimed compound and its properties are inseparable

178

Appx180

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

for purposes of § 103."). Here, the asserted claims of the Product Patent require an aflibercept concentration of 40 mg/ml, and the evidence at trial showed that Gaudreault's inflammation result would have discouraged the POSA from making a 40 mg/ml composition. As in <u>AstraZeneca v. Mylan</u>, <u>Institut Pasteur</u>, and <u>Chemours</u>, that teaching is relevant (and here, dispositive) even though the claims do not recite inflammation levels.

The Court concludes that Gaudreault's teaching away from a 40 mg/ml concentration "on its own is sufficient to sustain the nonobviousness" of the claims. <u>AstraZeneca v. Mylan</u>, 19 F.4th at 1336; <u>see</u> <u>Winner</u>, 202 F.3d at 1349-50 (teaching away "finding alone can defeat" nonobviousness). The Court nonetheless analyzes below the remaining issues between the parties pertaining to obviousness.

> **b)   Fraser did not motivate the POSA to make a 40 mg/ml formulation**

There is no dispute that Fraser disclosed a composition having 24.3 mg/ml of a VEGF Trap that was used to investigate ovarian functions in monkeys. DTX-729 at 1-2. Dr. Rabinow agreed that "Fraser says not one word about injecting its formulation into the eye." Tr. 1103:1-3. He nonetheless offered testimony that the POSA would have converted Fraser's 24.3 mg/ml concentration for <u>intravenous</u> injection for ovarian function in monkeys into the 40

179

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

mg/ml concentration in the claimed ophthalmic formulations for intravitreal injection in humans. Tr. 1067:2-1068:15. The Court does not find Dr. Rabinow's testimony credible as his chain of inferences appear to be driven entirely by hindsight and to lack any support in the prior art's teachings or the knowledge of the POSA, and the Court likewise rejects the Defendants' other arguments pertaining to the 40 mg/ml limitation, for the reasons discussed above. Because the claimed subject matter "as a whole" must have been obvious, 35 U.S.C. § 103(a), and the Defendants have failed to establish by clear and convincing evidence that the 40 mg/ml concentration would have been obvious, the Defendants' obviousness challenge fails. E.g., Univ. of Strathclyde v. Clear-Vu Lighting LLC, 17 F.4th 155, 165-66 (Fed. Cir. 2021).

> **c)** **The art did not motivate using a protein as large as glycosylated aflibercept**

The obviousness inquiry does not merely ask whether a skilled artisan could combine the references, but instead asks whether "they would have been motivated to do so." Adidas AG v. Nike, Inc., 963 F.3d 1355, 1359 (Fed. Cir. 2020) (quoting InTouch Techs., Inc. v. VGO Commc'ns, Inc., 751 F.3d 1327, 1352 (Fed. Cir. 2014)); Cyclobenzaprine, 676 F.3d at 1068-69. The Court concludes that the prior art would not have motivated the POSA to use a large

180

REGENERON V. MYLAN                                    1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

molecule like aflibercept because it would have been considered too large to reach the retina and exert a therapeutic effect.

Gaudreault taught specifically that "penetration of ranibizumab into the retina is critical for its clinical use" and that ranibizumab's "ability [to penetrate the retina] has been attributed to the small molecule size" of ranibizumab. PTX-1839 at 2, 6; Tr. 2026:2-2028:24 (Trout). Furthermore, Gaudreault's teachings were consistent with the scientific literature, which taught that proteins larger than 77 kDa would not penetrate the retina. Tr. 2028:25-2031:3; PTX-576 at 8 (Ghate) (the retina's "internal limiting membrane" was "impermeable to . . . globular molecules > 70 kDa"); PTX-1842 at 1 (Jackson) ("The [retinal exclusion limit] in human tissue was 76.5 ± 1.5 kDa."); PTX-1757 (Daly) ¶ 48 (the smaller 46 kDa "mini-trap" had "optimized characteristics for local/intra-vitreal delivery" and "has the ability to penetrate through the inner-limiting membrane (ILM) in the eye, and diffuse through the vitreous to the retina/retinal pigment epithelial (RPE) layer which will help to treat retinal disease").

As for Fraser, that reference undisputedly provides no teachings regarding intravitreal use of VEGF Trap and thus provides no motivation either. Because it was known that the protein later known as aflibercept had a molecular weight of 115 kDa,

181

REGENERON V. MYLAN                                      1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

substantially greater than the retinal exclusion limit, the POSA would not have been motivated to use aflibercept in an ophthalmic formulation.   The overwhelming weight of the evidence thus demonstrated that the POSA would not have been motivated to combine Fraser and Lucentis with a reasonable expectation of success to achieve the claimed compositions, which require the specific aflibercept protein that is also glycosylated in an ophthalmic formulation.  Adidas, 963 F.3d at 1359; see St. Jude Med., LLC v. Synders Heart Valve LLC, 977 F.3d 1232, 1242-43 (Fed. Cir. 2020).

            d)   **The combination fails to teach multiple claimed limitations**

    Claim 1 — aflibercept amino acid sequence and glycosylation requirement

The combination of Fraser and Lucentis fails to teach several limitations of the claims.   Neither Fraser nor the Lucentis publications teach the specific claimed amino acid sequence, i.e., amino acids 27-457 of SEQ ID NO:4.  Nor did the Defendants advance any persuasive reason to select that sequence from among the several others known in the prior art.  Tr. 2018:7-2022:16 (Trout); PTX-3619A.  The combination's failure to teach these limitations weighs strongly against obviousness.

Dr. Rabinow relied on inherency for the glycosylation limitation, but failed to provide any evidence that aflibercept is necessarily glycosylated.  Tr. 1044:13-19.  As the Federal Circuit

Appx184

REGENERON V. MYLAN                                                     1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

has explained, "[i]nherency . . . may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." PAR Pharm., Inc. v. TWI Pharm., Inc., 773 F.3d 1186, 1194 (Fed. Cir. 2014) (quoting In re Oelrich, 666 F.2d 578, 581 (C.C.P.A. 1981) (emphasis added). The prior art provides numerous examples of nonglycosylated proteins, such as ranibizumab, DTX-726 at 31:34, and nonglycosylated fusion proteins, such as mini-Trap, PTX-1757 (Daly) ¶ 48. Furthermore, Dr. Trout explained that even if a protein contains amino acid sequences that may be glycosylated, a given protein may not be glycosylated. Tr. 2023:9-2025:23. Dr. Trout's testimony was supported by the scientific literature, see PTX-1773 (Sinclair) at 2, and Dr. Rabinow did not offer any contrary testimony. Thus, the Defendants failed to meet the "high standard" for proving inherency. PAR, 773 F.3d at 1195-96.

Nor did the Defendants provide any reason to make the claimed fusion protein glycosylated. The Defendants, as "a party seeking to invalidate a patent as obvious[,] must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention." Cyclobenzaprine, 676 F.3d at 1068-69. The Defendants did not meet that burden. Dr. Rabinow did not advance

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

any motivation to glycosylate aflibercept.  Dr. Trout explained that the POSA would have sought to use nonglycosylated aflibercept, because glycosylation increases size and thus decreases retinal penetration.  Tr. 2022:20-2023:2, 2028:16-24, 2035:3-2036:24.  Dr. Rabinow did not dispute this testimony and did not establish any affirmative reason why the POSA would want to increase molecular size via glycosylation.

<u>Claim 1 — 98% native conformation</u>

Each of the asserted claims requires that "at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography."  The Defendants bear the burden not only of showing a motivation to combine the references to achieve the claimed invention, but also of "a reasonable expectation of success" in achieving the claimed invention.  <u>Endo Pharm. Inc. v. Actavis LLC</u>, 922 F.3d 1365, 1377-78 (Fed. Cir. 2019).  The Court finds that the Defendants have not shown a reasonable expectation of success in achieving the 98% native conformation limitation. The Defendants' argument is based on Dr. Rabinow's unsupported theory that formulations in a clinical trial would have 98% native conformation as claimed.  The Court finds that the Defendants' assertion is unsupported by the prior art and that the Defendants

184

Appx186

REGENERON V. MYLAN                                         1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

did not meet their burden in showing a reasonable expectation of success.

Nonetheless, even if all formulations in a clinical trial, such as the formulation disclosed in Shams, did have 98% native confirmation, Dr. Rabinow agreed that "[j]ust because one protein has a given native conformation at a specific condition, the [POSA] wouldn't expect that a different protein will have the same native conformation at that condition." Tr. 1156:20-24. The higher required concentration of aflibercept compared to the ranibizumab in Shams and aflibercept's identity as a fusion protein undermine any reasonable expectation of success. It was undisputed at trial that higher protein concentrations increase the risk for instability, and the claimed concentration of aflibercept (40 mg/ml) is four times higher than the 10 mg/ml concentration of ranibizumab in Shams. Tr. 2049:21-2050:21 (Trout); PTX-1556 (Wang 2005) at 7, 9. Thus, the Court finds that the POSA would not have had a reasonable expectation that the claimed formulations would have 98% native conformation in view of the Lucentis publications.

Furthermore, Dr. Trout explained that because fusion proteins are synthetic "Frankenstein" molecules that, unlike antibodies, did not evolve to possess inherent stability, the POSA would expect fusion proteins like aflibercept to have lower stability than antibodies (or antibody fragments like ranibizumab). Tr. 2068:18-

185

Appx187

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

2069:7.  Dr. Trout's explanation draws support in the scientific literature, PTX-1835 (Fast) at 15; Tr. 2014:21-2015:16 (Trout), and Dr. Rabinow did not offer any rebuttal.  The Court thus finds that the Defendants did not demonstrate a reasonable expectation of success.  Endo, 922 F.3d at 1377-78.

Claim 4 — polysorbate 20 concentration

Claim 4 of the Product Patent requires that "said organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20."  The references in the Defendants' combination disclose three different concentrations of polysorbate 20:  Fraser, a preclinical investigation of how intravenous administration of a VEGF Trap molecule affects ovarian function in monkeys, describes 0.1% polysorbate 20, DTX-729 at 2; Gaudreault, a preclinical study of intravitreal ranibizumab disclosed a composition with 0.05% polysorbate 20, PTX-1839 at 2; and Shams, directed to a clinical trial of ranibizumab, disclosed 0.01% polysorbate 20, DTX-726 at 31:27-32.

Despite offering testimony that more clinically advanced formulations would be more stable, Tr. 1031:7-16, Dr. Rabinow's conclusion of obviousness appears to assume that the POSA would not seek to use the 0.01% polysorbate 20 concentration in Shams, but rather would use the concentration from Fraser or Gaudreault. Dr. Rabinow did not offer any reason in the prior art's teachings

186

REGENERON V. MYLAN                                           1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

to prefer the polysorbate 20 concentration of Fraser or Gaudreault over the polysorbate 20 concentration contemplated for clinical use in Shams.

Dr. Trout, in contrast, considered Shams' teaching alongside Fraser and Gaudreault, and testified that if the POSA were to choose a polysorbate 20 concentration based on these references, the POSA would select the concentration in Shams, which is outside the scope of Claim 4, because it was the most clinically advanced. Tr. 2046:18-2047:13, 2048:5-2049:9. In view of the prior art's teachings and the trial record, the Court finds that the POSA would not have been motivated to select the polysorbate 20 concentration in Fraser or Gaudreault. Dr. Rabinow's approach is emblematic of hindsight, which is not permitted in the obviousness analysis. Sanofi-Aventis, 933 F.3d at 1375 (rejecting attempt to "chart[] a path to the claimed compound by hindsight").

Claim 9—pH

Claim 1 of the Product Patent, PTX-2, recites "a buffer," and claim 9 recites "wherein said buffer comprises a pH about 6.2-6.3." As with the polysorbate 20 concentration, the Defendants' prior art combination teaches three different pH values: 6.0 in Fraser, DTX-729 at 2; 5.0 in Gaudreault, PTX-1839 at 2; and 5.5 in Shams, DTX-726, 31:27-32. Dr. Trout gave unrebutted testimony that neither Gaudreault's 5.0 or Sham's 5.5 taught to use a pH of

Appx189

REGENERON V. MYLAN                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

"about 6.2-6.3." Tr. 2052:4-8. Dr. Rabinow, in contrast, did not establish any motivation to select the pH from Fraser, the only pH that arguably would fall within the claimed range. The Court thus concludes that the Defendants did not meet their burden to use a pH of "about 6.2-6.3" as required by claim 9.

For the reasons discussed, the Court concludes that the Defendants have failed to establish that the combination of Fraser and Lucentis render the Product Patent obvious.

### iii.    Fraser and Liu

#### a)    The POSA would not have been motivated to combine Fraser and Liu

The Court holds that the Defendants did not establish a motivation to combine Fraser and Liu. The Defendants argue that Fraser, a study on the effect of VEGF Trap on ovarian function in monkeys, used a VEGF antagonist concentration (24.3 mg/ml) higher than Lucentis (6 or 10 mg/ml), so the POSA would consult Liu to "optimize" Fraser's formulation. Even if the evidence supported this leap, neither reference provides any motivation to use aflibercept intravitreally. As Dr. Trout explained, the POSA would not have turned to Fraser's study on ovarian function using intravenous administration of a VEGF Trap and combined it with Liu's disclosure, which addresses the viscosity of certain antibody formulations and "doesn't have anything to do with

188

REGENERON V. MYLAN                                             1:22-CV-61

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

aflibercept or anything related," to make the claimed ophthalmic formulations of aflibercept. Tr. 2060:23-2061:2, 2062:20-25; <u>see</u> <u>Adidas</u>, 963 F.3d at 1359 ("Fundamental differences between the references are central to this motivation to combine inquiry.").

Even if the POSA did consider Liu's teachings in making an intravitreal formulation, the Court finds that the POSA would have heeded Liu's teachings regarding viscosity and used a lower concentration of protein. Liu taught that "[a]ntibodies tend to form viscous solutions at high concentration" and that sugars can further increase viscosity. DTX-730 ¶ 6. Dr. Trout, along with Dr. Furfine and Dr. Graham, explained that high viscosity would be especially problematic for intravitreal injections because it leads to "very long injection times" and even can make the formulation unusable, which would be exacerbated by the high amount of sugar already in Fraser's formulation. Tr. 2066:2-21 (Trout); <u>see also</u> Tr. 573:3-8 (Furfine); Tr. 1687:23-1688:21 (Graham). Thus, Liu would not have motivated the POSA to increase Fraser's VEGF Trap concentration, because such increase would increase viscosity, which would have been particularly problematic for a formulation for intravitreal injection. See <u>Henny Penny Corp. v.</u> <u>Frymaster LLC,</u> 938 F.3d 1324, 1331-32 (Fed. Cir. 2019) (the cited prior art "must be considered for all its teachings, not selectively."). Dr. Rabinow did not address Liu's viscosity

189

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

teachings. Dr. Trout's and the inventors' unrebutted testimony, which are consistent with Liu's express teachings, weigh strongly against a lack of motivation to combine. <u>Imperium</u>, 757 F. App'x at 978-79; <u>Raytheon</u>, 993 F.3d at 1382.

The Defendants invoke precedent directed to overlapping ranges to meet the 40 mg/ml limitation, but neither reference discloses the relevant range pertinent to the claims, <u>i.e.</u>, aflibercept concentration. The overlapping range cases may be invoked "when the only difference from the prior art is a difference in the range or value of a particular variable." <u>In re Kumar</u>, 418 F.3d 1361, 1366 (Fed. Cir. 2005). Where, as here, the prior art ranges have nothing to do with the "particular variable" claimed (aflibercept concentration), and instead are directed to different range—<u>i.e.</u>, Liu's concentrations of completely different proteins with no relevance to VEGF, DTX-730 ¶¶ 279-80; Tr. 2065:7-22—the range law is inapposite. <u>Pharmacyclics LLC v. Alvogen, Inc.</u>, 2022 WL 16943006, at *9 (Fed. Cir. Nov. 15, 2022) (not applying range law where "there are additional differences between the prior art and [the claim]"); <u>Teva Pharm. v. Corcept Therapeutics</u>, 18 F.4th 1377, 1382-83 (Fed. Cir. 2021) (range law did not apply where POSA would not expect claimed value and prior art range to behave same way); <u>ModernaTx v. Arbutus Biopharma</u>, 18 F.4th 1364, 1374 (Fed. Cir. 2021). Regardless, even if applicable,

190

Appx192

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

any presumption of obviousness based on optimizing within a range is rebutted by "teaching away, unexpected results, or other pertinent evidence of nonobviousness." <u>DuPont v. Synvina C.V.</u>, 904 F.3d 996, 1006 (Fed. Cir. 2018); <u>Allergan</u>, 796 F.3d at 1305 (concluding presumption was rebutted by teaching away and unexpected results).  Gaudreault's teaching away and the other objective evidence of nonobviousness (discussed below) rebut any presumption here.

          **b)**    **Fraser and Liu do not teach multiple claim limitations**

As described above regarding the Fraser and Lucentis combination, Fraser does not teach the aflibercept sequence or its glycosylation.  And Liu is undisputedly not directed to VEGF antagonists and does not disclose any sequences of such proteins, including aflibercept.  Tr. 1151:22-24 (Rabinow); Tr. 2063:1-18 (Trout).  The combination's failure to teach these claimed limitations weighs strongly against obviousness.

The Defendants rely on Liu for the 98% native conformation limitation, but Liu did not teach that formulations of aflibercept (or any other fusion proteins) would have 98% native conformation.  Dr. Rabinow acknowledged that Liu described antibodies, not fusion proteins, and did not disclose any stability data for aflibercept or any other VEGF antagonist.  Tr. 1152:20-1154:23 (Rabinow).

191

Appx193

REGENERON V. MYLAN                                           1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Crucially, both sides' experts agreed that "different proteins have different propensities for aggregation." Tr. 1155:25-1156:2 (Rabinow); Tr. 2068:5-2069:7 (Trout). Dr. Rabinow agreed that "[j]ust because one protein has a given native conformation at a specific condition, the [POSA] wouldn't expect that a different protein will have the same native conformation at that condition." Tr. 1156:20-24. And Dr. Trout explained, without rebuttal, that the POSA would have expected fusion proteins like aflibercept to be less stable than antibodies, since fusion proteins are "Frankenstein molecule[s]" that did not evolve like antibodies to possess inherent stability. Tr. 2068:18-2069:7; see PTX-1835 (Fast) at 15 ("fusion proteins may lack" the natural "interdomain interactions" that have "evolved to provide mutual stabilization"); Tr. 2014:21-2015:16, 2015:11-16 (Trout). In view of this evidence, which the Court credits, the Court finds that the Defendants failed to demonstrate the requisite reasonable expectation of success. Endo, 922 F.3d at 1373.

For the reasons discussed, the Court concludes that the Defendants have failed to establish that the combination of Fraser and Liu render the Product Patent obvious.

192

REGENERON V. MYLAN                                    1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

            iv.    Dix

The parties spend significant portions of their post-trial filings disputing the proper priority date of the Product Patent and, in turn, whether Dix '226 qualifies as a prior art reference. But the Court need not resolve these issues to get to the heart of the matter. For the reasons that follow, the Court finds that even if Dix '226 is prior art, it does not render the Product Patent obvious.

Dix '226 fails to render obvious the asserted claims for reasons similar to those explained above in connection with the Court's analysis of anticipation in light of Dix '226. Dix '226 undisputedly did not disclose, suggest, or contemplate ophthalmic formulations or intravitreal injections. Tr. 2072:18-20 (Trout); Tr. 1124:9-11, 1125:7-16 (Rabinow). Although Dix disclosed the range of 10-50 mg/ml of a VEGF antagonist, it disclosed no 40 mg/ml formulation, did not teach to use 40 mg/ml of the specific protein claimed, and provided no guidance as to whether any formulations in that range would be preferable for intravitreal use. DTX-13, 2:20-30. As discussed above, the Court finds that the 40 mg/ml "pre-lyophilized solution" was not an ophthalmic formulation or intended for injection, but rather was a "manufacturing intermediate" that the POSA would not have been motivated to use or have any expectation of success with regard to the 98% native

193

Appx195

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

conformation limitation.  Tr. 2077:1-16 (Trout).  Furthermore, the Court's findings regarding objective evidence apply equally to the Defendants' obviousness case over Dix '226.  Gaudreault undisputedly taught away from using a 40 mg/ml ophthalmic formulation, as described above, and the POSA would thus have been discouraged from using the 40 mg/ml concentration claimed in the Product Patent and would instead have used a lower concentration within the Dix '226 range.  Tr. 2072:25-2073:18 (Trout).

Thus, the Defendants have failed to establish that Dix '226 alone renders the asserted claims obvious.

### v.    Objective Evidence of Nonobviousness

At trial, Regeneron presented objective evidence of nonobviousness relevant to the Product Patent:  teaching away, unexpected results, industry skepticism, and copying.  Objective evidence "may often be the most probative and cogent evidence in the record," Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1538 (Fed. Cir. 1983), as it "guard[s] against slipping into use of hindsight" and "the temptation to read into the prior art the teachings of the invention at issue," Apple, 839 F.3d at 1052 (quoting Graham, 383 U.S. at 36).  Here, the objective evidence strongly supports nonobviousness.

194

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Along with refuting the requisite motivation, AstraZeneca v. Mylan, 19 F.4th at 1335, evidence of teaching away constitutes objective evidence of nonobviousness. Ecolochem, Inc. v. S. Cal. Edison Co., 227 F.3d 1361, 1379 (Fed. Cir. 2000) (considering teaching away as objective evidence); Monarch Knitting Machinery Corp. v. Sulzer Morat GmbH, 139 F.3d 877, 885 (Fed. Cir. 1998) (same). As described above, the prior art taught away from using a 40 mg/ml concentration of a VEGF antagonist.

Unexpected properties are present where "the claimed invention exhibits some superior property or advantage" that a POSA "would have found surprising or unexpected." Procter & Gamble, 566 F.3d at 994. Here, the unexpected properties of the claimed 40 mg/ml aflibercept compositions compared to the "closest prior art," the 40 mg/ml ranibizumab formulation in Gaudreault, strongly support nonobviousness. Millennium, 862 F.3d at 1368. The Defendants did not dispute that Gaudreault's 40 mg/ml formulation was the closest prior art.

The Court finds that Eylea's unexpected properties are well supported in the scientific literature.[7] Eylea is undisputedly an

---

[7] At trial, Dr. Rabinow testified that Eylea's properties were not unexpected because it was known that certain VEGF Trap molecules had strong binding affinity for VEGF. Tr. 1093:1-25. The Defendants forfeited this argument by not citing or discussing it in their Opening Post-Trial Brief. See Vanda Pharms., Inc. v. Teva Pharms. USA, Inc., 2022 WL 17593282, at *12 n.1 (D. Del. Dec.

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

embodiment of the claims, as it contains 40 mg/ml of glycosylated aflibercept, a buffer (pshosphate), a stabilizing agent (sucrose), 0.03% polysorbate 20, and meets the 98% native conformation limitation.  PTX-2, 9:20-44 (example 3); Tr. 2083:8-25 (Trout). The Court finds that Eylea demonstrated three critical and unexpected properties:  comparable (1) safety and (2) efficacy to ranibizumab, along with (3) the durability to be dosed <u>half</u> as frequently as ranibizumab (after three loading doses for wet AMD). PTX-1155 (Thomas) at 4.  Extended dosing with Eylea was not only unexpected, but revolutionary, providing "immediate benefits to patients who have a difficult time with intravitreal dosage administration" for the first time.  <u>Id.</u>  The "captivating aspect" of aflibercept that made "bimonthly dosing" possible and "altered current regimens of monthly dosing" was its "extended half-life." <u>Id.</u>; Tr. 2083:8-25, 2085:11-2086:5 (Trout).  In contrast, the 40 mg/ml Gaudreault formulation led to "moderate to severe" inflammation, no increase in VEGF inhibition over 10 mg/ml, and was ultimately discarded.  The Court finds that these "captivating" properties, which enabled a major change in the treatment of

---

13, 2022), <u>aff'd</u>, 2023 WL 3335538 (Fed. Cir. May 10, 2023) (holding that a party "forfeited its right" to raise a specific argument "by not raising it in timely fashion" and "by the passing manner in which it raised the argument in its post-trial brief").  Even if not forfeited, the Court would not credit Dr. Rabinow's testimony.

REGENERON V. MYLAN                                          1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

ophthalmic disease, were a "difference in kind" and not merely degree as compared to the 40 mg/ml Gaudreault formulation, Allergan, 796 F.3d at 1307.

The Defendants contest whether there is an adequate "nexus" between Eylea's unexpected properties and the claimed invention. However, the Court finds that Regeneron established a sufficient nexus between the claims and the unexpected properties. Here, "there is a presumption of nexus for objective [evidence]" because Regeneron showed undisputedly "that the asserted objective evidence is tied to a specific product," i.e., Eylea, "and that product is the invention disclosed and claimed in the patent." WBIP, 829 F.3d at 1330 (quotation marks omitted); see Crocs, 598 F.3d at 1311 ("Because the Commission found, based on substantial evidence, that Crocs shoes practice the '858 patent and that the Crocs shoes were commercially successful, Crocs established a prima facie case of nexus."). As relevant here, "the patent owner can show that it is the claimed combination as a whole that serves as a nexus for the objective evidence." WBIP, 829 F.3d at 1330. That is what Regeneron did. The record at trial demonstrated that the unexpected properties stemmed from the claimed compositions as a whole, including the 40 mg/ml aflibercept concentration. As the Defendants stress, and all appear to agree, the aflibercept protein does contribute to the longer half-life of Eylea, PTX-1155 at 4,

197

REGENERON V. MYLAN                                      1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

but aflibercept's concentration is also critical to its half-life. As Dr. Furfine explained, a key insight of the inventors was that "every time you double the concentration that you inject, you get an extra half-life." Tr. 473:2-15; see In re Sullivan, 498 F.3d at 1352 (considering inventor testimony regarding unexpected properties and holding that Board erred by not considering inventor declaration). Dr. Furfine's testimony explaining the relationship between the concentration and the half-life was unrebutted. Only with the higher 40 mg/ml concentration, resulting in a 2 mg dose, did Regeneron even attempt a bimonthly dosing regimen, as the trial record demonstrated unequivocally. PTX-1155 at 4, Table 1; Tr. 125:2-126:16, 135:7-23 (Yancopoulos). Dr. Trout likewise explained that the stability of the claimed compositions, including the required 98% native conformation, indicated to the POSA that the "there's a relatively lower risk of inflammation." Tr. 2170:5-21. Thus, Regeneron demonstrated a nexus between the unexpected properties and the claimed compositions, none of which were disclosed in the prior art.

The Defendants criticize the Product Patent for not describing Eylea's clinical and pharmacokinetic properties. However, the law does not require the inventors to have appreciated that the Eylea composition they invented would become the success it is; "understanding of the full range of an invention is not

198

Appx200

REGENERON V. MYLAN                                        1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

always achieved at the time of filing the patent application," and unexpected properties need not be appreciated at the time of the invention. Knoll Pharm. Co. v. Teva Pharm. USA, Inc., 367 F.3d 1381, 1384-85 (Fed. Cir. 2004); Genetics Inst., 655 F.3d at 1307-08 ("[W]e have held that evidence of unexpected results may be used to rebut a case of *prima facie* obviousness even if that evidence was obtained after the patent's filing or issue date." (emphasis added) (collecting cases)). The claimed compositions could have been among the many clinical failures Regeneron had experienced during its decades of existence. Tr. 97:16-98:7 (Yancopoulos). But Eylea was not one of them. The claimed composition — 40 mg/ml of aflibercept, with polysorbate 20, a buffer, and a stabilizing agent — instead became the leading medicine in its class and a revolutionary treatment for treating angiogenic eye disorders. Tr. 1745:3-1746:16 (Graham); Tr. 151:16-24 (Yancopoulos). Those results support nonobviousness.

Regeneron also pointed to evidence of industry skepticism, which may also support nonobviousness. WBIP, 829 F.3d at 1335 ("If industry participants or skilled artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it favors non-obviousness. Doubt or disbelief by skilled artisans regarding the likely success of a combination or solution weighs against the notion that one would combine elements

199

Appx201

REGENERON V. MYLAN                                           1:22-CV-61

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

in references to achieve the claimed invention."). Dr. Trout pointed to the teachings of Ferrara 2004 (PTX-1838), which taught the POSA that clinical use of fusion proteins like aflibercept "remains to be validated" and suggested that the "junctions between the various structural elements in such multi-component molecules can generate an immune response." PTX-1838 at 7. Dr. Trout explained that the POSA would have heeded the warning of Ferrara 2004, which was cited over 3,000 times by other authors. Tr. 2080:4-2081:19 (Trout). Specifically, Dr. Trout explained, "as a formulator," that the possibility of an immune response "is foremost in our mind of concern or one of the things that are of foremost concern." <u>Id.</u> Dr. Rabinow did not dispute the teachings of Ferrara 2004. The skepticism of Ferrara 2004—directed specifically at the use of VEGF Trap fusion protein and expressing "[d]oubt . . . by skilled artisans regarding the likely success of a combination or solution," <u>WBIP</u>, 829 F.3d at 1335—supports nonobviousness.

Dr. Trout also considered another Ferrara reference, Ferrara 2006 (PTX-701), and offered testimony that Ferrara 2006 constituted industry skepticism of the claimed invention. Tr. 2081:9-19. For the reasons expressed above with respect to teaching away, the Court finds that the teachings of Ferrara 2006 constitute further evidence of industry skepticism specifically

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

directed at intravitreal compositions comprising high molecular weight proteins such as VEGF Trap fusion proteins, and further support nonobviousness.  PTX-701 at 4; <u>WBIP</u>, 829 F.3d at 1335.

Evidence of copying can also support nonobviousness, and has greater force when the infringer tries but fails to circumvent the claimed invention.  <u>Depuy Spine v. Medtronic</u>, 567 F.3d 1314, 1328-29 (Fed. Cir. 2009).  Regeneron presented evidence that the



The Defendants' copying of these aspects of the Eylea formulation supports nonobviousness.  <u>Depuy</u>, 567 F.3d at 1328-29.

201

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

████████████████████████████████████████████████████

████████████████████████████████████████████ still
weighs in favor of nonobviousness. Copying requires only
"substantial similarity" with the patented product, not
identicality. Medtronic, Inc. v. Teleflex Innovations S.a.r.l.,
70 F.4th 1331, 1340-41 (Fed. Cir. 2023).

Having considered the Defendants' asserted prior art
combinations and all of the evidence, in addition to Regeneron's
arguments and objective evidence of nonobviousness, the Court
concludes that the Defendants have failed to prove by clear and
convincing evidence that the asserted claims of the Product Patent
would have been obvious.

    **c.   The Product Patent is not invalid under § 112**

The Defendants raise three challenges under 35 U.S.C. § 112
against the claims of the Product Patent. First, the Defendants
assert that the term "suitable for intravitreal administration"
recited in claim 1 is invalid as indefinite. Second, the
Defendants assert that the claims of the Product Patent lack
written description, focusing largely on claim 1. Third, the
Defendants assert that the claims of the Product Patent are not
enabled, also focusing on claim 1's limitations. Having reviewed
the Defendants' arguments and Plaintiff's responses at trial, the

202

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Court concludes that the Defendants have not met their burden of proving invalidity under § 112 for any claim of the Product Patent, either claim 1 on which they focus or the narrower dependent claims asserted at trial.

### i.      The Asserted Claims are not Indefinite.

Indefiniteness requires clear and convincing evidence to prove that the POSA could not understand with "reasonable certainty" what "suitable for intravitreal administration" means in the claims, despite the disclosure in the specification and the term's common use in the field.   Nautilus Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 901 (2014); see BASF, 875 F.3d at 1365 (indefiniteness assesses claim language "when read in light of the specification").   Courts have evaluated the claim term "suitable"—including in contexts similar to this one—and repeatedly concluded that this term is not indefinite.  See, e.g., Dey, L.P. v. Teva Parenteral Medicines, Inc., 2011 WL 2461888, at *3-7 (N.D.W. Va. June 17, 2011) (finding claim term "suitable for direct administration" not indefinite), aff'd, 600 F. App'x 773 (Fed. Cir. 2015); Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc., 510 F. Supp. 2d 356, 361 (D. Del. 2007) (finding claim term "suitable for intravenous administration" not indefinite); UCB, Inc. v. Accord Healthcare, Inc., 201 F. Supp. 3d 491, 545 (D. Del.

Appx205

REGENERON V. MYLAN                                    1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

2016), aff'd, 890 F.3d 1313 (Fed. Cir. 2018) (finding claim term "suitable" not indefinite because the "record [was] devoid of any evidence that a POSA would need 'clear guidelines' or 'explicit guidance' or 'the upper and lower limits'" to understand the term); In re Watson, 517 F.2d 465, 477 (C.C.P.A. 1975) (finding claim term "suitable" not indefinite); Panasonic Corp. v. Magna Int'l Inc., 2022 WL 625089, at *19 (W.D. Tex. Mar. 3, 2022) (same); Tecnomatic S.p.A v. ATOP S.p.A., 2021 WL 1410036, at *19 (E.D. Mich. Feb. 23, 2021), report and recommendation adopted, 2021 WL 2309933 (E.D. Mich. June 7, 2021) (same); Copan Italia S.p.A. v. Puritan Med. Prod. Co. LLC, 2019 WL 5699078, at *8 (D. Me. Nov. 4, 2019) (same); Sherwin-Williams Co. v. PPG Indus., Inc., 2018 WL 3845239, at *7 (W.D. Pa. Aug. 13, 2018) (same); Phoenix Licensing, L.L.C. v. AAA Life Ins. Co., 2015 WL 3866832, at *7 (E.D. Tex. June 22, 2015) (same); A.L.M. Holding Co. v. Akzo Nobel Surface Chemistry LLC, 2014 WL 12927041, at *3 n.19 (D. Del. Nov. 5, 2014) (same).

Both parties offered testimony demonstrating that the POSA understood the scope of the asserted claims, including the term "suitable for intravitreal administration." Dr. Rabinow had no difficulty opining which formulations were "suitable for intravitreal administration" in asserting obviousness. Tr. 1171:3-19 (Rabinow). And Dr. MacMichael conceded that knowledge

204

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

about "what formulations would be suitable for intravitreal administration" was "available in the literature," then agreed that the POSA could also consult an ophthalmologist—although Dr. MacMichael did not do so despite opining that the term is indefinite. Tr. 1519:7-18 (MacMichael). Dr. MacMichael's criticism was not that the scope of the claims was unclear, but rather that the claims were "open-ended and broad." Tr. 1520:3-1521:6.

The testimony from both parties confirmed that the POSA would not have viewed the term "suitable for intravitreal administration" as subjective. Dr. Trout testified that "suitable for intravitreal injection" is not subjective; the POSA would assess suitability by looking "to the teachings of the patent," which describe exemplary excipients, see PTX-2 at 4; and then, if needed, looking at "the literature" for suitable excipients with "structures that had been used in intravitreal administration" and consulting an ophthalmologist. Tr. 2112:20-2113:7 (Trout). Unlike Dr. MacMichael, who cited no evidence in support of his opinion, Dr. Trout cited literature as to how the POSA would interpret "suitable for intravitreal administration" — literature illustrating that those of skill in the art use and understand this term. Tr. 2114:5-2115:23 (citing Chang, PTX-1832 at 16 ("[I]t is preferred to select excipients that have been used in marketed

205

Appx207

REGENERON V. MYLAN                                          1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

products with a relevant route of delivery."); Peyman, PTX-1758, 3:26 at 4 (using the similar term "suitable for the treatment of ocular neovascularization").

    The Defendants strain to find ambiguity where none exists—as their own experts' testimony demonstrates.  Tr. 1171:3-19; BASF Corp. v. Johnson Matthey Inc., 875 F.3d 1360, 1368 (Fed. Cir. 2017) (expert's repeated use of terms "implicitly confirms that the terms at issue are ones whose scope is understood with reasonable certainty" by POSA); Sonix Tech. v. Publ'ns Int'l, 844 F.3d 1370, 1378-79 (Fed. Cir. 2017) (term not indefinite where expert has "no difficulty in applying it").  And Dr. MacMichael conceded that knowledge about "what formulations would be suitable for intravitreal administration" was "available in the literature," then agreed that the POSA could also consult an ophthalmologist — which Dr. MacMichael never did, despite opining that the term is indefinite.  Tr. 1519:7-18.  Dr. MacMichael's criticism was not that the scope of the claims was unclear, but rather that the claims were "open-ended and broad."  Tr. 1520:3-1521:6.  But as the Federal Circuit and its predecessor court have confirmed repeatedly, "breadth is not indefiniteness." BASF, 875 F.3d at 1367; SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1341 (Fed. Cir. 2005); In re Gardner, 427 F.2d 786, 788 (C.C.P.A. 1970).

REGENERON V. MYLAN                                           1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

The Defendants' attempted reliance on Dr. Furfine's testimony is misplaced. See Defs.' Opening Br. 28. The testimony they cite was directed to what was known "[b]efore [his] patent," i.e., without its guidance, whereas the indefiniteness analysis considers the meaning of a claim term in view of the patent's specification. Tr. 544:4-12 (Furfine). The Court also disagrees with the Defendants' suggestion that Dr. Trout's opinions were inconsistent. See Defs.' Opening Br. 29. Dr. Trout explained that the prior art did teach excipients suitable for intravitreal injection. Tr. 2114:5-2115:23. That does not imply, however, that the POSA would expect, based on the prior art without the patent's disclosure and data, to succeed in obtaining a stable, 40 mg/ml formulation of aflibercept with 98% native conformation as claimed in the Product Patent.

Supported only by Dr. MacMichael's conclusory opinion, the Defendants argue that "suitable for intravitreal administration" is "subjective." Tr. 1417:9-15, Defs.' Opening Br. 28. But the term bears no resemblance to subjective claim terms like "aesthetically pleasing," which turn entirely on "the preferences of the particular user." Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364, 1371 (Fed. Cir. 2014); Defs.' Opening Br. 28. The Defendants identified no circumstances where skilled artisans would disagree whether a formulation was "suitable for

**\*\*SEALED\*\***

<u>**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**</u>

intravitreal injection" based on their subjective preferences. <u>See, e.g.</u>, <u>Datamize, LLC v. Plumtree Software, Inc.</u>, 417 F.3d 1342, 1346, 1350 (Fed. Cir. 2005) (terms indefinite where they depend solely on individuals' "subjective beliefs"); <u>Intellectual Ventures v. T-Mobile USA</u>, 902 F.3d 1372, 1381 (Fed. Cir. 2018) (claims indefinite if they depend on "the unpredictable vagaries of any one person's opinion"); <u>NuVasive, Inc. v. Alphatec Holdings, Inc.</u>, 557 F. Supp. 3d 1069, 1076 (S.D. Cal. 2021) (finding claim term indefinite where the patentee's expert "could only offer an opinion for himself" about the precise boundaries of the claim term and "did not feel he could comment for other[s]"); <u>Cypress Lake Software, Inc. v. Samsung Elecs. Am., Inc.</u>, 382 F. Supp. 3d 586, 610 (E.D. Tex. 2019) (finding claim term indefinite where the patentee's expert conceded that "[d]ifferent people will have different interpretations" of the claim term's boundaries); <u>Prolifiq Software Inc. v. Veeva Sys. Inc.</u>, 2014 WL 3870016, at *7 (N.D. Cal. Aug. 6, 2014) (in finding claim term indefinite, posing questions regarding claim boundaries and concluding that "[s]ome people would say yes to these questions, some would say no.").

Dr. Trout testified that "suitable for intravitreal injection" is not subjective; the POSA would assess suitability by looking "to the teachings of the patent," which describe exemplary excipients, PTX-2, at 4 (2:39-48); and then, if needed, looking at

REGENERON V. MYLAN                                      1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

"the literature" for suitable excipients with "structures that had been used in intravitreal administration" and consulting an ophthalmologist. Tr. 2112:20-2113:7. Unlike Dr. MacMichael, Dr. Trout cited literature as to how the POSA would interpret the term. See Tr. 2114:5-2115:23 (Trout) (citing Chang, PTX-1832 at 6 ("[I]t is preferred to select excipients that have been used in marketed products with a relevant route of delivery"); Peyman, PTX-1758 at 4 (using term "suitable for the treatment of ocular neovascularization")). The Court thus concludes that the term "suitable for intravitreal injection" meets the standard for definiteness, which does not require "absolute or mathematical precision." See Biosig Instruments v. Nautilus, 783 F.3d 1374, 1381 (Fed. Cir. 2015); see Presidio Components v. Am. Tech. Ceramics, 875 F.3d 1369, 1376 (Fed. Cir. 2017) (claims definite where POSA would know "general approach" to ascertain whether claim term was met).

The Defendants have therefore failed to establish that the Product Patent is invalid under § 112 as indefinite.

209

Appx211

REGENERON V. MYLAN                                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

        ii.       The Asserted Claims Do Not Lack Written Description

A patent satisfies the written description requirement if the specification "allows [the POSA] to visualize or recognize the identity of the subject matter purportedly described"; the patent need not contain "either examples or an actual reduction to practice." Allergan, Inc. v. Sandoz Inc., 796 F.3d 1293, 1308 (Fed. Cir. 2015). Further, the written description requirement does not require that the specification "describe in the specification every conceivable and possible future embodiment of [the] invention." Cordis Corp. v. Medtronic AVE, Inc., 339 F.3d 1352, 1365 (Fed. Cir. 2003) (internal quotation omitted). Although the patent need not provide examples or demonstrate reduction to practice, the patent specification here provides both—including multiple formulations with different combinations of excipients and corresponding stability data (PTX-2 at 7-8 (Examples 1-6)) and lists of suitable excipients and amounts (PTX-2 at 4 (2:39-48)). Because the claims are drawn to a specific protein at a specific concentration with specific concentration ranges of polysorbate 20, the Court holds that the specification allows the POSA "to visualize or recognize the identity of the subject matter purportedly described" and thus meets the written description requirement. See Allergan, 796 F.3d at 1308.

REGENERON V. MYLAN                                        1:22-CV-61

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

Dr. Trout testified that each of the claim limitations in the Product Patent have "common structural features," including the "very specific" VEGF antagonist and the categories of organic co-solvent, buffer, and stabilizing agent.    Tr. 2109:17-2110:3 (Trout).    He further testified that these structures were well known in the art.  Tr. 2110:1-5.  Dr. MacMichael did not dispute this assertion, acknowledging that buffers and stabilizing agents are both "a known set of structures." Tr. 1509:13-1510:9, 1511:14-23 (MacMichael).  Dr. MacMichael even identified the handful of buffers that the POSA would consider in a formulation.  Tr. 1494:6-25 (MacMichael).

Dr. Trout also testified that the POSA could recognize the formulations that were claimed in the Product Patent, could visualize the formulations within the claims, and could recognize from the specification that the inventors invented the claimed formulations.  Tr. 2110:11-19 (Trout).  As for the specific disclosures in the Product Patent that allowed the POSA to recognize these features, Dr. Trout pointed to the disclosure of column 2, lines 39 to 57, as well as each of the examples.  Tr. 2110:20-25 (Trout); <u>see also</u> Tr. 2100:7-2104:20 (discussing disclosures in detail).  Those disclosures conveyed what structures would fall within the scope of the claim, permitting the POSA to visualize the claimed formulations and to recognize

211

REGENERON V. MYLAN                                                1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

that the inventors invented and possessed what the Product Patent claims.  Tr. 2100:7-2104:19, 2110:20-25 (Trout).  He noted that all of the Product Patent's examples have "at least 98 percent native conformation as measured by SEC after two months," and all "meet the turbidity limitation of Claim 15."  Tr. 2111:4-9 (Trout).

Following this analysis, Dr. Trout testified that the Product Patent provided "species or examples representative of the genus," claimed structures rather than function, and thus provided adequate written description for the asserted claims.  Tr. 2111:1-21 (Trout).  The Court credits Dr. Trout's analysis and conclusion.

The Defendants criticize the claims for reciting the structural categories of "buffer" and "stabilizing agent" instead of specific chemical structures.  But Dr. MacMichael acknowledged that buffers were "a known set of structures," Tr. 1509:13-1510:9, as were stabilizing agents, Tr. 1511:14-21, and he readily identified the handful of buffers that the POSA would consider in a formulation, Tr. 1494:6-25.  The POSA therefore can "visualize or recognize" the claimed structures.  Dr. Trout agreed that buffers and stabilizing agents were "structures well known in the art."  Tr. 2110:1-5.  For such known classes of structures, the patent did not need to provide an exhaustive description to the POSA.  McRO, Inc. v. Bandai Namco Games Am. Inc., 959 F.3d 1091, 1100 (Fed. Cir. 2020) (A "patent need not teach, and preferably

212

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

omits, what is well known in the art." (quoting Spectra-Physics, Inc. v. Coherent, Inc., 827 F.2d 1524, 1534 (Fed. Cir. 1987)); Erfindergemeinschaft UroPep GBR v. Eli Lilly & Co., 276 F. Supp. 3d 629, 650 (E.D. Tex. 2017) (Bryson, J.) (patent did not need to describe "hundreds of" compounds already "known" and within the claims to satisfy written description), aff'd, 739 F. App'x 643 (Fed. Cir. 2018). Rather, patents may describe such known structures through a "generalized formula" just as they may describe more specific chemical structures. In re Driscoll, 562 F.2d 1245, 1250 (C.C.P.A. 1977).

Further, a patent may satisfy the written description requirement by describing "structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus." Ariad, 598 F.3d at 1350. Since the specification here identifies the common structural features of the claimed compositions—40 mg/ml aflibercept, polysorbate 20, a buffer, and a stabilizing agent—and provides multiple examples thereof, it satisfies the written description requirement. Alcon Rsch. v. Barr Labs., 745 F.3d 1180, 1190-91 (Fed. Cir. 2014). The claims did not need to exclude other embodiments to comport with § 112; "[i]t is not the function of claims to exclude . . . but to point out what the combination is." In re Anderson, 471 F.2d 1237, 1242 (C.C.P.A. 1973).

213

Appx215

REGENERON V. MYLAN                                        1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

The Court has considered the decision in AstraZeneca AB v. Mylan Pharm. Inc., 2022 WL 16857400 (N.D.W. Va. Nov. 9, 2022), which has since been vacated, No. 18-cv-193, ECF No. 625 (N.D.W. Va. Mar. 8, 2023) ("AstraZeneca v. Mylan 2022"). While the decision is not binding, the Court finds that the factual record in that case is inapposite to the one here. The AstraZeneca court found that although "the asserted claims contain common structural limitations[,] . . . there is no correlation between such limitations and the functional stability requirement." 2022 WL 16857400, at *21. That was because the evidence in that case showed the "POSA could not apply [the] information [in the specification] to predict stable formulations" outside the examples as the structures "interact in interrelated and unpredictable ways." Id. at *13, 21 n.14.

Here, in contrast, the evidence demonstrated that the examples in the specification were predictive of the performance of formulations that were not exemplified in the patent. Regeneron pointed to several working examples of embodiments that were outside the disclosed examples (and the prior art) but nonetheless met the 98% native conformation and turbidity limitations of the claims. Tr. 1729:11-1732:3 (Graham) (discussing PTX-2281 and PTX-2282, showing a formulation using mannitol instead of sucrose as a stabilizing agent, that met both limitations); 1732:4-1733:23

214

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

(Graham) (discussing PTX-2265, PTX-2266, and PTX-2267, showing a formulation with 0.06% polysorbate 20 that likewise met both the 98% native conformation and turbidity limitations). The Defendants did not dispute these results, nor did the Defendants point to <u>any</u> formulation within the claims that did not achieve the claimed functional properties. Thus, unlike in <u>AstraZeneca</u>, here there was a "correlation between structure and function" that informs the POSA which formulations possess the properties recited in the claims. 2022 WL 16857400, at *21; <u>see</u> <u>Ariad</u>, 598 F.3d at 1350 ("correlation between structure and function" may satisfy written description requirement). Unlike in <u>Ariad</u> and its progeny, which involved claims to unlimited classes of molecules defined only by function, 598 F.3d at 1356; <u>AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.</u>, 759 F.3d 1285, 1292 (Fed. Cir. 2014) ("The claims . . . at issue in these appeals define the claimed antibodies by their function."), here the claims are limited to a specific protein molecule at a specific concentration along with other known structures (a buffer, stabilizing agent, and polysorbate 20). Just as in <u>Alcon</u>, the patent's description of those compositions shows possession of the claimed invention and thus satisfies the written description requirement, notwithstanding that "various formulation parameters, including osmolality and pH" may be selected when practicing the invention

215

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

(although notably, claim 9 does specify the pH as well).  See 745 F.3d at 1191.

Furthermore, in contrast to the evidence in AstraZeneca v. Mylan 2022 that the structures "interact in interrelated and unpredictable ways," 2022 WL 16857400, at \*13, the evidence showed that the POSA would have pursued a more linear process that, the Defendants' expert agreed, would not require making and testing each permutation of the structural elements of the claim, and that the POSA could use formulation design systems.  For example, the Kaisheva reference (DTX-3610) instructs that "[t]he formulation development approach is as follows:  selecting the optimum solution pH, selecting buffer type and concentration, evaluating the effect of various excipients of the liquid and lyophilized stability, and optimizing the concentration of the screened excipients using an I-optimal experimental design."  DTX-3610 ¶ 54.  Consistent with Kaisheva's teachings, Dr. MacMichael and Dr. Trout agreed that the POSA would not need to make and test every possible formulation in order to practice the claims.  Tr. 1497:25-1499:9 (MacMichael) (explaining that by using available software packages, "design of experiments" or "DOE" "reduces the amount of work," and "scientists would know that a DOE can be used to effectively reduce the number of variables that have to be looked at in an actual physical wet chemistry lab"); Tr. 2106:19-2108:4 (Trout) (agreeing that a POSA

216

Appx218

REGENERON V. MYLAN                                      1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

would use experimental design methods to reduce amount of experimentation).

Thus, the Court concludes that the Defendants have failed to demonstrate by clear and convincing evidence that the asserted claims of the Product Patent are invalid for lack of written description.

### iii.   The Asserted Claims Do Not Lack Enablement

The Supreme Court recently explained that although "a specification may call for a reasonable amount of experimentation to make and use a patented invention," it may not leave the POSA "forced to engage in 'painstaking experimentation' to see what works." Amgen Inc. v. Sanofi, 143 S. Ct. 1243, 1255-56 (2023). The Supreme Court's reasoning is consistent with the Federal Circuit's longstanding rubric inquiring whether making and using the claimed invention calls for "undue experimentation." Wands, 858 F.3d at 736-37.

During his testimony, Dr. Trout applied each of the Wands factors to the asserted claims of the Product Patent, supporting his conclusion that the claims are enabled because practicing the full scope of the claims requires only "routine experimentation," not "undue experimentation." Tr. 2109:6-14 (Trout).

217

REGENERON V. MYLAN                                      1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Dr. Trout first testified about the breadth of the claims, Wands factor 8.  He stated that the asserted claims are "narrow" rather than broad, because they claim "one specific biologic molecule . . . with a specific sequence ID" at just one concentration (40 mg/m), in a vial for intravitreal administration, and further claim specific structural components including a buffer, stabilizing agent, and the organic co-solvent of polysorbate 20 within a "narrow range."  Tr. 2089:10-2090:4 (Trout).  He also explained that the claim limitation reciting "98 percent present in native conformation following storage at 5 degrees Celsius for two months as measured by size-exclusion chromatography" is a narrowing limitation that removes suspensions and emulsions from the scope of the claims.  Tr. 2090:16-24 (Trout).  The Court finds that this factor weighs in favor of enablement.

Regarding the nature of the invention, Wands factor 4, Dr. Trout testified that "the nature of the invention is . . . an ophthalmic formulation . . . suitable for intravitreal administration, with the various formulation components, including the aflibercept and with the 98 percent native after two months storage at 5 degrees Celsius and all the rest of the specifics." Tr. 2091:16-24.  The experts agreed that the patent does not disclose or claim novel ingredients and does not require using or

218

Appx220

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

inventing novel ingredients to practice. <u>See</u> Tr. 1493:2-10 (MacMichael); Tr. 2125:15-20 (Trout). The Court finds that this factor weighs in favor of enablement.

Regarding the relative level of skill of the POSA, <u>Wands</u> factor 6, Dr. Trout testified that the level of skill was high—that is, the POSA "would be a professional with a master's degree at least in a relevant field, so a technical field directly relevant to formulations here." Tr. 2092:6-17 (Trout). Dr. MacMichael testified that the POSA would have an even higher level of skill: "at least a PhD in chemistry, chemical engineering, biochemistry, pharmacology, or a related field, along with one to two years of experience in the development and manufacture of formulations of therapeutic proteins or a lower degree with more practical industrial experience." Tr. 1372:25-1373:14 (MacMichael). The Court finds that this factor weighs in favor of enablement.

Regarding the level of predictability of the art, <u>Wands</u> factor 7, Dr. MacMichael notably did not testify that experimentation practicing the full scope of the claims would be unpredictable. He did not identify any formulation with the claimed components that failed to meet the 98% native conformation limitation, and Dr. Trout testified that he was not aware of any such formulation, either, <u>see</u> Tr. 2091:25-2092:5 (Trout).

REGENERON V. MYLAN                                          1:22-CV-61

**SEALED**

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

Further, in responding to Dr. MacMichael's reliance on materials suggesting that developing a stable formulation was nonroutine or not straightforward, Dr. Trout testified that those materials were inapposite, in that they did not disclose aflibercept formulations, whereas the Product Patent itself taught how to make stable aflibercept formulations. Tr. 2092:25-2096:3 (Trout). The Court finds that this factor weighs in favor of enablement.

Regarding the specification's guidance and working examples, <u>Wands</u> factor 2, Dr. Trout testified as to the "significant guidance" in the Product Patent. <u>See</u> Tr. 2096:4-22 (Trout). In particular, Dr. Trout highlighted the patent's disclosure of "known structures" as the claimed components, including an organic cosolvent such as polysorbate, polyethylene glycol, propylene glycol, or a combination thereof; a buffer such as phosphate and other known buffers that would achieve the disclosed pH range, such as succinate or histidine buffer; a stabilizing agent such as sucrose, sorbitol, glycerol, trehalose, or mannitol; and a pH range of 6.2 to 6.3. Tr. 2096:7-2099:18 (Trout). He also explained that "given the various formulations in the examples, if one encompasses the various structures that are described in the claims, one expects to meet the 98 percent limitation, or again the 99 under some circumstances with the different times." Tr. 2100:2-6 (Trout). Dr. Trout provided further testimony explaining

220

Appx222

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

specifically the relevance of guidance in Example 1, Tr. 2100:7-2103:18; Example 3, 2103:19-2014:7; and Example 5, 2104:8-2105:4. He also testified that Examples 4 and 6, which are "similar" to Examples 3 and 5 except that "they're in prefilled syringes instead of vials," are "important for a general understanding of how these formulations work too." Tr. 2105:5-17. As for the lyophilized formulations in Examples 7 and 8, Dr. Trout stated that lyophilization is just "another way of making formulations" taught by the specification. Tr. 2090:5-13. He testified that this _Wands_ factor thus favored enablement. Tr. 2105:22-2106:1. The Court agrees and finds that this factor weighs in favor of enablement.

Regarding the state of the prior art, _Wands_ factor 5, Dr. Trout testified that this factor weighed in favor of enablement because the prior art taught "how to substitute one excipient in a category, such as a stabilizing agent or buffer, for another," in addition to teaching how to perform SEC and turbidity testing. Tr. 2106:2-15 (Trout). The Court finds that this factor weighs in favor of enablement.

Regarding quantity of experimentation, _Wands_ factor 1, Dr. Trout testified that the steps of formulation development—which the Defendants' experts had called a "design of experiments" approach—involve "selecting optimal solution pH, selecting buffer type, concentration of the buffer, evaluating the effect of various

221

Appx223

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

excipients of the liquid and lyophilized stability, and optimizing the concentration of the screened excipients." Tr. 2106:23-2107:9 (Trout); see also DTX-3610 (Kaisheva) ¶ 54.  Based on this approach, Dr. Trout testified that the POSA would not need to test every possible combination of buffers and stabilizing agents in practicing this claim," but would instead "test the various combinations and variations of those combinations as the '865 patent did and via experimental design as needed."  Tr. 2107:10-14 (Trout).  The POSA would know to "use excipients that have the same structures, same structural characteristics as those discussed in the various categories in the patent," Tr. 2107:20-2108:4, further reducing the quantity of experimentation needed to practice the claims.  Dr. MacMichael similarly testified that "the POSA could do a design of experiment" using available computer software to "show which variables are not getting you to the desired outcome," which "reduces the amount of work" needed to practice the claims.  Tr. 1497:1-1499:12 (MacMichael).  The Court thus finds that it was not necessary to make and test every formulation within the claims in order to determine whether it would meet the 98% native conformation or turbidity limitations. The Court finds that this factor weighs in favor of enablement.

Likewise, the Court finds that the scope of the claims is not directed substantially to inoperative embodiments.  Each of the

222

Appx224

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Product Patent's several examples meets both the 98% native conformation and the turbidity limitation. And Regeneron pointed to several examples of embodiments that were outside the disclosed examples (and the prior art) but nonetheless met the 98% native conformation and turbidity limitations of the claims. Tr. 1729:11-1732:3 (Graham) (discussing PTX-2281 and PTX-2282, showing a formulation using mannitol instead of sucrose as a stabilizing agent, that met both limitations); 1732:4-1733:23 (Graham) (discussing PTX-2265, PTX-2266, and PTX-2267, showing a formulation with 0.06% polysorbate 20 that likewise met both the 98% native conformation and turbidity limitations). The Defendants did not dispute these results, nor did the Defendants point to any formulation within the claims that would require undue experimentation to make and use (when guided by the patent's teachings) or that did not exhibit the claimed properties.

Dr. Trout applied each of the Wands factors in turn and offered credible testimony concluding that practicing the asserted claims required only routine and not undue experimentation. Tr. 2089:7-2109:14 (Trout); see Wands, 858 F.2d at 737. Critically, "it is imperative when attempting to prove lack of enablement to show that one of ordinary skill in the art would be unable to make the claimed invention without undue experimentation." Johns Hopkins, 152 F.3d at 1360. Here, however, the Defendants' experts

223

Appx225

REGENERON V. MYLAN                                           1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

repeatedly declined to support that undue experimentation would be necessary to practice the claims, let alone prove nonenablement by clear and convincing evidence. While Dr. MacMichael also analyzed the asserted claims under these <u>Wands</u> factors, he repeatedly declined to offer the opinion that practicing the claims would require experimentation that rose to the level of "undue"—the longstanding requirement for non-enablement. <u>See</u> Tr. 1483:17-1487:13, 1535:3-1536:12 (MacMichael). The Defendants' other expert, Dr. Rabinow, agreed with Dr. Trout regarding enablement: "it wouldn't require undue experimentation to make formulations falling within the scope of the asserted claims." Tr. 1168:1-4 (Rabinow). The Court credits Dr. Trout's (largely unrebutted) testimony and finds the asserted claims enabled.

The claims recite specific structures, and the specification provides significant guidance to practice the claims, with examples and lists of excipients and amounts to use, as Dr. Trout explained. Tr. 2088:23-2106:1 (Trout). Using this guidance and tools for automating formulation design, Tr. 2106:19-2108:4 (Trout), Tr. 1497:1-1499:12 (MacMichael), DTX-3610 (Kaisheva) ¶ 54, the POSA could practice the claims with minimal and routine—not undue—experimentation, Tr. 2109:6-14 (Trout). "Such routine experimentation does not constitute undue experimentation"—"a considerable amount of experimentation is permissible, if it is

224

REGENERON V. MYLAN                                        1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

merely routine, or if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed to enable the determination of how to practice a desired embodiment of the claimed invention." Johns Hopkins, 152 F.3d at 1360 (quoting PPG, 75 F.3d at 1564); Wands, 858 F.2d at 736-40.

The Defendants argue that the claims cannot be both nonobvious and enabled and accuse Dr. Trout of inconsistency.  The Court disagrees.  Dr. Trout correctly applied the legal standards: obviousness is determined "in view of the prior art" without the benefit of the specification, whereas enablement is assessed "after reading the specification"; as a result, "there is no tension" in finding claims both nonobvious and enabled.  See Allergan, 796 F.3d at 1310.  The Defendants' articulation would collapse obviousness and enablement into two sides of the same inquiry as if the patent specification's teachings did not exist—that is not the law.

The Court likewise does not find persuasive the Defendants' citation to Regeneron's statements made during prosecution.  As Dr. Trout explained, Dr. Dix was not addressing, in prosecution, experimentation in view of the Product Patent's teachings.  Rather, Dr. Dix addressed, with respect to obviousness of a different patent, that "arriving at a stable formulation is not a

225

REGENERON V. MYLAN                                              1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

straightforward matter and it is not, for instance, possible to apply a formulation for one drug to another." Tr. 2094:7-2095:3; DTX-4430 at 3-4. Again, what matters for the enablement inquiry is what experimentation would be necessary "after reading the specification," Allergan, 796 F.3d at 1310, and at that point the POSA would not be left with applying formulations from one drug to another because the patent describes how to formulate aflibercept—the molecule in the claims—with numerous examples and additional disclosures. Tr. 2095:3-2096:3.

The Court also concludes that AstraZeneca v. Mylan 2022 does not support the Defendants' nonenablement arguments. 2022 WL 16857400 (N.D. W.Va. Nov. 9, 2022). While the decision is not binding on this Court, the Court nonetheless concludes that the factual record in that case is inapposite to the one here, for reasons similar to those above. In the AstraZeneca v. Mylan 2022 case at issue, the evidence showed that "[d]ue to the unpredictability of the art and lack of prior art to inform a POSA about the interactions between the ingredients, a POSA would have to test an astronomical number of formulations." 2022 WL 16857400, at *7. That was because the formulation ingredients "interact in interrelated and unpredictable ways." Id. at *13. That fatal aspect of practicing the claims in AstraZeneca was also the same as in the Federal Circuit's Idenix case, the Supreme Court's Amgen

226

REGENERON V. MYLAN                                           1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

case, and the Federal Circuit's similar precedent:  those cases premised their findings of non-enablement explicitly on the need for the POSA to make and test each compound or structure within structurally unlimited claims to determine whether it would work. Amgen, 143 S. Ct. at 1257 (specification "leave[s] [POSA] to 'random trial-and-error discovery'"); Idenix Pharm. LLC v. Gilead Sci. Inc., 941 F.3d 1149, 1161 (Fed. Cir. 2019) (POSA had to "make[] and test[]" "each" of unlimited set of structures); Wyeth & Cordis Corp. v. Abbott Labs., 720 F.3d 1380, 1384-85 (Fed. Cir. 2013) (claims purported to cover "any structural analog" of compound, and POSA could evaluate claimed function only by "synthesizing and screening each" compound); Pharm. Res., Inc. v. Roxane Labs., Inc., 253 F. App'x 26, 30 (Fed. Cir. 2007) ("a large part of the asserted claims' scope is directed toward inoperative embodiments," and experiments "evidence[d] numerous unsuccessful attempts . . . to practice subject matter within the scope of the claims").

Unlike in each of those cases, there is no such evidence of interactions among the various ingredients, necessitating making and testing an "astronomical" number of formulations at random, for the formulations claimed here.  The evidence showed that the POSA would have pursued a more linear process that would not require making and testing each permutation of the structural

227

Appx229

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

elements of the claim, and that would have been aided by
formulation design systems.  For example, the Kaisheva reference
(DTX-3610) instructs that "[t]he formulation development approach
is as follows:  selecting the optimum solution pH, selecting buffer
type and concentration, evaluating the effect of various
excipients of the liquid and lyophilized stability, and optimizing
the concentration of the screened excipients using an I-optimal
experimental design."  DTX-3610, ¶ 54.  Consistent with Kaisheva's
teachings, Dr. MacMichael and Dr. Trout agreed that the POSA would
<u>not</u> need to make and test every possible formulation in order to
practice the claims.  Tr. 1497:25-1499:9 (MacMichael) (explaining
that by using available software packages, "design of experiments"
or "DOE" "reduces the amount of work," and "scientists would know
that a DOE can be used to effectively reduce the number of
variables that have to be looked at in an actual physical wet
chemistry lab"); Tr. 2106:19-2108:4 (Trout) (agreeing that POSA
would use experimental design methods to reduce amount of
experimentation).

Furthermore, the <u>AstraZeneca v. Mylan 2022</u> court found that
making "embodiments outside the scope of the disclosed examples
would require substantial trial-and-error testing."  2022 WL
16857400, at *17.  Here, however, the Defendants have not pointed
to any experimentation that would be necessary to make and test

228

Appx230

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

formulations outside the claims. Because the Defendants "failed to make the threshold showing that any experimentation is necessary to practice the [claims]," their enablement arguments fail. Alcon, 745 F.3d at 1189; see McRO, Inc. v. Bandai Namco Games Am. Inc., 959 F.3d 1091, 1100 (Fed. Cir. 2020) (Defendants generally must make "concrete identification of at least some embodiment or embodiments asserted to be not enabled" so that claim "breadth is shown concretely and not just as an abstract possibility.").

In contrast, Regeneron pointed to several examples of embodiments that were outside the disclosed examples (and the prior art) but nonetheless met the 98% native conformation and turbidity limitations of the claims. Tr. 1729:11-1732:3 (Graham) (discussing PTX-2281 and PTX-2282, showing a formulation using mannitol instead of sucrose as a stabilizing agent, that met both limitations); 1732:4-1733:23 (Graham) (discussing PTX-2265, PTX-2266, and PTX-2267, showing a formulation with 0.06% polysorbate 20 that likewise met both the 98% native conformation and turbidity limitations). The Defendants did not dispute these results, nor did the Defendants point to any formulation within the claims that would require undue experimentation to make and use (when guided by the patent's teachings) or that did not exhibit the claimed properties. Again, the Defendants thus failed to make a threshold

229

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

showing of nonenablement. <u>Alcon</u>, 745 F.3d at 1189; <u>McRO</u>, 959 F.3d at 1100.

Similarly, the Defendants have not argued, let alone proven, that identifying formulations having the claimed structure (40 mg/ml of glycosylated aflibercept and polysorbate 20 within the specified concentration range, plus a buffer and a stabilizing agent) that exhibit the claimed properties amounts to finding a "needle in a haystack" using trial-and-error experimentation with a significant number of failures. <u>AstraZeneca v. Mylan 2022</u>, 2022 WL 16857400, at \*19 (discussing <u>Idenix</u>, 941 F.3d at 1162); <u>Roxane</u>, 253 F. App'x at 30. Unlike the "needle in a haystack" problem in <u>Idenix</u>, the experimental process here of identifying formulations having the claimed properties would be more akin to finding hay in a haystack. Each of the examples in the Product Patent achieved both the 98% native conformation and the turbidity limitation. PTX-2, Examples 1-8. And again, the Defendants did not point to <u>any</u> example of a formulation with the claimed structures that would not exhibit the claimed properties, whereas Dr. Graham pointed (without rebuttal) to multiple formulations outside the specification's examples, but within the claims, that meet the claimed properties. <u>Alcon</u>, 745 F.3d at 1189.

The Court also concludes that the Supreme Court's recent decision in <u>Amgen Inc. v. Sanofi</u>, 143 S. Ct. 1243 (2023) is readily

230

REGENERON V. MYLAN                                    1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

distinguishable.   There, the claims were entirely functionally defined—the Court explained that the patentee "seeks to monopolize an entire class of things defined by their function—every antibody that both binds to particular areas of the sweet spot of PCSK9 and blocks PCSK9 from binding to LDL receptors."   143 S. Ct. at 1256. Here, in contrast, the claims are directed to formulations of a specific protein at a specific concentration—not "an entire kingdom" of proteins.   The excipients recited in the claims are also structures:   categories for the buffer and stabilizing agent, and a specific substance (polysorbate 20) for the organic co-solvent.   Because the claims in Amgen were not limited to any particular structure, the POSA was left with "painstaking experimentation to see what works," id. at 1256-57 (quotation marks omitted), since "changing even one amino acid in the sequence can alter an antibody's structure and function," id. at 1249.   For such claims, limited specifications "offer[] [the POSA] little more than advice to engage in 'trial and error,'" and "the public does not receive its benefit of the bargain."   Id. at 1257-58. Those challenges associated with altering protein structure are irrelevant to practicing the claims here, which are limited to a particular amino acid sequence of aflibercept.   Cf. id. at 1250 (noting that patents claiming a particular amino acid sequence were not at issue).   As described above, the Defendants did not

231

Appx233

REGENERON V. MYLAN                                                    1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

present any evidence or argument that varying the claimed excipient structures (all known in the art) would have engendered the kind of "painstaking experimentation" necessary in Amgen.  Id. at 1256-57.

Thus, the Court concludes that the Defendants have failed to demonstrate by clear and convincing evidence that the asserted claims of the Product Patent are invalid for lack of enablement.

### 4.    Invalidity of the Treatment Patents

#### i.       Dixon Does Not Anticipate Claim 6

The Defendants cite Dixon (DTX-204) as an anticipating reference.  It is undisputed that Dixon does not expressly discuss the concept of isotonicity, and thus fails to disclose expressly "all of the limitations claimed" and "all of the limitations arranged or combined in the same way as recited in the claim." Net MoneyIN, 545 F.3d at 1371.  Instead, the Defendants argue that Dixon inherently anticipates Claim 6 on the ground that "the missing descriptive material is necessarily present, not merely probably or possibly present, in the prior art." Trintec, 295 F.3d at 1295. They that Dixon's reference to "VEGF Trap-Eye" as "formulated with different buffers and at different concentrations (for buffers in common) suitable for the comfortable, non-irritating, direct injection into the eye," only could have been

232

Appx234

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

describing an isotonic solution.  DTX-204 at 3.  In support of this position, the Defendants' clinical expert, Dr. Albini, relied on testimony offered by the Defendants' formulation expert, Dr. Rabinow, as to what the POSA would have believed about this sentence.  See Tr. 828:12-830:17 (Albini); Tr. 1098:23-1100:7 (Rabinow); DTX-204 at 3.

There is insufficient evidence that the "isotonic" limitation of claim 6 is necessarily present in Dixon's reference to formulations "suitable for the comfortable, non-irritating, direct injection into the eye."  DTX-204 at 3.

The Defendants' expert Dr. Rabinow did not rule out that a comfortable, non-irritating injection could be something other than isotonic.  He testified that "[t]he eye is remarkably tolerant to hypertonic solutions" exceeding the range of osmolality or tonicity for isotonic solutions, Tr. 1174:6-8 (Rabinow), showing that even he recognizes that formulation of aflibercept for a "comfortable, non-irritating injection" need not necessarily be isotonic.  Evidence that a comfortable, non-irritating injection *might* be isotonic is not enough to meet the Defendants' burden to show inherent anticipation, which "may not be established by probabilities or possibilities."  Continental, 948 F.2d at 1269.

Dr. Rabinow's testimony on this issue lacked credibility, including because he failed to explain the scientific basis for

233

Appx235

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

his opinions.  Dr. Albini's testimony — whether on his own behalf
or by reliance on Dr. Rabinow — cannot fill this gap, because Dr.
Albini admitted that he has no opinion regarding what "range
outside of isotonicity you would or wouldn't use to treat the eye."
Tr. 881:19-22 (Albini).  To the extent Dr. Albini purported to
offer testimony without reliance on Dr. Rabinow about what the
language in Dixon would have been understood to mean from a
formulation perspective, the Court declines to credit it.  Dr.
Albini admitted he is "not a formulation expert," and is "not an
expert" in "the design of therapeutics" or "the importance of the
isotonicity."  Tr. 819:2-16, 823:9-14 (Albini).  He has "no"
opinion regarding "what specific range outside of isotonicity you
would or wouldn't use to treat the eye."  Tr. 881:19-22 (Albini).
He acknowledged he was "definitely relying on" Dr. Rabinow for any
opinion on formulation issues, Tr. 913:17-914:6 (Albini),
including whether "aflibercept formulated for comfortable, non-
irritating injection was inherently isotonic," Tr. 942:2-12
(Albini).

Indeed, although the Defendants' expert, Dr. Rabinow,
initially maintained that a POSA would not have viewed a hypertonic
formulation as suitable for intravitreal administration, Tr.
1171:3-7 (Rabinow), when he was confronted by his prior statements
during cross-examination, Tr. 1171:9-19, he agreed that "[t]he eye

234

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

is remarkably tolerant to hypertonic solutions," Tr. 1173:6-1174:8 (Rabinow), supporting the conclusion that an injection may be "comfortable and non-irritating" to the eye, yet not isotonic.

The Defendants argue that Regeneron did not identify at trial "an isotonic aflibercept formulation" in use "that was not comfortable, and that did irritate the eye," and therefore "Dixon anticipates." ECF No. 576 (Defs.' Opening Post-Trial Brief) at 10-11. This not only impermissibly flips the burden of proof onto Regeneron to cite an example, but it also seeks the wrong type of example. As a factual matter, the question is not whether there existed some irritating isotonic aflibercept formulations; the question is whether Dixon's disclosure of a "comfortable and non-irritating" solution teaches that the aflibercept formulation necessarily must be isotonic. The Court finds that Dixon did not necessarily describe an isotonic formulation, because there is evidence that ophthalmic formulations of aflibercept existed that were not isotonic, including the formulation disclosed in Example 5 of the Product Patent, which was hypotonic ("below iso-osmolar"). Tr. 1721:11-1722:8 (Graham). And there was no evidence that as of the priority date, the POSA would have had information about which of the formulations disclosed in the Product Patent—all described as "suitable for intravitreal administration," PTX-2 at 2—were isotonic, or which, if any, of the formulations it disclosed was

REGENERON V. MYLAN                                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

being developed and used in the clinical studies.  See Tr. 1742:4-1743:2 (Graham).

The Court therefore does not credit Dr. Albini's ultimate conclusion that Dixon constitutes an anticipatory reference. While that alone constitutes a failure of proof, the Court also credits the testimony of Plaintiff's formulation expert Dr. Trout that the POSA would not have understood Dixon to say that aflibercept's formulation necessarily and only would be isotonic. Tr. 2117:6-24 (Trout).

The Court finds that the Defendants failed to demonstrate by clear and convincing evidence that all the limitations of claim 6 were disclosed in Dixon.

### ii.    Prior Art Renders Claim 6 Obvious

The Defendants have carried their burden, however, to demonstrate that claim 6 is rendered obvious by the combination of Dixon and Hecht.

The Defendants relied on the testimony of Dr. Albini and Dr. Rabinow in forming its obviousness arguments regarding claim 6 of the '572 patent.  The Defendants rely, generally, on the same prior art disclosures of Dixon for their obviousness arguments as they did for anticipation.  For example, Dr. Albini testified that Dixon disclosed the claimed dosing regimen through its disclosure of 2.0

236

REGENERON V. MYLAN                                            1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

mg VEGF Trap-Eye administered "at an 8 week dosing interval (following three monthly doses)." (Tr. 812:12-813:3 (Albini); DTX 204.4).

Dr. Albini also deferred to the expert background and testimony of Dr. Rabinow and his analysis of the Chemistry section of Dixon and the isotonic formulation limitation of claim 6. (See, e.g., Tr. 813:7-14, 819:5-8, 826:7-23, 914:1-6 (Albini); DTX 204.3). This disclosure alone, based on what Dr. Albini learned from Dr. Rabinow, suggested to Dr. Albini that the formulation described in Dixon should be isotonic. (Tr. 828:12-19 (Albini)).

However, Dr. Rabinow also testified that claim 6 of the '572 patent as construed by this Court is obvious in view of the disclosures from the Dixon reference. (Tr. 1096:15-21 (Rabinow)). For example, Dr. Rabinow explained that a POSA reading Dixon would understand that the phrase "suitable for the comfortable, non-irritating direct injection into the eye" in Dixon would tell a POSA that the formulation should be isotonic. (Tr. 1098:9-1099:10 (Rabinow)).

Dr. Rabinow further relied upon the Hecht reference, (Tr. 1096:23-1097:8 (Rabinow); see generally DTX 3588), which is an excerpt from Remington's Pharmaceutical Sciences, a reference that the asserted patents admit is a "formulary known to all pharmaceutical chemists" and contains "a multitude of appropriate

Appx239

REGENERON V. MYLAN                                    1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

formulations." (PTX 1.13 (5:55-58); PTX 3.16 (5:64-6:1). Hecht disclosed that ophthalmic solutions like aflibercept are formulated to be "sterile, isotonic, and buffered for stability and comfort," and that for such formulations, "isotonicity always is desirable and particularly is important." (Tr. 1097:9-22 (Rabinow); DTX 3588.11, 13). Dr. Rabinow explained that Hecht stresses that tonicity is a "general consideration" that formulators must consider when formulating an ophthalmic solution. (Tr. 1097:23-8 (Rabinow); DTX 3588.11, 13).

Dr. Rabinow likened these disclosures in Hecht to the disclosures of Dixon; notably, he stated that Hecht's ophthalmic solution guidance was particularly relevant to the disclosure in Dixon describing the aflibercept solution as "formulated with different buffers and at different concentrations for buffers in common suitable for the comfortable, nonirritating direct injection into the eye." (Tr. 1098:11-1099:4 (Rabinow); DTX 204.3). Dr. Rabinow explained that this disclosure, given the guidance gleaned from Hecht, would signal to a POSA that the aflibercept formulation described in Dixon should be isotonic. (Tr. 1099:5-22 (Rabinow)).

As with anticipation, Regeneron presented the testimony of Dr. Csaky and Dr. Trout to rebut the Defendants' arguments. Dr. Csaky testified that Dixon does not expressly disclose an isotonic

238

Appx240

REGENERON V. MYLAN                                                    1:22-CV-61

**SEALED**

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

formulation, and that any disclosure from Dixon would not be helpful to an ophthalmologist because they are not trained chemists. (Tr. 1868:8-1869:6 (Csaky)). Dr. Csaky also testified that the POSA would not have known the formulation of Eylea as of the date of Regeneron's Phase 3 trials and the filing date of the dosing patents, nor could a POSA such as Dr. Albini or Dr. Csaky offer an opinion as to what range would qualify as outside the isotonicity limitation. (Tr. 1869:11-13 (Csaky); <u>see also</u> Tr. 881:19-22, 913:17-25 (Albini)). On cross-examination of Dr. Albini, he admitted that the full formulation for Eylea had not been disclosed to the public in an identifiable prior art reference; however, Dr. Csaky did confirm that the isotonicity formulation component had been available as of November 2010. (Tr. 915:17-20 (Albini); Tr. 1979:12-1981:1 (Csaky); DTX 917.1-2; DTX 918.1). Dr. Csaky further deferred to Dr. Trout, (Tr. 1956:17-19 (Csaky)), who also testified that no prior art reference disclosed the aflibercept isotonic formulation limitation. (Tr. 2117:6-15 (Trout)).

With regard to Claim 6 the parties do not dispute that Dixon discloses the regimen. The Court also agrees with the Defendants that the claimed isotonic solutions were obvious in view of the disclosures of Dixon and Hecht, as explained by Dr. Albini and Dr. Rabinow.

Appx241

REGENERON V. MYLAN                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

The record further shows that a POSA would have had a reasonable expectation of success at using the claimed regimens. First, the record shows that there already were regimens in the prior art that permitted 5 monthly injections followed by less frequent administration. (See, e.g., DTX 2035.2-3; DTX 2730.22; DTX 3198.2). With regard to claim 6, the record reflects that the VIEW Phase 3 regimen, which Regeneron does not dispute falls within the scope of claim 1, was disclosed in the prior art Dixon reference, among other references, and that the Phase 2 results, using an even less aggressive dosing strategy than the Phase 3 regimen, resulted in significant improvement in visual acuity. (See DTX 204.4).

Second, "[a] finding of a reasonable expectation of success does not require absolute predictability of success" at making the invention. Almirall, LLC v. Amneal Pharms. LLC, 28 F.4th 265, 275 (Fed. Cir. 2022); see also OSI Pharms., LLC v. Apotex Inc., 939 F.3d 1375, 1385 (Fed. Cir. 2019) (declining to hold that "data is always required for a reasonable expectation of success" or to require "absolute predictability of success"). Dr. Csaky admitted that the claimed regimens showed some efficacy. (Tr. 1822:23-1823:17 (Csaky)); see Hoffmann-La Roche Inc. v. Apotex Inc., 748 F.3d 1326, 1331 (Fed. Cir. 2014) ("Conclusive proof of efficacy is not necessary to show obviousness."). Dr. Csaky also admitted

240

Appx242

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

that aflibercept exhibited visual acuity gains in AMD using an even less aggressive dosing schedule than the Phase 3 schedule. (Tr. 1881:14-1882:20 (Csaky) (CLEAR-IT 2 had less loading doses and different design than VIEW trials); Tr. 1882:24-1883:7 (Csaky) (CLEAR-IT 2 clearly showed "activity" in terms of "effect on visual acuity"); Tr. 1974:25-1977:2 (Csaky) (positive results from CLEAR-IT 2); DTX 204.4-5).  Under this standard, the Court finds that the Defendants have shown a POSA would have had a reasonable expectation of success at using the treatment regimen in claim 6. The Defendants' expert Dr. Albini testified as to several references that reported visual acuity gains (though no such gains are required of the claims), including aflibercept references showing efficacy in DME patients with just a single intravitreal injection or in the related AMD indication with repeated intravitreal injections.  (Tr. 790:25-792:2 (Albini); DTX 3102.3 ("The median improvement in BCVA was nine letters at 1 month and three letters at 6 weeks. . ."); see also DTX 204.3-4).  The record also reflects positive results obtained with the VEGF inhibitor ranibizumab in the treatment of both AMD and DME.  (See, e.g., DTX 2733.1 (mean gain of eight (8) letters in DME); DTX 3089.1, 4 (8 of 10 eyes showed visual acuity gains in DME); see also, e.g., DTX 2034.1 (mean gain of 7.2 letters in AMD); DTX 3115.1 (mean visual

241

REGENERON V. MYLAN                                      1:22-CV-61

**\*\*SEALED\*\***

## MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

acuity improvement of 9.3 letters in AMD); DTX 4061.4 (various studies in AMD)).

Third, the Defendants have shown that the differences, if any, between the prior art and the claimed dosing regimen, do not rise to the level of being nonobvious. Regeneron has not presented any evidence of differences between the prior art dosing regimens and the claimed regimens.

The Court finds that the Defendants have demonstrated by clear and convincing evidence that claim 6 is obvious in light of Dixon and Hecht. Based on this conclusion, the Court does not address the Defendants' assertion that claim 6 is also invalid under § 112.

### iii.    Prior Art Does Not Anticipate the DME Claims

Claim 11 of the '601 patent provides: A method for treating diabetic macular edema in a patient in need thereof, comprising intravitreally administering, to said patient, an effective amount of aflibercept which is 2 mg approximately every 4 weeks for the first 5 injections followed by 2 mg approximately once every 8 weeks or once every 2 months, "wherein approximately every 4 weeks comprises approximately every 28 days or approximately monthly." PTX-1 at 21.

242

REGENERON V. MYLAN                                    1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Claim 25 of the '572 patent provides: "A method of treating diabetic macular edema in a patient in need thereof comprising sequentially administering to the patient in a single initial dose of 2 mg of aflibercept, followed by one or more secondary doses of 2 mg of aflibercept, followed by one or more tertiary doses of 2 mg of aflibercept; wherein each secondary dose is administered to the patient by intravitreal injection approximately 4 weeks following the immediately preceding dose; and wherein each tertiary dose is administered to the patient by intravitreal injection approximately 8 weeks following the immediately preceding dose. The method of claim 15 wherein four secondary doses are administered to the patient."  PTX-3 at 25.

Both claims are directed to methods of treating patients with diabetic macular edema, where the physician administers five loading doses of aflibercept at a 2 mg dosage level, approximately 4 weeks or one month apart, followed by maintenance or extended fixed interval dosing approximately every 8 weeks or two months apart for the remainder of treatment.  While the claims do not use the phrase "loading doses," the parties' experts appeared to agree that this is the concept described in both claims.  Tr. 297:24-299:17 (Csaky);  Tr.  862:22-863:14  (Albini);  Tr.  1287:10-14 (Stewart); Tr. 1332:7-10 (Stewart).

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

The Court finds that the Defendants failed to demonstrate by clear and convincing evidence that the method of claim 11 and claim 25 were disclosed by a single reference in the prior art.  Neither of the two references the Defendants offered as anticipatory—a September 14, 2009 Press Release that describes aspects of Regeneron's Phase 2 DA VINCI trial (DTX-3198) and an earlier Regeneron patent referred to as the '747 patent (DTX-2730)—discloses every limitation of claims 11 and 25, as the law of anticipation requires.

### a)   September 14, 2009 Press Release

The Defendants urge that the September 14, 2009 Press Release Regeneron issued concerning several of its ongoing clinical trials anticipates claims 11 and 25.  It does not.  The relevant language from the Press Release provides:

> VEGF Trap-Eye is also in Phase 2 development for the treatment of Diabetic Macular Edema (DME).  VEGF Trap-Eye dosed at 0.5 mg or 2 mg monthly, 2 mg every eight weeks after three monthly loading doses, or 2mg on an as-needed (PRN) basis after three monthly loading doses is being compared to focal laser treatment, the current standard of care in DME.

DTX-3198 at 2.  This language describes regimens that contain three monthly loading doses, not five monthly loading doses, as the DME Claims require.

The Defendants to not assert that the September 2009 Press Release (DTX-3198) literally describes the claimed treatment

244

REGENERON V. MYLAN                                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

regimen.  Plainly, it does not, because it discloses three loading doses (not the claimed five) followed by a PRN dosing schedule (not the claimed fixed eight-week interval).  DTX-3198 at 2.  As such, the Press Release does not disclose every element of the claimed method, let alone those elements as arranged in the claimed method.  Net MoneyIN, 545 F.3d at 1369.

Instead, the Defendants argue that the POSA "would easily envisage" the claimed regimen as one possible regimen that could result from the administration of three loading doses followed by PRN treatment.  They focus on the description of one arm of the Phase 2 DA VINCI trial where patients were being treated with 2.0 mg of aflibercept for 3 initial loading doses, followed by PRN treatment.  They rely on Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC, 683 F.3d 1356, 1361 (Fed. Cir. 2012), to argue this disclosure is anticipatory because the POSA "would easily envision the rest of the regimen to include one option with 5 doses, separated by 4 weeks, followed by an 8-week dose interval."  ECF No. 576 at 14. In other words, the Defendants argue it is possible doctors following the regimen described in the Press Release would administer the three monthly loading doses described in the Press Release and then, for a given patient, just so happen to administer injections during the PRN phase in a pattern that matches that of the claimed regimen—(1) an injection at the first PRN visit, (2)

245

Appx247

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

an injection at the second PRN visit, (3) no injection at the third PRN visit, and (4) an injection at the fourth PRN visit. The Defendants argue such a pattern of injections conforms to the claimed regimen because it equates to five monthly doses followed by a dose eight weeks later, as the asserted claims require.

The Court disagrees; Wrigley is inapposite. In Wrigley, a case about chewing gum containing a combination of WS-23 (a cooling agent) and menthol (a flavoring agent), the prior art reference "list[ed] several categories of components that can be included in the compositions." Wrigley, 683 F.3d at 1360. The Court held that the reference anticipated because it plainly "envision[ed] using WS-23 and menthol in a single product" and "the number of categories and components in [the] reference was [not] so large that the combination of WS-23 and menthol would not be immediately apparent to one of ordinary skill in the art." Id. at 1361. In other words, the limitations of the claims themselves were disclosed in the prior art reference. That logic does not apply to the September 2009 Press Release, which does not disclose five loading doses and does not disclose various regimen components in a manner it suggests can be mixed and matched; it rather discloses a single regimen—three monthly loading doses followed by PRN dosing—that is not the one claimed.

246

Appx248

**\*\*SEALED\*\***

---
### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL
---

The evidence at trial did not support the Defendants'
assumptions. Dr. Albini testified that this theory of anticipation
<u>assumes</u> that the PRN regimen employed in the September 14, 2009,
Press Release was a monthly PRN regimen. Tr. 918:20-23 (Albini).
But the undisputed evidence at trial demonstrates that a "PRN"
regimen need not be monthly—it can occur on other intervals,
including once every two months, as was done, for example in the
"READ 2" trial.  Tr. 904:23-905:6 (Albini); PTX-3340.  The
September 2009 Press Release upon which the Defendants rely as
prior art does not specify whether that trial's PRN dosing regimen
was conducted monthly.  Tr. 1865:3-15 (Csaky) (Press Release does
not disclose "when those prn exams were being scheduled in this
trial.").[8]  In the absence of such a disclosure, the number of
possible dosing permutations administered during the PRN phase is
virtually infinite.  There is no reason the POSA would "easily
envisage" the claimed regimen from among them.

---

[8] The September 2009 Press Release does not disclose the details
of the protocol actually used in Regeneron's study.  Mylan did not
suggest at trial that the DA VINCI study itself — or any other
clinical study conducted by Regeneron — was itself prior art that
could render the Asserted Treatment Claims invalid nor did it
establish that any patient in that study received 5 loading doses
followed by a dose eight weeks later, as the claimed regimen
required."

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

The Defendants' own expert, Dr. Albini, acknowledged that there is no reason any particular patient would "necessarily" receive the claimed pattern of doses on the basis of the September 2009 Press Release's disclosure of an as-needed, PRN dosing phase. Tr. 919:4-14 (Albini) (agreeing that "[t]he Week 12 dose is one possibility from that [prn] dosing regimen, but it is not necessarily going to occur."). Regeneron's expert, Dr. Csaky, testified to the same effect. Tr. 1848:19-1849:25 (Csaky). In sum, the parties' experts agreed that if doctors performed the method described in the September 14, 2009 Press Release, it is merely *possible* that a patient would receive the claimed dosing regimen (among the many other possibilities), depending on the result of the examination the doctors performed in the study at each PRN visit, and whether that examination dictated that the patient should receive an injection. Tr. 1864:5-11 (Csaky) ("A prn is a conditional treatment, right? I wait, I see, I examine, take OCT."). That is insufficient to establish anticipation. <u>Infra</u>, ¶¶ 473-76.

Nor is this case analogous to <u>In re Petering</u>, 301 F.2d 676 (C.C.P.A. 1962), and its progeny, in which the court deemed the prior art anticipatory because it "expressly spelled out a definite and limited class of compounds that enabled a person of ordinary skill in the art to at once envisage each member of this limited

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

class," including those claimed, Eli Lilly & Co. v. Zenith Goldline Pharms., Inc., 471 F.3d 1369, 1376 (Fed. Cir. 2006) (describing holding of Petering). Here, by contrast, the number of potential patterns of injections that fall within the September 2009 Press Release's disclosure of three-monthly doses followed by PRN dosing on an undisclosed schedule is virtually limitless; the POSA would not "immediately envisage" every one of those possibilities, nor is there any narrower set of "preferred" regimens within the September 2009 Press Release's disclosure that would limit the inquiry. Accordingly, the September 2009 Press Release fails to meet the legal standard for anticipation.

In the absence of an express disclosure of the claimed invention, the Defendants' theory of anticipation is necessarily one of "inherent" anticipation. Net MoneyIN, 545 F.3d at 1371 (anticipatory reference must disclose expressly or inherently every element of claim as arranged in the claim). The Defendants' theory fails because it falls far short of the exacting standard for inherent anticipation—which requires that the undisclosed material is necessarily present in the disclosure—not merely possibly or probably present. Continental, 948 F.2d at 1269 ("The mere fact that a certain thing may result from a given set of circumstances is not sufficient."); Therasense, Inc. v. Becton, Dickinson & Co., 593 F.3d 1325, 1332 (Fed. Cir. 2010) ("Inherency,

249

REGENERON V. MYLAN                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

however, may not be established by probabilities or possibilities."). Possibilities and probabilities are all the Defendants presented at trial.

First, the Defendants' theory of anticipation relies on the assumption that the PRN regimen employed in the September 14, 2009 Press Release was a monthly PRN regimen. But the Press Release does not specify the PRN interval, and undisputed evidence confirms other PRN intervals are possible and were indeed discussed at trial. Id. Because it is merely possible and not necessarily true that the PRN interval disclosed in the September 2009 press release involved monthly PRN, the Defendants failed to establish anticipation on the basis of the September 2009 Press Release. Trintec, 295 F.3d at 1295 ("Inherency . . . may not be established by probabilities or possibilities."); see also Continental, 948 F.2d at 1269; Therasense, 593 F.3d at 1332; Perricone v. Medicis Pharm. Corp., 432 F.3d 1368, 1376–79 (Fed. Cir. 2005) (narrow application of applying lotion to sunburned skin not inherently anticipated by broad application of applying lotion topically).

Furthermore, even if one were to assume, contrary to law and the Press Release's disclosure, that the PRN dosing described in the September 2009 Press Release was monthly PRN dosing, the Defendants' anticipation theory still depends on probabilities and possibilities. The PRN dosing phase would result in an overall

250

Appx252

REGENERON V. MYLAN                                        1:22-CV-61

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

regimen of five monthly doses followed by an eight-week dosing
interval <u>only if</u> for a given patient those examinations just so
happened to result in the need to administer (1) a dose at the
first PRN opportunity, (2) a dose at the second PRN opportunity,
(3) no dose at the third PRN opportunity, and (4) a dose at the
fourth PRN opportunity. And, again, this would only be the case
if one were to assume the potential PRN dosing occurred monthly.
No disclosure in the September 2009 Press Release makes this
pattern of injections inevitable or necessarily true, and
therefore it falls short of inherently anticipating the claims.
<u>Trintec</u>, 295 F.3d at 1295; <u>Continental</u>, 948 F.2d at 1269;
<u>Therasense</u>, 593 F.3d at 1332; <u>Perricone</u>, 432 F.3d at 1376-79.

Accordingly, the Court holds that the Defendants failed to
establish by clear and convincing evidence that the September 2009
Press Release anticipates the DME Claims.


**b)   '747 Patent**

Defendants also have asserted that U.S. Patent No. 7,303,747,
assigned to Regeneron, anticipates claims 11 and 25. It is
undisputed that the '747 patent does not expressly disclose a
regimen of five loading doses followed by extended fixed dosing
intervals; nor does it direct itself to the concept of loading
doses followed by fixed extended dosing intervals. DTX-2730. The

251

REGENERON V. MYLAN                                      1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Defendants principally rely on Example 17 of the '747 Patent for their anticipation theory, which — according to Dr. Albini — "describes an initial injection" that is "followed by subsequent treatments given within one- to six-month intervals." Tr. 785:17-23. But Example 17 is not directed to Diabetic Macular Edema (or Diabetic Retinopathy), as the claims require, but is instead titled (and directed to) "Age-Related Macular Degeneration." DTX-2730, 20:15-67. In response, the Defendants' expert Dr. Albini stated that the patent was generally directed to "angiogenic eye disorders," but did not explain why such a disclosure applied to Example 17 or rendered its teachings broader than its title of "Age-Related Macular Degeneration." Tr. 916:7-12 (Albini). Nor did Dr. Albini identify any disclosure of diabetic macular edema in the patent whatsoever. Id. Accordingly, the Court concludes that the '747 patent does not disclose every limitation of the DME claims, and the disparate disclosures from the '747 patent on which the Defendants rely are not arranged as they are in the DME claims.

Dr. Albini nevertheless testified that the POSA would "immediately envisage" from the '747 patent treating DME with a series of monthly doses that result from "continuous monitoring" of patients, followed by an eight-week gap (also the result of such monitoring). Tr. 785:24-786:22 (Albini). However, as with the September 2009 Press Release, this is a speculative outcome,

REGENERON V. MYLAN                                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

not one that "necessarily" would result from the methodologies described in the '747 patent.  And despite Dr. Albini's testimony that the POSA would "immediately envisage" this scenario, his testimony on this point was undermined by the fact that he agreed at his deposition that the combinations of potential regimens contained in the '747 patent were "infinite," Tr. 236:8-12 (Albini), and that as to a more time limited period of administration, he had "not calculated the exact number of permutations possible." Tr. 917:7-15 (Albini).

The Court also credits Dr. Csaky's testimony that the methods of treatment that the '747 patent describes are directed to PRN regimens based on monitoring individual patients, Tr. 1861:20-1862:16 (Csaky), not fixed-interval dosing, and his unrebutted testimony that the language of the '747 patent does not provide any criteria that would inform the POSA as to what schedule a physician should use to treat the patient.  Tr. 1862:17-25 (Csaky). Dr. Albini in fact agreed that the specification of the '747 patent pointed toward "the need for continuous monitoring of patients," Tr. 786:7-16 (Albini), which, as described above, is different than the fixed dosing schedule provided for by claims 11 and 25.

Turning next to the '747 patent, the Court holds that it also fails to anticipate the DME Claims for substantially the same reasons.  Again, the parties agree that the '747 patent does not

253

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

expressly disclose a regimen for the treatment of DME using five monthly loading doses of aflibercept followed by a dose eight weeks later—instead it discloses an initial dose followed by subsequent doses one to six months later. <u>Supra</u> ¶¶ 215-16. It is undisputed that this disclosure encompasses an infinite number of treatment regimens. The Defendants nevertheless argue the POSA would read this disclosure and "immediately envisage" the particular regimen of five loading doses followed by a dose eight weeks later, as claimed in the DME Claims. The Court holds that the "immediately envisage" case law is inapplicable in this case, because the asserted reference fails to disclose all the elements of the asserted claim in *any* combination, and the large (here, infinite) number of dosing regimens disclosed in view of the absence of any preferred, narrower disclosure is such that the claimed dosing regimen would not be "immediately apparent" to the POSA. <u>Wrigley</u>, 683 F.3d at 1361 ("The question for purposes of anticipation is therefore whether the number of categories and components in Shahidi was so large that the combination of WS-23 and menthol would not be immediately apparent to one of ordinary skill in the art."). The '747 patent does not "expressly spell[] out a definite and limited class of compounds that enable[] a person of ordinary skill in the art to at once envisage each member of this limited

254

REGENERON V. MYLAN                                        1:22-CV-61

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

class," <u>Eli Lilly</u>, 471 F.3d at 1376, and therefore does not anticipate.

Additionally, as was the case with respect to the September 2009 Press Release, the POSA following the disclosure of the '747 patent would not necessarily perform the claimed regimen instead of one of the other infinite possibilities. As above, this mere possibility is insufficient to anticipate. <u>Continental</u>, 948 F.2d at 1269 ("The mere fact that a certain thing may result from a given set of circumstances is not sufficient."); <u>Therasense</u>, 593 F.3d at 1332.

Furthermore, the example on which the Defendants rely—Example 17—does not disclose a method of treating DME. <u>Supra</u> ¶ 215. The Defendants do not identify any disclosure of "diabetic macular edema" anywhere in the '747 patent and instead seek to mix and match the disclosure of the embodiment on which they rely with generic disclosures outside that embodiment, which is improper. To anticipate, it is not enough that the prior art reference discloses part of the claimed invention, which an ordinary artisan might supplement to make the whole, or that it includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention—all the elements of the invention disclosed must be arranged as in the claim. <u>Net MoneyIN</u>, 545 F.3d at 1371.

255

REGENERON V. MYLAN                                         1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Accordingly, the Court holds that the '747 patent does not anticipate the DME Claims.

> **iv.    Claim 25 of the '572 Patent and Claims 11 and 19 of the '601 Patent are Invalid as Obvious**

In general,

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

KSR, 550 U.S. at 406 (quoting Graham, 383 U.S. at 17-18); see also In re Copaxone Consol. Cases, 906 F.3d 1013, 1025-29 (Fed. Cir. 2018) (a 3-times per week dosing regimen was obvious over the prior art); Hoffmann-La Roche Inc. v. Apotex Inc., 748 F.3d 1326, 1332 (Fed. Cir. 2014) (monthly dosing regiments obvious in view of the prior art); Merck & Co., Inc. v. Teva Pharms. USA, Inc., 395 F.3d 1364, 1373-75 (Fed. Cir. 2005) (extending dosing from daily to weekly obvious over the prior art).

The Court in KSR explained that while "the sequence of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls.  If a court … conducts this analysis and concludes the claimed subject matter

256

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

was obvious, the claim is invalid under § 103." KSR, 550 U.S. at

407.   To weigh the Graham factors to decide whether a party has

met its burden of proof, the "legal determination of obviousness

may include recourse to logic, judgment, and common sense," even

"in lieu of expert testimony." Adapt Pharma Ops. Ltd. v. Teva

Pharms. USA, Inc., 25 F.4th 1354, 1368-69 (Fed. Cir. 2022) (quoting

Wyers v. Master Lock Co., 616 F.3d 1231, 1238 (Fed. Cir. 2010)).

Further, while the published prior art does of course matter,

"[t]he obviousness analysis cannot be confined by … overemphasis

on the importance of published articles and the explicit content

of issued patents." KSR, 550 U.S. at 419.

In addition, "[w]hen there is a design need or market pressure

to solve a problem and there are a finite number of identified,

predictable solutions, a person of ordinary skill has good reason

to pursue the known options within his or her technical grasp.  If

this leads to the anticipated success, it is likely the product

not of innovation but of ordinary skill and common sense. In that

instance the fact that a combination was obvious to try might show

that it was obvious under § 103." KSR, 550 U.S. at 421.

The Supreme Court in KSR rejected the Federal Circuit's more

rigid teaching-suggestion-motivation (TSM) test in favor of a more

flexible obviousness standard, holding that "the analysis need not

seek out precise teachings directed to the specific subject matter

**\*\*SEALED\*\***

## MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." KSR, 550 U.S. at 418. The Court also instructed that the more flexible KSR standard expands the obviousness analysis beyond just "published articles and the explicit content of issued patents," id. at 419, but that "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed," id. at 420.

Here, there is no dispute among the experts for the parties that there was market pressure to employ extended (i.e., less frequent than monthly) dosing regimens for aflibercept, given that monthly dosing with other anti-VEGF agents had already quickly fallen out of favor and extended dosing regimens were the dominant treatment paradigms with the existing therapies. (Compare Tr. 1816:4-24, 1919:7-8 (Csaky), with Tr. 773:23-774:6, 935:4-937:9 (Albini)).

In other words, the record reflects that there was motivation to employ DME-DR treatment regimens like those described in the 9-14-2009 Press Release and the '747 patent that would allow for monthly assessment and administered injections (which are without dispute uncomfortable to patients and can lead to potential irritation or infection, (Tr. 290:12-23, 292:6-19 (Csaky))), only

258

REGENERON V. MYLAN                                           1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

on those visits where the assessment indicated a need for an injection. (See DTX 2730.22; DTX 3198.2). This motivation also applies to claim 6 as well, given that DME and DR are disorders falling within the scope of claim 1. However, additional evidence of record also confirms, for AMD for example, the motivation to employ extended dosing regimens given that "[e]ach injection subjects patients to risks of cataract, intraocular inflammation, retinal detachment and endophthalmitis. A significant time and financial burden falls on patients during their treatment course." (DTX 204.5; see also Tr. 1816:4-24 (Csaky); Tr. 773:18-774:9 (Albini); DTX 2035.1-4).

Defendants also correctly note that the DME-DR Claims do not use any terminology denoting whether or not the 5 monthly injections are "loading doses" or whether they are administered as as-needed injections. (PTX-1.21 (claims 10 and 11); PTX 1.22 (claims 18 and 19); PTX 3.25 (claims 15 and 25); Tr. 1927:23-1928:10 (Csaky)). Neither Regeneron nor its expert have identified any way to tell the difference between "fixed loading" injections and as-needed injections, in the context of every-day, routine clinical practice.[9] Indeed, the named inventor himself noted that

---

[9] While there may be a difference in the context of a clinical trial, where investigators are required to follow specific clinical trial protocols that distinguish between fixed, or required injections, and discretionary, as-needed injections,

REGENERON V. MYLAN                                      1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

PRN administration is described in the '601 and '572 patents and is one of the possible approaches both contemplated by the specification and "within the scope of the present invention." (Tr. 231:4-24 (Yancopoulos)). The Court, as a result, finds that the dosing regimens discussed by both Dr. Albini, (Tr. 782:3-784:13 (Albini) (9-14-2009 Press Release); Tr. 785:24-787:17 (Albini) ('747 patent)), and Dr. Csaky, (Tr. 1958:19-1961:24 (Csaky)), derived from both the 9-14-2009 Press Release and the '747 patent permitted doses within the range of the regimen as set forth in the DME-DR Claims.

In his anticipation analysis, Defendants' expert Dr. Albini testified that the 9-14-2009 Press Release's disclosure of 3 monthly injections, followed by PRN administration, which Regeneron's expert Dr. Csaky testified is a regimen known to involve monthly evaluation, is a regimen that a POSA could immediately envision leading to the administration of 5 monthly injections followed by one or more injections at an 8-week interval. (Tr. 780:15-784:13 (Albini); Tr. 1824:1-8 (Csaky); DTX 3198.2; DDX 6.50-55). For the same reason, Defendants correctly argued that the claimed regimen — "approximately every 4 weeks for

---

Regeneron has grounded its infringement allegations in real-world clinical practice, and has not alleged that Defendants' use of the regimen in its clinical trial infringes the DME-DR Claims.

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

the first 5 injections followed by…approximately once every 8 weeks" — is not meaningfully or significantly different from the 3 monthly/PRN regimen disclosure of the 9-14-2009 Press Release, because when patients need 5 monthly injections in the prior art 3 monthly/PRN regimen to resolve their retinal fluid, they will receive them.  (Tr. 781:19-784:13, 793:19-794:1 (Albini); DDX-6.52-55, 75).

With regard to Claim 6 the parties do not dispute that Dixon discloses the regimen.  The Court also agrees with Defendants that the claimed isotonic solutions were obvious in view of the disclosures of Dixon and Hecht, as explained by Dr. Albini and Dr. Rabinow.

The record further shows that a POSA would have had a reasonable expectation of success at using the claimed regimens. First, the record shows that there already were regimens in the prior art that permitted 5 monthly injections followed by less frequent administration.  (See, e.g., DTX 2035.2-3; DTX 2730.22; DTX 3198.2).  With regard to claim 6, the record reflects that the VIEW Phase 3 regimen, which Regeneron does not dispute falls within the scope of claim 1, was disclosed in the prior art Dixon reference, among other references, and that the Phase 2 results, using an even less aggressive dosing strategy than the Phase 3

261

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

regimen, resulted in significant improvement in visual acuity. (See DTX 204.4).

Second, "[a] finding of a reasonable expectation of success does not require absolute predictability of success" at making the invention. Almirall, LLC v. Amneal Pharms. LLC, 28 F.4th 265, 275 (Fed. Cir. 2022); see also OSI Pharms., LLC v. Apotex Inc., 939 F.3d 1375, 1385 (Fed. Cir. 2019) (declining to hold that "data is always required for a reasonable expectation of success" or to require "absolute predictability of success"). Dr. Csaky admitted that the claimed regimens showed some efficacy. (Tr. 1822:23-1823:17 (Csaky)); see Hoffmann-La Roche Inc. v. Apotex Inc., 748 F.3d 1326, 1331 (Fed. Cir. 2014) ("Conclusive proof of efficacy is not necessary to show obviousness."). Dr. Csaky also admitted that aflibercept exhibited visual acuity gains in AMD using an even less aggressive dosing schedule than the Phase 3 schedule. (Tr. 1881:14-1882:20 (Csaky) (CLEAR-IT 2 had less loading doses and different design than VIEW trials); Tr. 1882:24-1883:7 (Csaky) (CLEAR-IT 2 clearly showed "activity" in terms of "effect on visual acuity"); Tr. 1974:25-1977:2 (Csaky) (positive results from CLEAR-IT 2); DTX 204.4-5). Under this standard, the Court finds that Defendants have shown a POSA would have had a reasonable expectation of success at using the claimed treatment regimens. Defendants' expert Dr. Albini testified as to several references

262

REGENERON V. MYLAN                                                1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

that reported visual acuity gains (though no such gains are required of the claims), including aflibercept references showing efficacy in DME patients with just a single intravitreal injection or in the related AMD indication with repeated intravitreal injections. (Tr. 790:25-792:2 (Albini); DTX 3102.3 ("The median improvement in BCVA was nine letters at 1 month and three letters at 6 weeks…"); see also DTX 204.3-4). The record also reflects positive results obtained with the VEGF inhibitor ranibizumab in the treatment of both AMD and DME. (See, e.g., DTX 2733.1 (mean gain of eight (8) letters in DME); DTX 3089.1, 4 (8 of 10 eyes showed visual acuity gains in DME); see also, e.g., DTX 2034.1 (mean gain of 7.2 letters in AMD); DTX 3115.1 (mean visual acuity improvement of 9.3 letters in AMD); DTX 4061.4 (various studies in AMD)).

In addition, the evidence shows that patients in the Do 2009 study achieved gains of nine letters at one month after the single injection of VEGF Trap-Eye, and that 2 of the patients achieved gains of 10 letters, while other patients achieved a gain of 9 letters; in all, 4 of the 5 patients showed gains in visual acuity. (DTX 3102.1, 3). Dr. Albini testified that these results would lead a POSA to have a reasonable expectation of success at using the claimed method to treat DME and DR. (Tr. 790:22-791:15, 791:20-792:2, 797:23-798:17, 800:23-801:5 (Albini)). It stands to

Appx265

REGENERON V. MYLAN                                           1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

reason that if a single injection resulted in visual acuity gains, repeated monthly injections for 5 months, followed by one or more injections at an 8-week interval will also result in visual acuity gains in those same patients.  (Tr. 791:20-792:2 (Albini)).  With regard to AMD, Dr. Albini confirmed that the Phase 2 results with aflibercept resulted in significant visual acuity gains, and with extended intervals between injections.  (DTX 204.4, 7 (Ref. 45); DTX 3173.6, 9, 12, 13, 16, 19; see also Tr. 840:15-844:23 (Albini)).

Third, Defendants have shown that the differences, if any, between the prior art and the claimed dosing regimen, do not rise to the level of being nonobvious.  For the DME-DR Claims, the Defendants showed that prior art regimens, such as the as-needed regimen disclosed in the '747 Patent and the PRN regimen in the 9-14-2009 Press Release, were designed to treat until resolution of subretinal fluid, and that monthly visits and assessments could very well lead to easily envisioned situations in which a patient would require 5 monthly injections to resolve the patient's edema.  (See Tr. 785:17-787:17 (Albini); DTX 2730.16 (7:52-67); DTX 2730.22 (20:16-67); DDX 6.59-61).  After that initial period of treatment, treating a patient once every 8 weeks under the '747 patent protocol or the 9-14-2009 Press Release protocol is an obvious outcome where the interim monthly assessment show an

264

Appx266

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

absence of fluid and monthly injections are no longer required. (<u>Id.</u>). Defendants' expert Dr. Albini further illustrated the obviousness of the regimens through Dr. Csaky's interpretation of claims 12 and 20, and what those claims reveal about the scope of independent claims 10 and 18, from which asserted claims 11 and 19 depend—that they included scenarios that are not substantively different from straight monthly dosing of aflibercept, which was not disputed to be in the prior art. (DTX 3198.2; <u>see also</u> Tr. 1957:6-21 (Csaky); DDX 6.65). For claim 6, Regeneron has not presented any evidence of differences between the prior art dosing regimens and the claimed regimens.

The facts here are analogous to those in <u>In re Copaxone Consol. Cases</u>, 906 F.3d 1013, 1025-29 (Fed. Cir. 2018), where the Court found dosing claims obvious over the prior art. The Court found that "[a]lthough the universe of potential GA doses is theoretically unlimited, the universe of dosages in the prior art that had clinical support for being effective and safe consisted of only two doses: 20mg and 40mg. Even if there were multiple injection frequencies not yet tested in the prior art — 1x, 2x, 3x a week etc. — these still represent a limited number of discrete permutations." <u>Id.</u>

Similarly, here, for the DME-DR Claims, there were a limited number of monthly injections available to a POSA for leading off

265

REGENERON V. MYLAN                                        1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

an anti-VEGF DME dosing regimen — in reality, 3-6.  (See DTX 4129.2; Tr. 805:1-8 (Albini)).  Everything else was provided in the prior art, including the disease (DME), the drug (aflibercept), the dose (2 mg), and the maintenance regimens (every-8-week, or as-needed).  (DTX 3198.2).

The Court has also taken into consideration Regeneron's counter-arguments, including those presented by Regeneron's expert, Dr. Csaky.  Dr. Csaky contends that concern over systemic side effects and potential over-treatment would have dissuaded a POSA from going with 5 monthly loading doses in the treatment of DME.  (Tr. 1833:12-1835:3, 1837:11-19, 1850:7-1851:6, 1855:6-1856:16, 1956:20-1958:18 (Csaky)).  While Regeneron does not style this argument as a "teaching away," that is essentially what they have presented.  However, teaching away occurs only when "a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." L'Oréal USA, Inc. v. Olaplex, Inc., 844 F. App'x 308, 318 (Fed. Cir. 2021) (quoting In re Urbanski, 809 F.3d 1237, 1244 (Fed. Cir. 2016)).  Absent evidence that the prior art "invariably" would have led to a different path, the prior art does not teach away.  See PAR Pharm., Inc. v. TWI Pharms., Inc., 773 F.3d 1186, 1199 (Fed. Cir. 2014).

266

Appx268

REGENERON V. MYLAN                                      1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

On claim 6, the Court also has considered Regeneron's counter-arguments, and finds that those arguments are not persuasive.  The testimony and evidence of record established that formulating ophthalmic solutions as isotonic would have been routine and commonplace.  (DTX 3588.11, 13; see Tr. 1096:23-1098:8, 1099:15-22(Rabinow)).  This is confirmed by the asserted '601 and '572 patents, which explain that "[a] multitude of appropriate formulations can be found in the formulary known to all pharmaceutical chemists: Remington's Pharmaceutical Sciences," and that the contemplated formulations involved the use of "excipients and carriers well known to pharmaceutical chemists."  (PTX 1.13 (5:55-58; 5:66 – 6:7); PTX 3.16 (5:64-67; 6:8-17)).

Further, "a reference does not teach away if it merely expresses a general preference for an alternative invention but does not criticize, discredit or otherwise discourage investigation into the invention claimed." UCB, Inc. v. Actavis Lab'ys UT, Inc., 65 F.4th 679, 692 (Fed. Cir. 2023) (quoting DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1327 (Fed. Cir. 2009)) (internal quotation marks omitted); see also Galderma Lab'ys, L.P. v. Tolmar, Inc., 737 F.3d 731, 738-39 (Fed. Cir. 2013) (prior art did not teach away when it did not show "side effects would be serious enough to dissuade" particular use).  In addition, none of Regeneron's witnesses were able to point to

267

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

anywhere in the specification of the asserted patents where the concerns over systemic side effects or over-treatment were explained or resolved, leaving the specification providing no more guidance than the prior art. <u>Merck & Co., Inc. v. Teva Pharms. USA, Inc.</u>, 395 F.3d 1364, 1373-74 (Fed. Cir. 2005).

As Defendants correctly observe, Plaintiff's expert Dr. Csaky did not provide any documentary evidence showing that anyone in the community was actively discouraging the use of additional loading doses in the treatment of DME or DR.  To the contrary, the evidence of record shows that by 2010 multiple parties had completed, or were conducting or planning, clinical trials that utilized dosing schemes that required or permitted five *or more* monthly injections.  This was evident from the 9-14-2009 Press Release alone, which included a treatment arm directed to straight monthly dosing, which is an even more aggressive treatment regimen than 5 monthly injections followed by extended intervals.  (DTX 3198.2; <u>see</u> <u>also</u> Tr. 803:1-5 (Albini)).  In addition, the 9-14-2009 Press Release disclosed the use of the PRN regimen following three monthly injections, which a POSA would recognize as permitting 5 monthly injections were they so needed.  (DTX 3198.2; <u>see</u> <u>also</u> Tr. 780:15-784:13 (Albini); Tr. 1958:19 – 1960:24 (Csaky); DDX 6.51-55).  The same is true with respect to prior art ranibizumab clinical trials, some of which included either monthly

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

dosing or as-needed regimens that permitted 5 or more monthly injections. (DTX 2733.2 ("Patients received 3 monthly injections followed by as-needed monthly injections after month 2.")).

Dr. Csaky also suggested that the range of loading doses in the prior art was fixed at 3-4, so a POSA would not have considered 5. (Tr. 1847:4-1848:1 (Csaky)). As Defendants point out, this testimony directly contradicts that routine workers in the field were contemplating a range of 3-6 monthly doses in the first 6 months for the DME clinical trial. (Tr. 804:23-805:9 (Albini); DTX 4129.2 (suggesting 3-6 monthly doses after receiving feedback from the Swedish Medical Products Agency, DTX 226); DDX 6.92). It also contradicts the approach that physicians were taking in actual, every-day clinical practice, as Dr. Albini testified, which often involved treating a VEGF-related eye disorder monthly until retinal fluid is resolved, then switching to longer injection intervals. (Tr. 771:7-772:19 (Albini); DTX 2035.1 ("I treat with ranibizumab monthly until optical coherence tomography (OCT) shows the macula to be completely free of fluid. *Some patients reach that point after 2 injections; others require as many as 8 injections*."); DTX2035.3 ("I give as many consecutive monthly doses as necessary to dry the macula."); <u>id.</u> ("I see patients 4 weeks after the initial injection. If the macula is still wet at

269

REGENERON V. MYLAN                                                1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

that time, I give another injection and see them in 4 weeks."); DDX 6.36; see also DTX 3198.2; DTX 204.4; DDX 6.91).

Dr. Csaky's fixed-dosing versus individualized dose argument in response is without merit, as Federal Circuit precedent emphasizes that the prior art need only disclose the dosing mechanism to obviate the claims; the theory for the dosing schedule need not be the same. Nalpropion Pharms., Inc. v. Actavis Lab'ys FL, Inc., 934 F.3d,1344, 1354-55 (Fed. Cir. 2019). The patented methods in Nalpropion were directed towards weight loss using specific dosages of naltrexone and bupropion. Id. at 1347-48. The patentee argued that there was no motivation to combine the prior art asserted because the claimed drug did not possess sufficient efficacy to secure FDA approval for weight loss; instead, the prior art disclosed the use of drugs to curb weight gain and reduced cravings in depression. Id. at 1353-54. The Court found that it must "consider a range of real-world facts to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." Id. at 1354 (cleaned up). It further reasoned that "[t]he inescapable, real-world fact ... is that people of skill in the art did combine [the drugs] for ... goals closely relevant to weight loss ... without understanding [the drugs'] mechanism of action." Id. Given the art disclosed that the drugs were "well-tolerated and safe" in a

270

Appx272

REGENERON V. MYLAN                                    1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

related condition, the person of skill had the requisite motivation and reasonable expectation of success. Id. Here too, the Court finds that though the rationale behind using fixed-dosing and individualized dosing may differ, "[t]he inescapable, real-world fact … is that people of skill in the art" *did* rely on the regimen disclosures of the 9-14-2009 Press Release and/or the '747 patent, and did so in light of the safety disclosures in Dixon, among others, and efficacy disclosures in Do 2009 and Lalwani 2009b. Id. That the exact theory—fixed-dosing—was not disclosed does not negate that persons of skill in the art were indeed practicing the claims, and they did so knowing aflibercept would be "well-tolerated and safe," id., given its history disclosed in the art.

The Court further finds Dr. Csaky's purported safety concerns related to the additional loading doses unpersuasive. While both parties' experts agreed that there are always concerns regarding safety, each of the references Dr. Csaky refers to, including Do 2009 and Lalwani 2009b, refer to continuing clinical studies that were designed to further test administration of these agents in DME patients, without any suggestion to halt or discontinue clinical studies due to systemic side effect or over-treatment concerns, thus contradicting Dr. Csaky's testimony. (DTX 3102.6 ("The results of this study *strongly* support additional testing of VEGF Trap-Eye in patients with DMO in which *repeated* injections

271

REGENERON V. MYLAN                                           1:22-CV-61

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

are given at an interval of every 6 weeks or longer.") (emphasis added); DTX 2733.1-2 (describing the READ-2 study that followed the READ-1 results, parallel Phase 2 RISE and RIDE studies, and "several" investigator-sponsored trials such as RESOLVE and the study conducted by Philip Ferrone, MD, each of which involved repeated injections, and, in some cases, dose escalation)).  The Do 2009 reference also notes that the purpose of the study was to assess the *safety*, tolerability and bioactivity of aflibercept and concludes that "[i]njections of VEGF Trap-Eye were well tolerated with no ocular toxicity," and the only serious systemic adverse event was graded as unrelated to the study drug.  (DTX 3102.1, 3). The larger Phase 2 AMD study of aflibercept also was reported as supporting the conclusion that VEGF Trap-Eye seems to be generally well-tolerated with no serious drug-related adverse events.  (DTX 204.4).  It also is the case that Regeneron was proceeding with, and had already publicly announced by 2009, DME clinical trials using regimens that required more than 5 monthly injections (the DME Phase 2 monthly dosing arm) or where 3-6 monthly injections were both permitted and contemplated (the DME Phase 2 PRN following 3 monthly injections arm), thus contradicting the argument that a POSA would have felt constricted because of safety concerns from using five monthly injections to initiate DME treatment.  (DTX-3198.2).

REGENERON V. MYLAN                                          1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

The Federal Circuit has held that "well-known, standard medical practices" are obvious, especially as it relates to addressing patient responses such as side effects and outcomes. Genentech, Inc. v. Sandoz Inc., 55 F.4th 1368, 1378 (Fed. Cir. 2022). In Genentech, the patented invention was directed towards the method of treatment of liver function abnormalities using a specific range of pirfenidone in milligrams at certain "periods," the amount changing depending on said period; a second family of patents claimed the same drug use, but in a lower dosage to "avoid[] adverse interactions" with related drugs. Id. at 1371-73, 1374-75. The alleged infringer claimed that prior art references "disclosed reescalation of dosage after temporary dose reduction for patients with" indicators of the claimed abnormalities and the "discontinu[ation of] pirfenidone only for patients" with the claimed abnormality indicators. Id. at 1376. The Federal Circuit, agreeing that the methods were disclosed in the prior art, noted "varying doses in response to the occurrence of [patient response] would seem to be a well-established, hence obvious, practice. Thus, claiming it as an invention would appear to be at best a long shot." Id. at 1376-77; see also Amgen Inc. v. Sandoz Inc., 66 F.4th 952, 968 (Fed. Cir. 2023). Here too, switching to 5 monthly loading doses followed by every-8-week dosing in DME/DR patients "in response to the occurrence" of less-

273

Appx275

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

than-favorable visual acuity results with fewer initial injections would've also been obvious. Genentech, 55 F.4th at 1377. Because the asserted claims "recite adjusting doses in the presence of [unfavorable patient responses]," they too "would have been obvious in view of the prior art" which disclosed what "clinicians routinely do." Id. at 1378.

In conclusion, the Court finds that Defendants have shown, by clear and convincing evidence, that claims 11 and 19 of the '601 patent, and claim 25 of the '572 patent, are invalid as obvious in view of both the '747 Patent alone, and the 9-14-2009 Press Release alone.

The Court also finds that the Defendants have shown, by clear and convincing evidence, that claims 11 and 19 of the '601 patent, and claim 25 of the '572 patent, are invalid as obvious in view of both the '747 patent, and the 9-14-2009 Press Release, either one in combination with Do 2009 and Lalwani 2009b. For these reasons, the Court does not address whether claims 11 and 19 of the '601 patent and claim 25 of the '572 patent are invalid under § 112.

The Court also finds that the Defendants have shown, by clear and convincing evidence, that claim 6 of the 572 Patent is invalid over Dixon in view of Hecht.

Furthermore, the claimed combinations were obvious to try. In In re Copaxone, the Federal Circuit, applying the Supreme

REGENERON V. MYLAN                                                      1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Court's obvious-to-try standard described in KSR, affirmed the judgment of the district court in favor of the patent challengers. See generally In re Copaxone Consol. Cases, 906 F.3d 1013 (Fed. Cir. 2018).  In KSR, the Supreme Court explained that:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.

KSR, 550 U.S. at 421.  The Federal Circuit explained that where "the prior art focused on two critical variables, dose size and injection frequency, and provided clear direction as to choices likely to be successful" the claimed invention is obvious to try. In re Copaxone, 906 F.3d at 1025 (Fed. Cir. 2018).  The Court further explained that as of the priority date, two dose sizes had been established and the prior art was encouraging POSAs to pursue less frequent dosing.  Id.  Here, there is even more direction in the prior art than that in Copaxone.  The prior art, including the 9-14-2009 Press Release, had identified the drug, the dose, and the indication—aflibercept, 2 mg, DME/DR.  (DTX 3198.2).  The prior also had identified monthly dosing.  (Id.).  The prior art also identified a very limited number of fixed extended dosing regimens

275

Appx277

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

that had maintenance dosing phases that were keyed to multiple-month intervals: every-2-months (i.e., every-8-weeks) and every-3-months (i.e., every-12-weeks); Regeneron's expert Dr. Csaky testified that ophthalmologists were moving away from monthly administration, and testified that every-12-week administration (i.e., the PIER regimen) was viewed as inferior, leaving only every-8-week as a target fixed extended maintenance regimen. (See, e.g., Tr. 1816:4-24, 1817:22-1819:20 (Csaky) (pivot to personalized regimens to get monthly dosing visual acuity gains without office visit burden); Tr. 1870:23-1872:9, 1872:19-1873:16, 1873:22-1874:8 (Csaky) (every-3-month dosing fell out of favor)). The prior art also identified monthly loading dosing, and the key metric or rationale for determining the number of loading doses: administering until the retina appears free of fluid by OCT examination. (See, e.g., PTX 722.1-3; DTX 204.4; DTX 2730.22, 20:16-67; DTX 3115.1; DTX 3198.2; DTX 4013.1-3; DTX 4061.4; Tr. 765:13-770:19 (Albini) (describing the evolution of the art, with loading doses and early monthly dosing becoming prevalent alongside the advent of OCT)); Tr. 771:7-772:10, 773:16-774:9 (Albini) (the same in clinical practice); Tr. 804:9-22 (Albini) (highlighting a range of monthly loading doses in the art); Tr. 1844:4-9 (Csaky) (validating Dr. Albini's loading dose summary)). Moreover, the prior art had settled on a very narrow range of

REGENERON V. MYLAN                                        1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

possible monthly loading doses: 3-6. (See DTX 3198.1-2; DTX 4129.2).

Not only that, but the prior art, as Defendants' expert Dr. Albini testified, had been employing extended dosing regimens, in both fixed and as-needed personalized contexts (which often results in even fewer injections being administered than in a fixed regimen) and been consistently obtaining results with visual acuity improvements. (See, e.g., PTX 722.1-3; DTX 204.4; DTX 2730.22, 20:16-67; DTX 3115.1; DTX 3198.2; DTX 4013.1-3; DTX 4061.4; Tr. 765:13-770:19, 771:7-772:10, 773:16-774:9 (Albini)). Indeed, visual acuity improvements were observed with just a single injection of aflibercept in DME patients, leading to a reasonable expectation that similar outcomes would result with repeated injections. (DTX 3102.1; Tr. 798:2-17 (Albini)).

Within such a context, "a POSITA had only a limited number of permutations of dose and frequency to explore that were not already disclosed in the prior art," rendering the claimed combination obvious-to-try. In re Copaxone Consol. Cases, 906 F.3d 1013, 1025 (Fed. Cir. 2018). As the Court in Copaxone explained, the fact that a POSA could calculate unlimited numbers of permutations, in theory, was irrelevant, and it was the universe outlined by the prior art that controlled. Id. at 1026. There, the universe of dosage amounts was two. Id. Here, we have a similar number, with

277

REGENERON V. MYLAN                                           1:22-CV-61

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

the prior art 9-14-2009 Press Release reporting 0.5 mg and 2.0 mg, with a clear focus on the 2 mg dose.  (DTX 3198.2).

The <u>Copaxone</u> court further explained that "[e]ven if there were multiple injection frequencies not yet tested in the prior art—1x, 2x, 3x a week etc.—these still represent a limited number of discrete permutations."  <u>In re Copaxone Consol. Cases</u>, 906 F.3d 1013, 1026 (Fed. Cir. 2018).  Here, the Court notes that the fact of there being a limited number of monthly loading dose permutations available, a POSA would have found five loading doses to be obvious-to-try.  This is particularly so in view of the use of 3-4 in treating AMD, and the common knowledge among POSAs, including Plaintiff's expert Dr. Csaky, that DME often required additional injections.  (<u>See, e.g.</u>, DTX 204.4; DTX 2733.3; Tr. 1853:7-15 (Csaky).

<u>Copaxone</u> further instructs that "conclusive proof of efficacy is not necessary to show obviousness" but that "[a]ll that is required is a reasonable expectation of success."  <u>In re Copaxone Consol. Cases</u>, 906 F.3d 1013, 1026 (Fed. Cir. 2018) (cleaned up).  The prior art presented here by Defendants' expert Dr. Albini also shows that a POSA would have had a reasonable expectation of success at using a regimen of 5 monthly injections followed by every-8-week injections in the treatment of DME.  (<u>See</u> DTX 204.4;

278

Appx280

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

DTX 2034.1; DTX 2733.1-2; DTX 3102.1; DTX 8190.3; Tr. 798:2-801:5

(Albini)).

    On claim 6, the Court finds that the use of isotonic formulations also represents an obvious-to-try approach. The record evidence establishes that Dixon discloses the claimed dosing regimen, and also that the formulation used in that dosing regimen is comfortable and non-irritating to the eye. (DTX 204.3-4). When it comes to tonicity, a POSA has three options: hypotonic, isotonic, or hypertonic. (See Tr. 212:14-24 (Yancopoulos) (noting options for osmolality); see also Tr. 1168:14-1169:2 (Rabinow) (distinguishing isotonic and hypertonic, but equating isotonic and iso-osmolar)). Given Dixon's guidance that a formulation ought to be comfortable and non-irritating, and Hecht's instruction that ophthalmic formulations should be isotonic, the hypotonic (not enough solute) and hypertonic (too much solute) options fall by the wayside, with the focus of the prior art primarily on isotonic. Accordingly, with isotonicity being a routine and commonplace aspect of ophthalmic formulations, and a limited number of permutations in the prior art for tonicity, the use of isotonic formulations for aflibercept becomes obvious-to-try. In re Copaxone Consol. Cases, 906 F.3d 1013, 1025 (Fed. Cir. 2018) (cleaned up).

Appx281

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

In view of the evidence, the Court finds that claims 11 and 19 of the '601 patent, and claim 25 of the '572 patent, are invalid as being drawn to combinations that are obvious to try in view of the directions and guidance of the prior art, including the 9-14-2009 Press Release, which provided POSAs with the drug, the dosage amount, the disease, and the 8-week maintenance dosing regimen. If Plaintiff contends that the only missing element was an express recitation of 5 monthly loading doses, that would have been provided by the general knowledge of those of ordinary skill in the art about the small number of permutations available for monthly loading doses.

Likewise, the Court finds that, due to the limited number of permutations in the prior art for tonicity of ophthalmic formulations, and the clear direction provided by the prior art, including Dixon and Hecht, claim 6 is invalid for being drawn to subject matter that would have been obvious to try.

Accordingly, claims 11 and 19 of the '601 patent, and claims 6 and 25 of the '572 patent, are invalid under 35 U.S.C. § 103.

The Court also weighs, as it must, any evidence or testimony of record relating to secondary considerations. KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 406 (2007). The Court's presentation of the parties' secondary considerations arguments follows.

Appx282

REGENERON V. MYLAN                                           1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Defendants assert that there was no evidence of secondary considerations presented at trial that would be sufficient to overcome the demonstrated obviousness of the asserted claims of the '601 and '572 patents.

Defendants point to the testimony of Plaintiff's expert Dr. Csaky, notably the fact that Dr. Csaky only presented purported evidence of long-felt need, failure of others, and industry praise during the Plaintiff's rebuttal case, and that the evidence was limited to aspects of the claims that were already in the prior art. (See Tr. 1914:4-1919:11 (Csaky)).

Regeneron argues that the claimed dosing regimen fulfilled a long-felt need for a reliable, fixed extended dosing regimen for the treatment of any angiogenic eye disorder. Regeneron's expert Dr. Csaky explained that no regimen prior to Regeneron's Q8 scheme equated to monthly dosing's outcomes. (Tr. 1914:12-17 (Csaky)). He elaborated that alternatives in the prior art such as treat-and-extend and PRN did not fulfill such a need, mostly because the ophthalmologist was required to "always … have [their] OCT to make … treatment decisions." (Tr. 1914:18-1915:6, 1915:21-1916:4 (Csaky)). Regeneron supplemented its long-felt need arguments by positing that its competitors had tried and failed to develop an extended dosing regimen like that claimed in the '601 and '572 patents. Regeneron points to testimony from its expert, Dr. Csaky,

281

REGENERON V. MYLAN                                          1:22-CV-61

**SEALED**

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

who commented on his own failures with siRNA technologies as it related to inhibition of VEGF, but did not elaborate on the schedule for the same. (Tr. 1828:7-15 (Csaky)). Dr. Csaky further commented on the failure of Macugen to fulfill such a need because the data for the six-week intervals were "quite poor." (Tr. 1916:7-25 (Csaky)). He clarified that a subsequent 12-week dosing regimen lacked any data, and thus also constituted a failure. (Tr. 1917:1-5 (Csaky)).

Regeneron alternatively relied on safety concerns in support of its failure of others claims, relying again on Dr. Csaky's testimony. Dr. Csaky began by commenting that there had been multiple failures "through the history" of anti-VEGF research and use, but identified only a single instance where safety concerns were raised. (Tr. 1828:16-20 (Csaky)). Dr. Csaky exclusively relied on the case of Beovu, which he described as a "weirdo" molecule, to suggest that developers failed to augment anti-VEGF therapy. (Tr. 1828:21-1829:12 (Csaky)). Again, this testimony did not mention the dosing regimen at which Beovu was administered.

Regeneron did not present any evidence of unexpected results in its rebuttal; though its expert Dr. Csaky discussed various clinical trials and internal documents disclosing study results, he did not characterize any as specifically relevant to this

282

Appx284

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

secondary consideration, nor did he explain how any of those results would not have been expected in light of the prior art.

Regeneron cited multiple publications that comment on the reaction to Eylea after it had launched. Regeneron's expert Dr. Csaky first identified comments from the Food and Drug Administration and underscored that it "recognized that [Regeneron's] two-month dosing schedule was the same as monthly dosing schedule." (Tr. 1917:12-18 (Csaky)).

Dr. Csaky likened the regulatory disclosure to other publications by his colleagues. (Tr. 1917:19-21). The sole reference he presented in response was the Ohr and Kaiser 2012 publication (PTX 841), which discussed the visual acuity gains from use of aflibercept compared to ranibizumab. (Tr. 1918:3-13). The study disclosed that aflibercept, dosed every two months, was non-inferior to monthly ranibizumab. (See PTX 841.1).

Regeneron further introduced the Thomas publication (PTX 1155) into evidence during its discussion of industry praise. Thomas discloses the cost-effect analysis in regard to ranibizumab, bevacizumab, and aflibercept—the major anti-VEGF agents used to treat angiogenic eye disorders. (PTX 1155.5). Though Thomas notes that "clear savings can be seen" with aflibercept, it subsequently highlights that bevacizumab is the most affordable treatment, and that "all three therapies are

283

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

considered to have equal efficacy across the board based on studies and clinical data that have been evaluated." (<u>Id.</u>)

Defendants note that Dr. Csaky's discussion of long-felt need was limited to a discussion of a purported long-felt need for a fixed extended dosing regimen. (Tr. 1914:12-1915:6, 1915:21-1916:4 (Csaky)). Defendants respond to this testimony by pointing to several shortcomings.

First, Defendants note that for this discussion, Dr. Csaky did not rely upon any documents or evidence to support his claims of there being a long-felt need, and that Dr. Csaky's expert report in this regard was limited to addressing AMD, not DME or DR. (Tr. 831:6-13, 839:24-840:7 (Albini); DDX 6.147). Accordingly, Defendants renew their motion *in limine* seeking to preclude Dr. Csaky from testifying on matters outside the scope of testimony provided in his expert reports and relying on secondary considerations testimony untethered to the novel features of the asserted claims of the dosing patents. (Dkt. 506). <u>Therasense, Inc. v. Becton, Dickinson & Co.,</u> 593 F.3d 1325, 1336 (Fed. Cir. 2010) (evidence of long-felt need failed "because it [was] not 'commensurate in scope with the claims which the evidence is offered to support'" (quoting <u>In re Grasselli</u>, 713 F.2d 731, 743 (Fed. Cir. 1983))); <u>Merck & Cie v. Gnosis S.P.A.,</u> 808 F.3d 829,

REGENERON V. MYLAN                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

838 (Fed. Cir. 2015) (long-felt need must be tied to novel claim elements).

Second, Defendants highlight that the "fixed extended dosing regimen" concept, which is the sole basis for Dr. Csaky's long-felt need opinions, was already disclosed in the prior art, and thus cannot form the basis for a showing of long-felt need. BTG Int'l Ltd. v. Amneal Pharms. LLC, 923 F.3d 1063, 1076 (Fed. Cir. 2019) ("[B]ecause other treatments for [the claimed indication] were available, the evidence presented here does not establish that there was a specific unsolved, long-felt need for the treatment."). For example, Defendants' evidence of record, including the prior art 2009 Dixon reference, disclosed to the public the use of fixed every-8-week dosing following a series of 3 monthly injections in the treatment of AMD. (DTX 204.4 ("2.0 mg at an 8 week dosing interval (following three monthly doses)"); see also Tr. 812:12-813:3 (Albini); DDX 6.116-119). Additional evidence of record presented by Defendants and their expert Dr. Albini includes the 9-14-2009 Press Release, which disclosed the same type of fixed regimen (i.e., 8-week injection intervals) in the treatment of DME. (DTX 3198.2 ("2 mg every eight weeks after three monthly loading doses"); see also Tr. 780:24-781:13; DDX-6.51). According to Defendants, such evidence, because it was in the prior art, as a matter of law cannot form the basis for any

285

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

secondary indicia of non-obviousness. See, e.g., Merck & Cie v. Gnosis S.P.A., 808 F.3d 829, 838 (Fed. Cir. 2015) (long-felt need must be tied to novel claim elements).

Third, Defendants point to Dr. Csaky's failure to show nexus, or in other words, to tie any of the purported long-felt need to the aspects of the asserted claims that are purported by Plaintiffs to be novel and absent from the prior art: isotonicity of the formulation (claim 6 of the '572 patent) and five "loading doses" spaced a month apart in the treatment of DME or DR (claim 25 of the '572 patent; claims 11 and 19 of the '601 patent). (See Dkt. 506).

Fourth, Defendants observe that Dr. Csaky did not dispute the evidence presented by Defendants' expert Dr. Albini showing there to be extended dosing regimens and approaches in use in the prior art that were capable of achieving visual acuity gains while minimizing injections or office visits, or in the case of "treat-and-extend," both. (Tr. 831:6-837:8 (Albini); PTX 722.2-3 ("Dr. Brown: … I treat and extend from the start. I give 3 monthly injections and see them in 8 weeks."); DTX 2040.24; DTX 3131.1, 4, 14; DTX 4113.8; DTX 4192.18; DTX 4194.13; DDX 6.136-147). Instead, Dr. Csaky attempted to narrow the scope of the asserted DME-DR Claims to regimens that were "fixed," where the 5 monthly injections are "loading doses," or where the claims exclude monthly

REGENERON V. MYLAN                                               1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

office visits. (Tr. 1816:4-24 (Csaky) (general goals and office visits); Tr. at 1861:7-1863:11 (Csaky) (limits in regard to the '747 patent); Tr. 1863:12-1865:15 (Csaky) (limits in regard to the 9-14-2009 Press Release); Tr. 1914:12-17 (Csaky) (focusing secondary considerations analysis on "fixed extended dosing regimen[s]")).

Defendants note that Plaintiff never sought during the claim construction phase of litigation to construe the claims to import the limitation "fixed," or to exclude uses in which monthly office visits occur, (Dkt. 124; Dkt. 174-2), and did not proffer such constructions at trial. As a result, Defendants urge that any effort by Plaintiffs to distinguish the prior art based on any such imported language should be rejected. See Key Pharms. v. Hercon Lab'ys Corp., 161 F.3d 709, 715 (Fed. Cir. 1998) (explaining "the doctrines of law … bar parties from fundamental changes in positions asserted at trial" and during claim construction, such as offering a new, alternative construction in post-trial briefing to "salvage" a party's case). Defendants further note that Plaintiff's approach is inconsistent with Plaintiff's presentation of its infringement case, where it did not see the need to distinguish allegedly infringing uses in which aflibercept was administered every 8 weeks in a "fixed" regimen from apparently non-infringing uses in which aflibercept was administered in a

287

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

personalized regimen where the intervals happened to fall every 8 weeks; Plaintiff also failed to see the need to find the concept of skipped office visits or the terms "loading doses" and "fixed" administration in Defendants' proposed prescribing information. (Dkt. 581, 20-28).

Fifth, Defendants point to Dr. Csaky's concession that "treat and extend and prn were clearly the dominating treatment regimens," and to the extent the 8-week fixed dosing regimen is ever used, it is only infrequently, in "certain settings with certain patients." (Tr. 1918:19-1919:11 (Csaky)). Defendants also note that Dr. Csaky could only tie that infrequent use to the rare situations where, for example, an OCT machine is not working. (Tr. 1914:18-1915:6, 1915:21-1916:4 (Csaky)). According to Defendants, the at worst non-existent, and at best very infrequent, use of the claimed 8-week regimen, cannot be grounds for a showing of long-felt need. (See Tr. 836:20-837:8 (Albini) (long-felt need met); DDX 6.147).

Lastly, Defendants argue that Regeneron's evidence is not commensurate in scope with claim 1 (from which claim 6 depends). Claim 1 is drawn to all angiogenic eye disorders, including some for which no successful clinical trials have been run, and some for which aflibercept has not demonstrated efficacy. (Tr. 1273:13-1275:22, 1276:7-1277:7, 1279:2-1280:15 (Stewart); Tr. 1887:25-1888:5, 1985:18-1993:2 (Csaky); see also, generally DTX 5429; DTX

288

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

5430; DTX 5431; DTX 9033; DTX 9034; DTX 9035).  According to Defendants, reliance on a purported long-felt need for an extended dosing regimen for one or two disorders is not a sufficient representation of the claimed genus, and the evidence thus is not commensurate in scope with the claimed subject matter.  *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008) (citing *In re Grasselli*, 713 F.2d 731, 743 (Fed. Cir. 1983)).

Defendants thus argue that Plaintiffs have not met their burden of showing that any long-felt need existed for the claimed dosing regimens as of January 2011, and certainly have not presented long-felt need evidence sufficient to overcome the showing of obviousness made by Defendants.

On failure of others, Defendants respond to the testimony of Plaintiff's expert by pointing to many of the same shortcomings that plagued Plaintiff's long-felt need evidence, including, *inter alia*: there was no evidence presented of any failure to develop an isotonic formulation or failure to administer 2 mg of aflibercept every 4 weeks for the first 5 injections in the treatment of DME; the "fixed extended" dosing concept involving 8-week injection intervals already had been published; and Dr. Albini's unrebutted testimony that regimens existed in the prior art, including PRN, which eliminated the need for monthly injections, and treat-and-extend, which eliminated the need for both monthly injections and

REGENERON V. MYLAN                                        1:22-CV-61

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

monthly office visits.  (See DTX 204.4; PTX 722.2-3 ("Dr. Brown: … I treat and extend from the start.  I give 3 monthly injections and see them in 8 weeks."); DTX 2040.24; DTX 3131.1, 4, 14; DTX 3198.2; DTX 4113.8; DTX 4192.18; DTX 4194.13; see also Tr. 831:6-838:21 (Albini)).

Defendants also point to the testimony of Plaintiff's expert Dr. Csaky, which Defendants argue is lacking, because Dr. Csaky's opinions include only a high-level discussion of Macugen, a drug that had fallen out of favor years prior to the approval of aflibercept.  (Tr. 1916:17-1917:5 (Csaky)).  However, Dr. Yancopoulos admitted that Macugen was a "game changer."  (Tr. 122:8-14 (Yancopoulos)).  Even if Macugen was a failure, this was resolved by the success of ranibizumab.  (Tr. 122:8-14 (Yancopoulos) ("Macugen sort of disappeared because the Lucentis was better.").  And physicians had being using ranibizumab to treat angiogenic eye disorders, after any so-called failure of Macugen. (See PTX 722).

Dr. Csaky also pointed to the failure of Beovu, a drug that experienced post-approval safety issues.  (Tr. 1828:21-1829:12 (Csaky)).  Dr. Csaky admitted that Beovu (brolucizumab) was a "weirdo kind of molecule," but did not attribute the failure to the dosing regimen.  (Tr. Id.) Defendants also point to the testimony of their own expert, Dr. Albini, which they note has

290

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

gone unrebutted, about the availability of extended dosing regimens, including treat and extend, that allow for personalized treatment while minimizing the need for both injections and office visits. (Tr. 831:6-837:8 (Albini); PTX 722.2-3 ("Dr. Brown: … I treat and extend from the start. I give 3 monthly injections and see them in 8 weeks."); DTX 2040.24; DTX 4113.8 ("In the 'treat-and-extend' approach … treatment is administered at each patient visit, even in the absence of macular edema. If the macula remains free of edema, and the vision is stable, the interval between visits is extended to a maximum of 10-11 weeks."); DTX 4194.13; DTX 3131.14 ("There are other strategies that may yield similar or even better VA outcomes and that require fewer visits. One such strategy is known as *treat and extend*, which is particularly appealing for use in routine clinical practice."); DTX 3215.2 (treat and extend results in "fewer patient visits and treatments than monthly dosing")).

On unexpected results, Defendants note that Dr. Csaky failed to present any such unexpected results testimony during Plaintiff's rebuttal case, and failed to present any testimony as to what constitutes the closest prior art or how any results compare to the closest prior art. (Tr. 1921:17-1922:5 (Csaky)).

In addition, Defendants point to the evidence presented by Defendants' expert Dr. Albini, and his testimony regarding the

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

lack of unexpected results.  For example, Dr. Albini testified as to the prior art disclosures of the positive results obtained with aflibercept in treating AMD patients in a Phase 2 clinical trial, using a regimen that involved even less frequent dosing than the regimen used in the Phase 3 clinical trial.   (Tr. 842:3-10 (Albini); DTX 204.4 (reporting the results of the Phase 2 CLEAR-IT-2 clinical trial); see also, generally DTX 2733; DTX 3102; DTX 3115; DTX 4061; DDX 6.150-152).  Specifically, Dr. Albini pointed to the 2009 Dixon prior art reference for its disclosure that patients who were treated with just 4 monthly doses, followed by PRN dosing, where patients received, on average, just 1.6 injections over the remainder of the one-year trial, achieved average visual acuity gains of 9.0 ETDRS letters, and 29% gained ≥ 15 letters by 52 weeks.  (Tr. 840:18-841:21, 940:13-941:3 (Albini); DTX 204.4; DDX 6.151).   Dr. Albini also testified regarding disclosures in Dixon that the median time to first re-injection in all Phase 2 patient groups was 110 days, or about 15-16 weeks, an interval longer than the claimed 8-week intervals, undermining any claims of unexpected results for the 8-week dosing regimens.  (Tr. 841:22-25, 941:4-11 (Albini); DTX 204.4; DDX 6.153).  Dr. Albini's testimony on the positive data resulting from the aflibercept Phase 2 clinical trial went unrebutted.

REGENERON V. MYLAN                                          1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

During cross examination, Plaintiff's expert Dr. Csaky conceded that the Phase 2 clinical trial results demonstrated that some patients required no injections at all during the PRN phase of the trial (i.e., between week 12 and week 52), meaning some patients went 40 weeks without requiring an injection of aflibercept. (Tr. 1977:7-1978:5 (Csaky); DTX 3173.12). Dr. Csaky also conceded that the median time to reinjection just in the Q4 loading arm was 150 days, or about 5 months. (Tr. 1978:6-13 (Csaky); DTX 3173.13). Dr. Csaky further conceded that 100% of the patients in the Q4 loading arm of the CLEAR-IT-2 trial achieved the commonly used clinical trial endpoint of fewer than 15 letters lost. (Tr. 1978:14-21 (Csaky); DTX 3173.19).

Defendants underscore that even if Plaintiff attempts to rely upon any purported unexpected results based on the Phase 3 AMD clinical trial results, those results were published in the prior art, along with a disclosure that VEGF Trap-Eye was an iso-osmotic formulation, and was the formulation used in the Phase 3 clinical trials. (Tr. 1979:12-1981:1 (Csaky); DTX 917.1-2; DTX 918.1). According to Defendants, Plaintiff has not adduced at trial evidence or testimony that establishes a conception and reduction to practice date prior to November 22, 2010 (the publication date of the disclosures in DTX 917) for claim 6 of the '572 patent. Defendants further note that Plaintiff has argued that dosing

293

Appx295

REGENERON V. MYLAN                                              1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

regimens in the prior art are not anticipating without knowing the results of Phase 3 clinical trials. (Tr. 1885:3-1887:7 (Csaky) (arguing lack of anticipation because Dixon was "unclear" as to the "ability" of alternative dosing strategies, and "th[e] question about efficacy was definitely on our minds" after the VIEW trial disclosures)). To the extent that the Court credits that argument, then Defendants argue that no such Phase 3 results are found in the '601 or '572 patents for either DME or DR, and Plaintiff has therefore failed to establish a conception and reduction to practice date prior to the publication date of any such Phase 3 DME or DR results.

Although Plaintiff's expert Dr. Trout was not qualified as an expert with regard to the dosing patents, Dr. Trout offered testimony that the low levels of observed side effects for Eylea during the VIEW Phase 3 clinical trials were unexpected based on prior art knowledge of fusion proteins. (Tr. 2086:13-25 (Trout)). First, this testimony, to the extent it was intended as secondary indicia evidence, was never tied to the asserted DME-DR Claims. (See Dkt. 506). Second, this testimony was not specific as to timeframe, and the evidence of record, including other testimony adduced at trial, shows that the side effect profile of aflibercept had already been tested, described and disclosed prior to 2011. For example, on cross examination, Plaintiff's other expert Dr.

Appx296

REGENERON V. MYLAN                                      1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Csaky admitted that the prior art Phase 2 aflibercept trial had shown there to be no serious systemic adverse events that were deemed drug-related.  (Tr. 1978:22-1979:1 (Csaky); DTX 3173.26). DTX 3173 also reported that aflibercept was "[g]enerally well tolerated with no drug-related serious adverse events."  (DTX 3173.28).  Likewise, the 2009 Dixon reference disclosed that aflibercept used in Phase 1 AMD trials showed that "[n]o adverse systemic or ocular events were noted" and "[n]o serious adverse events or ocular inflammation was identified during the study." (DTX 204.3).  Similarly, for Phase 2, Dixon reported that "[b]ased on Phase II study data, VEGF Trap-Eye seems to be generally well tolerated with no serious drug-related adverse events," (DTX 204.4), similar to reporting from Regeneron itself, which disclosed in April 2008 that "VEGF Trap-Eye was generally safe and well tolerated and there were no drug-related serious adverse events."  (DTX 2731.1).

Moreover, Regeneron has not managed to beat the bar set by monthly dosing; the claimed regimens are the same as all the other regimens previously disclosed in terms of efficacy.  (See DTX 915.7 ("The VEGF-Trap outcomes are essentially the same as ranibizumab. Furthermore, the results are very similar to the many clinical trials that have already assessed ranibizumab and other anti[-]VEGF agents ... The study is a non-inferiority trial, not a

295

Appx297

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

superiority trial. Statistically significant superiority to ranibizumab was not shown."); DTX 915.11 ("[Y]ou say that aflibercept will decrease treatment burden. So does PRN dosing which is the primary way Lucentis and Avastin are used.")..

Lastly, Defendants argue that Regeneron's evidence is not commensurate in scope with claim 1 (from which claim 6 depends), which is drawn to all angiogenic eye disorders, including some for which no successful clinical trials have been run, and some for which aflibercept has not demonstrated efficacy. (Tr. 1273:13-1275:22, 1276:7-1277:7, 1279:2-1280:15 (Stewart); Tr. 1887:25-1888:5, 1985:18-1993:2 (Csaky); see also, generally DTX 5429; DTX 5430; DTX 5431; DTX 9033; DTX 9034; DTX 9035). According to Defendants, reliance on any unexpected results for AMD or DME is not a sufficient representation of the claimed genus, and the evidence thus is not commensurate in scope with the claimed subject matter. Asyst Techs., Inc. v. Emtrak, Inc., 544 F.3d 1310, 1316 (Fed. Cir. 2008) (citing In re Grasselli, 713 F.2d 731, 743 (Fed. Cir. 1983)).

Defendants also point to the absence of any testimony or evidence from Plaintiff's experts of industry praise for the isotonicity of the Eylea formulation or for the use of five initial doses spaced a month apart in the treatment of DME or DR.

296

REGENERON V. MYLAN                                    1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Specifically, Defendants point to where Dr. Csaky directed his testimony to purported praise from the FDA and from an Ohr & Kaiser publication about the 8-week dosing interval. (Tr. 1917:12-1918:13 (Csaky)). Defendants again highlight the fact that the 8-week dosing interval that Plaintiff points to in those references was disclosed in the prior art, and therefore was not a novel or inventive feature of the claims. (See, e.g., DTX 204.4; DTX 2730.22, 20:16-67; DTX 3198.2; Tr. 761:22-763:12, 770:4-19, 777:5-12, 780:15-782:10, 784:14-786:22, 812:12-813:3 (Albini)). In addition, Defendants argue that to the extent the praise was directed to the VIEW clinical trial results, those results were published in the prior art, and Plaintiff has not adduced at trial evidence or testimony that establishes a conception and reduction to practice date for claim 6 of the '572 patent that is prior to the November 22, 2010 publication date of the evidence in DTX 917. (Tr. 1979:12-1981:1 (Csaky); DTX 917.1-2; DTX 918.1). In addition, as Defendants' expert Dr. Albini testified, the praise that Dr. Csaky discusses was directed to different subject matter than what is set forth in the claims, and aspects or properties of the aflibercept molecule, which is the subject of much earlier patents, all of which have now expired. (Tr. 845:1-18, 848:25-850:12, 850:21-852:14 (Albini); DTX 2062.105; DTX 2730.32; DTX 4116.32; DTX 4900.57). Dr. Albini further testified that Dr. Csaky's

297

Appx299

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

testimony and documents that Dr. Csaky relied upon were silent as to industry praise for EYLEA's isotonicity or for the use of 5 monthly injections in the treatment of DME or DR.  (Tr. 846:12-19 (Albini)).

Defendants argue that in view of these deficiencies and the inability of Plaintiff's expert Dr. Csaky to tie any of the objective indicia to the purportedly novel aspects of the asserted claims, Plaintiff has not met its burden of showing secondary considerations sufficient to overcome the showing of obviousness presented by Defendants with respect to the asserted claims of the '601 and '572 patents.

The Court also weighs, as it must in its obviousness analysis, any evidence or testimony of record relating to secondary considerations.  KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 406 (2007).  However, "secondary considerations of nonobviousness … simply cannot overcome a strong prima facie case of obviousness." Wyers v. Master Lock Co., 616 F.3d 1231, 1246 (Fed. Cir. 2010). Further, to weigh against a finding of obviousness, "objective evidence of non-obviousness must be commensurate in scope with the claims which the evidence is offered to support." In re Patel, 566 Fed. App'x 1005, 1011 (Fed. Cir. 2014); see also In re Dill, 604 F.2d 1356, 1361 (C.C.P.A. 1979) ("The evidence presented to rebut

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

a prima facie case of obviousness must be commensurate in scope with the claims to which it pertains.").

"But there is a more fundamental requirement that must be met before secondary considerations can carry the day. For objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the *claimed invention.* Where the offered secondary consideration actually results from something other than what is both claimed and *novel* in the claim, there is no nexus to the merits of the claimed invention." In re Huai-Hung Kao, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (quotations and internal citations omitted) (emphasis added); see also Novartis AG v. Torrent Pharms. Ltd., 853 F.3d 1316, 1330-31 (Fed. Cir. 2017) ("In evaluating whether the requisite nexus exists, the identified objective indicia must be directed to what was not known in the prior art"); In re GPAC, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("[F]or objective evidence to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention."). Even "impressive" evidence of secondary considerations is not "entitled to weight" unless "it is relevant to the claims at issue." In re Paulsen, 30 F.3d 1475, 1482 (Fed. Cir. 1994).

REGENERON V. MYLAN                                      1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Secondary considerations "when considered with the balance of the obviousness evidence in the record, guard as a check against hindsight bias." In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig., 676 F.3d 1063, 1079 (Fed. Cir. 2012). However, the mere fact that a party has presented some evidence of secondary considerations does not mean that such evidence controls; all of it must be weighed. See, e.g., id. (court must consider "all relevant evidence, including that relating to the objective considerations"); Genentech, Inc. v. Sandoz Inc., 55 F.4th 1368, 1378 (Fed. Cir. 2022) ("[W]eak secondary considerations generally do not overcome a strong prima facie case of obviousness.") (internal citations and quotation marks omitted); Sealy Tech., LLC v. SSB Mfg. Co., 825 Fed. App'x 795, 800 (Fed. Cir. 2020) (same); NantKwest, Inc. v. Lee, 686 Fed. App'x 864, 873 (Fed. Cir. 2017) ("Moreover, secondary considerations ... cannot overcome a strong prima facie case of obviousness.") (internal citations and quotation marks omitted); Ohio Willow Wood Co. v. Alps S., LLC, 735 F.3d 1333, 1344 (Fed. Cir. 2013) ("[W]here a claimed invention represents no more than the predictable use of prior art elements according to established functions, … evidence of secondary indicia are frequently deemed inadequate to establish non-obviousness."); Stone Strong, LLC v. Del Zotto Prods. of Fla., Inc., 455 Fed. App'x 964, 971 (Fed. Cir.

300

REGENERON V. MYLAN                                                1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

2011) (noting "secondary considerations are inadequate to establish nonobviousness as a matter of law" where a strong prima facie case of obviousness is shown); Stamps.com Inc. v. Endicia, Inc., 437 Fed. App'x 897, 905 (Fed. Cir. 2011) (evidence of secondary considerations is "inadequate to overcome" a "strong showing of obviousness"); Agrizap, Inc. v. Woodstream Corp., 520 F.3d 1337, 1344 (Fed. Cir. 2008) ("[O]bjective evidence of nonobviousness simply cannot overcome … a strong prima facie case of obviousness"); Leapfrog Enters., Inc. v. Fisher-Price, Inc., 485 F.3d 1157, 1162 (Fed. Cir. 2007) ("[G]iven the strength of the prima facie obviousness showing, the evidence on secondary considerations was inadequate to overcome a final conclusion that [the claim] would have been obvious."); DyStar Textilfarben GmbH & Co. Deutscheland KG v. C.H. Patrick Co., 464 F.3d 1356, 1371 (Fed. Cir. 2006) ("[S]econdary considerations of nonobviousness are insufficient as a matter of law to overcome our conclusion that the … claim [at issue] would have been obvious."); Richardson-Vicks Inc. v. Upjohn Co., 122 F.3d 1476, 1484 (Fed. Cir. 1997) ("The unexpected results and commercial success of the claimed invention, although supported by substantial evidence, do not overcome the clear and convincing evidence that the subject matter sought to be patented is obvious.")

301

Appx303

REGENERON V. MYLAN                                            1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Here, the Court agrees with the Defendants that Plaintiff has not tied any of the asserted secondary indicia to the aspects of the claims that Plaintiff has relied upon to attempt to distinguish the asserted claims from the prior art: the isotonicity of the formulation (claim 6 of the '572 patent), and 5 monthly "loading doses" (claims 11 and 19 of the '601 patent, and claim 25 of the '572 patent.  As a result, Plaintiff has not established the required nexus that must be shown between the secondary indicia and any novel aspects of the claims.  In re Huai-Hung Kao, 639 F.3d 1057, 1068 (Fed. Cir. 2011); Vanda Pharms. Inc. v. Teva Pharms. USA, Inc., No. 2023-1247, 2023 WL 3335538, at \*4 (Fed. Cir. May 10, 2023) (industry praise must be tied to claimed method).

In addition to the lack of a demonstrated nexus, the Court agrees with Defendants that the secondary considerations evidence presented by Plaintiff is not commensurate in scope with the claims, including claim 6, which is drawn to all angiogenic eye disorders.  Defendants correctly point out that the long list of angiogenic eye disorders, (e.g., PTX3.16, 5:30-48), include some for which no clinical trials have never been run, and some for which aflibercept has not demonstrated efficacy.  (Tr. 1273:13-1275:22, 1276:7-1277:7, 1279:2-1280:15 (Stewart); Tr. 1887:25-1888:5, 1985:18-1993:2 (Csaky); see also, generally DTX 5429; DTX

302

Appx304

REGENERON V. MYLAN                                            1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

5430; DTX 5431; DTX 9033; DTX 9034; DTX 9035).  This renders Plaintiff's focus on a narrow set of disorders for its secondary considerations case insufficient to represent the full scope of the claimed genus, and the evidence thus is not commensurate in scope with the claimed subject matter.  Asyst Techs., Inc. v. Emtrak, Inc., 544 F.3d 1310, 1316 (Fed. Cir. 2008) (In re Grasselli, 713 F.2d 731, 743 (Fed. Cir. 1983)).

Evidence that the industry praised a claimed invention is relevant to the obviousness analysis because industry participants are unlikely to praise an obvious development over the prior art. Apple Inc. v. Samsung Elecs. Co., Ltd., 839 F.3d 1034, 1053 (Fed. Cir. 2016).  However, for the praise to be relevant it must be tied to the claimed invention, here the claimed methods. Vanda Pharms. Inc. v. Teva Pharms. USA, Inc., No. 2023-1247, 2023 WL 3335538, at *4 (Fed. Cir. May 10, 2023) (industry praise must be tied to claimed method).

For example, the industry praise that Plaintiff and its expert Dr. Csaky point to say nothing of isotonicity or DME-DR loading doses, and appear to instead be directed to either properties of the aflibercept molecule itself, which the Court understands was the subject of earlier-filed and now-expired patents, or the VIEW two-month dosing interval and results of that trial.  (Tr. 845:1-18, 846:12-19, 848:25-850:12, 850:21-852:14 (Albini); DTX 204.5;

REGENERON V. MYLAN                                      1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

DTX 2062.105; DTX 2730.32; DTX 2731.1; DTX 4116.32; DTX 4900.57).

The two-month dosing interval was in the prior art, a fact not

disputed by Plaintiff, and the asserted claims are not drawn to

any particular visual acuity levels.   In any event, the VIEW

clinical trial results were in AMD, and therefore not relevant to

the subject matter of the DME-DR Claims.

     Failure of others to solve "the problem that a patent purports

to solve," is relevant to the obviousness analysis.   In re

Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent

Litig., 676 F.3d 1063, 1082 (Fed. Cir. 2012).   "The purpose of

evidence of failure of others is to show 'indirectly the presence

of a significant defect in the prior art, while serving as a

simulated laboratory test of the obviousness of the solution to a

skilled artisan.'"   Id. (quoting Symbol Techs., Inc. v. Opticon,

Inc., 935 F.2d 1569, 1578-79 (Fed. Cir. 1991)).   The failure of

others analysis requires that the Court define the problem the

patent purports to solved.   Mintz v. Dietz & Watson, Inc., 679

F.3d 1372, 1378 (Fed. Cir. 2012).   "Long-felt need is closely

related to the failure of others. Evidence is particularly

probative of obviousness when it demonstrates both that a demand

existed for the patented invention, and that others tried but

failed to satisfy that demand."   In re Cyclobenzaprine

REGENERON V. MYLAN                                          1:22-CV-61

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Hydrochloride Extended-Release Capsule Patent Litig., 676 F.3d
1063, 1082 (Fed. Cir. 2012).

However, when the need was already satisfied by the prior art
or the differences between the prior art and the claimed invention
are minimal, there cannot be any long-felt unmet need. Geo. M.
Martin Co. v. All. Mach. Sys. Int'l LLC, 618 F.3d 1294, 1304 (Fed.
Cir. 2010) ("Where the differences between the prior art and the
claimed invention are as minimal as they are here, however, it
cannot be said that any long-felt need was unsolved."); Cubist
Pharms., Inc. v. Hospira, Inc., 805 F.3d 1112, 1126 (Fed. Cir.
2015) ("[D]aptomycin treatment regimens that were only slightly
different from Cubist's had previously been shown to be effective
against a variety of bacterial infections. Although the prior art
daptomycin treatment methods had not proved effective for SAE, the
court noted that SAE is the target infection in only about 5% of
the cases in which daptomycin is administered. Accordingly, the
court concluded that any "long-felt need" or "unexpected results"
applied only to the small percentage of cases in which daptomycin
was used to treat SAE.")

Likewise, with failure of others and long-felt need, no
evidence was presented that others failed or had a long-felt need
for an isotonic formulation of aflibercept or for a regimen that
included 5 initial monthly doses for the treatment of DME or DR.

305

Appx307

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

In addition, the Court agrees with Defendants that the purported failures that Dr. Csaky points to, such as Macugen and Beovu, lack relevance. First, the testimony presented at trial shows that Macugen was an early generation anti-VEGF therapy, and a poor VEGF blocker, based on different technology than aflibercept and ranibizumab; that technology had largely fallen out of favor, being supplanted by ranibizumab and off-label bevacizumab years before aflibercept was approved. (See Tr. 122:5-14 (Yancopoulos); Tr. 763:16-764:17 (Albini)). The Court does not find the limited Macugen evidence persuasive, including because of the timing of the purported Macugen failure. Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc., 903 F.3d 1310, 1341 (Fed. Cir. 2018) (evidence "'not particularly probative' because the [failed] study preceded publications that would render the invention obvious to those of skill in the art"). Second, expert testimony established that the use of Beovu, also a different technology than ranibizumab or aflibercept, was discontinued because of safety risks, and not because of a failure to develop a DME regimen of 5 monthly injections followed by every-8-week dosing, a failure to make an isotonic formulation, or a failure to come up with an extended dosing regimen. (Tr. 861:10-21 (Albini); Tr. 1828:21-1829:12 (Csaky)).

306

REGENERON V. MYLAN                                                    1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Moreover, Plaintiff's expert Dr. Csaky did not address Dr. Albini's numerous examples of extended dosing regimens in the art that met any purported need for an extended dosing regimen, other than to testify that these examples were not examples of "fixed" dosing.  The absence of the language "fixed" in the asserted DME-DR Claims has been noted elsewhere in this opinion, and the Court declines to read such language into the claims.  The Court also is persuaded that the prior art regimens that Dr. Albini presented, including the widespread use of PRN and treat-and-extend, show that the need had been met for extended regimens that reduce the need for monthly injections (in the case of PRN) or reduce the need for both injections and office visits (in the case of treat-and-extend).  (Tr. 831:6-837:8 (Albini); PTX 722.2-3 ("Dr. Brown: … I treat and extend from the start. I give 3 monthly injections and see them in 8 weeks."); DTX 2040.24; DTX 4113.8 ("In the 'treat-and-extend' approach … treatment is administered at each patient visit, even in the absence of macular edema.  If the macula remains free of edema, and the vision is stable, the interval between visits is extended to a maximum of 10-11 weeks."); DTX 4194.13; DTX 3131.14 ("There are other strategies that may yield similar or even better VA outcomes and that require fewer visits.  One such strategy is known as treat and extend, which is particularly appealing for use in routine clinical practice.");

307

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

DTX 3215.2 (treat and extend results in "fewer patient visits and treatments than monthly dosing"); see also DTX 204.4 (aflibercept PRN regimen reducing the need for monthly injections)).  The existence and use of these prior art regimens, including regimens for aflibercept, also show that ophthalmologists had not failed in the development of regimens that could treat VEGF-related eye disorders while reducing injections and office visits.

Lastly, the Court finds that the blocking patents, which, as Dr. Albini explained, claimed subject matter that would have prevented anyone from developing and then using extended dosing regimens with aflibercept, also weigh in favor of a finding that there has not been a demonstrated failure of others in this case. (Tr.  850:21-852:14  (Albini);  DTX  2062.105;  DTX  2730.32;  DTX 4116.32; DTX 4900.57; DDX 6.165-166).  Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc., 903 F.3d 1310, 1341-42 (Fed. Cir. 2018).

"Evidence of unexpected results can be used to rebut a prima facie case of obviousness." Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1369 (Fed. Cir. 2007).  "The basic principle behind this rule is straightforward—that which would have been surprising to a person of ordinary skill in a particular art would not have been obvious." In re Soni, 54 F.3d 746, 750 (Fed. Cir. 1995)

The law holds that a patentee must "show that the claimed invention exhibits some superior property or advantage that a

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

person of ordinary skill in the relevant art would have found surprising or unexpected" compared to the closest prior art.  In re Geisler, 116 F.3d 1465, 1469 (Fed. Cir. 1997) (cleaned up); see also Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc., 752 F.3d 967, 977 (Fed. Cir. 2014) ("To be particularly probative, evidence of unexpected results must establish that there is a difference between the results obtained and those of the closest prior art, and that the difference would not have been expected by one of ordinary skill in the art at the time of the invention."); Alcon, Inc. v. Teva Pharms. USA, Inc., 664 F. Supp. 2d 443, 464 (D. Del. 2009) ("When 'unexpected' and 'significant' differences exist between the properties of the claimed invention and those of the prior art, a finding of nonobviousness may be warranted.") (relying on Eli Lilly & Co. v. Zenith Goldline Pharms., Inc., 471 F.3d 1369, 1378 (Fed. Cir. 2006)).

However, unexpected results also "do not necessarily guarantee that a new [product] is nonobvious." Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc., 752 F.3d 967, 977 (Fed. Cir. 2014). "While a 'marked superiority' in an expected property may be enough in some circumstances to render a [product] patentable, a mere difference in degree is insufficient." Id. (citation and internal quotation marks omitted).

REGENERON V. MYLAN                                              1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Here, Dr. Csaky did not present any evidence that results for DME-DR using a regimen of 5 monthly injections followed by every-8-week dosing were unexpected.   On claim 6, no evidence was presented on unexpected results, but the Court did receive some limited testimony from Dr. Csaky in the context of reasonable expectation of success, where oblique reference was made to "incredible results" from the VIEW AMD clinical trials.   (Tr. 1867:2-15 (Csaky)).   However, as Defendants observe, this discussion was not tied to the purportedly novel aspect of claim 6—isotonicity of the formulation—and there is little-to-no evidence of record with regard to any unexpected results stemming from the isotonicity of the Eylea formulation.   The Court also received no evidence from Plaintiff as to the closest prior art, or what any unexpected results are being compared to, rendering Plaintiff's unexpected results assertions insufficient. Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc., 752 F.3d 967, 977 (Fed. Cir. 2014) ("To be particularly probative, evidence of unexpected results must establish that there is a difference between the results obtained and those of the closest prior art…").

In addition, when assessing unexpected results, any evidence that is in fact provided should be "weighed against contrary evidence indicating that the results were not unexpected or not a substantial improvement over the prior art." See Santarus, Inc. v.

310

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Par Pharm., Inc., 720 F. Supp. 2d 427, 457 (D. Del. 2010), rev'd

on other grounds, 694 F.3d 1344 (Fed. Cir. 2012) (relying upon In

re Soni, 54 F.3d 746, 751 (Fed. Cir. 1995)).  Here, for the results

in general, as they relate to observations of visual acuity gains

in the VIEW clinical trials, Dr. Albini testified as to the

successes observed in the Phase 2 aflibercept AMD clinical trial,

including the relatively few number of PRN injections required

after the 4 monthly loading doses, and the long interval between

the end of the initial doses and the first as-needed injection,

pointing to a duration of action of aflibercept that would be

expected to cover an 8-week interval.  (Tr. 840:15-842:10 (Albini);

DTX 204.4; DDX 6.150-154; see also Tr. 1977:7-1979:11 (Csaky); DTX

3173.6, 12-13, 19, 26, 28).  Dr. Csaky did not contest or otherwise

rebut the data reported for the aflibercept Phase 2 clinical trial.

In conclusion, the Court finds that Regeneron failed to

demonstrate that any secondary considerations of non-obviousness

overcome the showing of obviousness presented by Defendants.

### IV.  CONCLUSION

For the reasons discussed, the Court concludes as follows:

1.   Regeneron has demonstrated by a preponderance of the

evidence that the Defendants have infringed claims 4, 7, 9, 11,

14, 15, 16, and 17 of the '865 Patent;

Appx313

REGENERON V. MYLAN                                          1:22-CV-61

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

2.    Regeneron has demonstrated by a preponderance of the evidence that the Defendants will induce infringement of claims 6 and 25 of the '572 Patent and claims 11 and 19 of the '601 Patent;

3.    Mylan has not demonstrated by clear and convincing evidence that claims 4, 7, 9, 11, 14, 15, 16, and 17 of the '865 Patent are anticipated or obvious in light of the prior art or invalid under 35 U.S.C. § 112 for lack of written description, lack of enablement, or indefiniteness.

4.    Mylan has not demonstrated by clear and convincing evidence that claim 6 of the '572 Patent is invalid as anticipated;

5.    Mylan has demonstrated by clear and convincing evidence that claim 6 of the '572 Patent is invalid as obvious;

6.    Mylan has not demonstrated by clear and convincing evidence that claim 25 of the '572 patent is invalid as anticipated;

7.    Mylan has demonstrated by clear and convincing evidence that claim 25 of the '572 patent is invalid as obvious;

8.    Mylan has not demonstrated by clear and convincing evidence that Claim 11 of the '601 Patent is invalid as anticipated;

9.    Mylan has demonstrated by clear and convincing evidence that Claim 11 of the '601 patent is invalid as obvious;

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

10.  Mylan has demonstrated by clear and convincing evidence that Claim 19 of the '601 Patent is invalid as obvious; and

11.  The Oral Motion for Judgment [ECF No. 548] is **DENIED.**

Out of an abundance of caution, the Court enters this Memorandum Opinion and Order under seal.  The parties shall meet and confer to discuss which portions of this Memorandum Opinion can be unsealed.  They shall submit a joint proposed redaction for the Court's review **on or before January 10, 2024.**

It is so **ORDERED.**

The Clerk is directed to transmit copies of both orders to counsel of record and to enter a separate judgment order.

DATED: December 27, 2023

_Tom S Kleh_
_____
THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA

313

# UNITED STATES DISTRICT COURT

for the
Northern District of West Virginia

Regeneron Pharmaceuticals, Inc.

*Plaintiff(s)*

v.

Mylan Pharmaceuticals, Inc., et al.

*Defendant(s)*

Civil Action No.   1:22-cv-61

## JUDGMENT IN A CIVIL ACTION

The court has ordered that:

☐ Judgment award        ☐ Judgment costs        ☒ Other

other:   The Court concludes that Regeneron has demonstrated by a preponderance of the evidence that the Defendants have infringed claims 4, 7, 9, 11, 14, 15, 16, and 17 of the '865 Patent; Regeneron has demonstrated by a preponderance of the evidence that the Defendants will induce infringement of claims 6 and 25 of the '572 Patent and claims 11 and 19 of the '601 Patent; (continued below)

This action was:

☐ tried by jury        ☐ tried by judge        ☒ decided  by judge

decided by Judge   Thomas S. Kleeh

Mylan has not demonstrated by clear and convincing evidence that claims 4, 7, 9, 11, 14, 15, 16, and 17 of the '865 Patent are anticipated or obvious in light of the prior art or invalid under 35 U.S.C. § 112 for lack of written description, lack of enablement, or indefiniteness. Mylan has not demonstrated by clear and convincing evidence that claim 6 of the '572 Patent is invalid as anticipated; Mylan has demonstrated by clear and convincing evidence that claim 6 of the '572 Patent is invalid as obvious; Mylan has not demonstrated by clear and convincing evidence that claim 25 of the '572 patent is invalid as anticipated; Mylan has demonstrated by clear and convincing evidence that claim 25 of the '572 patent is invalid as obvious; Mylan has not demonstrated by clear and convincing evidence that Claim 11 of the '601 Patent is invalid as anticipated; Mylan has demonstrated by clear and convincing evidence that Claim 11 of the '601 patent is invalid as obvious; Mylan has demonstrated by clear and convincing evidence that Claim 19 of the '601 Patent is invalid as obvious.

Date:   December 27. 2023

*CLERK OF COURT*

Cheryl Dean Riley

/s/ D. Kinsey

*Signature of Clerk or Deputy Clerk*

Appx316

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

IN RE: AFLIBERCEPT PATENT
LITIGATION                                    MDL No. 1:24-MD-3103

This Document Relates to:
No. 1:22-CV-61

** SEALED **

<u>ORDER GRANTING MOTION FOR PERMANENT INJUNCTION</u>

Pending before the Court is Plaintiff's Motion for Permanent Injunction [ECF No. 708[1]].  The motion is fully briefed and, therefore, ripe for decision.  For the reasons stated herein, the motion is **GRANTED.**

I.   <u>BACKGROUND INFORMATION</u>

A.   **Regeneron and Its Eylea Products**

Regeneron invented and developed Eylea, which the U.S. Food and Drug Administration ("FDA") approved on November 18, 2011. The Court has previously addressed the pertinent background and development of Eylea.  See <u>Regeneron Pharms., Inc. v. Mylan Pharms.</u> <u>Inc.</u>, --- F. Supp. 3d ---, 2024 WL 382495, at *13-14 (N.D.W. Va. Jan. 31, 2024) (discussing relevant background of Eylea).  "Eylea is an ophthalmic drug product invented by Regeneron scientists that has been used to treat millions of patients suffering from

_____

[1] Unless noted otherwise, the docket numbers cited in this Order refer to the docket in Case No. 1:22-CV-61.

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

diseases that can cause vision loss or even blindness." <u>Id.</u> at
*13.  The active ingredient in Eylea is the fusion protein now
referred to as aflibercept.  Aflibercept was initially developed
as a cancer therapeutic, and Regeneron later discovered that
aflibercept could be used to treat angiogenic eye diseases — eye
diseases caused by uncontrolled blood vessel growth in the
retina — through intravitreal injections (injection into the
vitreous of the eye).  <u>Id.</u> at *13-14.

Only after more than a decade of development and multiple
clinical trials did Regeneron discover an Eylea formulation that
improved on the leading treatment for one angiogenic disease— wet
Age-Related Macular Degeneration ("AMD").  <u>Id.</u> at 13 (quoting Trial
Tr. 172:16-24 (Yancopoulos) (ECF No. 558)).  The Eylea formulation
contains 40 mg/mL aflibercept, 10 mM sodium phosphate, 40 mM sodium
chloride, 0.03% polysorbate 20, and 5% sucrose, pH 6.2.  <u>Id.</u>
Following its initial FDA approval, Regeneron tested Eylea's
safety and efficacy in patients with other angiogenic eye
disorders, ultimately obtaining approval for Eylea's use to treat
those conditions as well.  <u>Id.</u>

Following the success of Regeneron's Eylea vial formulation,
Regeneron developed two other Eylea products containing
aflibercept, which also treat angiogenic eye disorders.  In August

Appx318

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

2019, FDA approved Eylea as a 2 mg single-dose injection packaged in a prefilled syringe ("PFS"). A pre-filled syringe is "ready to inject," once a provider opens the package. Clark Tr. 38:13-19. In contrast, "when a product is in a vial, a physician or their staff needs to take it out of the refrigerator, potentially warm it for a little bit, draw it up," which can take more time. See id. Regeneron's Eylea PFS product is approved to treat the same conditions as the vial product. Clark Decl. ¶ 3 (ECF No. 708-16). In August 2023, Regeneron received approval to sell Eylea HD, an 8 mg formulation that requires less frequent injections and provides improved anatomical outcomes in the form of drier retinas. Sheridan Decl. ¶ 48 (ECF No. 708-4); Clark Decl. ¶ 3. Eylea HD is currently approved to treat wet AMD, Diabetic Retinopathy ("DR"), and Diabetic Macular Edema ("DME"). Clark Decl. ¶ 3.

**B.  Other Anti-VEGF Treatments**

For the past five years, Eylea has maintained its place as the "category leader" in anti-VEGF treatments, ▮▮▮▮▮▮ ▮▮

▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮   The second most popular anti-VEGF agent, Avastin (bevacizumab), ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮   ▮▮▮▮▮▮▮   Avastin is an oncology drug for metastatic colorectal cancer (among other cancers), but

3

Appx319

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

ophthalmologists sometimes use it off-label (i.e., for diseases for which it does not have FDA approval) to treat angiogenic eye disorders. Sheridan Decl. ¶ 55. The third- and fourth-most popular anti-VEGF agents, Vabysmo (faricimab) and Lucentis (ranibizumab), are approved to treat angiogenic eye disorders. Id. ¶¶ 57-59. Genentech manufactures all three drugs. Id. ¶¶ 55, 57-59.

Eylea, Avastin, Vabysmo, and Lucentis make up more than 96% of anti-VEGF ophthalmic sales. Clark Decl. ¶ 6; Clark Ex. 1 at -399. Other products on the market, such as Beovu, are prescribed less frequently. Trial Tr. 861:6-862:4 (Albini) (ECF No. 571). According to Regeneron, Eylea has maintained its category leadership due to its safety, efficacy, and dosing advantage. Clark Decl. ¶ 7; see infra pp. 13-14.

C. **Aflibercept Biosimilars**

At least ▆▆ pharmaceutical companies are developing and seeking FDA approval for aflibercept biosimilars, each of which contains the same active ingredient as Eylea, also in a 2 mg vial formulation. Sheridan Decl. ¶ 49. Absent injunctive relief, Regeneron expects ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆ ▆▆ Defendants' aflibercept biosimilar, Yesafili, is among

Appx320

**\*\* SEALED \*\***

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

the closest to launch, having received FDA approval on May 20, 2024.  See _infra_.

## II.  PROCEDURAL HISTORY

Mylan informed Regeneron on January 2, 2022 that it had applied for FDA approval of M170, "a proposed biosimilar to aflibercept," which Regeneron markets under the brand name Eylea. ECF No. 692 at 5; 42 U.S.C. § 262(l)(2).  Regeneron responded by providing the list of patents it would consider asserting against Mylan.  ECF No. 692 at 5; 42 U.S.C. § 262(l)(3)(A).  The parties then went through the "patent dance," a series of information exchanges laid out in 42 U.S.C. § 262(l) designed to address patent disputes about proposed biosimilars.

Regeneron filed a complaint against Mylan on August 2, 2022, asserting that M710, which would be marketed as Yesafili, would infringe at least twenty-four of Regeneron's patents.  ECF No. 1; _see also_ 42 U.S.C. § 262(l)(6)(B) (authorizing an immediate patent infringement action if the parties cannot reach an agreement). Mylan later transferred its rights in Yesafili to Biocon, a biopharmaceutical company based in India, and the parties agreed to join Biocon as a Defendant-Counterclaim Plaintiff in this action.  ECF No. 523 at 1-2; Trial Tr. 310:7-15 (Csaky) (ECF No. 559).

Appx321

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

Regeneron sought an expedited trial schedule, which the Court granted over Defendants' objection, to seek permanent injunctive relief before the FDA approved Yesafili.  ECF No. 7 at 5.  The Court issued a Scheduling Order allowing for an initial trial on a narrowed set of patents and claims in June 2023.  ECF No. 87 at 1-2.  Shortly after the Order, Regeneron identified six patents from three patent families for claim construction and trial: U.S. Patent Nos. 10,888,601; 11,053,280; 11,084,865; 11,104,715; 11,253,572; and 11,299,532.  ECF No. 88 at 1.

The parties cross-moved for summary judgment before trial. ECF Nos. 428, 429.  Mylan moved for summary judgment as to certain claims directed to treatment regimens.  In its April 2023 claim construction ruling, the Court found certain language in these claims to be non-limiting and lacking patentable weight.  ECF No. 427 at 37-39.  As a result, Regeneron stipulated to the invalidity of claims 5, 6, and 9 of the '601 Patent and claims 1-5, 8-11, 14, and 26-28 of the '572 Patent, while preserving its appellate rights, and narrowed the patents and claims for the initial trial.[2]

---

[2] In its stipulation, Regeneron also accepted summary judgment of noninfringement of certain claims of U.S. Patent No. 11,104,715 based on the Court's claim construction ruling, subject to Regeneron's appellate rights.  ECF No. 433.  The '715 Patent was not at issue in the parties' June 2023 trial.

Appx322

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---

ECF No. 433 at 1.  The Court denied the remainder of the parties'
summary judgment motions.  ECF No. 525.

The next month, Regeneron further narrowed the patents and
claims for the initial trial to the following claims from three
patents: in U.S. Patent No. 10,888,601, claims 11 and 19; in U.S.
Patent No. 11,084,865, claims 4, 7, 9, 11, 14-17; and in U.S.
Patent No. 11,253,572, claims 6 and 25 (the "Initial Claims").

The Court held a two-week bench trial on the Initial Claims
in June 2023, hearing testimony from several fact and expert
witnesses.  After the trial, the parties filed three rounds of
post-trial briefing, and the Court heard closing arguments on
August 3, 2023.

On January 31, 2024, the Court issued a detailed Memorandum
Opinion and Order holding that Regeneron demonstrated by a
preponderance of the evidence that Defendants' Yesafili product
infringed claims 4, 7, 9, 11, and 14-17 of the '865 Patent (the
"Product Patent") and that Defendants failed to establish those
claims are anticipated, obvious, or invalid.  ECF No. 692 at 311-
12.  The Court also held that Defendants' marketing of their
Yesafili product would induce infringement of claims 6 and 25 of
the '572 Patent and claims 11 and 19 of the '601 Patent, but it
concluded that Mylan demonstrated by clear and convincing evidence

7

**\*\* SEALED \*\***

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

that these claims are invalid as obvious (but not anticipated). Id. at 312-13. In sum, the Court found that Yesafili infringed eight claims in Regeneron's Product Patent, which are valid and do not expire until June 14, 2027.

Following this Court's ruling, Regeneron petitioned the Judicial Panel on Multidistrict Litigation to coordinate this action with five other patent infringement lawsuits relating to aflibercept biosimilar launches, which Regeneron filed in this district and the Central District of California. See 28 U.S.C. § 1407. On April 11, 2024, the Panel granted Regeneron's motion and consolidated the cases into In re: Aflibercept Patent Litigation, centralizing them in this district. Transfer Order, In re: Aflibercept Patent Litig., MDL No. 1:24-md-3103-TSK (Apr. 11, 2024), ECF No. 1 ("MDL ECF No."). Regeneron's claims against Amgen, Inc., Celltrion, Inc., Formycon AG, and Samsung Bioepis Co., Ltd., are thus also pending before this Court.

On February 22, 2024, Regeneron moved for a permanent injunction to prohibit Mylan and Biocon from launching Yesafili before the Product Patent expires, citing Defendants' continued efforts to market Yesafili ████████████████. Regeneron PI Br. at 1 (ECF No. 708-3). Again, the motion is fully briefed and ripe

Appx324

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---

for the Court's decision.  Id.; Opp. (ECF No. 722-1); Reply (ECF
No. 747-2).

Seeking to prevent Defendants from launching Yesafili while
the Court considered the permanent injunction motion, Regeneron
moved for a temporary restraining order, which Defendants opposed.
ECF Nos. 70, 105.  On May 17, 2024, the Court granted Regeneron's
motion after finding that "Regeneron has clearly shown through
specific facts in an affidavit that any manufacture, importation,
or commercialization of YESAFILI prior to the expiry of the '865
Patent will cause it immediate and irreparable injury, including
to Regeneron's market share, pricing, goodwill with patients and
clinicians, and/or research and development funding as a result of
facing improper competition from an infringing product."  ECF No.
776 at 2-3.  The Court determined that "[s]uch injury would not be
fully redressable by monetary damages."  Id. at 2.  It then
"enjoined and restrained" Defendants "from manufacturing, using,
offering to sell, or selling within the United States, or importing
into    the    United    States    without    a    license    from
Regeneron . . .  YESAFILI" for "fourteen days," unless extended
for "good cause."  Id.  On May 20, 2024, the FDA approved Yesafili
as an interchangeable biosimilar to Eylea.  The FDA approved
Yesafili as a treatment for wet AMD, DR, DME, and Macular Edema

Appx325

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

following Retinal Vein Occlusion ("RVO").  *See FDA Approves First
Interchangeable Biosimilars to Eylea to Treat Macular Degeneration
and Other Eye Conditions*, U.S. Food & Drug Admin. (May 20, 2024),
https://www.fda.gov/drugs/news-events-human-drugs/fda-approves-
first-interchangeable-biosimilars-eylea-treat-macular-
degeneration-and-other-eye.

### III. FACTUAL BACKGROUND

**A.   Permanent Injunction Expert, Fact Declarants and
       Irreparable Harm Declarants**

Regeneron supported its motion for a permanent injunction
with a declaration from one fact witness and one expert witness.
Defendants provided one fact witness declaration and two expert
witness declarations.  All declarants were deposed, and the parties
relied on this deposition testimony in their briefing.

**1.   Kevin Clark**

Kevin Clark is Vice President of Regeneron's Ophthalmology
Commercial Business Unit, a role he has held since 2020.  Clark
Decl. ¶ 1.  Mr. Clark's focus at Regeneron has been on the
commercialization of Eylea and Eylea HD.  Id. ¶ 3. Mr. Clark's
declaration addressed the effect of biosimilar entry on Regeneron
and its Eylea product from Regeneron's perspective.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---

### 2.   Matthew Erick

Matthew Erick is Chief Commercial Officer of Biocon's Advanced Markets unit, where he directs the commercial strategy for Biocon's biosimilar business in the United States, among other areas.  Erick Decl. ¶¶ 1-2 (ECF No. 722-16).  Prior to joining Biocon, he worked for Mylan for nearly ten years, including as President of the Sales & Marketing unit for North America.  Id. ¶ 6. ████████████████████████████████

████████████████████████████████████

██████████████████████████ ████████

███████████████ ███████████████████

████ ████████ ████████ █ ███ ███ ██████ ████████

████████████████████████████████████

████████████████████████████████████

████████████████████████ ████ █████

████████

### 3.   Dr. Sean Sheridan

Dr. Sean Sheridan is a Vice President at Charles River Associates, an international business consulting firm, and has a Ph.D. in genetics as well as an M.B.A. with concentrations in finance and economics from the University of Chicago.  Sheridan Decl. ¶¶ 1-2.  Dr. Sheridan's declaration addressed whether

11

Appx327

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

Regeneron would be irreparably harmed by market entry of Eylea biosimilars prior to expiry of the asserted patents. Dr. Sheridan's previous experience has included the quantification of economic damages, and he has experience in modeling and valuation in a variety of intellectual property matters. Id. ¶¶ 3-5.

### 4.   Dr. Ivo Abraham

Dr. Ivo Abraham is a Professor of Pharmacy, Professor of Medicine, and Professor of Clinical Translational Sciences at the University of Arizona. Abraham Decl. ¶ 1 (ECF No. 722-17). He is also Co-Founding Principal and Chief Scientist at Matrix45 LLC, a research and consulting group that advises pharmaceutical companies and other stakeholders on development and post-approval marketing of pharmaceuticals. Id. ¶ 5. Dr. Abraham, trained as a registered nurse, describes himself as "an advocate for biosimilars" and has studied the cost-efficiency of expanded access to biosimilars. Abraham Tr. 52:5-10; see Abraham Decl. ¶ 5. Dr. Abraham's declaration addresses how biosimilars' entry into the market can promote cost-savings and "create alternative sources of important therapies." Abraham Decl. ¶¶ 15, 18.

### 5.   Christopher Spadea

Christopher Spadea is the principal owner of Folio Expert Services, LLC, which provides expert testimony, valuation,

12

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---

licensing, and other consulting services to clients in the
pharmaceutical and other industries.  Spadea Decl. ¶ 2 (ECF No.
722-18).  He has no specialized knowledge regarding the
ophthalmology pharmaceutical industry, however, and was unclear
about what anti-VEGF drugs that were cited in his report were
actually used for ophthalmic applications.  Id. ¶ 13; Spadea Tr.
120:5-124:12 (stating that he obtained that information from
drugs.com and that he did not know whether Sprycel was used for
ophthalmic purposes or available as an intravitreal injection).
In his declaration, Mr. Spadea opined that only harm to Regeneron's
2 mg vial presentation of Eylea is relevant to the irreparable
harm inquiry here and that any harm was quantifiable, reversible,
or speculative.

**B.    Defendants May Launch Yesafili in the Absence of an
Injunction**

Biocon has announced it intends to appeal this Court's ruling
that it infringes Regeneron's valid Product Patent.  ECF No. 691
at 7 (stating Defendants' plan to file "an expedited appeal" of
the Court's decision following the June 2023 trial "soon").  The
parties attempted, unsuccessfully, to reach a stipulated
injunction that would preserve the status quo in the marketplace
during that appeal.  Kayali Ex. 2 at 1, 3 (ECF No. 708-17); Kayali
Exs. 3-4 (ECF No. 708-17).  Absent an injunction, therefore,

IN RE: AFLIBERCEPT PATENT LITIGATION          1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

Defendants could launch Yesafili at the expiration of the temporary restraining order entered by this Court on May 17 (and extended on May 30). MDL ECF Nos. 107, 151. Regeneron seeks a permanent injunction preventing Defendants from producing, marketing, or selling their infringing product until the Product Patent expires in June 2027.

### IV.   GOVERNING STANDARDS

Plaintiff seeks a permanent injunction given the Court's findings on the '865 patent. This Court is authorized to award such equitable relief. See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 390 (2006). Moreover, the Patent Act provides that in patent infringement cases, courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. In eBay, Justice Thomas set forth the standard for permanent injunctive relief:

> [A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

14

Appx330

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---

eBay, 547 U.S. at 391 (citations omitted).   Even in patent
litigation, this assessment must be made on a case-by-case basis
and must be undertaken independently from a finding of
infringement.   See id. at 394.   More specifically, eBay rejected
the prior "categorical" approach where permanent injunctions
necessarily followed a finding of patent infringement "absent
exceptional circumstances."   Id. at 391.[3]   The patentee has the
burden of proof on each factor.   See eBay, 547 U.S. at 393-394;
Nichia Corp. v. Everlight Americas, Inc., 855 F.3d 1328, 1341 (Fed.
Cir. 2017) ("The movant must prove that it meets all four equitable
factors.").

### V.   ANALYSIS

**A.   Irreparable Harm/Inadequate Damages**

In assessing a request for a permanent injunction, courts
often consider the first two eBay factors together.   See, e.g.,
Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1327 (Fed. Cir. 2008).

---

[3]  To the extent Regeneron urges the Court to follow this
"categorical" approach, this Court declines. Regeneron, in its
papers, repeatedly insinuates a required automatic result here.
Although, ultimately, the Court found each of the eBay factors
sufficiently satisfied here after the required analysis, the Court
likewise would not have hesitated to be the "first" to deny a
motion for permanent injunction if the record did not justify such
extreme equitable relief under applicable precedent, "historical
practice" notwithstanding.   Id. at 395 (Roberts, C.J.,
concurring).

Appx331

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

Indeed, the core of an irreparable harm inquiry is the question whether legal remedies, such as monetary damages, could address the claimed injury or whether such damages are even calculable. Metalcraft of Mayville, Inc. v. The Toro Co., 848 F.3d 1358, 1368 (Fed. Cir. 2017); Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012). Courts recognize multiple types of irreparable harm. See, e.g., Celsis In Vitro, 664 F.3d at 930 ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."). The Court will analyze each type of claimed harm in turn.

> **1. Appropriate Universe of Comparator Products To Assess Irreparable Harm**

Initially, however, the Court must first assess which of Regeneron's aflibercept products and/or delivery mechanisms are appropriately considered in this analysis. Regeneron urges the Court to consider the potential impact of Yesafili on its entire catalogue of Eylea offerings. The Court declines to do so for the PFS presentation and Eylea HD. The Second Circuit explained the difference in the market between anti-VEGF medications presented in the form of a vial and those presented in the form of a PFS:

> For several years after they were first introduced, anti-VEGF medications [like aflibercept] were packaged into vials and

16

IN RE: AFLIBERCEPT PATENT LITIGATION                1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

administered in a two-step process.  A doctor would first fill a syringe with medicine from an anti-VEGF vial and then inject the drug into a patient's eye.  The newer versions of the medications are sold in prefilled syringes ("PFSs") and administered in one step. PFSs contain the same medication as vials but are injected directly into the patient's eye. This simpler process carries a significantly lower risk of complications and infections and is now the preferred way of administering anti-VEGF medications.

Regeneron Pharms., Inc. v. Novartis Pharma AG, 96 F.4th 327, 332 (2d Cir. 2024). ██████████████████████

██ ████ █ █ █ █ █ ▌ █ ██ ██

████████████████████████████

██████████████████████ ██████████████

████████████████████████████

████████████

Kevin Clark, Vice President of Regeneron's Ophthalmology Commercial Business Unit, asserts generally that the "launch of one or more infringing Eylea biosimilars would all but certainly reduce Eylea and Eylea HD's sales and market share in each and every market in which our products compete." (ECF No. 708-16, Clark Decl. ¶ 8; ECF No. 722-3, Birkos Decl. Ex. 6, Clark Dep. Tr. at 219:15–220:5 (opining that biosimilar aflibercept will "impact sales of the vial and the prefilled syringe")). Mr. Clark acknowledges, however, that he does not define a "market" or

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

"market share."   (ECF No. 708-16, Clark Decl. ¶ 5 n.1).   Dr.
Sheridan likewise declined to define the market for the products
at hand.  (ECF No. 708-4, Sheridan Decl. ¶ 8 n.1).

Defendants take issue with Regeneron including all three
Regeneron products (2 mg vial, 2 mg PFS, 114.3 mg/mL Eylea HD
product) in its harm analysis.  (ECF No. 722-1 at 6-8).  Defendants
note that Regeneron in antitrust litigation claimed that the 2 mg
aflibercept market has distinct vial and PFS markets.  (ECF No.
722-1 at 7 (citing Regeneron v. Novartis, 22-427 (2d Cir. June 10,
2022 (Doc. No. 65))).  ███████████████████████████

████████ ██████ █████ ██ ███████ ███ █ █ ██████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████  ████████████████
████████████████████████████████████████
████████████████████  Defendants' expert, Mr. Chris
Spadea, explains that "Dr. Sheridan's failure to consider the
market segmentation in his analysis, or consider other factors
found in other non-asserted patents that may drive sales, makes
his opinions unreliable and thus they should not be given weight
in an analysis of irreparable harm in this matter."  (ECF No. 722-
18, Spadea Decl. ¶ 19).

Appx334

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

Regeneron responds that the market definition for antitrust purposes is a complex one based on whether a higher-priced product would cause a market switch. (ECF No. 747-2 at 4 n.3). Regeneron argues that where insurance coverage drives purchasing decisions, it is easier for Yesafili to take sales away from all of Regeneron's aflibercept products. (Id. at 4). Regeneron also urges that the Yesafili vial will compete directly with Eylea in a vial form. (Id.)

Regeneron asks the Court to consider whether products within the market "can both meet the same needs," Broadcom v. Emulex, 2012 WL 13036855, at *3 (C.D. Cal. March 16, 2012), or "compet[e] for the same customers in the same markets," Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 702 F.3d 1351, 1363 (Fed. Cir. 2012). (ECF No. 747-2 at 3-4). Regeneron urges that all its products are "treating the same diseases in the same way," and that Yesafili will be attractive to existing "Eylea" customers due to having the same "dosing schedule, safety, and effectiveness." (ECF No. 747-2 at 5).

Defendants urge that the actual claims asserted as part of the infringement judgment were each limited to a 40 mg/mL "vial." Defendants seem to agree that doctors will find Yesafili attractive to prescribe but have noted that dosing schedule benefits are tied

19

CONFIDENTIAL MATERIAL REDACTED

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---

to dosing patents that this Court's Trial Decision invalidated, and that drug potency and performance benefits originate with the aflibercept molecule itself, the patents to which have expired. (ECF No. 722-1 at 5-6, 16; Trial Decision at 46-50, 312-13). Defendants' position also is consistent with ███████ ███████

████████████████████████████████████ ███

███████████████████████████ █████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████ █████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

    The Court finds that the claims that were the subject of the Court's Trial Decision were not directed to the aflibercept molecule generally, but to "a vial" specifically, not a PFS.

**a.  2 mg vial vs. 2 mg PFS.**

    The '865 patent claims Regeneron asserted against Defendants were limited to vials at 40 mg/mL concentration (i.e., the 2 mg vial product).  The '865 patent itself does not equate a PFS and a vial; it treats them as separate products.  (*See, e.g.,* ECF No. 1-17, '865 patent at 5:24 ("pre-filled syringe *or* vial" (emphasis

20

CONFIDENTIAL MATERIAL REDACTED

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---

added)).  Claims that Regeneron **did not** assert against Defendants had elements to a PFS.  (See id. at 20:65–21:12 (PFS claims)).  That is further support that the marketing and sales of the two products should be considered independently.  Also supporting this position is that before the Second Circuit, Regeneron took the position that the 2 mg vial and 2 mg PFS products reflected distinct markets for antitrust purposes since the PFS provided added safety benefits.  (ECF No. 722-8, Birkos Decl. Ex. 9, Regeneron Opening Br. at 29, Regeneron v. Novartis, 22-427 (2d Cir. June 10, 2022) (Doc. No. 65) ("PFS treatments have important practical and medical benefits that distinguish them from alternative treatment methods, including vials")).

███████ ████  ████ ████  ████  ████  ████  ████  ████  ████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████████████████  ████████████████
████████████████████████████████████████████████████████████
███████ ███  ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████████████  Regeneron told the Second Circuit that "independent analysts, leading medical journals," and other data showed a reduction in side

21

CONFIDENTIAL MATERIAL REDACTED

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

effects and preparation time from using a PFS instead of a vial. (ECF No. 722-8, Birkos Decl. Ex. 9, Regeneron Opening Br. at 30, Regeneron v. Novartis, 22-427 (2d Cir. June 10, 2022) (Doc. No. 65)). The Second Circuit's explanation above likewise adopted the reasoning on the added safety and convenience that a PFS provides over a vial. Nor does it appear that Regeneron has discovered the PFS no longer provides any benefits worth marketing; ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████   ██   █████   ████████   ██   ███████

███████████   ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████   ECF No. 722-8, Ex. 9, Regeneron Opening Br. at 1-2, Regeneron v. Novartis, 22-427 (2d Cir. June 10, 2022) (Doc. No. 65) (Regeneron telling the Second Circuit that the PFS gives "more accurate dosing, require[s] fewer steps to administer, and reduce[s] the risk of severe complications, such as inflammation."); id. at 2 ("physicians now overwhelmingly prefer and prescribe . . . PFS")).

22

Appx338

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

Thus, the 2 mg vial and 2 mg PFS represent distinct customer markets, and the PFS meets a different need or administration preference compared to the vial.

**b.   2 mg vial vs. Eylea HD**

For Eylea HD, it is again important to start with what the asserted claims state.  As noted above, claim 2 limited all asserted claims to a 40 mg/mL concentration (i.e., the 2 mg vial). Regeneron confirms that Eylea HD is not a 40 mg/mL concentration, but a much higher 114.3 mg/mL concentration.  (ECF No. 708-16, Clark Decl. ¶ 3).



23

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---



Regeneron's briefing also carefully argues that Yesafili would compete with "Eylea," not the full franchise that includes "Eylea HD." (ECF No. 747-2 at 5-6).

Thus, on the present record, the market for the Eylea HD product is distinct from the market for the aflibercept 2 mg (40 mg/ml) vial product as well.

Given the above and other record evidence considered, the 2 mg aflibercept vials, 2 mg aflibercept PFS, and the 8 mg Eylea HD products represent distinct products and markets for purposes of assessing irreparable harm.

24

CONFIDENTIAL MATERIAL REDACTED

IN RE: AFLIBERCEPT PATENT LITIGATION                1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

2.   **Lost Market Share**

However, the direct competition between Yesafili and Regeneron's Eylea 2 mg vial alone adequately supports a finding of irreparable harm. ██████████ ███████ ████ ██████████ ██████

██████████████████████████████████████████████████████████

███████   ██████████████ That is a significant volume of sales, by any measure. Even if the rest of Regeneron's sales were somehow immune from harm, █ ███████ ██████ █████ ████████ is a valuable part of its business, and any competitive threats to it are significant.

Defendants argue that Regeneron's lost market share is quantifiable and that legal remedies are adequate to compensate Regeneron. This Court disagrees. Courts regularly recognize that being "forced to compete against products that incorporate and infringe [one's] own patented inventions" creates irreparable harm. Douglas Dynamics, 717 F.3d at 1345. Defendants' cited cases (Opp. 17) do not support their position. Unlike the patentee in Praxair, Inc. v. ATMI, Inc., Regeneron "described . . . specific sales [and] market data to assist the court" and explained "why it may have difficulties calculating damages going forward." 479 F. Supp.2d 440, 444 (D. Del. 2007). In Philip Morris Prods. S.A. v. R.J. Reynolds Vapor Co., the district court found the patentee had

25

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---

not shown a monetary remedy was insufficient because the patentee
"did not have a significant market before [the defendant] infringed
its patent." 2023 WL 2843796, at \*5 (E.D. Va. Mar. 30, 2023),
appeal dismissed sub nom. RAI Strategic Holdings, Inc. v. Altria
Client Servs. LLC, 2024 WL 413427 (Fed. Cir. Feb. 5, 2024). That
is far from the case here. The Court also recognizes that early
infringing competition can alter market dynamics moving forward in
a way that cannot be unwound, giving Defendants a "competitive
foothold" they would not otherwise have had and which cannot be
fully quantified and remedied by damages. Indivior Inc., 2018 WL
3496643, at \*12. This is classic irreparable harm. Thus, this
Court concludes that Regeneron has shown its likely harm due to
lost market share and sales is not fully addressable through legal
or monetary remedies.

### 3. Price Erosion

Again, "price erosion, loss of goodwill, damage to
reputation, and loss of business opportunities are all valid
grounds for finding irreparable harm." Celsis In Vitro, Inc., 664
F.3d at 930 (citing Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341,
1362 (Fed. Cir. 2008); Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d
1368, 1382-83 (Fed. Cir. 2006)).

Appx342

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

When a competing product launches, the patented product often must drop its price to remain competitive.  Courts consistently recognize this drop in price as a source of irreparable harm.  See, e.g., Celsis In Vitro, 664 F.3d at 930 (affirming "price erosion" as source of "permanent, irreparable harm"); Sanofi-Synthelabo, 470 F.3d at 1383 n.9 (same); Abbott Lab'ys, 544 F.3d at 1362 (same).

"The phenomenon of price erosion in the pharmaceutical industry is well known." Hoffmann-La Roche Inc. v. Cobalt Pharms. Inc., 2010 WL 4687839, at *12 (D.N.J. Nov. 10, 2010), modified, 2012 WL 458435 (D.N.J. Feb. 9, 2012).  And "[p]rice erosion is most likely to occur in cases . . . in which no generic competitors have yet entered the marketplace, placing the patentee in an exclusive position." Id.

Price erosion is typically irreversible even if the infringing product exits the market, because returning prices to pre-infringement levels risks loss of goodwill and reputation with payors and customers.  Sanofi-Synthelabo v. Apotex Inc., 488 F. Supp.2d 317, 343 (S.D.N.Y. 2006) (patentee would be "harmed by loss of consumer good will by customers who will have grown accustomed to lower prices" if it restored pre-infringement

Appx343

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

pricing), aff'd, 470 F.3d 1368; Celsis In Vitro, 664 F.3d at 930

(same).

     Regeneron has also shown that Yesafili's launch will cause

Eylea's price to erode.  See Clark Decl. ¶¶ 8-10; Sheridan Decl.

¶ 62.  ████████████████████████████████████████

████████████████████████████████████  ███████████████

████

          a.    The launch of a biosimilar typically causes
                price erosion

     Researchers who study biosimilars, including Defendants' own

expert Dr. Ivo Abraham, have found repeatedly that biosimilars'

launching causes the reference product to lower its prices.

Abraham Dep. Ex. 5 at 6-12.  That is because a biosimilar's launch

creates a commodity market — one in which products (here, Yesafili

and Eylea) have "full or substantial fungibility" with each other.

Abraham Dep. Ex. 13 at 1.  And because biosimilars are generally

priced lower than the reference product, the reference product's

manufacturer typically must lower its own prices to stem sales

losses.  Sheridan Decl. ¶¶ 66-69, 77-84; ███████████████████████

As Dr. Abraham confirmed, "[i]t is a generally accepted perspective

that commercialization [of a biosimilar] lowers prices" of the

reference product.  Abraham Tr. 123:17-18.

Appx344

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---

████████████████████████████████████████

████████████████████████████████████████

████ ██████████ ██████ ████ The WAC is the price a drug
manufacturer lists, not including any discounts, rebates, or
negotiated price reductions. <u>Id.</u> ¶ 35. Biosimilars launch at an
Average Sale Price (ASP) — the average price that manufacturers
charge purchasers after discounts and rebates — that is ████████

█████████████████████ ████ ████████ ███████████████████████

████████████████████████████████████████

████████████████████████████████ ████ █ ████

When other biosimilars have launched — such as biosimilars
for Neulasta, trastuzumab, and bevacizumab — the ASP for the
reference drug began to decline immediately and never recovered.
Abraham Tr. 124:1-2 (discussing price erosion of Neulasta upon
launch of its biosimilars); Abraham Dep. Ex. 5 at 7 (discussing
price erosion of reference drugs upon launch of trastuzumab and
bevacizumab biosimilars); Abraham Tr. 126:16-128:16 (same).

Samsung Bioepis's Biosimilar Market Report for Q1 2024 states
that "[b]iosimilar launches have led to significant price
decreases over time," and "[o]n average, ASP declined by 41% three
years . . . post first biosimilar launch with more mature markets

Appx345

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

demonstrating increasing price concessions." Sheridan Ex. 33 at 12 (ECF No. 708-7).

Amgen has observed the same trend, stating in its 2022 Biosimilars Trend Report that the ASP "for both reference products and biosimilars" "is declining, due to competition." Sheridan Ex. 52 at 6 (ECF No. 708-9); see Sheridan Decl. ¶ 39. This same report shows that biosimilar prices "have decreased at a negative compound annual growth rate . . . of -9% to -24%," and "[t]he prices of most reference products have decreased at a negative [compound annual growth rate] of -4% to -21%." Sheridan Ex. 52 at 6. Amgen's 2022 Report contains a graph illustrating the trend in reference products' declining ASP following the launch of biosimilars:



Appx346

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---

Id. at 13 (Fig. 5); Sheridan Decl. ¶ 39.

Ophthalmic drugs are not immune from this trend, as the launch
of ranibizumab biosimilars has shown.  See Sheridan Decl. ¶ 41;
Sheridan Ex. 33 at 9 ("Recent ranibizumab biosimilar launches have
already led to lower reference product ASP costs.").  When these
biosimilars entered the market, Genentech, the maker of the branded
biologic Lucentis, was forced to reduce its ASP to or below the
ASPs of the competing biosimilars.  Sheridan Decl. ¶ 41.  As of Q1
2024, the ASP of all ranibizumab products has declined 23% since
the biosimilars' launch.  Sheridan Ex. 33 at 22.  Despite these
price reductions, Lucentis continued to lose significant market
share to ranibizumab biosimilars; as of Q3 2023 the two ranibizumab
biosimilars hold a combined market share of 34%.  Id.

The figures below, featured in Samsung Bioepis's 2024 Market
Report, illustrate the decline in Lucentis's ASP and market share
that ranibizumab biosimilars caused:

Appx347

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---



Figure 27. Ranibizumab Volume Market Share[5]

Figure 28. Ranibizumab ASP Trend[3]

Id. (Figs. 27 & 28).

> **b.   Regeneron will likely experience price erosion if Yesafili launches**

The downward pricing pressure Eylea will face after Yesafili's launch is different in kind from ordinary, non-biosimilar competition with other anti-VEGF medications. Almost across the board, biosimilars lead to permanent price erosion of the reference drug. That is because their launch causes the reference drug to compete for the first time with *a highly similar version of itself*. The same will happen with Eylea if Yesafili is permitted to launch.

Appx348

CONFIDENTIAL MATERIAL REDACTED

Case 1:22-cv-00061-TSK-JPM  Document 799  Filed 06/21/24  Page 33 of 80  PageID #:
IN RE: AFLIBERCEPT PATENT LITIGATION    66767                    1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**



Defendants' evidence confirmed Eylea will likely experience price erosion from Yesafili launching.

33

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

█████████████ ████████████ ████████████

██ ███ ███ ████ █████ ███ █████ ███ ██ █

████████████████████████████████████████

█████████████████ ████████████████████

████████████████████████ ███████████

████████████████████████████████████████

████████████████████████████████████████

██████████ Defendants' expert, Mr. Spadea, did not consider ██

█ ████ ████████ ██████ ███ ██ in

offering his opinion about price erosion, █████ ██████ █

████████ ██████ ████████ ██████ █████ ███ █

███ █ ████ ████ ██████ █████████ Because

█████████ █ ████████ are a more reliable estimate of

█████████████, the Court finds that Mr. Spadea's price

erosion analysis is incomplete and less reliable than the evidence

Regeneron offered.

Further, if Regeneron is forced to lower prices on Eylea
because of biosimilar entry, such price erosion will likely be
permanent. ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████ ████████████████████

34

CONFIDENTIAL MATERIAL REDACTED

Case 1:22-cv-00061-TSK-JPM  Document 799  Filed 06/21/24  Page 35 of 80  PageID #:
IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

\*\* SEALED \*\*

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**



Should Regeneron nonetheless attempt

to revert prices on Eylea to their original values despite the

foregoing, it would suffer further harm in the form of reputational

damage and loss of goodwill.

Given this ample evidence in the record showing declines in

reference product pricing following a biosimilar's launch, and the

evidence of Defendants' plans in particular, the Court finds that

Appx351

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

Regeneron is likely to suffer price erosion if Yesafili is permitted to launch. And based on this same body of evidence, the Court finds that the price of Regeneron's Eylea is unlikely to return to pre-launch levels even if Yesafili is later taken off the market following Defendants' appeal in this case.

██████████████████████████████████████████████

█████████████████████████████████ Historically, biosimilars have launched at below the reference product's price, which often causes reference products to lower the price in order to compete. Id. It is unlikely that Yesafili will be an exception to the general trend. ███████████████████████████████

Appx352

IN RE: AFLIBERCEPT PATENT LITIGATION                              1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████     This evidence confirms that Regeneron will likely

have to lower the price of its Eylea products if Yesafili launches.

██████████████████████████████████████████████

██████████████████████████████████████████     "[p]rice

erosion is most likely to occur in cases . . . in which no generic

competitors have yet entered the marketplace, placing the patentee

in an exclusive position." Hoffmann-La Roche Inc., 2010 WL

4687839, at *12. Currently, Regeneron is the only company with an

aflibercept product on the market, ███ ███ ███ ████████ ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████     ████████████████████

████████████████████████████████████████████████████████

████████████████████

The term "price erosion" sounds of economic loss and not

necessarily the type of irreparable harm required under eBay.

Regardless, the Federal Circuit has upheld findings of irreparable

harm based on evidence that the infringer offered "significantly

discounted prices," forcing the patentee to lower its prices to

compete. Celsis In Vitro, 664 F.3d at 930. Regeneron has shown

37

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

that it will experience the same harm here.  Thus, based on the
consistent recognition that such a price drop is a source of
irreparable harm, this Court holds that allowing Defendants to
launch Yesafili would irreparably harm Regeneron.

Additionally, Regeneron's irreparable harm from price erosion
would be irreversible even if Yesafili lost its appeal from trial
in this case and left the market.  For one, contractual price
concessions would be locked in for at least the terms of the
contracts.  And, because Medicare reimbursement rates lag market
pricing, future price increases would leave physicians paying a
higher rate to purchase Eylea than they were being reimbursed.  In
short, Regeneron could only raise its prices by risking the "loss
of consumer good will by customers who will have grown accustomed
to lower prices." Sanofi-Synthelabo, 488 F. Supp. 2d at 343.

Given the evidence in the record, the Court concludes that
Regeneron's claim of price erosion is not merely speculative.  This
case is dissimilar from Integra Lifesciences Corp. v. Hyperbranch
Medical Technology, Inc., which Defendants cite (Opp. 13), where
the allegedly infringing product had already launched, and six
months after the plaintiff filed a motion for a preliminary
injunction, it still could not demonstrate any lost market share
or price erosion.  2016 WL 4770244, at *13 (D. Del. Aug. 12, 2016).

38

Appx354

IN RE: AFLIBERCEPT PATENT LITIGATION                1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

Nor is it like SmartSky Networks, LLC v. Gogo Business Aviation, LLC (Opp. 13), where the patentee dropped its prices before the infringer announced its prices and the patentee's expert "offered no economic analysis other than conclusory assertions, to support its price erosion theory." See 2024 WL 358136, at *5 (Fed. Cir. Jan. 31, 2024).

The harms to Regeneron from price erosion, as the Federal Circuit has recognized, are also not sufficiently calculable or compensable. The evidence shows that it will be nearly impossible to calculate and fully compensate for price erosion. This is because, in part, the price erosion will extend beyond any damages period and may impact future price negotiations in unquantifiable ways. Id.

In summary, the Court finds that price erosion prompted by Yesafili's launch would cause Regeneron irreparable harm.

### 4. Reputational Injury

Reputational injury is also a well-recognized form of irreparable harm. Douglas Dynamics, 717 F.3d at 1344-45. This can occur when doctors or patients know that a patentee is responsible for removing an available drug. AstraZeneca LP v. Apotex, Inc., 623 F. Supp.2d 579, 613 (D.N.J. 2009) ("AstraZeneca claims that an unauthorized launch by Apotex (followed by a

39

** SEALED **

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---

subsequent exit) would result in intangible and unquantifiable damage to AstraZeneca's reputation and goodwill.  For example, they assert that doctors who would have prescribed Apotex's BIS may blame AstraZeneca for the sudden unavailability of Apotex's generic BIS once Apotex is forced to leave the market. . . .  The Court agrees that an unauthorized launch by Apotex would have some intangible effects on AstraZeneca's goodwill."), supplemented, 623 F. Supp. 2d 615 (D.N.J. 2009), aff'd, 633 F.3d 1042 (Fed. Cir. 2010); see also Baxalta Inc. v. Genentech, Inc., 2018 WL 3742610, at *11 (D. Del. Aug. 7, 2018) (where defendant already launched its product before the preliminary injunction hearing, patentee would suffer reputational harm when doctors would know that patentee was responsible for removing an available drug).

Regeneron has also established that it will suffer reputational harms in the pharmaceutical community and among healthcare professionals if Yesafili is permitted to launch but later is removed from the market.  If a biosimilar launches and then is taken off the market as a result of litigation, providers and, most importantly, patients will blame Regeneron for the loss of their chosen treatment.  Sheridan Decl. ¶¶ 85-87; Sheridan Tr. 63:17-65:5, 139:2-8.  Here, the trial has already taken place, but Defendants will appeal as soon as they are able. Unlike a course

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

of antibiotics or a temporary pain-relief medication, patients must take aflibercept regularly for a long period of time. Trial Tr. 137:3-14 (Yancopoulos). Yesafili's removal from the market after affirmance, once it has been administered to perhaps thousands of patients, will disrupt these patients' course of treatment. Not only may patients feel uncomfortable switching medication mid-course, but they will also have to seek approval from private insurers and Medicare and Medicaid for a different product, a process likely to interrupt their treatment schedule. Sheridan Decl. ¶ 87. The Court finds that this harm to Regeneron's relationships with its customers and their treatment regimens would be a likely result of Yesafili's launching.

Regeneron has established that it will suffer such irreparable harm from reputational injury if Yesafili is permitted to launch now. See Douglas Dynamics, 717 F.3d at 1344-45. Were Yesafili to launch and then later exit the market, patients and doctors would know that Regeneron was responsible for removing the available drug and would likely be upset given the disruption of losing their preferred treatment. See AstraZeneca, 623 F. Supp.2d at 613. Because Regeneron has demonstrated that it likely would be blamed for removing Yesafili from the market — should Yesafili launch and then have to exit following a judgment for

41

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

Regeneron — Regeneron has demonstrated irreparable reputational harm.

### 5.  Impairment of R&D Funding

Regeneron also suggests, as a separate form of irreparable harm, that its research and development (R&D) funding and spending will be negatively affected if Yesafili launches.  The Court rejects this as a basis of irreparable harm here.

Regeneron's Mr. Clark states that Regeneron is committed to future R&D funding, and that "any harm to Regeneron's sales of Eylea and Eylea HD would necessarily impinge on the amount of money available for investment into research."  (ECF No. 708-16, Clark Decl. ¶ 19).  Dr. Sheridan does not address this topic as evidence of irreparable harm.  Regeneron in its briefing argues that biosimilars "will reduce revenues from its flagship product, and thereby reduce the money available to support its research and development efforts."  (ECF No. 708-3 at 12).  Regeneron argues that loss of R&D investment has routinely been held to serve as a basis for finding irreparable harm.  (Id.)

Defendants respond that Mr. Clark's suggestion that Regeneron will lack R&D funds for its projects if an aflibercept biosimilar launches contradicts what Regeneron has said in public statements and to investors.  (ECF No. 722-1 at 19-20).  As recently as March

42

Appx358

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

6, 2024, when Regeneron was asked what it would do with the "now $16 billion of cash" Regeneron has amassed, an amount that is "only getting larger," Regeneron answered, that "I think you're going to see us continue to fund our pipeline in a very meaningful way. Obviously, we have plenty of resources to do that . . . . [W]e're looking for opportunities . . . to deploy our cash just because we have a lot of it."[4]   Regeneron told the SEC they expected to continue increasing R&D expenditures. (ECF No. 708-16, Ex. 14 at 91).

█████████████████████████████████████

█████████████████████████████████████

███████ ████ ██ ███ █ ██ ██████ ████████

█████████████████████████████████████

██████████████████████████  Defendants urge that Mr. Clark himself confirmed that robust competition in this field has not harmed Regeneron's ability to bring new products to market. (ECF No. 722-3, Ex. 6, Clark Dep. Tr. at 50:19 – 51:5). Defendants also noted that when they previously deposed Dr. Yancopoulos before trial, he was unable to articulate any research project that might be put on hold if Yesafili were to enter the market. (ECF No. 722-3, Ex. 4, Yancopoulos Dep. Tr. at 53:15-24

---

[4] ECF No. 722-14, Ex. 28, Regeneron Pharmaceuticals, Inc. (REGN) TD Cowen 44th Annual Health Care Conference Call Transcript (Mar. 6, 2024) at 10.

Appx359

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---

(Yancopoulos saw no documents and CEO never informed him Regeneron would cut back on R&D if Mylan product on the market)).

Regeneron responded that even if it has the funds to continue **"some** R&D programs — it will fund less if it is deprived of hundreds of millions of dollars by Defendants' infringement," and because other competitors may be "emboldened by one premature launch to also launch," as in Amgen v. F. Hoffmann-LaRoche, 581 F. Supp. 2d 160, 212 (D. Mass. 2008). (ECF No. 747-2 at 10).

The Court finds that Regeneron has not met its burden with this element of claimed irreparable harm. The Federal Circuit cautioned against allowing generalized assertions that loss of revenue would lead to a loss of research and development opportunities because

> that claim of injury is not materially different from any claim of injury by a business that is deprived of funds that it could usefully reinvest. If a claim of lost opportunity to conduct research were sufficient to compel a finding of irreparable harm, it is hard to imagine any manufacturer with a research and development program that could not make the same claim and thus be equally entitled to preliminary injunctive relief. Such a rule would convert the "extraordinary" relief of a preliminary injunction into a standard remedy, available whenever the plaintiff has shown a likelihood of success on the merits.

Eli Lilly & Co. v. Am. Cyanamid Co., 82 F.3d 1568, 1578 (Fed. Cir.

Appx360

CONFIDENTIAL MATERIAL REDACTED

Case 1:22-cv-00061-TSK-JPM   Document 799   Filed 06/21/24   Page 45 of 80   PageID #:
IN RE: AFLIBERCEPT PATENT LITIGATION                           1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

1996) (affirming denial of injunction against generic drug competitor). This principle also differentiates Amgen. In Amgen, the district court noted that Amgen's infringed patents were directed to "the source" of "what enables mass production and commercial viability" of the drug at issue. 581 F. Supp.2d at 195. The patents also were "admittedly 'the foundation of Amgen's business,'" and any question into their value or ability to keep other competitors off the market would cause Amgen to lose access to research and development funds. Id. at 212. Regeneron's cited cases also do not support a finding of irreparable harm. In Mylan Institutional, for example, there was evidence of record that the harm to R&D would result from the loss of "half or more of [patentee's] revenue," ███████████████████████████

███████████████████████████████████████. See Mylan Institutional LLC v. Aurobindo Pharma Ltd, 2016 WL 7587325, at *23 (E.D. Tex. Nov. 21, 2016). The same is true of Regeneron's Janssen case. See Janssen Prods., L.P. v. Lupin Ltd., 109 F. Supp. 3d 650, 697 (D.N.J. 2014) (irreparable harm where evidence indicates "Janssen would lose 70 to 80 percent of its sales upon a generic launch").

That is not applicable here, ████ ██████ ███ ███ ███

███████████████████████████████████████

Appx361

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

_____

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███  █████  ████████  █████  ████  ██  █  ███████████████

████████████████████████████████████████████████████████

████████  █████████  ██  ███████     Regeneron's analysis is

essentially that it would like more funds to usefully invest, which

is not enough under the Federal Circuit precedent noted above.

Therefore, Regeneron's claimed impact on R&D prospects finds no

basis in either fact or law, and the Court does not rely upon it

in issuing the permanent injunction.

### 6.   Causal Nexus

To obtain a permanent injunction, a patentee must show "some

causal nexus between [a defendant's infringement] and [the]

alleged harm" — i.e., "show that the patentee is irreparably

harmed **by the infringement**." Apple Inc. v. Samsung Elecs. Co.,

735 F.3d 1352, 1363-64 (Fed. Cir. 2013) ("Apple III").

In cases involving "complex, multi-featured" products, such

as "smartphones and tablets," where consumer demand is driven by

some features of the finished good and not others, this nexus

analysis can be complicated. Id. at 1362; see also Genband US LLC

v. Metaswitch Networks Corp., 861 F.3d 1378, 1384 (Fed. Cir. 2017)

Appx362

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

(discussing "the causation approach suitable for a multi-feature,
multi-purchaser context").  In such cases, a patentee must show
"some connection between the patented feature and demand" for the
accused product, though it need not "show that a patented feature
is the exclusive reason for consumer demand." Apple III, 735 F.3d
at 1364.

The nexus inquiry can be much simpler for products that
"ha[ve] a small number of features," like medications. Id. at
1361-62.  That is because the nexus inquiry has "little work to
do . . . when the infringing product contains no feature relevant
to consumers' purchasing decisions other than what the patent
claims." Genband, 861 F.3d at 1384, n.2.  Accordingly, the multi-
feature nexus analysis is straightforward for patents that cover
the product itself instead of a "feature" or "attribute[] of the
finished consumer good" because "it is not possible to separate"
the patent "from the product itself in evaluating consumer demand
and nexus." Janssen Prods., 109 F. Supp. 3d at 700.  In such
cases, nexus is "apparent." Genband, 861 F.3d at 1384 n.2.  If
the "Patent encompasses nearly the entire Device[,
then] . . . Demand for the Device can fairly be described as demand
for the Patent." Apnea Scis. Corp. v. Koncept Innovators, Inc.,
2016 WL 9086937, at *6 (C.D. Cal. Nov. 7, 2016); see also Power

47

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

Probe Grp., Inc. v. Innova Elecs., Corp., 2023 WL 7043388, at *13
(D. Nev. Oct. 25, 2023) (distinguishing multi-featured nexus
inquiry because "Plaintiff's patent encompasses the entire product
at issue, not merely a feature, and Plaintiff's evidence that it
will likely suffer irreparable harm absent an injunction
demonstrates the requisite causal nexus").

Applying the above principles to the pharmaceutical context,
the nexus requirement is satisfied if a manufacturer "would not be
able to make the products proposed in its" regulatory filing
without infringing the asserted patents. Janssen Prods., 109 F.
Supp. 3d at 699; see also Mylan Inst'l LLC v. Aurobindo Pharma
Ltd., 857 F.3d 858, 873 (Fed. Cir. 2017) (upholding nexus finding
because "[w]ithout infringing the . . . patents" defendants "would
not be able to make the . . . product described in its ANDA")
(internal quotation marks omitted).

If the connection between the infringed patent and the harm
is undeniable, courts often find irreparable harm without
discussing the nexus factor. See Metalcraft of Mayville, 848 F.3d
at 1368-69 (affirming the grant of a preliminary injunction after
reciting, but not discussing, the nexus requirement of the
irreparable harm factor); see also In re Depomed Pat. Litig., 2016
WL 7163647, at *78 (D.N.J. Sept. 30, 2016), aff'd sub nom.

48

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

Grunenthal GMBH v. Alkem Lab'ys Ltd., 919 F.3d 1333 (Fed. Cir.
2019) (finding irreparable harm after reciting, but not
discussing, the nexus requirement).

    This Court finds that Regeneron has shown "some causal nexus
between [Defendants' infringement] and [the] . . . alleged harm,"
which is sufficient to demonstrate that Regeneron "is irreparably
harmed by the infringement." Apple III, 735 F.3d at 1363.

    Defendants' Yesafili product is not a "complex, multi-
featured" product, where consumer demand is driven by some features
of the finished product and not others. Id. at 1362. In Apple
III, for example, the patentee sought to enjoin the sale of various
smartphones and tablets, and the patents at issue were directed to
specific features of those devices, like pinch-to-zoom and double-
tap-to-zoom functionalities that allow users to navigate the
display screens. Id. at 1358. Yesafili does not have analogous
segregable features that one can mentally divide and then ask: "Is
this a feature that drives demand?" There is no "feature" that
parallels, for example, a double-tap to zoom gesture on a smart
phone. Thus, Regeneron need not show the specific "connection
between the patented feature and demand" that is required in cases
involving multi-featured products. Id. at 1364.

49

IN RE: AFLIBERCEPT PATENT LITIGATION                          1:24-MD-3103

\*\* SEALED \*\*

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

In other words, the nexus inquiry has "little work to do" here because Yesafili "contains no feature relevant to consumers' purchasing decisions other than what the patent claims," which is the drug product. Genband, 861 F.3d at 1384, n.2. The multi-feature nexus analysis does not apply to the Product Patent because its claims cover Yesafili itself — a 40 mg/mL ophthalmic formulation containing aflibercept that has recited purity recited in the claims — not a "feature" or "attribute[] of the finished consumer good." Janssen Prods., 109 F. Supp. 3d at 700. Indeed, in assessing another nexus question, the Court previously noted that there was a connection between the Product Patent's claims and certain unexpected properties because Eylea exhibited those properties and Eylea "is the invention disclosed and claimed in the [Product] patent." ECF No. 664 at 197. So too here. The claims require a vial comprising aflibercept, an organic co-solvent, a buffer, and a stabilizing agent and 98% native conformation as measured by size exclusion chromotography. Defendants' Yesafili product — not a component or feature thereof — is the subject of the infringed claims. ECF No. 692 at 74. As a result, "it is not possible to separate" the Product Patent "from the product itself in evaluating consumer demand and

50

Appx366

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

nexus." Janssen Prods., 109 F. Supp. 3d at 700. Thus, nexus is

"apparent." Genband, 861 F.3d at 1384 n.2.

In yet another framing of this concept as applied to the

pharmaceutical context, the nexus requirement is satisfied here

because Defendants "would not be able to make the products proposed

in its" BLA without infringing the Product Patent. Janssen Prods.,

109 F. Supp. 3d at 700. This Court has already held that

Defendants' BLA Product infringes the asserted claims of the

Product Patent. ECF No. 664 at 113; see also PTX-1541. Defendants

have not offered evidence that they have sought, let alone

received, FDA approval to manufacture any alternative biosimilar

aflibercept products that do not infringe. Because "without

infringing the . . . patents" Defendants "would not be able to

make the . . . product described in" their BLA, Defendants'

infringement is a prerequisite to Yesafili's sales and causes

Regeneron's harm. Mylan Inst'l, 857 F.3d at 873.

The nexus requirement is thus satisfied.

B.   Balance of Equities

This third injunctive relief factor requires the court to

balance the harm an injunction would cause to the party opposing

an injunction with the harm the movant would suffer should the

requested injunction be denied. See Robert Bosch LLC v. Pylon

Appx367

IN RE: AFLIBERCEPT PATENT LITIGATION                1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

Manufacturing Corp., 659 F.3d 1142, 1156 (Fed. Cir. 2011).  In performing this balancing of hardships, the court considers only the harm to the parties, not to the interests of third parties such as customers or patients.  Acumed, 551 F.3d at 1330.

Regeneron contends that, absent injunctive relief, Defendants will launch Yesafili and compete directly with Regeneron, placing a substantial hardship on Regeneron.  ECF No. 708-1 at 6-13. Regeneron argues that such sales of Yesafili will cause it to suffer irreparable harms, including market share erosion, price erosion, disruption of payor relationships, harm to the commercial trajectory of Regeneron's Eylea HD product,[5] reputational harm, and loss of research and development funding.  Id.  Regeneron submits testimony from Mr. Clark and Dr. Sheridan to substantiate those harms.  Clark Decl. ¶¶ 6-19; Sheridan Decl. ¶¶ 60-101.

Defendants argue they will suffer lost sales if an injunction is entered.  ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████  ████████████████████  ████████████

██  ██████████  ██████  ██████  ██  ██████████  Regeneron does not

---

[5] Again, the Court does not consider impacts upon Eylea HD in its analysis.

Appx368

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

dispute that at least some sales will be lost if an injunction is entered.  Defendants also suggest the Court should consider in its balancing analysis that (i) Regeneron already has "secured over 12 years of regulatory exclusivity, and significant compensation beyond its R&D investment," Opp. 21, (ii) Regeneron "has been acutely aware of, and planned for, biosimilar competition upon expiration of Eylea's regulatory exclusivity in May 2024," id., (iii) Regeneron is engaged in pending litigation regarding alleged kickbacks and payments to key opinion leaders to incentivize Eylea prescriptions, id. at 21 n.8, and (iv) denial of an injunction would "dampen[]" "manufacturers' incentives, to invest in biosimilars going forward," id. at 22.

Regeneron responds that lost sales of Yesafili are not harms that should be given weight in the balance of hardships analysis, as they would be sales of a product found to infringe Regeneron's patent rights.  ECF No. 747-2 at 11 (citing Qualcomm, 543 F.3d at 704).

The Court finds the balance of hardships favors the requested injunctive relief here.  As described above, the Court finds that the launch and continued sale of Yesafili in the absence of an injunction will result in direct competition between Defendants and Regeneron and cause harms to Regeneron that cannot be fully

Appx369

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---

calculated, quantified, or compensated by remedies available at
law. See Sheridan Decl. ¶¶ 60-101. Forcing a patentee to compete
directly with its patented technology results in substantial
hardship for the patentee. See Robert Bosch, 659 F.3d at 1156
("requiring [the patentee] to compete against its own patented
invention, with the resultant harms described above, places a
substantial hardship on [the patentee]."); Hafco Foundry & Mach.
Co. v. GMS Mine Repair & Maint., Inc., 2018 WL 1786588, at *4
(S.D.W. Va. Apr. 12, 2018) (patentee "will be forced to compete
against its own patent, in itself, a significant hardship").
Absent an injunction, Defendants will launch and sell Yesafili,
and those sales will cause Regeneron to suffer market share
erosion, price erosion and disruption of payor relationships. See
Clark Decl. ¶¶ 6-19; Sheridan Decl. ¶¶ 60-101. In the event
Yesafili were later removed from the market, Defendants' at-risk
launch also would cause Regeneron to suffer loss of reputation and
goodwill should Regeneron attempt to recapture the higher prices
eroded by Defendants. See Clark Decl. ¶ 11; Sheridan Decl. ¶¶ 84-
87. And, in the event Yesafili were later removed from the market
by a subsequent injunction, Regeneron also would suffer loss of
reputation and goodwill associated with being faulted for the
removal of a competing product from the market.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

While Defendants will lose some prospective revenue from issuance of an injunction, those lost sales of Yesafili do not tip the balance in Defendants' favor. Defendants' lost sales would result from their decision to develop and seek to market Yesafili, a drug product the Court has determined infringes valid claims of the Product Patent. Such lost infringing sales typically are not given meaningful weight in a balance of hardships analysis. See Celsis In Vitro, Inc., 664 F.3d at 931 ("[T]he preliminary record suggests that LTC's losses were the result of its own calculated risk in selling a product with knowledge of Celsis' patent."); Acumed, 551 F.3d at 1330 (finding no abuse of discretion where a district court did not consider [the accused infringer's] expenses in designing and marketing the [accused product], since those expenses related to an infringing product"); Qualcomm, 543 F.3d at 704 (agreeing that an accused infringer "should not be permitted to prevail on a theory that successful exploitation of infringing technology shields a party from injunctive relief" (internal quotation marks omitted)); Sanofi-Synthelabo, 470 F.3d at 1383 (noting that the accused infringer's harms were "almost entirely preventable" and "the result of its own calculated risk" (internal quotation marks omitted)); Windsurfing Int'l v. AMF, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects to build a business on

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."). And, even were Defendants' lost sales given full weight here, the Court would find they do not outweigh the above-described irreparable harms that Regeneron would incur in the absence of an injunction.

The Court's conclusion on this factor is further supported by the fact that Defendants have not yet launched Yesafili. An injunction therefore will not force Defendants to withdraw their product from the market and face the potential consequences and harms that may flow from such withdrawal. Instead, an injunction simply will maintain the status quo, a possibility regardless given the Court's infringement findings. See Impax Lab'ys, Inc. v. Aventis Pharms., Inc., 235 F. Supp. 2d 390, 396 (D. Del. 2002) ("[G]ranting the Motion for Preliminary Injunction will cause Impax only minimal hardship since doing so will leave Impax in the same position as it was in before the injunction was granted, i.e., excluded from the riluzole market."). The harm from a patentee's loss of the value of its patent is more substantial than the harm from an accused infringer's inability to enter the market earlier. See Glaxo Grp. Ltd. v. Apotex, Inc., 64 F. App'x 751, 756 (Fed. Cir. 2003) ("[W]ithout the preliminary injunction, Glaxo would

Appx372

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---

lose the value of its patent while Apotex would only lose the
ability to go on to the market and begin earning profits
earlier."). Thus, Regeneron's hardship absent an injunction
outweighs Defendants' hardship if an injunction delays their early
entry into the aflibercept via vial market.

The Court is not persuaded by Defendants' argument that
"Regeneron secured over 12 years of regulatory exclusivity" and
has "planned for" biosimilar sales. Opp. 21. Whether Regeneron
already has received a period of **regulatory** exclusivity is
irrelevant — the issue at hand is Regeneron's **patent** exclusivity.
Likewise, that Regeneron has taken steps to prepare for potential
biosimilar entry does not mean it should be forced to incur the
harms associated with Defendants' infringing sales. See Novartis
Pharms. Corp. v. Accord Healthcare Inc., 2019 WL 2588450, *5 (D.
Del. June 24, 2019) ("[T]he fact that Novartis is preparing, as
best as it can, to deal with legitimate generic competition when
it arrives does not mean that Novartis should be confronted with
premature [(likely infringing)] generic competition."). Finally,
the Court gives no weight to Defendants' references to the
currently unproven and disputed allegations of misconduct with
respect to certain Eylea sales, Opp. 20-21, or to Defendants'
contention that denial of an injunction would dampen industry

Appx373

** SEALED **

**ORDER GRANTING MOTION FOR PERMANENT INJUNCTION**

---

incentives to develop biosimilars, id. at 22, as this factor
considers the balance of hardships only "between a plaintiff and
a defendant," Acumed, 551 F.3d at 1330 ("[T]he balance considered
is only between a plaintiff and a defendant, and thus the effect
on customers and patients alleged by Stryker is irrelevant under
this prong of the injunction test."). The Court further finds
that even if the above arguments were properly considered in a
balance of hardships analysis, they would not tip the scales here
and outweigh the irreparable harms Regeneron would endure in the
absence of an injunction.

   C.   **Public Interest**

      The final factor in the injunctive relief analysis requires
the Court to consider the impact of an injunction on the public
interest. See Hybritech Inc. v. Abbott Lab'ys, 849 F.2d 1446,
1458 (Fed. Cir. 1988). There is a well-recognized "public interest
in protecting rights secured by valid patents." Id.; see also,
e.g., Sanofi-Synthelabo, 470 F.3d at 1383-84 (Fed. Cir. 2006);
Patlex Corp. v. Mossinghoff, 758 F.2d 594, 599 (Fed. Cir. 1985).
This factor "nearly always weighs in favor of protecting property
rights in the absence of countervailing factors, especially when
the patentee practices his inventions." Apple Inc. v. Samsung
Elecs. Co., 809 F.3d 633, 647 (Fed. Cir. 2015).

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

Regeneron contends the public interest factor favors entry of an injunction because the public benefits from innovation in the pharmaceutical industry and that such innovation is fostered by intellectual property rights. ECF No. 708-2 at 14-16. Regeneron points out that it has invested billions to discover and develop its own medicines and argues that this work is made possible by Regeneron's intellectual property and the sales of its patent-protected products, including Eylea and Eylea HD. Id. at 14; Clark Decl. ¶ 19.

For their part, Defendants contend this factor counsels against an injunction because the public has an interest in access to lower-cost aflibercept products. Opp. 22. Defendants also advance a pair of "equity" arguments, suggesting that (i) "equity counsels against issuance of an injunction based on patent claims that were drafted after Defendants developed their Yesafili formulation," id. at 14, and (ii) because "Regeneron stipulated it would not seek an injunction for unasserted Complaint patents, which include U.S. Patent No. 11,066,458 ('458 patent') . . . it can hardly complain if no injunction issues for the similarly styled '865 patent claims," id. at 25.

The Court finds the public interest factor favors entry of an injunction. Intellectual property rights promote innovation

59

IN RE: AFLIBERCEPT PATENT LITIGATION                        1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

across a number of fields, including pharmaceuticals. The Court finds there exists a public interest in protecting such rights and encouraging this innovation. See Sanofi-Synthelabo, 470 F.3d at 1383-84; Hybritech, 849 F.2d at 1458; Patlex Corp., 758 F.2d at 599. The Court has found Defendants' sales of Yesafili would infringe valid claims of the Product Patent. The public has an interest in safeguarding these patent rights.

The Court finds the public interest in access to lower-cost aflibercept products is outweighed by the compelling public interest in fostering pharmaceutical innovation. In reaching this conclusion, the Court finds itself in company with most courts that have considered this issue, including the Federal Circuit. See, e.g., Hybritech, 849 F.2d at 1458; Douglas Dynamics, 717 F.3d at 1346 ("[T]he public has a greater interest in acquiring new technology through the protections provided by the Patent Act than it has in buying 'cheaper knock-offs.'"). The Court is not persuaded by the authority Defendants rely upon to argue the public's interest in access to less expensive medicines outweighs its interest in safeguarding patent rights and promoting innovation. Genentech, Inc. v. Immunex R.I. Corp., 395 F. Supp. 3d 357, 366 n.6 (D. Del. 2019); Biogen, 2023 WL 7130655, at *4. Defendants' cited cases address this factor only in dicta.

60

Appx376

## ** SEALED **

### ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

Further, both Genentech and Biogen ultimately cite to and rely upon the Federal Circuit's decision in Hybritech. Hybritech, however, affirmed the grant of an injunction. Id. at 1458. Indeed, the district court in Hybritech recognized that the public interest in guarding patent rights "is embodied in the Constitution and our patent laws." Hybritech, Inc. v. Abbott Lab'ys, 1987 WL 123997, at *21 (C.D. Cal. July 14, 1987). While the Federal Circuit did note that "the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief," Hybritech, 849 F.2d at 1458, the district court was able to protect such interests by tailoring its injunction to ensure (1) continuity of care for patients already being monitored with certain of the accused products and (2) that "the public will [not] have to switch to an alternative technology that is presumably less effective," Hybritech, 1987 WL 123997, at *21. No analogous public interests are at issue here — Yesafili is not yet for sale, so no continuity of care concerns are presented, and there has been no suggestion that Regeneron's own aflibercept via vial product is not at least an equally effective treatment that will be available to patients in the absence of Yesafili.

Appx377

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

Finally, the Court gives no weight to Defendants' pair of "equity" arguments. With respect to Defendants' suggestion that "equity counsels against issuance of an injunction based on patent claims that were drafted after Defendants developed their Yesafili formulation," Opp. 24, the Court notes that Defendants have offered no authority for the proposition that Regeneron may not enforce the Product Patent because it obtained those claims after the development of Yesafili had begun.[6] Even if such "equity" arguments were properly considered in a public interest analysis, the Court does not perceive any unfairness in Regeneron's enforcing these claims against the Defendants, which had access to the publicly available application that disclosed the claimed inventions for more than fifteen years, before they even began the

---

[6] Defendants do not contend the doctrine of prosecution laches applies here. See Cancer Rsch. Tech. Ltd. v. Barr Lab'ys, 625 F.3d 724, 728 (Fed. Cir. 2010) (explaining that "[p]rosecution laches is an equitable defense to a charge of patent infringement" that "may render a patent unenforceable when it has issued only after an unreasonable and unexplained delay in prosecution that constitutes an egregious misuse of the statutory patent system under the totality of the circumstances" (quotations omitted)). And, even if Defendants had plead this affirmative defense, which they did not, see ECF No. 505-4; see also Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . laches . . . ."), they have not demonstrated the necessary "unreasonable and unexplained delay" or "egregious misuse."

62

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

development of Yesafili. Nor does the timing of the Product
Patent's issuance create any unfairness with respect to its patent
term, which is tied not to the date of issue but rather to the
date on which the original non-provisional application was filed
in 2007. The Court is likewise unpersuaded by Defendants' argument
that because "Regeneron stipulated it would not seek an injunction
for unasserted Complaint patents, which include U.S. Patent No.
11,066,458 ('458 patent') . . . it can hardly complain if no
injunction issues for the similarly styled '865 patent claims."
Opp. 25. Regeneron stipulated it would not seek an injunction on
the '458 Patent and certain other patents specifically because it
was seeking an expedited schedule and the opportunity to pursue
injunctive relief on the Product Patent. ECF No. 78 at 1-2; ECF
No. 90 at 10-12, 24.

Thus, for these reasons, the Court finds this final factor
likewise counsels in favor of granting the requested injunctive
relief. One additional basis, however, requires specific mention
as the Court does not consider it a valid ground in its public
interest analysis.

Regeneron urges that the public interest is served by denying
Biocon access to the market as ▌▌ ▌▌▌ ▌ ▌▌▌ ▌▌
▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

Appx379

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION



Defendants also argue that the Court need not credit the arguments made regarding ███████ █████ ████████████ █████ █████

███████████████████████████████████████████████████████████

███ █████████ ███ ████████ █████ ██████ ███ ██ ██ ██ ███

According to Defendants, the FDA review and approval process involves the review of manufacturing documentation, in-person inspection of manufacturing facilities, and confirmation of compliance with Good Manufacturing Practices. (Id.; ECF No. 722-17, Abraham Decl. ¶¶ 20-22; see also, e.g., FDA Approves First Interchangeable Biosimilars to Eylea (FDA noting that "[a]ll

Appx380

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

biological products are approved only after they meet FDA's rigorous approval standards.")).[7]

Regarding Regeneron's argument that the Court must consider



In addition, the Court rejects this consideration in its public interest factor assessment given its role. Courts do not — or, at least, should not — declare what the law is or make

---

[7] https://www.fda.gov/drugs/news-events-human-drugs/fda-approves-first-interchangeable-biosimilars-eylea-treat-macular-degeneration-and-other-eye.

[8]



IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

policy. That responsibility is reserved unto the other branches of government.    Here,  Regeneron  urges  the  Court  to  assume  the remaining steps of the legislative process (bicameral passage and Presidential  signature  or  overridden  veto)  and  instill  the  force of  law  into  introduced[9]  and  pending  legislation.    This  Court declines that invitation.

* * *

The Court recognizes the apparent tension between traditional patent law concepts and the BPCIA, particularly as it pertains to the eBay public interest factor.   Of  course,  "the  public  has  a well-recognized interest in protecting patent rights and fostering innovation," Apple, 809 F. 3d at 647, Congress also has enacted significant  legislation,  the  BPCIA,  that  is  designed  to  foster competition  and  make  alternative  and  lower-cost  therapeutics available to patients, and Courts have expressly found in the BPCIA biosimilar  context  that  "[f]or  pharmaceutical  drugs  that  prolong and save lives, there is a critical public interest in affordable access to those drugs," Genentech, Inc. v. Immunex Rhode Island Corp., 395 F. Supp. 3d 357, 366 n.6 (D. Del. 2019), aff'd, 964

---

[9] Respectfully, and not specific to ███████████, the only constraint on introducing legislation, even at the federal level, is the sponsor's imagination, which only highlights the need for courts to refrain from fast-forwarding past the necessary steps set forth in the Constitution.

Appx382

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

\*\* SEALED \*\*

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

F.3d 1109 (Fed. Cir. 2020); see also Janssen Biotech, Inc. v. Celltrion Healthcare Co., 210 F. Supp. 3d 244, 252 (D. Mass. 2016) (recognizing a strong public interest in "[a] less expensive biosimilar alternative to compete fairly with [the reference product]").  The parties repeatedly made clear – during the contentious, protracted dispute over the proper schedule governing discovery and trial – this matter presented one of the first, if not the first, BPCIA case to proceed on a trial trajectory.  None of the cases that Regeneron provides to the Court are directed to biosimilar litigation, and indeed they mostly pre-date the BPCIA, and in some cases, pre-date even eBay.

Nonetheless, after considering the applicable authority, even if not squarely within BPCIA's umbrella, the Court ultimately concludes that the public interest factor also weighs in favor of permanent injunctive relief here.

V.    CONCLUSION

After a nine-day bench trial, the Court held that Defendants infringed claims 4, 7, 9, 11, 14, 15, 16, and 17 of the '865 Patent and that Defendants did not demonstrate by clear and convincing evidence that claims 4, 7, 9, 11, 14, 15, 16, and 17 of the '865 Patent are anticipated or obvious in light of the prior art or invalid under 35 U.S.C. § 112 for lack of written description,

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

lack of enablement, or indefiniteness.  Upon consideration of Plaintiff's Motion for Permanent Injunction, accompanying Memorandum in Support, exhibits attached thereto, and all the evidence presented before this Court, including at trial, for the reasons set forth below, it is **ORDERED THAT:**

Plaintiff's Motion for a Permanent Injunction is **GRANTED.**

Pursuant to Federal Rule of Civil Procedure 65(d)(1), and for the reasons provided herein, the Court makes the following findings and conclusions based upon the record developed in connection with Regeneron's motion.

1.   Defendants sought FDA approval via their Biologics License Application No. 761274 to market a biosimilar version of Regeneron's drug Eylea.  Defendants' product that is the subject of this BLA is also known as "Yesafili."

2.   After a nine-day bench trial, the Court determined that Defendants would infringe claims 4, 7, 9, 11, 14, 15, 16, and 17 of the '865 Patent by making, using, selling, or offering for sale Yesafili, or importing Yesafili into the United States.

3.   After the same nine-day bench trial, the Court determined that that Defendants did not demonstrate by clear and convincing evidence that claims 4, 7, 9, 11, 14, 15, 16, and 17 of the '865 Patent are anticipated or obvious in light of the prior

68

** SEALED **

### ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

art or invalid under 35 U.S.C. § 112 for lack of written description, lack of enablement, or indefiniteness.

4.   Regeneron has demonstrated that any manufacture, importation, or commercialization of Yesafili prior to the expiry of the '865 patent will cause it irreparable harm.

5.   Regeneron has demonstrated that the balance of hardships favors Regeneron, not Defendants.

6.   Regeneron has demonstrated that the public interest favors granting the permanent injunction in order to protect intellectual property rights and because the public is already able to receive aflibercept via vial in the form of Eylea.

   **A.   Scope of Injunction and Meet-and-Confer Requirement**

The Court is mindful that there are complexities associated with ███████████████████████████████████████ — markets which are beyond the territorial reach of U.S. patent laws. <u>Microsoft Corp. v. AT&T Corp.</u>, 550 U.S. 437, 454-55 (2007) ("The presumption that United States law governs domestically but does not rule the world applies with particular force in patent law."). In order to ensure that the injunction entered by this Court does not ████████████ ████████████████████████████████████████████ ████████████████████████, **the Court hereby orders the parties**

69

IN RE: AFLIBERCEPT PATENT LITIGATION                1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

**to meet and confer regarding the conditions and scope of the injunction and jointly submit to the Court a proposed form of injunction order within five (5) business days of entry of this order.**  The Court further finds that because the only harm that Regeneron presented in the record of these injunction proceedings is directed to commercial marketing within the U.S., the proposed form of injunction should likewise be restricted to prohibiting the commercial sale to customers in the U.S. of the Biocon BLA No. 761274 product that the FDA approved May 20, 2024.

**B.    Meet-and-Confer on Public Order**

The Court is filing this Order under seal, as the Court understands that there is information herein that the parties have designated Confidential or Outside Counsel Eyes Only under the Protective Order.  The Court expects the parties to confer on preparing and submitting a public version containing appropriate redactions to protect each party's confidential information.  The parties shall meet and confer to discuss which portions of this Order can be unsealed.  **They shall submit a joint proposed redacted version for the Court's review within seven (7) days of the entry of this Order.**

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

C.   **Order Pursuant To Fed. R. Civ. P. 54(B)**

At a recent hearing before the Court, both Regeneron and
Mylan/Biocon stated their interest in having the Court further
certify its Trial Decision and this order pursuant to Federal Rule
of Civil Procedure 54(b) for entry of final judgment in accordance
with the issues previously tried, including the Court's Findings
of Fact and Conclusions of Law (ECF No. 664) pertaining to the
patents asserted, namely the '572 Patent; the '601 Patent; and the
'865 patent.[10]  (ECF No. 778, May 17, 2024 Hearing Tr. at 14-15
(Regeneron), 13-14 (Mylan/Biocon)).  Having considered the matter,
and in view of the agreement by the parties, and in view of the
facts set forth below, this Court agrees that entry of judgment
pursuant to Rule 54(b) is appropriate, and as such this Order
further directs entry of final judgment as to Counts 12, 17, and
21 of Regeneron's Complaint pursuant to Federal Rule of Civil
Procedure 54(b).  (ECF No. 1 (Complaint)).

Federal Rule of Civil Procedure 54(b) provides, in relevant
part, "[w]hen an action presents more than one claim for relief,

---

[10] The Court notes the parties' respective interest in the swift
adjudication of this matter has vacillated during this phase's
pendency.  Regardless, for the reasons set forth hereinafter, the
Court finds it appropriate to certify the judgment(s) rendered to
date under Rule 54(b) so the parties may take their respective
appeals.

Appx387

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

whether as a claim, counterclaim, crossclaim, or third-party claim, or when multiple parties are involved, the court may direct entry of final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b).

The Supreme Court has established a two-part test for determining when Rule 54(b) certification is appropriate. First, the district court must determine that its decision is a "final" judgment as to the relevant claim. Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 7 (1980). Second, the district court must expressly determine that there is "no just reason for delay." Id. at 8. For the reasons explained below, both requirements are satisfied here.

The Court hereby states that for purposes of Rule 54(b), the Court has rendered a "final" judgment on the '572, '601, and '865 patents in its Trial Decision, because it has ruled on Regeneron's infringement claims, Defendants' dispositive defenses, and on Regeneron's request for injunctive relief (which Regeneron limited to the '865 patent). And, as set forth below, there is also no just reason for delay. Thus, the two-part test is satisfied here.

Uncontroverted facts in support of Rule 54(b) certification include:

Appx388

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

_____

1. In June 2023, the Court presided over a two-week trial
   on Regeneron's claims of infringement of claims 4, 7, 9,
   11, and 14-17 of the '865 patent, claims 6 and 25 of
   Regeneron's '572 Patent; and claims 11 and 19 of
   Regeneron's '601 Patent; as well as Defendants'
   counterclaims of invalidity of those patent claims.

2. On December 27, 2023, the Court entered findings of fact
   and conclusions of law holding that claims 4, 7, 9, 11,
   and 14-17 of the '865 patent asserted by Regeneron at
   trial were infringed and not invalid; that claims 6 and
   25 of the '572 patent were infringed and invalid; and
   that claims 11 and 19 of the '601 patent were infringed
   and invalid.

3. With the present Order, the Court is also issuing
   judgment on Regeneron's request for permanent
   injunction, which resolves the sole remedy request by
   Regeneron for the '865 patent.

4. No claims or counterclaims remain with respect to the
   '865 patent, the '572 patent, or the '601 patent.

5. On January 26, 2024, both Regeneron and Mylan/Biocon
   filed protective Notices of Appeal to the Court of
   Appeals for the Federal Circuit.  The Federal Circuit

Appx389

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

dismissed those appeals for lack of a final judgment on
April 12, 2024.

6.  On May 17, 2024, both parties represented to this Court
that they wished the Court to enter a final judgment
pursuant to Federal Rule of Civil Procedure 54(b), to
allow the parties to proceed to an appeal of the Court's
judgments on the '865, '572, and '601 patents.

7. There is no just reason to delay the Court's judgment
concerning these patents.  The Court's conclusive
findings in the Trial Decision on the '865, '572, and
'601 patents are separable from and not intertwined with
Regeneron's remaining claims and Defendants' related
counterclaims, which involve alleged infringement and
invalidity defenses of other patents.

8. There is no risk that further proceedings in the case
between Regeneron and Mylan/Biocon will moot the need
for Federal Circuit review of the Court's findings of
fact and conclusions of law in the Trial Decision, or in
the present Injunction Order.

9. An expedited Federal Circuit review will also serve
principles of judicial efficiency, as separate
defendants before this Court in multidistrict litigation

Appx390

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

are also involved in litigation with Regeneron involving these same patents.

10.     The Court's merits decisions with respect to the '572, '601, and '865 patents, and Defendants' BLA product, are ripe for appellate review now, and will not be rendered moot by any proceedings currently pending before this Court involving Regeneron and Defendants for that accused product.

11.     The equities also weigh in favor of appeal of the Court's findings of fact and conclusions of law in the Trial Decision, instead of delaying review pending the adjudication of the remaining unrelated claims.   As noted above, both parties previously filed Notices of Appeal of the Court's judgment, and both parties have represented to this Court their interest in having issues addressed and resolved promptly on appeal.

12.     There further is a public interest in having these claims under the BPCIA resolved, because the outcome at the Federal Circuit may ultimately facilitate Defendants' product reaching the market earlier without infringement liability risk.

75

Appx391

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

### i.  The Court's Decision as to the '572, '601, and '865 Patents Is Now Final

"The Supreme Court has stated that a district court's judgment is final where it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" <u>W.L. Gore & Assocs., Inc. v. Int'l Med. Prosthetics Rsch. Assocs., Inc.</u>, 975 F.2d 858, 863 (Fed. Cir. 1992) (quoting <u>Catlin v. United States</u>, 324 U.S. 229, 233 (1945)).

This Court has rendered a "final" judgment on the '865 patent because it has ruled that the claims of the '865 patent asserted by Regeneron at trial were infringed and not invalid, and with this Order is adjudicating Regeneron's request for injunctive relief.  <u>See</u> <u>id.</u> ("Because the infringement claim and several dispositive defenses were ruled upon, the district court's judgment was final."); <u>Creative Compounds, LLC v. Starmark Lab'ys</u>, 2009 WL 5171738, at *1 (Fed. Cir. Dec. 30, 2009).

The Court has rendered a "final" judgment on the '572 and '601 patents because it has ruled that the claims of those patents asserted by Regeneron at trial were infringed but invalid, and in view of that ruling, Regeneron is not permitted any further remedy.

Thus, the Court's holdings as to the validity and infringement of the asserted claims of the '865 patent, and invalidity and infringement of the asserted claims of the '572 and '601 patents,

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

are final and appealable.  See PODS, Inc. v. Porta Stor, Inc., 484

F.3d 1359, 1365 (Fed. Cir. 2007).

### ii.  There Is No Just Reason for Delay of Entry of Final Judgment

"[I]n deciding whether there are no just reasons to delay the

appeal of individual final judgments in setting such as this, a

district court must take into account . . . the equities involved."

Curtiss-Wright, 446 U.S. at 8.  Courts have determined that equity

favors entry of final judgment under Rule 54(b) when appeal of

such a judgment could bring the generic version of a pharmaceutical

product to market faster than would occur absent such an entry.

See Sun Pharms. Indus. Ltd. v. Eli Lilly & Co., 2009 WL 3497797,

at *2 (E.D. Mich. Oct. 29, 2009).

Regeneron acknowledges that, "[a]s of May 18, 2024 . . . the

only impediments to Defendants' planned launch of Yesafili are

Regeneron's patent rights," specifically the '865 patent.  (ECF

No. 708-3 at 2).  Defendants wish to appeal the Court's adverse

infringement and validity judgments on the '865 patent.  Regeneron

wishes to appeal the Court's adverse invalidity judgments against

it on the '572 and '601 patents.  (ECF No. 778, May 17, 2024

Hearing Tr. at 14-15 (Regeneron), 13-14 (Mylan/Biocon)).

Both parties also concede that prompt appeal of the Court's

holdings as to the '865 patent would, if the Defendants prevail on

IN RE: AFLIBERCEPT PATENT LITIGATION                      1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

the merits, allow the Defendants to bring Yesafili to market
shortly after that date.  (ECF No. 708-3 at 2; see also ECF No.
779, May 17, 2024 Hearing Tr. at 13-14).

Defendants have expressed that expedited entry of Yesafili to
the market has the potential to lower costs for consumers, which
expands access to a wider patient population that would benefit
from those lower costs in battling their (potentially sight-
threatening) ophthalmic disorders.  (ECF No. 722-1, Defendants'
Opposition Brief at 2-3; ECF No. 774, Defendants' TRO Brief at 15;
ECF No. 691 at 10).  Defendants have further emphasized the
critical importance of being first to market, and not losing the
advantage they have obtained against their other competitors by
litigating early under the BPCIA.  (ECF No. 722-1, Defendants'
Opposition Brief at 21; ECF No. 691 at 6).

Regeneron wishes to appeal to try to preserve the patents
that the Court has held invalid, to forestall further market entry,
or receive damages if the Court's invalidity findings warrant
reversal.  (ECF No. 680-1).

Moreover, regardless of the Federal Circuit's decision as to
the validity or infringement of the '865, '572, and '601 patent
claims, resolution of an appeal serves the public interest by
"resolving questions of patent validity."  <u>Cardinal Chem. Co. v.</u>

## ** SEALED **

### ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

Morton Int'l, Inc., 508 U.S. 83, 100 (1993).  This is especially important here, where Regeneron is presently asserting claims from these same patents against a series of separate Defendants, which cases were recently consolidated before this Court by the Judicial Panel on Multidistrict Litigation.  (MDL ECF No. 1 (24-md-3103-TSK)).  The Court encourages both parties to cooperate to expedite their respective appeals, as this will also contribute to judicial efficiency and conservation of resources.

"[I]n deciding whether there are no just reasons to delay," the Court also should "consider such factors as whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals." Curtis-Wright, 446 U.S. at 8.  For purposes of assessing finality under Rule 54(b), infringement claims and invalidity counterclaims of a patent are separate from infringement claims and invalidity counterclaims of other patents assigned to the same entity even if directed to the same subject matter.  See Sun Pharms., 2009 WL 3497797, at *2, aff'd, 611 F.3d 1381 (Fed. Cir. 2010).

Following Sun, the Court's holdings — namely that the asserted claims of the '865 patent asserted by Regeneron at trial

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PERMANENT INJUNCTION

---

were both (1) not invalid and (2) infringed by the Defendants'
BLA, and also that the asserted claims of the '572 and '601 patents
asserted by Regeneron at trial were both (1) invalid and (2)
infringed by the Defendants' BLA — are unrelated to whether any of
the claims of the other patents Regeneron has asserted against the
Defendants are invalid or infringed.

Similarly, the issues that the Federal Circuit would rule
upon remain the same: whether the '865 patent is not invalid and
infringed by the Defendants' BLA, and whether the '572 and '601
patents are invalid and infringed.  (ECF No. 1, Seventeenth Cause
of Action, ¶¶ 183-92; ECF No. 435, Count 17, ¶¶ 153-59 (the '865
patent), Twenty-First Cause of Action ¶¶ 223-32 (the '572 patent),
Twelfth Cause of Action, ¶¶ 133-42 (the '601 patent)).

Thus, the Court hereby **ORDERS** entry of final judgment pursuant
to Federal Rule of Civil Procedure 54(b) for Counts 12, 17, and
21.

It is so **ORDERED**.

The Clerk is **DIRECTED** to transmit copies of this Order <u>only</u>
to counsel for Regeneron, Mylan, and Biocon.

DATED: June 11, 2024

_Tom S Kleh_
_____
THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA

Appx396

# UNITED STATES DISTRICT COURT

for the

Northern District of West Virginia

IN RE: AFLIBERCEPT PATENT
LITIGATION

MDL NO. 1:24-MD-3103

This Document Relates to:
No. 1:22-CV-61

## JUDGMENT IN A CIVIL ACTION

The court has ordered that:

Other: <u>The Court hereby **ORDERS** entry of final judgment pursuant to Federal Rule of Civil Procedure 54(b) for Counts 12, 17, and 21.</u>

This action was:

Decided by Judge: <u>Thomas S. Kleeh</u>

Date: <u>June 11, 2024</u>

*CLERK OF COURT*
Cheryl Dean Riley

<u>/s/ S. Cole</u>
*Signature of Clerk of Deputy Clerk*

Appx397

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

In re: Aflibercept Patent Litigation

MDL No. 1:24-md-03103-TSK

**THIS ORDER APPLIES TO**

Case No. 1:22-CV-0061-TSK

**ORDER FOR INJUNCTIVE RELIEF
AGAINST BIOCON AND MYLAN**

Upon consideration of Plaintiff's Motion for Permanent Injunction, accompanying Memorandum in Support, exhibits attached thereto, and all of the evidence presented before this Court, including at trial, for the reasons set forth in the Court's June 11, 2024 Order Granting Motion for Permanent Injunction (Dkt. No. 162), it is

ORDERED THAT:

Pursuant to Rule 65(d)(1)(A), the reasons why this injunction is being issued are detailed in the Court's June 11, 2024 Order Granting Motion for Permanent Injunction (Dkt. No. 162), while the Court's findings and conclusions with respect to infringement and validity are detailed in the Court's Memorandum Opinion and Order Following Bench Trial (22-cv-61, Dkt. No. 664).

Pursuant to Rules 65(d)(1)(B)-(C), the terms of the permanent injunction and the acts restrained are as follows:

Defendants, their officers, agents, servants, representatives and employees and any and all persons or entities acting by, through, under or in active concert with any or all of them, are hereby enjoined and restrained from offering to sell or selling within the United States without a license from Regeneron any product that is the subject of BLA No. 761274 that the FDA approved May 20, 2024, until the expiry of U.S. Patent No. 11,084,865 ("the '865 Patent").

Defendants, their officers, agents, servants, representatives and employees and any and all persons or entities acting by, through, under or in active concert with any or all of them shall be so enjoined until the expiry of the '865 Patent.

Pursuant to Rule 65(d)(2), Biocon shall provide copies of this order to its respective officers and any employee with current and ongoing responsibility for Biocon's development or commercialization of YESAFILI as soon as possible and no later than three (3) business days of the issuance of this order. To the extent Mylan Pharmaceuticals Inc. has an employee with current

1

Appx399

and ongoing responsibility for Biocon's development or commercialization of YESAFILI, a copy of this order shall be provided to that employee within three (3) business day of the issuance of this order.

Nothing herein shall impact, disrupt or otherwise restrict or prohibit any activities undertaken in the United States solely for commercialization of product in non-U.S. markets.

It is so ORDERED.

DATED: June 21, 2024

_Tom S Kleh_
_____

Hon. Thomas S. Kleeh, Chief Judge

2

Appx400



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE
#### United States Patent and Trademark Office

July 22, 2022

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *11,084,865*
ISSUE DATE: *August 10, 2021*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Rodney Glover
Certifying Officer



**PLAINTIFF'S EXHIBIT**

CASE NO.      1:22-cv-00061-TSK

EXHIBIT NO.   **PTX-0002**



US011084865B2

(12) **United States Patent**
Furfine et al.

(10) Patent No.: **US 11,084,865 B2**
(45) Date of Patent: **\*Aug. 10, 2021**

(54) **VEGF ANTAGONIST FORMULATIONS SUITABLE FOR INTRAVITREAL ADMINISTRATION**

(71) Applicant: **REGENERON PHARMACEUTICALS, INC.,** Tarrytown, NY (US)

(72) Inventors: **Eric Furfine**, Concord, MA (US); **Daniel Dix**, LaGrangeville, NY (US); **Kenneth Graham**, Pleasant Valley, NY (US); **Kelly Frye**, Mendham, NJ (US)

(73) Assignee: **REGENERON PHARMACEUTICALS, INC.,** Tarrytown, NY (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/739,559**

(22) Filed: **Jan. 10, 2020**

(65) **Prior Publication Data**

US 2020/0131246 A1 Apr. 30, 2020

**Related U.S. Application Data**

(60) Continuation of application No. 16/582,486, filed on Sep. 25, 2019, which is a continuation of application No. 16/159,269, filed on Oct. 12, 2018, now Pat. No. 10,464,992, which is a continuation of application No. 15/879,294, filed on Jan. 24, 2018, now Pat. No. 10,400,025, which is a continuation of application No. 15/095,606, filed on Apr. 11, 2016, now Pat. No. 9,914,763, which is a continuation of application No. 14/330,096, filed on Jul. 14, 2014, now Pat. No. 9,340,594, which is a continuation of application No. 13/914,996, filed on Jun. 11, 2013, now Pat. No. 8,802,107, which is a continuation of application No. 13/329,770, filed on Dec. 19, 2011, now Pat. No. 8,481,046, which is a continuation of application No. 12/833,417, filed on Jul. 9, 2010, now Pat. No. 8,092,803, which is a continuation of application No. 12/560,885, filed on Sep. 16, 2009, now Pat. No. 7,807,164, which is a division of application No. 11/818,463, filed on Jun. 14, 2007, now Pat. No. 7,608,261.

(60) Provisional application No. 60/814,484, filed on Jun. 16, 2006.

(51) **Int. Cl.**

| A61K 38/17 | (2006.01) |
|---|---|
| A61K 38/18 | (2006.01) |
| C07K 19/00 | (2006.01) |
| C07K 14/71 | (2006.01) |
| A61K 9/00 | (2006.01) |
| A61K 9/19 | (2006.01) |
| C07K 14/47 | (2006.01) |
| A61M 5/178 | (2006.01) |
| A61K 47/26 | (2006.01) |
| A61K 47/02 | (2006.01) |
| A61K 47/10 | (2017.01) |

(52) **U.S. Cl.**
CPC ............ *C07K 14/71* (2013.01); *A61K 9/0019* (2013.01); *A61K 9/0048* (2013.01); *A61K 9/19* (2013.01); *A61K 38/179* (2013.01); *A61K 38/1793* (2013.01); *A61K 47/02* (2013.01); *A61K 47/10* (2013.01); *A61K 47/26* (2013.01); *A61M 5/178* (2013.01); *C07K 14/47* (2013.01); *C07K 14/4705* (2013.01); *C07K 2319/00* (2013.01); *C07K 2319/30* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 6,100,071 | A | 8/2000 | Davis-Smyth et al. |
|---|---|---|---|
| 6,171,586 | B1 | 1/2001 | Lam |
| 6,897,294 | B2 | 5/2005 | Davis-Smyth et al. |
| 7,052,691 | B2 | 5/2006 | Sleeman et al. |
| 7,608,261 | B2 † | 10/2009 | Furfine |
| 8,110,546 | B2 | 2/2012 | Dix et al. |
| 9,340,594 | B2 † | 5/2016 | Furfine |
| 9,580,489 | B2 † | 2/2017 | Furfine |
| 10,464,992 | B2 | 11/2019 | Furfine et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| JP | 10273450 | 10/1998 |
|---|---|---|
| JP | H11510170 | 9/1999 |

(Continued)

OTHER PUBLICATIONS

Petition for Inter Partes Review of U.S. Pat. No. 10,464,992, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 59 pgs.
File History of U.S. Pat. No. 10,464,992, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 124 pgs.
Declaration of Dr. Reiner Gentz, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 76 pgs.

(Continued)

*Primary Examiner* — Christine J Saoud
*Assistant Examiner* — Jon M Lockard
(74) *Attorney, Agent, or Firm* — Karl Bozicevic; Bozicevic Field & Francis LLP

(57) **ABSTRACT**

Ophthalmic formulations of a vascular endothelial growth factor (VEGF)-specific fusion protein antagonist are provided suitable for intravitreal administration to the eye. The ophthalmic formulations include a stable liquid formulation and a lyophilizable formulation. Preferably, the protein antagonist has an amino acid sequence of SEQ ID NO:4.

**64 Claims, No Drawings**
**Specification includes a Sequence Listing.**

## (56) References Cited

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2003/0113316 A1 | 6/2003 | Kaisheva et al. |
| 2003/0138417 A1 | 7/2003 | Kaisheva et al. |
| 2004/0197324 A1 | 10/2004 | Liu et al. |
| 2005/0281831 A1 | 12/2005 | Davis-Smyth et al. |
| 2006/0217311 A1 | 9/2006 | Dix et al. |
| 2008/0085276 A1 | 4/2008 | Wiegand et al. |
| 2014/0012227 A1 | 1/2014 | Sigg et al. |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 2002516871 | | 6/2002 |
| WO | WO 97/04801 | | 2/1997 |
| WO | WO1998045331 | † | 10/1998 |
| WO | WO 99/62536 | | 12/1999 |
| WO | WO2000075319 | † | 12/2000 |
| WO | WO 2004/091658 | | 10/2004 |
| WO | WO 2005/000895 | | 1/2005 |
| WO | WO 2005011734 | | 2/2005 |
| WO | WO 2005/020972 | | 3/2005 |
| WO | WO 2006/047325 | | 5/2006 |
| WO | WO 2006/088650 | | 8/2006 |
| WO | WO 2006/104852 | | 10/2006 |

### OTHER PUBLICATIONS

Fraser et al., "Single Injections of Vascular Endothelial Growth Factor Trap Block Ovulation in the Macaque and Produce a Prolonged, Dose-Related Suppression of Ovarian Function," *J. Clin. Endocrinol. & Metab.*, 90(2):1114-1122 (2004).

Wulff et al., "Prevention of Thecal Angiogenesis, Antral Follicular Growth, and Ovulation in the Primate by Treatment with Vascular Endothelial Growth Factor Trap R1R2," *Endocrinology*, 143(7):2797-2807 (2002).

Certificate of Correction dated Mar. 3, 2020, in U.S. Pat. No. 10,464,992, 1 pg.

Holash et al., "VEGF-Trap: A VEGF blocker with potent antitumor effects," *PNAS*, 99(17):11393-11398 (2002).

Response to Office Action in U.S. Appl. No. 12/835,065, filed Nov. 22, 2011, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 4 pgs.

Declaration Pursuant to 37 C.F.R. § 1.131 of Daniel B. Dix, Kelly Frye, and Susan Kautz in Support of Response to Office Action in U.S. Appl. No. 12/835,065, filed Nov. 22, 2011, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 11 pgs.

Resume of Reiner Gentz, Ph.D., as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 3 pgs.

Rudge et al., "VEGF Trap as a Novel Antiangiogenic Treatment Currently in Clinical Trials for Cancer and Eye Diseases, and VelociGene®-based Discovery of the Next Generation of Angiogenesis Targets," *Cold Spring Harbor Symposia on Quantitative Biology*, 70:411-418 (2004).

Chi et al., "Physical Stability of Proteins in Aqueous Solution: Mechanism and Driving Forces in Nonnative Protein Aggregation," *Pharmaceutical Research*, 20(9):1325-1336 (2003).

Bontempo, "Preformulation Development of Parenteral Biopharmaceuticals," *Drugs and the Pharmaceutical Sciences*, 85:91-108 (1997).

"Guidance for Industry Q1A(R2) Stability Testing of New Drug Substances and Products," U.S. Department of Health and Human Services, Food and Drug Administration, Rockville, MD, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 25 pgs.

Parkins et al., "The formulation of biopharmaceutical products," *Pharmaceutical Science & Technology Today*, 3(4):129-137 (2000).

Randolph et al., "Surfactant-Protein Interactions," *Rational Design of Stable Protein Formulations*, pp. 159-175, Springer, Boston, MA (2002).

"Phosphate buffer," Cold Spring Harbor Protocols, 2006:pdb. rec8543, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 1 pg.

Lucentis® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 14 pgs.

Avastin® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 37 pgs.

Remicade® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 58 pgs.

Xolair® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 17 pgs.

Raptiva® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 36 pgs.

Simulect® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 7 pgs.

Herceptin® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 2 pgs.

Andersen et al., "Recombinant protein expression for therapeutic applications," *Current Opinion in Biotechnology*, 13:117-123 (2002).

Janeway et al., "The structure of a typical antibody molecule," Immunobiology: The Immune System in Health and Disease, 5th edition, New York: Garland Science, 6 pgs. (2001).

Drug Vehicle (Code C927), National Cancer Institute (NCI), retrieved Jan. 6, 2021, from <https://ncithesaurus.nci.nih.gov/ncitbrowser/ ConceptReport jsp?dictionary=NCI_Thesaurus&ns=ncit&code= C927 >, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 2 pgs.

Controls in SCI experiments, RegenBase, retrieved Jan. 6, 2021, from <http://regenbase.org/control-groups.html>, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 2 pgs.

Fraser, Hamis M., et al., "Single Injections of Vascular Endothelial Growth Factor Trap Block Ovulation in the Macaque and Produced Prolonged, Dose-Related Suppression of Ovarian Function," (2004) J. Clin. Endocrin. & Metabol. 90(2):1114-1122.

Anonymous: "Lucentis in the treatment of neovascular (wet) age-related macular degeneration (AMD)", Jan. 1, 2007, pp. 1-54.

Ex Parte Request for Reexamination of U.S. Pat. No. 10,464,992, pp. 1-70, published Feb. 11, 2020.†

USPTO Communication on Ex Parte Reexamination of U.S. Pat. No. 10,464,992, pp. 1-12, published Apr. 1, 2020.†

† cited by third party

1

# VEGF ANTAGONIST FORMULATIONS SUITABLE FOR INTRAVITREAL ADMINISTRATION

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation application of U.S. patent application Ser. No. 16/582,486, filed on Sep. 25, 2019, which is a continuation application of U.S. patent application Ser. No. 16/159,269, filed on Oct. 12, 2018, which issued as U.S. Pat. No. 10,464,992 on Nov. 5, 2019, which is a continuation application of U.S. patent application Ser. No. 15/879,294, which issued as U.S. Pat. No. 10,400,025 on Sep. 2, 2013, filed on Jan. 24, 2018, which is a continuation application of U.S. patent application Ser. No. 15/095,606, filed on Apr. 11, 2016, which issued as U.S. Pat. No. 9,914,763 on Mar. 13, 2018, which is a continuation application of U.S. patent application Ser. No. 14/330,096, filed Jul. 14, 2014, which issued as U.S. Pat. No. 9,340,594 on May 17, 2016, which is a continuation application of U.S. patent application Ser. No. 13/914,996, filed Jun. 11, 2013, which issued as U.S. Pat. No. 8,802,107 on Aug. 12, 2014, which is a continuation application of U.S. patent application Ser. No. 13/329,770, filed Dec. 19, 2011, which issued as U.S. Pat. No. 8,481,046 on Jul. 9, 2013, which is a continuation application of U.S. patent application Ser. No. 12/833,417, filed Jul. 9, 2010, which issued as U.S. Pat. No. 8,092,803 on Jan. 10, 2012, which is a continuation application of U.S. patent application Ser. No. 12/560,885, filed Sep. 16, 2009, which issued as U.S. Pat. No. 7,807,164 on Oct. 5, 2010, which is a divisional application of U.S. patent application Ser. No. 11/818,463, filed Jun. 14, 2007, which issued as U.S. Pat. No. 7,608,261 on Oct. 27, 2009, which claims the benefit under 35 U.S.C. §119(e) of U.S. Provisional Application No. 60/814,484, filed Jun. 16, 2006, which applications are each hereby incorporated by reference.

## BACKGROUND OF INVENTION

### Field of the Invention

The present invention is directed to pharmaceutical formulations suitable for intravitreal administration comprising agents capable of inhibiting vascular endothelial growth factor (VEGF), and to methods for making and using such formulations. The invention includes liquid pharmaceutical formulations having increased stability, as well as formulations that may be lyophilize and reconstituted for intravitreal administration.

### Statement of Related Art

Vascular endothelial growth factor (VEGF) expression is nearly ubiquitous in human cancer, consistent with its role as a key mediator of tumor neoangiogenesis. Blockade of VEGF function, by binding to the molecule or its VEGFR-2 receptor, inhibits growth of implanted tumor cells in multiple different xenograft models (see, for example, Gerber et al. (2000) Cancer Res. 60:6253-6258). A soluble VEGF-specific fusion protein antagonist, termed a "VEGF trap" has been described (Kim et al. (2002) Proc. Natl. Acad. Sci. USA 99:11399-404; Holash et al. (2002) Proc. Natl. Acad. Sci. USA 99:11393-8), which applications are specifically incorporated by reference in their entirety.

2

Ophthalmic formulations are known, see for example, U.S. Pat. Nos. 7,033,604 and 6,777,429. An ophthalmic formulation of a VEGF antibody is described in U.S. Pat. No. 6,676,941.

Lyophilization (freeze drying under controlled conditions) is commonly used for long-term storage of proteins. The lyophilized protein is substantially resistant to degradation, aggregation, oxidation, and other degenerative processes while in the freeze-dried state (see, for example, U.S. Pat. No. 6,436,897).

## BRIEF SUMMARY OF THE INVENTION

Stable formulations of a VEGF-specific fusion protein antagonist are provided. Pharmaceutically acceptable formulations are provided that comprise a VEGF "trap" antagonist with a pharmaceutically acceptable carrier. In specific embodiments, liquid and lyophilized formulations are provided.

In a first aspect, a stable liquid ophthalmic formulation of a VEGF-specific fusion protein antagonist is provided, comprising a fusion protein that comprises a receptor component consisting essentially of an immunoglobulin-like (Ig) domain 2 of a first VEGF receptor and Ig domain 3 of a second VEGF receptor, and a multimerizing component (also termed a "VEGF trap"). In a specific embodiment of the VEGF-specific fusion protein antagonist, the first VEGF receptor is Flt1 and the second VEGF receptor is Flk1 or Flt4. In a more specific embodiment the fusion protein has the amino acid sequence of SEQ ID NO:2 or SEQ ID NO:4. Preferably, the VEGF antagonist is a dimer comprising two fusion proteins of SEQ ID NO:4.

In one aspect, a stable liquid ophthalmic formulation is provided that comprises 1-100 mg/ml VEGF-specific fusion protein antagonist, 0.01-5% of one or more organic co-solvent(s), 30-150 mM of one or more tonicity agent(s), 5-40 mM of a buffering agent, and optionally, 1.0-7.5% of a stabilizing agent, pH between about 5.8-7.0.

In one or more specific embodiments, the organic co-solvent may be polysorbate, for example, polysorbate 20 or polysorbate 80, polyethylene glycol (PEG), for example, PEG 3350, or propylene glycol, or a combination thereof; the tonicity agent may be, for example, sodium chloride or potassium chloride; the stabilizing agent may be sucrose, sorbitol, glycerol, trehalose, or mannitol; and the buffering agent may be, for example, phosphate buffer. In a specific embodiment, the phosphate buffer is a sodium phosphate buffer.

In various embodiments, the organic co-solvent is polysorbate and/or PEG, the stabilizing agent is sucrose, the buffering agent is phosphate buffer, and the tonicity agent is sodium chloride.

More specifically, the stable liquid ophthalmic formulation comprises about 40-50 mg/ml of the VEGF antagonist (SEQ ID NO:4) about 10 mM phosphate buffer, 0.01-3% polysorbate and/or PEG, 40-135 mM sodium chloride, and optionally 5.0% sucrose, pH about 6.2-6.3.

In a specific preferred embodiment, the stable liquid ophthalmic formulation comprises about 50 mg/ml of the VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 50 mM sodium chloride, 0.1% polysorbate, and 5% sucrose, pH about 6.2-6.3.

In a specific preferred embodiment, the stable liquid ophthalmic formulation comprises about 50 mg/ml of the VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 50 mM sodium chloride, 3% PEG, and 5% sucrose, pH about 6.2-6.3.

PTX-0002.0004

Appx404

RGN-EYLEA-MYLAN-00028409

In a specific preferred embodiment, the stable liquid ophthalmic formulation comprises about 40 mg/ml of the VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 40 mM sodium chloride, 0.03% polysorbate, and 5% sucrose, pH 6.2-6.3.

In a specific preferred embodiment, the stable liquid ophthalmic formulation comprises about 40 mg/ml of the VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 135 mM sodium chloride, and 0.03% polysorbate, pH about 6.2-6.3.

In another aspect, a stable liquid ophthalmic formulation is provided that comprises 1-100 mg/ml VEGF-specific fusion protein antagonist; 0.01-5% of one or more organic co-solvent(s); 5-40 mM of a buffering agent; and optionally 30-150 mM of one or more tonicity agent(s) and/or 1.0-7.5% of a stabilizing agent; having a pH between about 5.8-7.0.

In various embodiments, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 10 to about 80 mg/ml. In various embodiments the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 10, about 20, about 30, about 40, about 50 about 60, about 70, or about 80 mg/ml. In a preferred embodiment, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 40 mg/ml.

In another embodiment, the stabilizing agent is selected from one or more of sucrose, sorbitol, glycerol, trehalose, and mannitol.

In another embodiment, the organic co-solvent is selected from one or more of polysorbate, for example, polysorbate 20 or polysorbate 80, polyethylene glycol (PEG), for example, PEG 3350, and propylene glycol.

In another embodiment, the buffer is a phosphate buffer, for example, sodium phosphate.

In another embodiment, the tonicity agent is a salt, for example, sodium chloride.

In one embodiment, the stable liquid ophthalmic formulation comprises 10 mM sodium phosphate buffer, about 0.03 to about 0.1% polysorbate and/or about 3% PEG or propylene glycol, about 40 mM sodium chloride, and about 5% sucrose. In a specific embodiment, the stable liquid ophthalmic formulation comprises 10 mM sodium phosphate buffer, about 0.03% polysorbate, about 40 mM sodium chloride, and about 5% sucrose. In another specific embodiment, the pH of the formulation is about 6.2 to about 6.3. In another specific embodiment, the pH is achieved by mixing mono- and dibasic sodium phosphate to the desired pH without acid/base titration.

In another specific embodiment, the stable liquid ophthalmic formulation consists essentially of a VEGF antagonist (SEQ ID NO:4) at 40 mg/ml, 10 mM sodium phosphate buffer, polysorbate at 0.03%, sodium chloride at 40 mM, and sucrose at 5%, pH 6.2-6.3.

In another aspect, a stable liquid ophthalmic formulation is provided that comprises about 10 to about 80 mg/ml VEGF antagonist, about 10 mM sodium phosphate buffer, about 0.03% polysorbate, and about 135 mM sodium chloride, pH 6.2 to 6.3.

In various embodiments, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 10 to about 80 mg/ml. In various embodiments, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 10, about 20, about 30, about 40, about 50, about 60, about 70, or about 80 mg/ml. In a specific embodiment, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 40 mg/ml.

In one embodiment, the stable liquid ophthalmic formulation comprises 40 mg/ml of VEGF antagonist (SEQ ID

NO:4), 10 mM sodium phosphate buffer, 0.03% polysorbate, and 135 mM sodium chloride at pH 6.2-6.3. In a specific embodiment, the stable liquid ophthalmic formulation consists essentially of 40 mg/ml of VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 0.03% polysorbate, and 135 mM sodium chloride at pH 6.2-6.3.

In another aspect, a lyophilizable formulation of a VEGF antagonist is provided, wherein upon lyophilization followed by reconstitution, a stable liquid ophthalmic formulation as described herein is obtained.

In another aspect, a lyophilizable formulation of a vascular endothelial growth factor (VEGF)-specific fusion protein antagonist is provided, comprising 5-50 mg/ml of the VEGF antagonist, 5-25 mM buffer, such as phosphate buffer, 0.01 to 0.15% of one or more of an organic co-solvent, such as polysorbate, propylene glycol and/or PEG, and optionally 1-10% of a stabilizing agent such as sucrose, sorbitol, trehalose, glycerol, or mannitol, pH about 5.8-7.0. In various embodiments, the VEGF antagonist (SEQ ID NO:4) is present at about 5, about 10, about 20, about 30, or about 40 mg/ml. In a specific embodiment, the lyophilizable ophthalmic formulation of the invention comprises 20 mg/ml of the VEGF antagonist, 10 mM sodium phosphate buffer, 0.03% polysorbate, 0.1% PEG, and 2.5% sucrose, pH about 6.2-6.3. In further embodiments, the lyophilizable formulation further comprises sodium chloride. In a specific embodiment, the sodium chloride is present at a concentration of about 20 mM. In another specific embodiment, the sodium chloride is present at a concentration of about 67.5 mM.

In another specific embodiment, the lyophilizable ophthalmic formulation of the invention comprises 20 mg/ml of the VEGF antagonist, 5 mM sodium phosphate buffer, 0.015% polysorbate, 20 mM sodium chloride, and 2.5% sucrose, pH about 6.2-6.3.

In another embodiment, the lyophilizable ophthalmic formulation comprises 5 mg/ml, 10 mg/ml, or 40 mg/ml VEGF antagonist, 5 mM sodium phosphate buffer, 0.015% polysorbate, 20 mM sodium chloride, and 2.5% sucrose, at pH 6.2-6.3. In a specific embodiment, the lyophilizable ophthalmic formulation consists essentially of 5 mg/ml, 10 mg/ml, or 40 mg/ml VEGF antagonist (SEQ ID NO:4), 5 mM sodium phosphate buffer, 0.015% polysorbate, 20 mM sodium chloride, and 2.5% sucrose, at pH 6.2-6.3.

In another specific embodiment, the lyophilizable ophthalmic formulation comprises 20 mg/ml of the VEGF antagonist, 5 mM sodium phosphate buffer, 0.015% polysorbate, and 67.5 mM sodium chloride, pH about 6.2-6.3. In a more specific embodiment, the lyophilizable ophthalmic formulation consists essentially of 20 mg/ml of the VEGF antagonist (SEQ ID NO:4), 5 mM sodium phosphate buffer, 0.015% polysorbate, and 67.5 mM sodium chloride, pH 6.2-6.3.

In another specific embodiment, the lyophilizable ophthalmic formulation comprises 5 mg/ml, 10 mg/ml, or 40 mg/ml VEGF antagonist, 5 mM sodium phosphate buffer, 0.015% polysorbate, and 67.5 mM sodium chloride, pH 6.2-6.3. In a more specific embodiment, the lyophilizable ophthalmic formulation consists essentially of 5 mg/ml, 10 mg/ml, or 40 mg/ml VEGF antagonist (SEQ ID NO:4), 5 mM sodium phosphate buffer, 0.015% polysorbate, and 67.5 mM sodium chloride, pH about 6.2-6.3.

Generally, the reconstituted formulation is about 2 times the concentration of the pre-lyophilized formulation, e.g., a 20 mg fusion protein/ml pre-lyophilized formulation is reconstituted to a final formulation of 40 mg fusion protein/ml.

PTX-0002.0005

Appx405

RGN-EYELA-MYLAN-00028410

Generally, the lyophilized formulation is reconstituted with sterile water suitable for injection. In one embodiment, the reconstitution liquid is bacteriostatic water.

In another aspect, the invention features a method of producing a lyophilized formulation of a VEGF-specific fusion protein antagonist, comprising subjecting the lyophilizable formulation of the invention to lyophilization to generate a lyophilized formulation. The lyophilized formulation may be lyophilized by any method known in the art for lyophilizing a liquid.

In another related aspect, the invention features a method of producing a reconstituted lyophilized formulation of a VEGF antagonist, comprising reconstituting the lyophilized formulation of the invention to a reconstituted formulation. In one embodiment, the reconstituted formulation is twice the concentration of the pre-lyophilized formulation, e.g., the method of the invention comprises: (a) producing a pre-lyophilized formulation of a VEGF-specific fusion protein antagonist, (b) subjecting the pre-lyophilized formulation of step (a) to lyophilization; and (c) reconstituting the lyophilized formulation of step (b).

The invention further features ophthalmic formulations provided in a pre-filled syringe or vial, particularly suitable for intravitreal administration.

Other objects and advantages will become apparent from a review of the ensuing detailed description.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention is not limited to particular methods, and experimental conditions described, as such methods and conditions may vary. It is also to be understood that the terminology used herein is for the purpose of describing particular embodiments only, and is not intended to be limiting unless indicated, since the scope of the present invention will be limited only by the appended claims.

Unless stated otherwise, all technical and scientific terms and phrases used herein have the same meaning as commonly understood by one of ordinary skill in the art to which the invention belongs. Although any methods and materials similar or equivalent to those described herein can be used in the practice or testing of the present invention, the preferred methods and materials are now described. All publications mentioned herein are incorporated herein by reference.

### General Description

Safe handling and administration of formulations comprising proteins represent significant challenges to pharmaceutical formulators. Proteins possess unique chemical and physical properties that present stability problems: a variety of degradation pathways exist for proteins, implicating both chemical and physical instability. Chemical instability includes deamination, aggregation, clipping of the peptide backbone, and oxidation of methionine residues. Physical instability encompasses many phenomena, including, for example, aggregation and/or precipitation.

Chemical and physical stability can be promoted by removing water from the protein. Lyophilization (freeze-drying under controlled conditions) is commonly used for long-term storage of proteins. The lyophilized protein is substantially resistant to degradation, aggregation, oxidation, and other degenerative processes while in the freeze-dried state. The lyophilized protein may be reconstituted

with water optionally containing a bacteriostatic preservative (e.g., benzyl alcohol) prior to administration.

### Definitions

The term "carrier" includes a diluent, adjuvant, excipient, or vehicle with which a composition is administered. Carriers can include sterile liquids, such as, for example, water and oils, including oils of petroleum, animal, vegetable or synthetic origin, such as, for example, peanut oil, soybean oil, mineral oil, sesame oil and the like.

The term "excipient" includes a non-therapeutic agent added to a pharmaceutical composition to provide a desired consistency or stabilizing effect. Suitable pharmaceutical excipients include, for example, starch, glucose, lactose, sucrose, gelatin, malt, rice, flour, chalk, silica gel, sodium stearate, glycerol monostearate, talc, sodium chloride, dried skim milk, glycerol, propylene, glycol, water, ethanol and the like.

The term "lyophilized" or "freeze-dried" includes a state of a substance that has been subjected to a drying procedure such as lyophilization, where at least 90% of moisture has been removed.

### VEGF Antagonists

A VEGF antagonist is a compound capable of blocking or inhibiting the biological action of vascular endothelial growth factor (VEGF), and includes fusion proteins capable of trapping VEGF. In a preferred embodiment, the VEGF antagonist is the fusion protein of SEQ ID NO:2 or 4; more preferably, SEQ ID NO:4. In specific embodiments, the VEGF antagonist is expressed in a mammalian cell line such as a CHO cell and may be modified post-translationally. In a specific embodiment, the fusion protein comprises amino acids 27-457 of SEQ ID NO:4 and is glycosylated at Asn residues 62, 94, 149, 222 and 308. Preferably, the VEGF antagonist is a dimer composed of two fusion proteins of SEQ ID NO:4.

The VEGF antagonist of the methods and formulations of the invention can be prepared by any suitable method known in the art, or that comes to be known. The VEGF antagonist is preferably substantially free of protein contaminants at the time it is used to prepare the pharmaceutically acceptable formulation. By "substantially free of protein contaminants" is meant, preferably, that at least 90% of the weight of protein of the VEGF-specific fusion protein antagonist preparation used for making a formulation is VEGF fusion protein antagonist protein, more preferably at least 95%, most preferably at least 99%. The fusion protein is preferably substantially free of aggregates. "Substantially free of aggregates" means that at least 90% of the weight of fusion protein is not present in an aggregate at the time the fusion protein is used to prepare the pharmaceutically effective formulation. Unless stated otherwise, the phosphates employed are sodium phosphates and a desired buffering pH is achieved by mixing appropriate amounts of mono- and dibasic sodium phosphate.

### Stable Liquid Ophthalmic Formulations

In one aspect, the invention provides a stable pharmaceutically acceptable formulation comprising a VEGF antagonist, wherein the formulation is a liquid formulation suitable for ophthalmic use. Preferably, the liquid formulation comprises a pharmaceutically effective amount of the VEGF antagonist. The formulation can also comprise one or more

PTX-0002.0006

RGN-EYLEA-MYLAN-00028411

Appx406

pharmaceutically acceptable carriers, buffers, tonicity agents, stabilizers, and/or excipients. An example of a pharmaceutically acceptable liquid formulation comprises a VEGF antagonist in a pharmaceutically effective amount, a buffer, an organic co-solvent such as polysorbate, a tonicity agent such as NaCl, and optionally, a stabilizer such as sucrose or trehalose.

Stability is determined in a number of ways at specified time points, including determination of pH, visual inspection of color and appearance, determination of total protein content by methods known in the art, e.g., UV spectroscopy, and purity is determined by, for example, SDS-PAGE, size-exclusion HPLC, bioassay determination of activity, isoelectric focusing, and isoaspartate quantification. In one example of a bioassay useful for determining VEGF antagonist activity, a BAF/3 VEGFR1/EPOR cell line is used to determine VEGF165 binding by the VEGF antagonist of the invention.

Liquid formulations can be stored in an oxygen-deprived environment. Oxygen-deprived environments can be generated by storing the formulations under an inert gas such as, for example, nitrogen or argon. Liquid formulations are preferably stored at about 5° C.

## Ophthalmic Lyophilized Formulations

In one aspect of the invention, an ophthalmically acceptable formulation comprising a VEGF antagonist is provided, wherein the formulation is a lyophilizable formulation. Lyophilizable formulations can be reconstituted into solutions, suspensions, emulsions, or any other suitable form for administration or use. Lyophilizable formulations are typically first prepared as liquids, then frozen and lyophilized. The total liquid volume before lyophilization can be less, equal to, or more than, the final reconstituted volume of the lyophilized formulation. The lyophilization process is well known to those of ordinary skill in the art, and typically includes sublimation of water from a frozen formulation under controlled conditions.

Lyophilized formulations can be stored at a wide range of temperatures. Lyophilized formulations may be stored below 25° C., for example, refrigerated at 2-8° C., or at room temperature (e.g., approximately 25° C.). Preferably, lyophilized formulations are stored below about 25° C., more preferably, at about 4-20° C.; below about 4° C.; below about −20° C.; about −40° C.; about −70° C., or about −80° C. Stability of the lyophilized formulation may be determined in a number of ways known to the art, for example, by visual appearance of the cake and/or by moisture content.

Lyophilized formulations are typically reconstituted for use by addition of an aqueous solution to dissolve the lyophilized formulation. A wide variety of aqueous solutions can be used to reconstitute a lyophilized formulation. Preferably, lyophilized formulations are reconstituted using water. Lyophilized formulations are preferably reconstituted with a solution consisting essentially of water (e.g., USP WFI, or water for injection) or bacteriostatic water (e.g., USP WFI with 0.9% benzyl alcohol). However, solutions comprising buffers and/or excipients and/or one or more pharmaceutically acceptable carries can also be used.

Freeze-dried or lyophilized formulations are typically prepared from liquids, that is, from solutions, suspensions, emulsions, and the like. Thus, the liquid that is to undergo freeze-drying or lyophilization preferably comprises all components desired in a final reconstituted liquid formula-

tion. As a result, when reconstituted, the freeze-dried or lyophilized formulation will render a desired liquid formulation upon reconstitution.

## EXAMPLES

Before the present methods are described, it is to be understood that this invention is not limited to particular methods, and experimental conditions described, as such methods and conditions may vary. It is also to be understood that the terminology used herein is for the purpose of describing particular embodiments only, and is not intended to be limiting, since the scope of the present invention will be limited only to the appended claims.

As used in this specification and the appended claims, the singular forms "a", "an", and "the" include plural references unless the context clearly dictates otherwise. Thus for example, a reference to "a method" includes one or more methods, and/or steps of the type described herein and/or which will become apparent to those persons skilled in the art upon reading this disclosure and so forth.

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as commonly understood by one of ordinary skill in the art to which this invention belongs. Although any methods and materials similar or equivalent to those described herein can be used in the practice or testing of the present invention, the preferred methods and materials are now described. All publications mentioned herein are incorporated herein by reference in their entirety.

Example 1. Stability of 50 mg/ml VEGF Trap
Liquid Formulation Stored at 5° C. in 3 ml Glass
Vials

An ophthalmic liquid formulation containing 50 mg/ml VEGF Trap (SEQ ID NO:4), 10 mM phosphate, 50 mM NaCl, 0.1% polysorbate 20, 5% sucrose, and pH 6.25, was stored at 5° C. in 3 ml glass vials and samples tested at 3, 6, 9, 12, 18 and 24 months. Stability was determined by SE-HPLC The results are shown in Table 1. Turbidity was measured at $OD_{405}$ nm; and percent recovered protein and purity by size exclusion HPLC.

### TABLE 1

| | Stability of 50 mg/ml VEGF Trap Protein (VGFT-SS065) | | | | |
|---|---|---|---|---|---|
| Months | Visual Appearance | Turbidity ($OD_{405}$ nm) | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
| 0 | Pass | 0.00 | 6.2 | 100 | 98.8 |
| 3 | Pass | 0.00 | 6.2 | 101 | 98.7 |
| 6 | Pass | 0.01 | 6.3 | 100 | 98.3 |
| 9 | Pass | 0.01 | 6.3 | 101 | 98.3 |
| 12 | Pass | 0.01 | 6.3 | 104 | 98.4 |
| 18 | Pass | 0.01 | 6.3 | 96 | 98.1 |
| 24 | Pass | 0.01 | 6.3 | 105 | 98.1 |

Example 2. Stability of 50 mg/ml VEGF Trap
Liquid Formulation Stored at 5° C. in 3 ml Glass
Vials

A liquid formulation containing 50 mg/ml VEGF Trap (SEQ ID NO:4), 10 mM phosphate, 50 mM NaCl, 3% polyethylene glycol 3350, 5% sucrose, and pH 6.25, was stored at 5° C. in 3 nil glass vials and samples tested at 3, 6,

9, 12, 18 and 24 months. Stability results are shown in Table 2. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 2

Stability of 50 mg/ml VEGF Trap Protein (VGFT-SS065)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|--------|-------------------|-----------|-----|----------------------|----------------------------------|
| 0 | Pass | 0.00 | 6.2 | 100 | 98.9 |
| 3 | Pass | 0.00 | 6.1 | 104 | 98.5 |
| 6 | Pass | 0.01 | 6.3 | 99 | 98.3 |
| 9 | Pass | 0.00 | 6.3 | 102 | 97.6 |
| 12 | Pass | 0.01 | 6.3 | 103 | 98.0 |
| 18 | Pass | 0.00 | 6.3 | 113 | 97.7 |
| 24 | Pass | 0.00 | 6.2 | 106 | 97.6 |

Example 3. Stability of 40 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in 3 ml Glass Vials

A liquid formulation containing 40 mg/ml VEGF Trap (SEQ ID NO:4), 10 mM phosphate, 40 mM NaCl, 0.03% polysorbate 20, 5% sucrose, and pH 6.3, was stored at 5° C. in 3 ml glass vials and samples tested at 0.5, 1, 2, 3, and 4 months. Stability results are shown in Table 3. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 3

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS207)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|--------|-------------------|-----------|-----|----------------------|----------------------------------|
| 0 | Pass | 0.00 | 6.3 | 100 | 99.5 |
| 0.5 | Pass | 0.00 | 6.3 | 99 | 99.4 |
| 1 | Pass | 0.00 | 6.2 | 98 | 99.5 |
| 2 | Pass | 0.00 | 6.2 | 95 | 99.2 |
| 3 | Pass | 0.01 | 6.4 | | |
| 4 | Pass | 0.01 | 6.3 | | |

Example 4. Stability of 40 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in Pre-Filled Glass Syringe

A liquid formulation containing 40 mg/ml VEGF trap (SEQ ID NO:4), 10 mM phosphate, 40 mM NaCl, 0.03% polysorbate 20, 5% sucrose, and pH 6.3, was stored at 5° C. in 1 ml prefilled luer glass syringe with 4023/50 FluroTec coated plunger and samples tested at 0.5, 1, 2, 3, and 4 months. Stability results are shown in Table 4. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 4

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS207)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|--------|-------------------|-----------|-----|----------------------|----------------------------------|
| 0 | Pass | 0.00 | 6.3 | 100 | 99.4 |
| 0.5 | Pass | 0.00 | 6.3 | 100 | 99.3 |

TABLE 4-continued

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS207)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|--------|-------------------|-----------|-----|----------------------|----------------------------------|
| 1 | Pass | 0.00 | 6.3 | 100 | 99.4 |
| 2 | Pass | 0.00 | 6.3 | 97 | 99.1 |
| 3 | Pass | 0.01 | 6.4 | | |
| 4 | Pass | 0.01 | 6.3 | | |

Example 5. Stability of 40 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in 3 ml Glass Vials

A liquid formulation containing 40 mg/ml VEGF trap (SEQ ID NO:4), 10 mM phosphate, 135 mM NaCl, 0.03% polysorbate 20, and pH 6.3, was stored at 5° C. in 3 ml glass vials and samples tested at 0.5, 1, 2, 3, and 4 months. Stability results are shown in Table 5. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 5

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS203)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|--------|-------------------|-----------|-----|----------------------|----------------------------------|
| 0 | Pass | 0.00 | 6.3 | 100 | 99.3 |
| 0.5 | Pass | 0.00 | 6.2 | 87 | 99.2 |
| 1 | Pass | 0.00 | 6.2 | 88 | 99.1 |
| 2 | Pass | 0.00 | 6.3 | 103 | 99.2 |
| 3 | Pass | 0.00 | 6.3 | 88 | 99.0 |
| 4 | Pass | 0.00 | 6.2 | 85 | 98.9 |
| 5 | Pass | 0.00 | 6.3 | 84 | 99.0 |

Example 6. Stability of 40 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in 1 ml Pre-Filled Glass Syringe

A liquid formulation containing 40 mg/ml VEGF trap (SEQ ID NO:4), 10 mM phosphate, 135 mM NaCl, 0.03% polysorbate 20, and pH 6.3, was stored at 5° C. in 1 ml prefilled glass luer syringe with 4023/50 FluroTec coated plunger and samples tested at 0.5, 1, 2, 3, 4, and 5 months. Stability results are shown in Table 6. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 6

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS203)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|--------|-------------------|-----------|-----|----------------------|----------------------------------|
| 0 | Pass | 0.00 | 6.3 | 100 | 99.2 |
| 0.5 | Pass | 0.01 | 6.3 | 101 | 99.2 |
| 1 | Pass | 0.00 | 6.3 | 101 | 99.2 |
| 2 | Pass | 0.00 | 6.3 | — | — |
| 3 | Pass | 0.01 | 6.3 | 102 | 99.1 |
| 4 | Pass | 0.01 | 6.3 | 103 | 98.8 |
| 5 | Pass | 0.00 | 6.3 | 99 | 98.9 |

PTX-0002.0008

Appx408

RGN-EYLEA-MYLAN-00028413

Example 7. Stability of Lyophilized 20 mg/ml
VEGF Trap Formulation Stored at 5° C. in 3 ml
Glass Vials and Reconstituted to 40 mg/ml

0.8 ml of a liquid formulation containing 20 mg/ml VEGF trap (SEQ ID NO:4), 5 mM phosphate, 20 mM NaCl, 0.015% polysorbate 20, 2.5% sucrose, and pH 6.3, were lyophilized in 3 ml glass vials. Samples were stored at 5° C. and tested at 1, and 2 months. VEGF trap was reconstituted to a final concentration of 40 mg/ml VEGF Trap (final volume of 0.4 ml). Stability results are shown in Table 7 (t=time in months; *=visual appearance; **=reconstitution time). Turbidity, percent recovered protein and purity was determined as described above.

TABLE 7

Stability of Lyophilized 20 mg/ml VEGF Trap Protein (VGFT-SS216)

| t | Vis. App.* | Recon. Time** (min) | Vis. App.* Reconst'd Liquid | Tur- bidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Config. |
|---|---|---|---|---|---|---|---|
| 0 | Pass | 0.6 | Pass | | 6.3 | 100 | 99.5 |
| 1 | Pass | 0.6 | Pass | 0.01 | 6.3 | 106 | 99.4 |
| 2 | Pass | 0.4 | Pass | 0.01 | 6.2 | 103 | 99.3 |

Example 8. Stability of Lyophilized 20 mg/ml
VEGF Trap Formulation Stored at 5° C. in 3 ml
Glass Vials

0.8 ml of a liquid formulation containing 20 mg/ml VEGF trap (SEQ ID NO:4), 5 mM phosphate, 67.5 mM NaCl, 0.015% polysorbate 20, and pH 6.3, were lyophilized in 3 ml glass vials. Samples were stored at 5° C. and tested at 1, 2, and 3 months. VEGF trap was reconstituted to a final concentration of 40 mg/ml VEGF trap (final volume of 0.4 ml). Stability results are shown in Table 8 (t=time in months; *=visual appearance; **=reconstitution time).

TABLE 8

Stability of Lyophilized 20 mg/ml VEGF Trap Protein (VGFT-SS216)

| t | Vis. App.* | Recon. Time** (min) | Vis. App. Reconst'd Liquid | Tur- bidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Config. |
|---|---|---|---|---|---|---|---|
| 0 | Pass | 0.7 | Pass | 0.00 | 6.3 | 100 | 99.0 |
| 1 | Pass | 0.7 | Pass | 0.01 | 6.2 | 105 | 98.9 |
| 2 | Pass | 0.4 | Pass | 0.01 | 6.2 | 103 | 98.9 |

```
                    SEQUENCE LISTING

<160> NUMBER OF SEQ ID NOS: 4

<210> SEQ ID NO 1
<211> LENGTH: 1453
<212> TYPE: DNA
<213> ORGANISM: Artificial sequence
<220> FEATURE:
<223> OTHER INFORMATION: Synthetic

<400> SEQUENCE: 1

aagcttgggc tgcaggtcga tcgactctag aggatcgatc cccgggcgag ctcgaattcg      60

caaccaccat ggtcagctac tgggacaccg gggtcctgct gtgcgcgctg ctcagctgtc     120

tgcttctcac aggatctagt tccggaggta gacctttcgt agagatgtac agtgaaatcc     180

ccgaaattat acacatgact gaaggaaggg agctgtcat tccctgccgg gttacgtcac      240

ctaacatcac tgttactttta aaaaagtttc cacttgacac tttgatccct gatggaaaac    300

gcataatctg ggacagtaga aagggcttca tcatatcaaa tgcaacgtac aaagaaatag     360

ggcttctgac ctgtgaagca acagtcaatg ggcatttgta taagacaaac tatctcacac     420

atcgacaaac caatacaatc atagatgtgg ttctgagtcc gtctcatgga attgaactat     480

ctgttggaga aaagcttgtc ttaaattgta cagcaagaac tgacaagatg ttggggattg     540

acttcaactg ggaataccct tcttcgaagc atcagcataa gaaacttgta aaccgagacc     600

taaaaaccca gtctgggagt gagatgaaga aatttttgag caccttaact atagatggtg     660

taacccggag tgaccaagga ttgtacacct gtgcagcatc cagtgggctg atgaccaaga     720

agaacagcac atttgtcagg gtccatgaaa agggcccggg cgacaaaact cacacatgcc     780

caccgtgccc agcacctgaa ctcctgggg gaccgtcagt cttcctcttc ccccaaaaac      840

ccaaggacac cctcatgatc tcccggaccc ctgaggtcac atgcgtggtg gtggacgtga     900

gccacgaaga cctgaggtc aagttcaact ggtacgtgga cggcgtggag gtgcataatg     960

ccaagacaaa gccgcgggag gagcagtaca acagcacgta ccgtgtggtc agcgtcctca    1020
```

RGN-EYLEA-MYLAN-00028414

-continued

```
ccgtcctgca ccaggactgg ctgaatggca aggagtacaa gtgcaaggtc tccaacaaag    1080

ccctcccagc ccccatcgag aaaaccatct ccaaagccaa agggcagccc cgagaaccac    1140

aggtgtacac cctgcccca tcccgggatg agctgaccaa gaaccaggtc agcctgacct    1200

gcctggtcaa aggcttctat cccagcgaca tcgccgtgga gtgggagagc aatgggcagc    1260

cggagaacaa ctacaagacc acgcctcccg tgctggactc cgacggctcc ttcttcctct    1320

atagcaagct caccgtggac aagagcaggt ggcagcaggg gaacgtcttc tcatgctccg    1380

tgatgcatga ggctctgcac aaccactaca cgcagaagag cctctccctg tctcccgggta    1440

aatgagcggc cgc                                                       1453
```

<210> SEQ ID NO 2
<211> LENGTH: 458
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Synthetic

<400> SEQUENCE: 2

```
Met Val Ser Tyr Trp Asp Thr Gly Val Leu Leu Cys Ala Leu Leu Ser
1               5                   10                  15

Cys Leu Leu Leu Thr Gly Ser Ser Ser Gly Gly Arg Pro Phe Val Glu
            20                  25                  30

Met Tyr Ser Glu Ile Pro Glu Ile Ile His Met Thr Glu Gly Arg Glu
        35                  40                  45

Leu Val Ile Pro Cys Arg Val Thr Ser Pro Asn Ile Thr Val Thr Leu
    50                  55                  60

Lys Lys Phe Pro Leu Asp Thr Leu Ile Pro Asp Gly Lys Arg Ile Ile
65                  70                  75                  80

Trp Asp Ser Arg Lys Gly Phe Ile Ile Ser Asn Ala Thr Tyr Lys Glu
                85                  90                  95

Ile Gly Leu Leu Thr Cys Glu Ala Thr Val Asn Gly His Leu Tyr Lys
            100                 105                 110

Thr Asn Tyr Leu Thr His Arg Gln Thr Asn Thr Ile Ile Asp Val Val
        115                 120                 125

Leu Ser Pro Ser His Gly Ile Glu Leu Ser Val Gly Glu Lys Leu Val
    130                 135                 140

Leu Asn Cys Thr Ala Arg Thr Glu Leu Asn Val Gly Ile Asp Phe Asn
145                 150                 155                 160

Trp Glu Tyr Pro Ser Ser Lys His Gln His Lys Lys Leu Val Asn Arg
                165                 170                 175

Asp Leu Lys Thr Gln Ser Gly Ser Glu Met Lys Lys Phe Leu Ser Thr
            180                 185                 190

Leu Thr Ile Asp Gly Val Thr Arg Ser Asp Gln Gly Leu Tyr Thr Cys
        195                 200                 205

Ala Ala Ser Ser Gly Leu Met Thr Lys Lys Asn Ser Thr Phe Val Arg
    210                 215                 220

Val His Glu Lys Gly Pro Gly Asp Lys Thr His Thr Cys Pro Pro Cys
225                 230                 235                 240

Pro Ala Pro Glu Leu Leu Gly Gly Pro Ser Val Phe Leu Phe Pro Pro
                245                 250                 255

Lys Pro Lys Asp Thr Leu Met Ile Ser Arg Thr Pro Glu Val Thr Cys
            260                 265                 270

Val Val Val Asp Val Ser His Glu Asp Pro Glu Val Lys Phe Asn Trp
        275                 280                 285
```

-continued

```
Tyr Val Asp Gly Val Glu Val His Asn Ala Lys Thr Lys Pro Arg Glu
    290                 295                 300

Glu Gln Tyr Asn Ser Thr Tyr Arg Val Val Ser Val Leu Thr Val Leu
305                 310                 315                 320

His Gln Asp Trp Leu Asn Gly Lys Glu Tyr Lys Cys Lys Val Ser Asn
                325                 330                 335

Lys Ala Leu Pro Ala Pro Ile Glu Lys Thr Ile Ser Lys Ala Lys Gly
            340                 345                 350

Gln Pro Arg Glu Pro Gln Val Tyr Thr Leu Pro Pro Ser Arg Asp Glu
        355                 360                 365

Leu Thr Lys Asn Gln Val Ser Leu Thr Cys Leu Val Lys Gly Phe Tyr
    370                 375                 380

Pro Ser Asp Ile Ala Val Glu Trp Glu Ser Asn Gly Gln Pro Glu Asn
385                 390                 395                 400

Asn Tyr Lys Thr Thr Pro Pro Val Leu Asp Ser Asp Gly Ser Phe Phe
                405                 410                 415

Leu Tyr Ser Lys Leu Thr Val Asp Lys Ser Arg Trp Gln Gln Gly Asn
            420                 425                 430

Val Phe Ser Cys Ser Val Met His Glu Ala Leu His Asn His Tyr Thr
        435                 440                 445

Gln Lys Ser Leu Ser Leu Ser Pro Gly Lys
    450                 455
```

```
<210> SEQ ID NO 3
<211> LENGTH: 1377
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Synthetic

<400> SEQUENCE: 3

atggtcagct actgggacac cggggtcctg ctgtgcgcgc tgctcagctg tctgcttctc     60

acaggatcta gttccggaag tgataccggt agactttttcg tagagatgta cagtgaaatc    120

cccgaaatta tacacatgac tgaaggaagg gagctcgtca ttccctgccg ggttacgtca    180

cctaacaca ctgttacttt aaaaaagttt ccacttgaca ctttgatccc tgatggaaaa    240

cgcataatct gggacagtag aaagggcttc atcatatcaa atgcaacgta caaagaaata    300

gggcttctga cctgtgaagc aacagtcaat gggcatttgt ataagacaaa ctatctcaca    360

catcgacaaa ccaatacaat catagatgtg gttctgagtc cgtctcatgg aattgaacta    420

tctgttggag aaaagcttgt cttaaattgt acagcaagaa ctgaactaaa tgtggggatt    480

gacttcaact gggaatacc ttcttcgaag catcagcata agaaacttgt aaaccgagac    540

ctaaaaaccc agtctgggag tgagatgaag aaatttttga gcaccttaac tatagatggt    600

gtaacccgga gtgaccaagg attgtacacc tgtgcagcat ccagtgggct gatgaccaag    660

aagaacagca catttgtcag ggtccatgaa aaggacaaaa ctcacacatg cccaccgtgc    720

ccagcacctg aactcctggg gggaccgtca gtcttcctct tccccccaaa acccaaggac    780

accctcatga tctcccggac ccctgaggtc acatgcgtgg tggtggacgt gagccacgaa    840

gaccctgagg tcaagttcaa ctggtacgtg gacggcgtgg aggtgcataa tgccaagaca    900

aagccgcggg aggagcagta caacagcacg taccgtgtgg tcagcgtcct caccgtcctg    960

caccaggact ggctgaatgg caaggagtac aagtgcaagg tctccaacaa agccctccca   1020

gcccccatcg agaaaaccat ctccaaagcc aaaggccaga gccgagaacc acaggtgtac   1080
```

**PTX-0002.0011**

RGN-EYLEA-MYLAN-00028416

Appx411

```
accctgcccc catcccggga tgagctgacc aagaaccagg tcagcctgac ctgcctggtc   1140

aaaggcttct atcccagcga catcgccgtg gagtgggaga gcaatgggca gccggagaac   1200

aactacaaga ccacgcctcc cgtgctggac tccgacggct ccttcttcct ctacagcaag   1260

ctcaccgtgg acaagacag gtggcagcag gggaacgtct tctcatgctc cgtgatgcat   1320

gaggctctgc acaaccacta cacgcagaag agcctctccc tgtctccggg taaatga    1377
```

<210> SEQ ID NO 4
<211> LENGTH: 458
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Synthetic

<400> SEQUENCE: 4

```
Met Val Ser Tyr Trp Asp Thr Gly Val Leu Leu Cys Ala Leu Leu Ser
1               5                   10                  15

Cys Leu Leu Leu Thr Gly Ser Ser Ser Gly Ser Asp Thr Gly Arg Pro
                20                  25                  30

Phe Val Glu Met Tyr Ser Glu Ile Pro Glu Ile Ile His Met Thr Glu
            35                  40                  45

Gly Arg Glu Leu Val Ile Pro Cys Arg Val Thr Ser Pro Asn Ile Thr
        50                  55                  60

Val Thr Leu Lys Lys Phe Pro Leu Asp Thr Leu Ile Pro Asp Gly Lys
65                  70                  75                  80

Arg Ile Ile Trp Asp Ser Arg Lys Gly Phe Ile Ile Ser Asn Ala Thr
                85                  90                  95

Tyr Lys Glu Ile Gly Leu Leu Thr Cys Glu Ala Thr Val Asn Gly His
                100                 105                 110

Leu Tyr Lys Thr Asn Tyr Leu Thr His Arg Gln Thr Asn Thr Ile Ile
            115                 120                 125

Asp Val Val Leu Ser Pro Ser His Gly Ile Glu Leu Ser Val Gly Glu
        130                 135                 140

Lys Leu Val Leu Asn Cys Thr Ala Arg Thr Glu Leu Asn Val Gly Ile
145                 150                 155                 160

Asp Phe Asn Trp Glu Tyr Pro Ser Ser Lys His Gln His Lys Lys Leu
                165                 170                 175

Val Asn Arg Asp Leu Lys Thr Gln Ser Gly Ser Glu Met Lys Lys Phe
                180                 185                 190

Leu Ser Thr Leu Thr Ile Asp Gly Val Thr Arg Ser Asp Gln Gly Leu
            195                 200                 205

Tyr Thr Cys Ala Ala Ser Ser Gly Leu Met Thr Lys Lys Asn Ser Thr
        210                 215                 220

Phe Val Arg Val His Glu Lys Asp Lys Thr His Thr Cys Pro Pro Cys
225                 230                 235                 240

Pro Ala Pro Glu Leu Leu Gly Gly Pro Ser Val Phe Leu Phe Pro Pro
                245                 250                 255

Lys Pro Lys Asp Thr Leu Met Ile Ser Arg Thr Pro Glu Val Thr Cys
                260                 265                 270

Val Val Val Asp Val Ser His Glu Asp Pro Glu Val Lys Phe Asn Trp
            275                 280                 285

Tyr Val Asp Gly Val Glu Val His Asn Ala Lys Thr Lys Pro Arg Glu
        290                 295                 300

Glu Gln Tyr Asn Ser Thr Tyr Arg Val Val Ser Val Leu Thr Val Leu
```

PTX-0002.0012

-continued

```
305              310              315              320

His Gln Asp Trp Leu Asn Gly Lys Glu Tyr Lys Cys Lys Val Ser Asn
                325              330              335

Lys Ala Leu Pro Ala Pro Ile Glu Lys Thr Ile Ser Lys Ala Lys Gly
            340              345              350

Gln Pro Arg Glu Pro Gln Val Tyr Thr Leu Pro Pro Ser Arg Asp Glu
        355              360              365

Leu Thr Lys Asn Gln Val Ser Leu Thr Cys Leu Val Lys Gly Phe Tyr
    370              375              380

Pro Ser Asp Ile Ala Val Glu Trp Glu Ser Asn Gly Gln Pro Glu Asn
385              390              395              400

Asn Tyr Lys Thr Thr Pro Pro Val Leu Asp Ser Asp Gly Ser Phe Phe
            405              410              415

Leu Tyr Ser Lys Leu Thr Val Asp Lys Ser Arg Trp Gln Gln Gly Asn
        420              425              430

Val Phe Ser Cys Ser Val Met His Glu Ala Leu His Asn His Tyr Thr
    435              440              445

Gln Lys Ser Leu Ser Leu Ser Pro Gly Lys
450              455
```

We claim:

1. A vial comprising an ophthalmic formulation suitable for intravitreal administration that comprises:
   a vascular endothelial growth factor (VEGF) antagonist
   an organic co-solvent,
   a buffer, and
   a stabilizing agent,
   wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; and
   wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography.

2. The vial of claim 1, wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml, and wherein said organic co-solvent comprises polysorbate.

3. The vial of claim 2, wherein said organic co-solvent comprises 0.01% to 3% polysorbate.

4. The vial of claim 2, wherein said organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20.

5. The vial of claim 2, wherein said organic co-solvent comprises 0.01% to 3% polysorbate 20.

6. The vial of claim 5, wherein said buffer comprises a phosphate buffer.

7. The vial of claim 5, wherein said buffer comprises 5-25 mM buffer.

8. The vial of claim 5, wherein said buffer comprises a pH between about 5.8-7.0.

9. The vial of claim 5, wherein said buffer comprises a pH about 6.2-6.3.

10. The vial of claim 5, wherein said stabilizing agent comprises a sugar.

11. The vial of claim 10, wherein said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol.

12. The vial of claim 5, wherein said stabilizing agent comprises 1.0-7.5% of sucrose.

13. The vial of claim 5, wherein said formulation further comprises a tonicity agent.

14. The vial of claim 5, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

15. The vial of claim 5, wherein said formulation is capable of providing a turbidity of 0.01 or lower at $OD_{405}$ after 2 month storage at 5° C.

16. The vial of claim 5, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as measured by size exclusion chromatography.

17. The vial of claim 5, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for 24 months as measured by size exclusion chromatography.

18. The vial of claim 5, wherein said formulation does not contain phosphate.

19. The vial of claim 5, wherein said formulation does not contain trehalose.

20. The vial of claim 5, wherein said stabilizing agent comprises 1.0-10% of sucrose.

21. The vial of claim 20, wherein said formulation further comprises a tonicity agent.

22. The vial of claim 20, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

23. The vial of claim 20, wherein said formulation is capable of providing a turbidity of 0.01 or lower at $OD_{405}$ after 2 month storage at 5° C.

24. The vial of claim 20, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as measured by size exclusion chromatography.

25. The vial of claim 20, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for 24 months as measured by size exclusion chromatography.

26. A pre-filled syringe comprising an ophthalmic formulation suitable for intravitreal administration comprising:

**PTX-0002.0013**

RGN-EYLEA-MYLAN-00028418

a vascular endothelial growth factor (VEGF) antagonist fusion protein,

an organic co-solvent,

a buffer, and

a stabilizing agent;

wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; and

wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography.

**27.** The pre-filled syringe of claim **26**, wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml, and wherein said organic co-solvent comprises polysorbate.

**28.** The pre-filled syringe of claim **27**, wherein said organic co-solvent comprises 0.01% to 3% polysorbate.

**29.** The pre-filled syringe of claim **27**, wherein said organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20.

**30.** The pre-filled syringe of claim **27**, wherein said organic co-solvent comprises 0.01% to 3% polysorbate 20.

**31.** The pre-filled syringe of claim **30**, wherein said buffer comprises a phosphate buffer.

**32.** The pre-filled syringe of claim **30**, wherein said buffer comprises 5-25 mM buffer.

**33.** The pre-filled syringe of claim **30**, wherein said buffer comprises a pH between about 5.8-7.0.

**34.** The pre-filled syringe of claim **30**, wherein said buffer comprises a pH about 6.2-6.3.

**35.** The pre-filled syringe of claim **30**, wherein said stabilizing agent comprises a sugar.

**36.** The pre-filled syringe of claim **35**, wherein said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol.

**37.** The pre-filled syringe of claim **30**, wherein said stabilizing agent comprises 1.0-7.5% of sucrose.

**38.** The pre-filled syringe of claim **30**, wherein said formulation further comprises a tonicity agent.

**39.** The pre-filled syringe of claim **30**, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

**40.** The pre-filled syringe of claim **30**, wherein said formulation is capable of providing a turbidity of 0.01 or lower at $OD_{405}$ after 2 month storage at 5° C.

**41.** The pre-filled syringe of claim **30**, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as measured by size exclusion chromatography.

**42.** The pre-filled syringe of claim **30**, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for 24 months as measured by size exclusion chromatography.

**43.** The pre-filled syringe of claim **30**, wherein said formulation does not contain phosphate.

**44.** The pre-filled syringe of claim **30**, wherein said formulation does not contain trehalose.

**45.** The pre-filled syringe of claim **30**, wherein said stabilizing agent comprises 1.0-10% of sucrose.

**46.** The pre-filled syringe of claim **45**, wherein said formulation further comprises a tonicity agent.

**47.** The pre-filled syringe of claim **45**, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

**48.** The pre-filled syringe of claim **45**, wherein said formulation is capable of providing a turbidity of 0.01 or lower at $OD_{405}$ after 2 month storage at 5° C.

**49.** The pre-filled syringe of claim **45**, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as measured by size exclusion chromatography.

**50.** The pre-filled syringe of claim **45**, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for 24 months as measured by size exclusion chromatography.

**51.** An ophthalmic formulation comprising:

(a) 40 mg/ml of a glycosylated VEGF antagonist fusion protein comprising amino acids 27-457 of SEQ ID NO:4;

(b) 0.03% to 0.1% polysorbate;

(c) 5-40 mM of sodium phosphate buffer, pH between 5.8-7.0; and

(d) sucrose;

wherein the ophthalmic formulation is suitable for intravitreal administration; and

wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for 2 months as measured by size exclusion chromatography.

**52.** The formulation of claim **51**, wherein said formulation comprises at least 5% sucrose.

**53.** The formulation of claim **51**, wherein said formulation comprises 1-10% sucrose.

**54.** A pre-filled syringe suitable for intravitreal administration comprising the formulation of claim **51**.

**55.** A vial suitable for intravitreal administration comprising the formulation of claim **51**.

**56.** The formulation of claim **51**, wherein said formulation comprises 10 mM sodium phosphate buffer, 0.03% polysorbate, 5% sucrose, and a pH between 6.2-6.3.

**57.** A pre-filled syringe suitable for intravitreal administration comprising the formulation of claim **56**.

**58.** A vial suitable for intravitreal administration comprising the formulation of claim **56**.

**59.** The formulation of claim **56**, wherein said formulation further comprises 40 mM NaCl.

**60.** A pre-filled syringe suitable for intravitreal administration comprising the formulation of claim **59**.

**61.** A vial suitable for intravitreal administration comprising the formulation of claim **59**.

**62.** The formulation of claim **59**, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

**63.** A pre-filled syringe suitable for intravitreal administration comprising the formulation of claim **62**.

**64.** A vial suitable for intravitreal administration comprising the formulation of claim **62**.

* * * * *

PTX-0002.0014

Appx414

RGN-EYLEA-MYLAN-00028419

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 2024-2002

**Short Case Caption:** Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,923 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 08/21/2024

Signature: /s/ Deanne M. Mazzochi

Name: Deanne M. Mazzochi

Save for Filing